FILED

# UNITED STATES DISTRICT COURT
### 2016 DEC 19 PM 3: 31
for the
## DISTRICT OF CONNECTICUT

US DISTRICT COURT
BRIDGEPORT CT

| | |
|---|---|
| NORIANA RADWAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNIVERSITY OF CONNECTICUT | ) |
| BOARD OF TRUSTEES, WARDE | ) |
| MANUEL, LEONARD TSANTIRIS, | ) |
| and MONA LUCAS, individually and in | ) |
| their official capacities, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 3:16cv 2091 (VAB)

## COMPLAINT AND JURY DEMAND

There is no other civil action among these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a Judge.

NOW COMES the Plaintiff, NORIANA RADWAN, *pro se*, for her Complaint against

Defendants UNIVERSITY OF CONNECTICUT BOARD OF TRUSTEES, WARDE MANUEL,

LEONARD TSANTIRIS, and MONA LUCAS, and asserts and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      The Plaintiff, NORIANA RADWAN ("Plaintiff"), is, and was at all relevant times,

a citizen and resident of Dutchess County, State of New York.

2.      Defendant UNIVERSITY OF CONNECTICUT BOARD OF TRUSTEES ("UConn")

is the governing body of the University of Connecticut, a public university that operates an

educational facility in, among other places, Storrs, Connecticut, which receives federal financial

assistance and is subject to the personal jurisdiction of the United States and this Honorable District Court. Because Defendant UConn receives federal financial assistance, all programs at Defendant UConn, including the award of athletic scholarships and financial assistance, are subject to the requirements of Title IX.

3.      Defendant WARDE MANUEL ("Manuel") is believed to have been, at all relevant times herein, a citizen and resident of the state of Connecticut, now believed to be residing in and a resident of the state of Michigan while employed as Director of Athletics at the University of Michigan, being subject to the personal jurisdiction of the United States and this Honorable District Court, because he was, at all times material hereto, employed by Defendant UConn as its Director of Athletics in its Division of Athletics.

4.      Defendant LEONARD TSANTIRIS ("Tsantiris") is believed to be, and at all relevant times was, a citizen and resident of the state of Connecticut, who is subject to the personal jurisdiction of the United States and this Honorable District Court, and who was, at all times material hereto, employed by Defendant UConn as the head coach of the women's varsity soccer team.

5.      Defendant MONA LUCAS ("Lucas") is believed to be, and at all relevant times was, a citizen and resident of the state of Connecticut who is subject to the personal jurisdiction of the United States and this Honorable District Court, and who was, at all times material hereto, employed by Defendant UConn as the Director of Student Financial Aid Services.

6.      This Honorable District Court has subject-matter jurisdiction over the action by virtue of the provisions of

a.      Title 28 U.S.C. § 1331, providing original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States, as the Plaintiff seeks relief for

violations of 20 U.S.C. § 1681, prohibiting sex discrimination in any education program or activity receiving federal financial assistance;

b.  Title 28 U.S.C. § 1332, providing jurisdiction over civil actions where diversity of citizenship exists and the amount in controversy exceeds $75,000, exclusive of interest and costs, as diversity of citizenship exists between the Plaintiff, a citizen of New York, and the Defendant citizens and a university in Connecticut, and the amount in controversy exceeds $75,000;

c.  Title 28 U.S.C. § 1343 (3) and (4), providing jurisdiction over actions to secure civil rights extended by the U.S. Government, as the Plaintiff seeks relief for violations of her constitutional rights; and

d.  Title 28 U.S.C. § 1367, providing the district court with supplemental jurisdiction over state law claims, as state law claims form part of the same case or controversy as the federal law claims over which this Court has original jurisdiction.

7.  The venue of the action lies with the Honorable District Court of the District of Connecticut pursuant to 28 U.S.C. § 1391(b) because all Defendants resided in or were organized in the state of Connecticut.

## FACTUAL ALLEGATIONS

8.  On or about August 7, 2014, the Plaintiff, then 18 years old, enrolled as a full-time student and a member of the women's varsity soccer team at Defendant UConn.

9.  At all times mentioned in this Complaint, Defendant UConn was a member institution of the National Collegiate Athletic Association ("NCAA"), competing in Division I athletics ("DI").

10.     At all times mentioned in this Complaint, Defendant UConn competed in women's varsity soccer as a member of the American Athletic Conference ("AAC").

11.     Prior to enrolling at Defendant UConn, on or about February 5, 2014, by letter from Defendant Lucas (Exhibit A), the Plaintiff was offered a "Full Out-of-State Grant-in-Aid" conditional athletics scholarship ("Scholarship").

12.     Accompanying the Scholarship offer letter were two pertinent interrelated documents already signed by Defendant Lucas on February 5, 2014:

a.     the voluntary "National Letter of Intent," providing a good-faith commitment to attend a member institution of the NCAA (Exhibit B), showing the Plaintiff's "Prospective Student-Athlete's NCAA ID" as "1307378362," signed on February 10, 2014 by the Plaintiff and her father, Khaled Radwan, and returned to Defendant Lucas with the Contract; and

b.     the "UNIVERSITY OF CONNECTICUT Division of Athletics ATHLETICS FINANCIAL AID AGREEMENT 2014-2015" ("Contract") (Exhibit C); the Contract was signed by the Plaintiff and her father on February 10, 2014, and sometime thereafter it was "Reviewed" and signed by the UConn women's varsity soccer head coach, Defendant Tsantiris.

13.     The bilateral written Contract between the Plaintiff and Defendant UConn for the Scholarship was entered on or about February 10, 2014, to be performed effectively in Connecticut subject to the respective rules and bylaws applicable to a student-athlete and other separate rules applicable to all students of Defendant UConn, as provided under Defendant UConn's agreements

with the NCAA and AAC, we well as under UConn's Code of Conduct applicable to all students of Defendant UConn.

14.     On November 9, 2014, Defendant UConn's women's soccer team played the University of South Florida ("USF") in Tampa, Florida, for the AAC conference championship and automatic NCAA DI championship tournament seeding when, in excitement and celebration of defeating USF by penalty kicks in overtime, having become a part of her first championship team, the Plaintiff inadvertently in celebration showed her middle finger to an ESPNU camera, which broadcasted it live along with its Internet steaming affiliate, Watch ESPN, creating an unintended immediate social media and Internet topic for comments ("the Incident").

15.     After the game and the Incident, and before returning to the locker room, Defendant Tsantiris pulled Plaintiff aside and confronted her with a picture of the Incident, presumably from the Internet. Plaintiff tried to apologize and explain her conduct, and despite Defendant Tsantiris acknowledging to the Plaintiff that he had no problems with the Plaintiff's attitude and that he knew she did not mean it, and that it was, as he said a "silly mistake," because it was all over the Internet and television, Defendant Tsantiris said he unfortunately had to punish her by suspending the Plaintiff from all team activities effective immediately, removing her entirely from playing at all in the NCAA Championship Tournament no matter how far the team went.

16.     Defendant Tsantiris then issued a press release (Exhibit D).  It was disseminated through the Associated Press (Exhibit E), indicating an "obscene gesture" was used for "celebrating with teammates." There was no discussion with any of the coaches about the Incident before leaving Tampa, and no truly negative comments about the Incident were received by the Plaintiff from USF or any players.

17.     On Monday, November 10, 2014, the Plaintiff wrote a letter to Assistant Coach Margaret "Mags" Rodriguez (Exhibit F),  apologizing for the Incident and providing much of what she could not express to Defendant Tsantiris, who did not want to listen to her reasons when suspending her after the USF game in Tampa. She received no response to that letter.

18.     At  all times mentioned in this Complaint, the conduct of a student-athlete at Defendant UConn was governed by the rules and by-laws of the NCAA, ACC, and University of Connecticut 2013-2014 Student-Athlete Handbook ("Handbook"), which was also applicable to the 2014-2015 academic year (Exhibit G).

19.     At sometime early in the 2014-2015 women's soccer season, Defendant Tsantiris had all women soccer players sign an agreement or "pact" of some kind. The agreement or "pact" was pursuant to the Handbook, which stated that for each athletic team at Defendant UConn, the "coach has his/her own very specific team rules covering everything from conduct to dress code. Again, if your coach has written team rules, you may wish to keep them in the back of this Handbook." (Exhibit G, at 4.)

20.     Defendant Tsantiris did not provide a copy of the signed "pact" or written team rules to Plaintiff, and upon information and belief, none of the other team players were provided with a copy.

21.     On October 19, 2015, Plaintiff's New York attorney, Gregory J. Tarone, Esquire ("Tarone"), made a Freedom of Information Law ("FOIL") request pursuant to the Connecticut Freedom of Information Act ("CFOIA"), C.G.S. §§ 1-200 et seq., upon Defendant UConn's Division of Athletics for "an opportunity to inspect or obtain copies of public records regarding rules

6

governing player conduct of all NCAA Division I sports teams at the University of Connecticut, except for men's basketball."

22.      In response to Tarone's October 19, 2015 FOIL, UConn offered a detailed Affidavit by Deputy Director of Athletics/Chief of Staff Paul McCarthy (Exhibit H), dated February 16, 2016, which listed in paragraph 12 all NCAA Division teams that currently had no written rules, as advised by Defendant Tsantiris.

23.      Plaintiff believes that the "pact" she signed with other women's soccer team members amounted to "team rules" because she recalls it was a commitment that had to do with conduct and responsibilities, and Defendant Tsantiris had an obligation according to the Handbook to provide each team member with a copy of that "pact."

24.      If the "pact" can be properly considered "team rules," then Defendant Tsantiris violated the CFOIA and is subject to its enforcement. With respect to "team rules" addressed *supra* in paragraph "18" (Exhibit G, at 4), Defendant Tsantiris did not reveal the "pact" as a record that was requested by Tarone under the FOIL, thereby violating the CFOIA and subjecting himself to its enforcement.

25.      The Handbook indicates that "[t]he head coach will meet with the student-athlete at the first sign of non-compliance of team rules to clearly delineate the responsibilities of the student-athlete to correct the reasons given by the coach as substandard. The head coach will memo the sport administrator of this occurrence." (Exhibit G, at 15.)

26.      No such memo as required by the Handbook is known to ever have been issued by Defendant Tsantiris, or shown to the Plaintiff, or provided to the sport administrator, as  required.

Defendant Tsantiris therefore violated the Handbook rules and should be held properly accountable by Defendant UConn.

27.     A couple of days after returning from Tampa and being suspended, the Plaintiff visited Defendant Manuel in his office and asked him if she was going to lose Scholarship over the Incident, and he said: "I have no intention of pulling your scholarship over this."

28.     To address the Incident with the women's soccer coaches, the Plaintiff then hand-delivered a letter to each of the three coaches, undated but provided on or about November 18, 2014 (Exhibit I), apologizing and explaining her conduct. None of the coaches acknowledged the Plaintiff's letter, replied to it, or discussed it with her.

29.     On December 5, 2014, nearly a month after the Incident, the Plaintiff sent a follow-up email to equipment manager Megan Hostillo (Exhibit J), indicating her cleat size for a specific shoe type she that had not indicated in her December 3, 2014 email.  This shows by behavior the preparation for Plaintiff's being on the roster for the 2015-2016 season. There was no indication her Scholarship would not be renewed in May.

30.     In the evening of Sunday, December 19, 2014, the Plaintiff received a telephone call from Defendant Tsantiris notifying her that he was canceling her Scholarship because of the Incident.

31.     Soon thereafter in the evening of December 21, 2014, the Plaintiff wrote directly to Defendant Manuel (Exhibit K), pleading with him in the misguided belief that is was Defendant Tsantiris's decision alone and not Defendant Manuel's to either approve or deny Defendant Tsantiris's decision to cancel a scholarship mid-year, because Defendant Tsantiris had told the Plaintiff that it was his decision alone to cancel Scholarship, and not Defendant Manuel's. Though on clear and complete notice of the wrongful conduct of Defendant Tsantiris under the NCAA By-Laws,

Defendant Manuel failed to intervene or stop the actions of the UConn Division of Athletics that he led, thereby becoming complicit in Defendant Tsantiris's conduct.

32.     On January 29, 2016, Defendant Manuel became the 13th Director of Athletics at his alma mater, the University of Michigan in Ann Arbor, Michigan, where he played NCAA D1 football.

33.     On December 21, 2014, the Plaintiff emailed Defendant Tsantiris (Exhibit L), in which the Plaintiff said to him:

> [P]lease reconsider . . . taking away my scholarship for the spring. The ramification of this is devastating to me and my future. Taking away a scholarship is a very serious act. I've studied the student athlete and I sincerely don't believe that [I have] done anything that would be considered a violation of the scholarship agreement.

34.     The Plaintiff's December 21 email demonstrates her state of mind at that time, being of the full impression that her status as a women's soccer team member was restored and that she was going to be playing the 2015-2016 season, because she had met with Defendant Tsantiris on December 3, 2014 for her evaluation and had been told she was back on the team, discussing usual team player business such as uniforms and health insurance, etc., noting when writing to him:

> When you evaluated me two weeks ago, you discussed your expectations of my performance in the spring season. You stated, "I want you to come back and play hard and make an impact on the team. You have not expressed to me that I was in jeopardy of losing my spot on the team and my scholarship before the end of May. I've been very excited since our meeting and . . . working hard on [a] daily basis to get myself ready."

(*Id.*)

35.     Then Plaintiff confronted Defendant Tsantiris about his shocking phone call two nights prior on December 19 when, without justification, he entirely abandoned the Plaintiff:

Further, you've advised me "to not attend UConn" in the spring, but if I must go to school, to "take classes at a community college"? This doesn't sound appropriate to me. . . .

. . . [P]lease advise what has transpired over the course of the last few days since your last meeting with me for player evaluation at the conclusion of the season.

. . . I spoke with [Assistant Coach] Mags . . . [who said] my scholarship will not be up for renewal in May, but what I don't understand is how does this effect my scholarship for the spring?

36.    To ensure that Defendant Tsantiris understood that the Plaintiff was not accepting the reason for her loss of Scholarship and that she intended to further confront Defendant Tsantiris about his action, she finished her email with a clear notice about her resolve: "I'm looking forward to hearing back from you, and if your decision is final, please note that I will be appealing this so I can have my chance to finish up my classes in May . . . to transfer for fall 2015," because Defendant Tsantiris had already threatened the Plaintiff with retribution if she appealed his decision. (*Id.*)

37.    Defendant Tsantiris advised the Plaintiff in a phone conversation soon thereafter, because she had earned advance placement credits in high school and had extra credits for eligibility, to take the semester off and come back in the fall, that he would take her back then, telling her, "You have my word on it." But in another phone conversation the next day, Defendant Tsantiris told her if she appealed his decision that he would not help her transfer to another school and she would not be given a good recommendation. However, the Plaintiff was told by Defendant Tsantiris that if she walked away silently, then he would contact prospective transfer institution coaches and would not say anything bad about her if the interested coach should contact him.

38.    On December 23, 2014, the Plaintiff emailed Defendant Neal Eskin, UConn's Assistant Athletic Director (Exhibit M). This email expresses much of what the Plaintiff would have

expressed in a hearing if she had been given an opportunity. That is the voice that Defendant Tsantiris took away from the Plaintiff by not providing her with a proper hearing and appeal.

39.     On or about December 24, 2014, the Plaintiff received a letter from Defendant Lucas ("Cancellation Letter") (Exhibit N), indicating that "upon recommendation of the Division of Athletics and the application of NCAA By-Law 15.3.4," her Scholarship was being canceled for "serious misconduct." The specific provision that was clearly intended and should have been cited more specifically is NCAA By-Law ("By-Law") 15.3.4.2(c) (Exhibit O (applicable 2013-2014 NCAA Manual cover page and By-Law).

40.     Upon information and belief, Defendant Tsantiris went on a recruiting trip during the fall semester break, and he ran into an opportunity he could not resist at any cost. Defendant Tsantiris needed the Plaintiff's grant-in-aid to complete a full out-of-state scholarship offer he wanted to make to Morgan Andrews ("Andrews") of Milford, New Hampshire, an accomplished varsity soccer player at the University of Notre Dame who was solicited by Defendant Tsantiris to transfer to Defendant UConn. After canceling the Plaintiff's Scholarship, her aid was used to complete the out-of-state full scholarship offer to Andrews. However, Andrews did not accept the offer from Defendants UConn and Tsantiris but, rather, accepted an offer from the University of Southern California and transferred there. Because Plaintiff's Scholarship had already been canceled by Defendant Tsantiris, it is unknown what happened with Plaintiff's financial aid.

41.     Accompanying Defendant Lucas's Cancellation Letter was a two-page guide to the "University of Connecticut—Financial Aid Hearing Procedure," found under NCAA By-Law 15.3.2.3 (Exhibit P (a copy of which two pages and the actual NCAA By-Law are annexed hereto collectively)).

11

42.     By-Law 15.3.2.3 requires certain procedures to be followed and sets a "deadline by which a student-athlete must request a hearing." (Exhibit P.) A deadline should be a date certain.

43.     The Cancellation Letter merely indicated the appeal must be made "in writing within fourteen business days of the receipt of this letter." (Exhibit N.) This requires figuring out the "business days" properly, which can be difficult for anyone around the Christmas Holidays and New Year.

44.     The Plaintiff did file her appeal with Lucas on January 14, 2015 by emailed letter (Exhibit Q), believing it was her last day to do so.

45.     Defendant Lucas notified the Plaintiff by letter of January 29, 2015 ("Appeal Denial") (Exhibit R) that her appeal was "denied because the request for a hearing was not submitted within 14 business days of the December 22, 2014 notification letter." Defendant Lucas's Cancellation Letter of December 22, 2014 specified that Plaintiff must contact her office "in writing within fourteen business days of the *receipt* of this letter." (Exhibit N (emphasis added).) However, the Appeal Denial indicates that the Plaintiff's request was denied because it was "not submitted within fourteen business days of the December 22, 2014 notification letter," which makes Defendant Lucas's two letters inconsistent and shows that the Plaintiff's appeal was, in fact, timely. Defendant Lucas contradicted herself and showed how difficult and confusing it is to use Defendant UConn's method of calculating a "deadline" rather than specifying an exact date, such as "January 13, 2014" as a true deadline.

46.     Under By-Law 15.3.2.3, any reduction or cancellation of a grant-in-aid award during the period for which it was awarded may not occur unless the student-athlete is provided an opportunity for a hearing. It specifically says that the written notification "shall include . . . the

deadline by which a student-athlete must request a hearing." (Exhibit P.) The Appeal Denial purposefully or inadvertently provided a confusing hearing timeline and "deadline" date for the appeal that does not comply with By-Law 15.3.2.3.

47.     Moreover, Defendant UConn's Athletics Division should have provided *at a minimum*, pursuant to By-Law 15.3.2.3, a hearing by the university's regular student disciplinary authority to determine whether "serious misconduct" had occurred because Defendant UConn was seeking to cancel the Plaintiff's one-year Contract in the middle of its term.

48.     No such hearing was provided to the Plaintiff, nor any hearing provided before a qualified tribunal, as required by NCAA By-Laws and Defendant UConn's own Handbook, and as further required for all UConn students under Defendant UConn's student body *"Responsibilities of Community Life: The Student Code"* ("Student Code") (Exhibit S), which addresses standards of conduct applicable to *all* UConn students and in which there is no definition of "serious misconduct."

49.     The Incident over which Defendant UConn canceled the Scholarship and Contract could not be considered "serious misconduct" without the aforementioned required hearings for student-athletes and all UConn students, which failure to provide them ipso facto breaches the Contract. Evoking By-Law 15.3.4.2(c) was also, therefore, illegal and void.

50.     The Incident is not "serious misconduct" under any applicable NCAA By-Law or other applicable by-law, rule, regulation, guideline, or the American public norm, including UConn's own Student Code.  The Cancellation Letter cited "a serious misconduct issue" as the basis for canceling the Scholarship under By-Law 15.3.4.  Section 2(c) of that By-Law can only be evoked when the student-athlete in the course of a grant-in-aid contract term, "[e]ngages in serious

13

misconduct warranting substantial disciplinary penalty." (Exhibit O.) There must first be "serious misconduct," but as a *prerequisite* only that misconduct which warranted "substantial disciplinary penalty" can be the basis for canceling a grant-in-aid in the middle of the contract term. (*Id.*)

51.     In a CBS sports article of May 29, 2015 by Jon Solomon, "SEC Meetings: New Rule Prevents Transfers with 'Serious Misconduct'" (Exhibit T), he quotes the NCAA Southeastern Conference ("SEC") in its new policy, showing leadership among prominent D1 conferences nationwide, as defining "serious misconduct" to be "sexual assault, domestic violence or other forms of sexual violence."  The SEC rule bans "transfers if at a previous school the player had 'limited discipline applied by a sports team, or temporary disciplinary action during an investigation.'" Today, the SEC rule would preclude Plaintiff from transferring into an SEC institution and playing, even *without* a grant-in-aid scholarship, because Defendant Tsantiris's and Defendant UConn's Division of Athletics' characterization of the Incident as "serious misconduct" along with the cancellation of the Scholarship as discipline would specifically preclude it.  Conduct and discipline are therefore intertwined.

52.     In another CBS Sports article by Ben Kercheval on June 3, 2016 (Exhibit U), it was reported that the SEC's newly "expanded definition of 'serious misconduct' applies to transfers who pled guilty or no contest to a felony involving serious misconduct. Additionally, the new definition applies to acts of 'dating violence, stalking, or conduct of a nature that creates serious concerns about safety to others.'" The Incident at bar cannot be in any way analogized to having created serious concerns of safety to others from the Plaintiff's conduct, nor of being any kind of felonious misconduct.

53.     In his *New York Times* article of August 26, 2015, entitled "College Conferences Try to Block Athletes Who Have Violent Past" (Exhibit V), Marc Tracey comments pointedly:

> As colleges struggle to control the public-relations damage caused by athlete's criminal behavior, prominent conferences have begun measures to keep players with troubling pasts out of their teams' nationally televised colors.

> The Big 12 this week [of August 2015] became the second major conference to move to bar incoming transfers who had been disciplined for "serious misconduct" at their previous universities . . . modeled after the Southeastern Conference . . . [and] rising awareness of the issue of sexual violence by athletes on campus.

54.     The Plaintiff's Incident could be viewed several ways from various perspectives as impolite, inappropriate, offensive, and even vulgar, but it is nonetheless protected speech under the First Amendment to the U.S. Constitution.

55.     After her Scholarship was canceled, the Plaintiff, with no financial means to continue as a student at Defendant UConn, accepted a 37% grant-in-aid scholarship from Hofstra University ("Hofstra") for the spring 2015 semester (Exhibit W (Agreement of January 21, 2015)). That was for one semester, but her scholarship has been twice that for 2015-2016 and 2016-2017 years because it is applied to two semesters, so she is provided with a 75% grant-in-aid athletic scholarship by Hofstra.

56.     On May 15, 2016, Tarone emailed another request letter under the CFOIA for Defendant UConn's records of "NCAA Student-Athletes Disciplined in 2014-15 Academic Year" (Exhibit X). Defendant UConn's response through Rachel Krinsky Rudnick, J.D., Assistant Director of Compliance, by email to Tarone of June 27, 2016 (Exhibit Y) includes six pages in spreadsheet form of partially redacted personal information of student-athlete incidents and resulting discipline for each. The response contains no record whatsoever of the Plaintiff's discipline in that academic year. Again, Defendant Tsantiris appears to have not accounted for his canceling of the Plaintiff's

Scholarship, and Defendant UConn provided an incomplete and misleading record under the CFOIA.

Defendant Lucas also may have purposely or negligently failed to properly advise the Division of

Athletics as to Plaintiff's Scholarship and the freed-up financial aid money resulting from its

cancellation.

## COUNT I
### (Violation of Title IX Against Defendant UConn)

57.     The allegations of paragraphs 1 through 56 above are incorporated by reference as

if fully set forth herein.

58.     Title IX, enacted in 1972, provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under any
> education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

59.     The Civil Rights Restoration Act of 1987 made plain Congress's intent that "program

or activity," as used in Title IX, applies to any program or activity offered by an educational

institution that receives federal financial assistance, whether or not the program itself receives such

assistance. 20 U.S.C. § 1687. Because Defendant UConn receives federal financial assistance, its

athletic program is subject to Title IX and Defendant UConn must comply with its requirements.

60.     In the statute, Congress expressly delegated authority to the U.S. Department of

Health, Education and Welfare to promulgate regulations interpreting Title IX. 20 U.S.C. § 1682.

In 1975, the Department of Health, Education and Welfare promulgated these regulations as 45

C.F.R. Part 86. The United States Department of Education later adopted these regulations and

codified them at 34 C.F.R. Part 106.

61.     The Regulations include specific provisions that state:

in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

> (1)   Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or      service;

> (2)   Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

> (3)   Deny any person any such aid, benefit, or service;

> (4)   Subject any person to separate or different rules of behavior, sanctions, or other treatment;

> (5)   Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

> (6)   Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

> (7)   Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

34 C.F.R. § 106.31(b).

62.    Defendant UConn discriminated against the Plaintiff, a female student-athlete, by subjecting her to different treatment regarding disciplinary actions and sanctions than male student-athletes. While her conduct during the Incident was unsportsmanlike, it was not "severe misconduct" such that it warranted the revocation of her Scholarship mid-year. "Serious misconduct" applied by Defendant Tsantiris to Plaintiff in abuse of her student rights was an excuse for his own administrative misconduct to benefit him as a coach, thereby displaying conduct far closer to NCAA "serious misconduct" than Plaintiff's Incident.

63.     Upon information and belief, male student-athletes have engaged in similar acts of unsportsmanlike conduct without an affect on their scholarships, and have engaged in more inappropriate, and sometimes illegal, conduct without having their scholarships revoked.

64.     On October 2, 2015, less than a year after the Plaintiff's incident, UConn football player Andrew Adams engaged in a similar act of celebration during a football game at Brigham Young University, according to an October 8, 2014 article in the *Hartford Courant* (Exhibit Z). At the end of a play, with eight minutes left in the game, Adams "carelessly booted the dead ball into the stands." Adams was "called" by the officials for unsportsmanlike conduct, and incurred a 15-yard penalty for his team. Adams told the *Courant* that it was a "dumb play," that he should not have done it, and that he had "learned his lesson."

65.     Although the *Courant* reports that the coaches "gave it to Adams pretty good after the play," it does not appear that Adams faced any formal discipline from the team, such as suspension from any games or team activity or, moreover, revocation of his scholarship. Defendant UConn's defensive coordinator and safeties coach, Anthony Poindexter, told the *Courant* that Adam's conduct was "the kind of stuff you can't do at the game but no one around here is harping on it and Andrew has been bringing it every day. It was a one-time thing he did. He'll never do it again, but I can tell you nobody felt worse than him when it happened," and he implied that the action was unintentional. Poindexter further stated that Adams "has a lot of responsibilities, and he's ready for that kind of stuff. The young man is well put together. He gets good grades in the classroom; he understands and is active in the community; he understands football. He's built for all this kind of stuff. He's very important to our team and he's been doing a great job," and concluded that "[h]e just made a mistake. We all do." (Exhibit Z.)

66.     Similarly, the Plaintiff made a mistake—the Incident—but not only did Defendant UConn "harp on it" rather than excuse her conduct, it characterized it as "serious misconduct" and suspended her from the team and ultimately revoked her Scholarship because of it. Defendant UConn clearly treated the unsportsmanlike conduct of the Plaintiff, a female student-athlete, differently than they treated Adam's misconduct.  Adams received no actual discipline.

67.     Additionally, in several instances recently, male student-athletes have allegedly engaged in criminal conduct, resulting in criminal charges being brought against them, yet the male-student athletes have not experienced repercussions as serious as those experienced by the Plaintiff for her unsportsmanlike gesture.

68.     On September16, 2016, Brian Cespedes, a redshirt freshman member on the UConn football team, was involved in a fight in a home during which five people were injured, according to an article in the *New Haven Register* (Exhibit AA). On December 10, 2016,Cespedes was charged with third-degree assault and second-degree breach of the peace, according to an article in the *Hartford Courant* (Exhibit BB). A UConn spokesperson said that the coaching staff has been aware of the incident since it occurred and "addressed it at the time." (*See* Exhibit Z.) However, Cespedes was not suspended from the team after the fight, not was he suspended after his arrest.

69.     This arrest comes on the heels of the arrests of two other UConn football players, Felton Blackwell and Nazir Williams, on October 19. (*See* Exhibit AA.) Blackwell was arrested on a felony charge of illegal possession of a weapon in a motor vehicle, and was expelled from UConn following his arrest. Williams was charged with possession of marijuana, possession of weapon in a motor vehicle, and possession of alcohol by a minor. Although both players were immediately

suspended from the football team, a UConn spokesperson said in November that Williams may be allowed to return to the team because it was his first transgression. (Exhibit BB.)

70.     The examples above demonstrate that male student-athletes enjoy the privilege of a much more lenient standard regarding team suspension and discipline than female student-athletes such as the Plaintiff. While Brian Cespedes was not suspended in light of his pending criminal charges and Williams was suspended after his arrest but may be reinstated, the Plaintiff was suspended and ultimately had her Scholarship terminated over an unsportsmanlike gesture. In no way does the Plaintiff's conduct during the Incident rival that of Cespedes and Williams, who are facing criminal charges but remain on their team.

71.     Through FOIL requests to UConn, the Plaintiff has obtained a spreadsheet listing the violations of student-athletes during the 2014-2015 school year and the discipline that resulted. (Exhibit Y.) Because of the Family Educational Rights and Privacy Act ("FERPA"), all personal identifying information about the student-athletes, including their names, sex, and sport they play, had been redacted from the spreadsheet by the time the Plaintiff received it.

72.     In Exhibit Y, there are five incidents categorized as "theft from bookstore." For four of these incidents, the punishment was "Warning [and] Living Your Values Workshop," while for the fifth incident, the punishment was "Warning [and] Living Your Values Workshop [and] Educational Project." Upon information and belief, one of the bookshop thefts was perpetrated by a male member of the soccer team. Exhibit Y shows that this male student-athlete received the punishment of "Warning [and] Living Your Values Workshop," and possibly an "Educational Project."

73.     The only incident that warranted any discipline more serious than "university probation" was an assault that resulted in expulsion. The next most serious punishment, "university probation," was given to athletes who were found to engage in "off-campus nuisance violation," "transport due to alcohol," "possession of alcohol, uncooperative" in connection with an active status from a previous case, "moped in room" in connection with an active status from a previous case, academic integrity, "off-campus party," and "plagiarism." (Exhibit Y.) Each of these incidents involved a finding that the student either engaged in "endangering behavior," a violation of the alcohol and drugs policy, a violation of the on-campus housing contract, a violation of academic integrity, "disruptive behavior," or some combination thereof. No student was placed on probation for "disruptive behavior" alone. (*Id.*)

74.     The Plaintiff's Incident of unsportsmanlike conduct did not appear on Exhibit Y, which purported to contain all the official cases of Defendant UConn's student-athlete discipline in the 2014-2015 school year.

75.     Without being able to view the redacted information on the spreadsheet, the true extent of Defendant UConn's differential treatment of female student-athletes is not yet known.

76.     However, upon information and belief, Defendant UConn addressed the Plaintiff's Incident differently than they would have had the Plaintiff been a male student-athlete. By subjecting female student-athletes such as the Plaintiff to more stringent disciplinary standards, Defendant UConn discriminated against the Plaintiff on the basis of sex, in violation of Title IX.

77.     On or about November 29, 2014, while the UConn men's basketball team was in San Juan, Puerto Rico, playing in a tournament, several players of the team engaged in a violation of team rules. The exact nature of the violation is not known to the Plaintiff at this time, as FERPA has

21

prevented the Plaintiff's New York counsel, Tarone, from gaining access to the information about this incident that he requested under CFOIA.

78.     By letter to Defendant UConn of March 24, 2015 (Exhibit CC), Tarone requested the "2014-15 men's basketball team code or rules governing player conduct." In response, Defendant UConn's Compliance & Public Information Specialist, Liz Vitullo ("Vitullo"), responded by letter of April 6, 2015 (Exhibit BB), "Attached please find the document you requested in your Freedom of Information request," which was Handbook and nothing more. The lack of any explanation as to why only the Handbook was being sent to Tarone, without any reference to the records requested not qualifying under CFOIA as "records," was deemed as a finessing nonresponse, aimed to challenge the request.

79.     Tarone then appealed to Connecticut's Freedom of Information Commission. At its hearing, Tarone learned from Vitullo's testimony that the basketball team's rules are oral and therefore, pursuant to CFOIA, not a "record" under CFOIA even though they would be required to be provided under the federal FOIL and most states' version of FOIL.

80.     Even though UConn men's basketball "team rules " were oral, they exist. The only way to learn more about the oral rules as applicable at all times herein and as publicly represented in news conferences by the team's head coach, Kevin Ollie ("Ollie"), is through discovery in this lawsuit.

81.     The various organizational standards of student-athlete conduct are addressed but not clearly set forth, as follows:

> All UConn students are subject to the University of Connecticut
> Student Code including the "Responsibilities of Community Life" .
> . . while involved in off-campus University activities. In addition, you
> as a student-athlete are expected to abide by the Division of Athletics

> Student-Athlete Code of Conduct. . . In addition, each student-athlete
> is subject to all rules and regulations that are required for individual
> participation on a specific team. While these rules may be particular
> to each team, they are presented to the student-athlete by the coaching
> staff with the full support of the athletic administration.

(Exhibit G, at 5.)

82.     The foregoing indicates how each team can have its own specific rules in addition to

the rules applying to all student-athletes. Those rules can be recorded or oral, in which case they may

and may not be discoverable under CFOIA.

83.     On Sunday, November 23, 2014, according to *Hartford Courant* reporter Dom Amore

in his article of November 24, 2014, "Rakim Lubin, Omar Calhoun Among 4 UConn Players

Suspended" (Exhibit DD), the defending national champions, UConn's men's basketball team, while

in San Juan, Puerto Rico, played West Virginia without four of its players due to "violation of team

rules." Coach Ollie would not disclose any further information about the incident(s) in San Juan.

When asked what the "violation" was, Ollie responded: "I have no comment on it, . . . we'll assess

the situation when we get back to Connecticut." (*Id.*)

84.     Four days later, when back in Storrs, Connecticut, Ollie was quoted by Amore in his

November 28, 2014 *Hartford Courant* article, "Ollie Reinstates Calhoun, Lubin; Texas Up Next"

(Exhibit EE). Having cleared all the suspended players without further discipline, Ollie said:

> Everybody's on a *short leash*, they know. Everybody who didn't get
> in trouble, they're on a short leash. I'm just not going to tolerate
> breaking rules. We've got team rules n place and they understand that.
> As a man, you learn your lesson and that's what we're are here to
> provide[.] . . . [T]hey've got two choices: to get better from it or leave
> the program.

(*Id.* (emphasis added).)

85.     Amore reported that at that late November press conference, when asked what rule the players have broken, Ollie said, "No. I'm not going to comment on that." (*Id.*) No FERPA information was claimed by Ollie as a basis for not disclosing the rule(s) broken.

86.     Upon information and belief, the violation of the men's basketball team was more serious than the Plaintiff's Incident. As a result of their violation of team rules in Puerto Rico, several member of the men's varsity basketball team were suspended, although none had their scholarships revoked as the Plaintiff had. The U.S. Attorney for San Juan, Puerto Rico, should investigate for any truly serious misconduct, including any violations of law.

87.     Accordingly, upon information and belief, Defendant UConn subjected the Plaintiff to a more severe penalty for her Incident than it did for male student-athletes who were believed to have engaged in more serious misconduct, in violation of the Plaintiff's constitutional rights.

88.     As a proximate result of Defendant UConn's conduct, the Plaintiff has suffered, and will continue to suffer, general damages, including mental and emotional pain and suffering, humiliation, fear, anxiety, and loss of personal and professional reputation.

89.     As a further result of the Defendants' conduct, Plaintiff has suffered, and will continue to suffer, special damages. These damages include her cost of tuition, room and board, fees, books, and meals at Hofstra. While the Plaintiff had a full Scholarship to Defendant UConn, she received only a 75% Grant to Hofstra, leaving her responsible for the remaining costs. The Plaintiff has been forced to take out loans to cover her expenses at Hofstra, the costs associated with which are a further element of the damages.

90.     The Plaintiff has been required to retain the undersigned attorney to prosecute this action. Therefore, the Plaintiff is entitled to recover reasonable attorney's fees, expenses, and expert fees pursuant to 42 U.S.C. § 1988.

### COUNT II
### Violation Of Constitutional Rights, 42 U.S.C. § 1983, Equal Protection
### (Against Defendants Manuel, Tsantiris, And Lucas)

91.     The allegations of paragraphs 1 through 90 above are incorporated by reference as if fully set forth herein.

92.     The Plaintiff's contract with Defendant UConn created a property interest both in its protection against cancellation absent serious misconduct or other conditions and in the completion of its terms.

93.     As discussed in Count I, Defendant UConn arbitrarily discriminated against the Plaintiff, a female student-athlete, by subjecting her to different treatment than male student-athletes regarding disciplinary actions and sanctions for unsportsmanlike conduct.

94.     The Plaintiff's rights under the Equal Protection Clause of the U.S. Constitution require that the Defendants treat all similarly situated individuals similarly. By subjecting female student-athletes to more stringent disciplinary standards than male student-athletes, the Defendants treated the Plaintiff differently than they would have had the Plaintiff been a male.

95.     As set forth above, the Plaintiff lost her Scholarship over the Incident, which the Defendants classified as serious misconduct. By contrast, similar unsportsmanlike conduct by a male student-athlete resulted in no discipline or sanctions, and more serious violations of the Code of Student Conduct by male athletes, such as theft, resulted in only minor discipline.

96.     This practice of subjecting female student-athletes to stricter standards of conduct than males caused serious harm to the Plaintiff, resulting in the loss of her Scholarship, and deprived her of her constitutional rights to equal protection.

97.     As a proximate result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, general damages, including mental and emotional pain and suffering, humiliation, anxiety, and loss of personal and professional reputation.

98.     As a further result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, special damages. These damages include her cost of tuition, room and board, fees, books, and meals at Hofstra. While the Plaintiff had a full Scholarship to Defendant UConn, she received only a 75% Grant to Hofstra, leaving her responsible for the remaining costs. The Plaintiff has been forced to take out loans to cover her expenses at Hofstra, the costs associated with which are a further element of the damages suffered.

99.     The Defendants violated the Plaintiff's rights intentionally, maliciously, and with conscious disregard of the Plaintiff's rights. Therefore, the Plaintiff is entitled to recover punitive damages from the Defendants.

100.     The Plaintiff has been required to retain the undersigned attorney to prosecute this action. Therefore, the Plaintiff is entitled to recover reasonable attorney's fees, expenses, and expert fees pursuant to 42 U.S.C. § 1988.

101.     By reason of the described conduct, the Defendants are liable to Plaintiff under 42 U.S.C. § 1983 for injuries suffered by the Plaintiff, in that their conduct deprived the Plaintiff of rights, privileges, and immunities granted Plaintiff by the U.S. Constitution.

**Count III**
**Violation of Constitutional Rights, 42 U.S.C. § 1983, Procedural Due Process**

**(Against Defendants Manuel, Tsantiris, And Lucas)**

102.    The allegations of paragraphs 1 through 101 above are incorporated by reference as if fully set forth herein.

103.    The Plaintiff's contract with Defendant UConn created a property interest both in its protection against cancellation absent serious misconduct or other conditions and in the completion of its terms.

104.    The deadline contained in the Cancellation Letter, indicating that an appeal must be made "in writing within fourteen business days of the receipt of this letter," was unconstitutionally vague and nonspecific enough to cause confusion. (Exhibit N.)

105.    The vague deadline in the Cancellation Letter left it to 19-year-old student-athlete Plaintiff to figure out what a "business day" was during Defendant UConn's holiday break, setting her up to miscalculate it. (Exhibit N.)

106.    The Plaintiff was, in fact, confused, and she believed that she had filed her appeal within the required timeframe, but Defendant UConn and Lucas disagreed and found that her appeal was untimely based upon a deadline inconsistent with the Cancellation Letter.

107.    The vague deadline in the Cancellation Letter, indicating that an appeal must be filed within 14 business days of receipt, contradicted the procedures set forth in the "University of Connecticut—Financial Aid Hearing Procedure," which stated that "the student-athlete will have 14 business days from the date on the notification letter to submit a written request for a hearing." (Exhibit P.)

108.    By filing her appeal on January 14, 2015, 14 business days after receipt of the Cancellation Letter, the Plaintiff's appeal was timely in light of the standard set forth in the Cancellation Letter.

109.    Despite this, the Plaintiff had her Scholarship terminated without a proper hearing or an opportunity to be heard.

110.    Defendant UConn easily could have specified the actual deadline date in its letter, thereby providing clear notice that would be indisputable. If the deadline was stated as "January 13, 2015," would have left no room for error and would have been consistent with due process.

111.    The Defendants' termination of the Plaintiff's scholarship deprived her of a property interest without procedural due process as required by the U.S. Constitution.

112.    As a proximate result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, general damages, including mental and emotional pain and suffering, humiliation, anxiety, and loss of personal and professional reputation.

113.    As a further result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, special damages. These damages include her cost of tuition, room and board, fees, books, and meals at Hofstra. While the Plaintiff had a full Scholarship to Defendant UConn, she received only a 75% Grant to Hofstra, leaving her responsible for the remaining costs. The Plaintiff has been forced to take out loans to cover her expenses at Hofstra, the costs associated with which are a further element of the damages suffered.

114.    The Defendants violated the Plaintiff's rights intentionally, maliciously, and with conscious disregard of the Plaintiff's rights. Therefore, the Plaintiff is entitled to recover punitive damages from the Defendants.

115.    The Plaintiff has been required to retain the undersigned attorney to prosecute this action. Therefore, the Plaintiff is entitled to recover reasonable attorney's fees, expenses, and expert fees pursuant to 42 U.S.C. § 1988.

116.    By reason of the described conduct, the Defendants are liable to Plaintiff under 42 U.S.C. § 1983 for injuries suffered by the Plaintiff, in that their conduct deprived the Plaintiff of rights, privileges, and immunities granted Plaintiff by the U.S. Constitution.

**COUNT IV**
**Violation Of Constitutional Rights, 42 U.S.C. § 1983,  First Amendment**
**(Against Defendants Manuel, Tsantiris, And Lucas)**

117.    The allegations of paragraphs 1 through 116  above are incorporated by reference as if fully set forth herein.

118.    The Plaintiff's conduct during the Incident, although offensive and inappropriate, is free speech and is protected by the First Amendment to the U.S. Constitution.

119.    The Plaintiff's conduct during the Incident was speech of a private citizen on a matter of public concern.

120.    The Defendants violated the Plaintiff's right to free speech by terminating her Contract as a result of her protected expression during the Incident.

121.    The Defendants acted intentionally and with callous disregard for the Plaintiff's clearly established constitutional rights.

122.    As a proximate result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, general damages, including mental and emotional pain and suffering, humiliation, fear, anxiety, and loss of personal and professional reputation.

123.   As a further result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, special damages, including her cost of tuition, room and board, fees, books, and meals at Hofstra. While the Plaintiff had a full scholarship to Defendant UConn, she received only a 75% Grant to Hofstra, leaving her responsible for the remaining costs. The Plaintiff has been forced to take out loans to cover her expenses at Hofstra, the costs associated with which are a further element of the damages suffered.

124.   The Defendants violated the Plaintiff's rights intentionally, maliciously, and with conscious disregard of the Plaintiff's rights. Therefore, the Plaintiff is entitled to recover punitive damages from the Defendants.

125.   The Plaintiff has been required to retain the undersigned attorney to prosecute this action. Therefore, the Plaintiff is entitled to recover reasonable attorney's fees, expenses, and expert fees pursuant to 42 U.S.C. § 1988.

## COUNT V
## Breach Of Contract
### (Against Defendants UConn, Manuel, Tsantiris, And Lucas)

126.   The allegations of paragraphs 1 through 125 above are incorporated by reference as if fully set forth herein.

127.   The Plaintiff performed all the conditions, covenants, promises, and agreements required of her under the terms of the Contract.

128.   The Contract was subject to the respective student and student-athlete codes, rules, and by-laws of Defendant UConn, the NCAA, and the ACC.

129.   The Defendants breached the Contract by canceling the Plaintiff's Scholarship without providing her an opportunity for a hearing, as required by the NCAA By-Laws.

130.    By providing only vague and nonspecific information about the deadline for filing

an appeal, as detailed *supra* in the paragraphs 41-45, the Defendants violated NCAA By-Law

15.3.2.3, requiring a hearing opportunity. Plaintiff received no hearing opportunity.

131.    Because the opportunity for a hearing was not provided to the Plaintiff, the Incident

over which Defendant UConn canceled the Contract could not be considered "serious misconduct"

because the requisite student body determination under NCAA By-Laws was never made.  Indeed,

the definition of "serious misconduct" does not exist, but it is well understood to be felonious or

other conduct of a criminal nature highly punished by society.

132.    The Incident was, in fact, not "serious misconduct" under any applicable NCAA By-

Law or other applicable rule, regulation, or guideline, or the American public norm, including the

UConn Student Body or Division of Athletics Student-Athlete Codes of Conduct. It was not even

close, and it cannot be reasonably established as in any way applicable to Plaintiff's Incident.

133.    By disregarding the conditions of the Contract and the rules and by-laws to which it

was subject, the Defendants breached the Contract.

134.    Under the new structure of NCAA enforcement violations as of August 2013, a four-

level structure has been instituted to focus on breaches of conduct that seriously undermine or

threaten the integrity of the NCAA Collegiate model. (*See* Exhibit FF (copy of NCAA.org article of

August 1, 2013 and applicable NCAA 2013-2014 Manual regarding By-Law19.1 et seq.).)  If the

Defendants' termination of the Plaintiff because of the Incident is found to violate the NCAA

regulations as a "severe breach of conduct," UConn could be disciplined accordingly as a member

institution under By-Law 19.1.1 as punishment.

135.    As a proximate result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, general damages, including mental and emotional pain and suffering, humiliation, fear, anxiety, and loss of personal and professional reputation.

136.    As a further result of the Defendants' conduct, Plaintiff has suffered, and will continue to suffer, special damages. These damages include her cost of tuition, room and board, fees, books, and meals at Hofstra, added travel expanses and other costs. While the Plaintiff had a full Scholarship to Defendant UConn, she received only a 75% Grant to Hofstra, leaving her responsible for the remaining costs. The Plaintiff has been forced to take out loans to cover her expenses at Hofstra, the costs associated with which are a further element of the damages suffered.

137.    The Defendants breached the Contract wantonly and with a reckless and conscious disregard of the Plaintiff's rights. Therefore, the Plaintiff is entitled to recover punitive damages from the Defendants.

## COUNT VI
### Negligent Infliction Of Emotional Distress
### (Against Defendants Uconn, Manuel, Tsantiris, And Lucas)

138.    The allegations of paragraphs 1 through 137 above are incorporated by reference as if fully set forth herein.

139.    The conduct of the Defendants created an unreasonable risk of causing the Plaintiff extreme emotional distress in the circumstances.

140.    Given the sheer surprise during semester break of learning her Scholarship was canceled, especially as it was a jolting reversal of the coach's prior conduct consistent with the Plaintiff's retaining her Scholarship, the Plaintiff's extreme emotional distress was foreseeable.

141.    For an 18-year-old at college for the first time, to learn one week before her 19th birthday that she no longer was on her team, that she could not any longer wear any team gear, and that she was effectively ostracized from the women's varsity soccer team, that she was no longer able to attend Defendant UConn or participate in any team activities, and that she would have to change schools and would lose personal relationships formed in her first semester, in addition to the extreme emotional distress of losing her Scholarship, it was entirely foreseeable to cause and result in an illness to the Plaintiff, including depression.

142.    L In her December 23, 2014 email to Eskin, Plaintiff expressed her extreme emotional distress to Defendant UConn's Assistant Athletic Director:

> I thank you very much for all your effort in getting coach's decision reconsidered. . . . *I want to tell you all that UCONN and the women's soccer program means to me. It has always been the school I wanted to attend and there was simply no other university like it.* It is perfect for my major and it is where I wanted to be even after I get my undergraduate degree. I love all its facilities and everything it has to offer and simply put, I could not picture myself anywhere else. Soccer is my whole life. I have grown to love my teammates like they are family and all the other athletes that I have known here. I trust the coaching staff and the athletic trainer and I am always eager to learn from them. . . .
>
> *Now, I feel as if my whole life has been turned upside down.* One minute I was excited and ready to come back in the Spring and turn my game around, and the next minute everything changes with one phone call. I have my classes already registered, my cleats ordered, and everything back at my dorm. *This is my worst nightmare and I feel like I am being completely ostracized and banished from not only the soccer team, but the university as a whole.* . . . I have apologized many times in person and in writing to my coaches as well as my teammates. . . .This decision has destroyed my life. . . . Now, I do not know where to go and what to do, and I have less than a month to figure it out. I am unable to consider other options.

Neal, *the psychological and emotional agony is overwhelming* and I feel injustice has fallen upon me.

(Exhibit M (emphasis added).)

143.     The Defendants' conduct was the proximate cause of severe emotional distress for the Plaintiff.

144.     Because the conduct of Defendants UConn, Manuel, Tsantiris, and Lucas showed a reckless indifference to the Plaintiff's rights, the Plaintiff is entitled to an award of punitive damages.

145.     As a proximate result of the Defendants' conduct, the Plaintiff has suffered, and will continue to suffer, general damages, including mental and emotional pain and suffering, humiliation, fear, anxiety, and loss of personal and professional reputation in an amount according to proof.

146.     As a further result of the Defendants' conduct, Plaintiff has suffered, and will continue to suffer, special damages. The Defendants violated the Plaintiff's rights intentionally, maliciously, and with conscious disregard of the Plaintiff's rights. Therefore, the Plaintiff is entitled to recover punitive damages from the Defendants in an amount according to proof.

WHEREFORE, the Plaintiff requests that this Court enter judgment against the Defendants providing the following relief:

A.     Declare Defendants' conduct to be in violation of the Plaintiff's rights;

B.     Award compensatory damages to the Plaintiff in the amount to which the Plaintiff is found to be entitled according to proof;

C.     Award punitive damages to the Plaintiff in the amount to which the Plaintiff is found to be entitled according to proof;

D.     Award interest, costs, reasonable attorney's fees, and expert fees to the Plaintiff for the § 1983 and Title IX claims; and

E.      Award any such other and further relief as the Court deems appropriate.


**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE TO A JURY.**

**DECLARATION UNDER PENALTY OF PERJURY**

The undersigned declares under penalty of perjury that she is the Plaintiff in the above action, that she has read the above complaint and that the information contained in the complaint is true and correct.  28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at Newburgh, New York on December 18, 2016.


NORIANA RADWAN, *pro se*
70 Holly Loop
Wappingers Falls, NY 12590
Telephone:  (845) 554-6818
Facsimile: None.
Email: nornor100@aim.com