## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NORIANA RADWAN | : CIVIL ACTION NO. 3:16-CV-02091 (VAB) |
| PLAINTIFF, | : |
| | : |
| v. | : |
| | |
| UNIVERSITY OF CONNECTICUT | : November 1, 2019 |
| BOARD OF TRUSTEES, WARDE | : |
| MANUEL, LEONARD TSANTIRIS, | : |
| AND MONA LUCAS, INDIVIDUALLY, | : |
| DEFENDANTS | : |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL HISTORY AND SUMMARY OF FACTUAL ALLEGATIONS CONTAINED IN PLAINTIFF'S COMPLAINT[1]

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants University of Connecticut ("UConn"), Leonidas Tsantiris, UConn women's soccer coach ("Coach Tsantiris"); Mona Lucas, Director of Financial Aid Services ("Ms. Lucas"); and Warde Manuel, UConn Athletic Director at all times relevant to the complaint ("AD Manuel"), move for summary judgment as to the complaint brought by Noriana Radwan ("Ms. Radwan" or "plaintiff"). Ms. Radwan, a UConn student, was a member of the UConn women's soccer team for the 2014 season. Her athletic grant-in-aid was cancelled at the end of Fall 2014 based upon Coach Tsantiris and UConn Athletic Department's determination that Ms. Radwan engaged in serious misconduct, a basis for which the National Collegiate Athletic Association ("NCAA") bylaws permit a member institution to cancel athletic grant-in-aid. Ms. Radwan's serious misconduct occurred at the end of the UConn-University of South Florida American Athletic Conference ("AAC") Championship game on November 9, 2014, when Ms. Radwan showed her middle finger to the ESPNU camera while UConn was on the field celebrating their conference

---

[1] The Defendants' Local Rule 56(a)(1) Statement of Undisputed Facts, submitted pursuant to Local Rule 56(a), constitutes the facts of this case. Said Statement of Material Facts is incorporated herein by reference. All Statement of Facts are referred to as "SOF ¶__."

championship. The incident was widely publicized. Ms. Radwan was suspended from all team activities immediately following the incident, and the AAC reprimanded Ms. Radwan for her actions.

Ms. Radwan alleges that the defendants' cancellation of her athletic grant-in-aid violated her rights under Title IX (Count 1), the Equal Protection Clause of the Fourteenth Amendment (Count 2), the Procedural Due Process Clause of the Fourteenth Amendment (Count 3), the First Amendment right to Free Speech (Count 4), and amounted to breach of contract (Count 5) and negligent infliction of emotional distress (Count 6). After the court granted the defendants' motion to dismiss, Count 1 is the only claim remaining against UConn; and Counts 2 through 6 are claims against the UConn defendants in their individual capacities only ("UConn individual defendants").

The defendants move for summary judgment on all claims as follows:

1) Plaintiff's Title IX (Count 1) claim against UConn and her Equal Protection Claim (Count 2) against Coach Tsantiris and AD Manuel fails, as plaintiff is unable to satisfy her burden under the <u>McDonnell Douglas</u> burden-shifting analysis because she cannot establish a *prima facie* case, or satisfy her ultimate burden to show pretext for discrimination, and she must do both; and fails against Ms. Lucas, as there is no allegation (or evidence) that she had personal involvement with the decision to cancel plaintiff's athletic grant-in-aid or the alleged violation of plaintiff's right to equal protection;

2) Plaintiff's Procedural Due Process claim (Count 3) fails because her athletic grant-in-aid was not a protected property interest and, in the alternative, plaintiff was provided all the process she was due when her athletic grant-in-aid was cancelled; and with regard to Coach Tsantiris and AD Manuel, plaintiff's claim fails for the additional reason that she has not alleged that they had any personal involvement in violating her Procedural Due Process rights;

3) Plaintiff's First Amendment retaliation claim (Count 4) fails because plaintiff showing her middle finger to the ESPNU camera at the end of the UConn ACC championship game was not protected speech; and with regard to Ms. Lucas, plaintiff has failed to allege (or present

evidence) that she had any personal involvement in the decision to cancel plaintiff's grant-in-aid because of her conduct;

4) Plaintiff's breach of contract (Count 5) claim fails against the UConn individual defendants because only UConn is a party to the agreement;

5) Plaintiff's negligent infliction of emotional distress (Count 6) claim against the UConn individual defendants is barred by statutory immunity as provided in Conn. Gen. Stat. § 4-165; and

6) Lastly, qualified immunity shields the UConn individual defendants from plaintiff's Equal Protection claim, Procedural Due Process claim and First Amendment claim.

The material facts not in dispute, as set forth in the accompanying Local Rule 56(a) (1) Statement, amply demonstrate that the plaintiff cannot prevail on her claims and where applicable, the UConn individual defendants are entitled to qualified immunity.

**SUMMARY JUDGMENT STANDARD**

"Summary judgment is appropriate where there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law, Fed. R. Civ. P. 56(c), i.e., [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Kia P. v. McIntyre, 235 F.3d 749, 755 (2d Cir. 2000) (citations omitted).

Summary judgment is a favored remedy. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Such motions "must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate . . . prior to trial, that the claims and defenses have no factual basis." Id. A moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue or dispute as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Id. at 322; *see* Fed. R. Civ. P. 56(c).

In making this determination, the Supreme Court has emphasized that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, factual disputes that are irrelevant or unnecessary to the resolution of the legal issues shall be disregarded in a motion for summary judgment. Id. at 248. A factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A factual issue is not "material" unless it "might affect the outcome of the suit under the governing law." Larkin v. Town of W. Hartford, 891 F. Supp. 719, 723-24 (D. Conn. 1995).

To defeat a motion for summary judgment, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" McCloskey v. Union Carbide Corp., 815 F. Supp. 78, 81 (D. Conn. 1993), quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12, (2d. Cir. 1986) *cert. denied*, 480 U.S. 932 (1987). Moreover, "summary judgment must be entered 'against a party who fails . . . to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'" Larkin, 891 F. Supp. at 723, quoting Celotex, 477 U.S. at 322.

**ARGUMENT**

**I. PLAINTIFF'S  TITLE IX CLAIM AND §1983 EQUAL PROTECTION CLAIMS FAIL UNDER THE McDONNELL DOUGLAS BURDEN-SHIFTING ANALYSIS BECAUSE SHE CANNOT ESTABLISH A PRIMA FACIE CASE, OR SATISFY HER ULTIMATE BURDEN TO SHOW PRETEXT FOR DISCRIMINATION, AND SHE MUST DO BOTH.**

**A. Section 1983 Equal Protection Clause Analysis**

"A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal

statutory rights, or her constitutional rights or privileges." Annis v. Cnty of Westchester, 136 F.3d 239, 245 (2d Cir. 1998), citing Eagleston v. Guido, 41 F.3d 865, 872 (2d Cir. 1994).

As to the first element of a § 1983 claim, "state employment is generally sufficient to render the defendant a state actor. . . . Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." West v. Atkins, 487 U.S. 42, 50 (U.S. 1988).

As to the second element under a § 1983 claim when asserting an Equal Protection claim based on gender discrimination, "the plaintiff must prove that she suffered purposeful or intentional discrimination on the basis of gender." Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 118 (2d Cir. 2004). "[A] plaintiff pursuing a claim for . . . discrimination under § 1983 . . . must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse . . . action. . . . It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct." Naumovski v. Norris, 934 F.3d 200, 214 (2d Cir. 2019) (Employment discrimination claim based upon sex brought pursuant to § 1983 and the the Equal Protection Clause of the Fourteenth Amendment).

Plaintiff's claim of discrimination based on sex in the imposition of university discipline does not allege direct evidence of UConn or the individual defendants' intent to discriminate against her on the basis of sex; thus her claim must be analyzed under the McDonnell Douglas burden-shifting framework for identifying discriminatory intent. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015); *see also* Doe v. Columbia University, 831 F.3d 46, 54-56(2d Cir. 2016); Raspardo v. Carlone, 770 F.3d 97, 125 (2d Cir. 2014). Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015) (disparate treatment claim based on race brought under Title VII and Section 1983); Ruiz v. Cnty of Rockland, 609 F.3d 486, 491 (2d Cir. 2010) (selective enforcement claim (discriminatory discharge) based on race and national origin brought under Title VII and Section 1983 analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green). "In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII

claims." Annis, 136 F.3d at 245; *see also* R.S. v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 371 Fed.Appx. 231, 234 (2d Cir. 2010) (observing that where the plaintiff alleges parallel Title IX and Equal Protection claims, they may fail for the same reason).

Notwithstanding, when courts use the McDonnell Douglas framework to analyze § 1983 claims, "courts must account for a § 1983 plaintiff's higher burden of producing evidence from which a jury could infer that the individual's discriminatory intent was a '*but for' cause* of the the adverse . . . action." Naumovski, 934 F.3d at 214. Under Title IX, a plaintiff's claim of discrimination based on sex is analyzed under the lessened causation standard that sex was "a motivating factor of the adverse action." *See* Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994); see also Naumovski, 934 F.3d at 214.

**B. Title IX And Equal Protection Discrimination Analysis Under the McDonnell Douglas Burden-Shifting Framework**

Title IX prohibits subjecting a student to discrimination on account of sex, and thus "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." Yusuf, 35 F.3d at 715. Plaintiff's Title IX and Equal Protection claims sound in selective enforcement. In selective enforcement, "the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Id. "A plaintiff must show that 'gender bias was a motivating factor' behind . . . the severity of the penalty." Yu v. Vassar College, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015). A plaintiff can meet that burden through either direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination.

The McDonnell Douglas burden-shifting framework is as follows:

> [I]n the initial phase of the case, the plaintiff can establish a prima facie case without evidence sufficient to show discriminatory motivation.... If the plaintiff can show (1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action;

and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation, such a showing will raise a temporary "presumption" of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff.

However, once the employer presents evidence of its justification for the adverse action, joining issue on plaintiff's claim of discriminatory motivation, the presumption "drops out of the picture" and the McDonnell Douglas framework "is no longer relevant."

At this point, in the second phase of the case, the plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her.

Doe v. Columbia, 831 F.3d at 54, quoting Littlejohn, 795 F.3d at 307-08.

In short, if the plaintiff succeeds in establishing a *prima facie* case of discrimination, then the defendant must come forward with and articulate a legitimate, non-discriminatory reason for the adverse treatment against plaintiff. Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 92 (2d Cir. 2011).

Once the defendant meets this burden of production, the burden shifts back to the plaintiff to prove that the defendant's stated reason is false and the real reason for the adverse action was discrimination based upon sex. *See* Ruiz, 609 F.3d at 492. "[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason." (Emphasis in original.). St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

With regard to plaintiff's Equal Protection claim, at the third stage of the McDonnell Douglas analysis, "a plaintiff asserting a § 1983 claim bears a higher burden [than Title VII or Title IX] in establishing that the . . . nondiscriminatory reason for the adverse . . . action is 'pretextual.' To establish 'pretext' under Title VII, a plaintiff need only establish 'that discrimination played a role in an adverse employment decision.'" Naumovski, 934 F.3d at 214. "A § 1983 plaintiff's burden at the third stage of the McDonnell Douglas analysis is not simply to establish that discrimination played *some* role in [the adverse action] but that it played a

decisive role. In other words. . . . [the plaintiff] must establish that a reasonable jury could find that Defendants would not have [taken adverse action against plaintiff] based on their stated reason alone." Id. at 217 (emphasis in original).

**1. Plaintiff cannot satisfy the fourth prong of the *prima facie* standard required to demonstrate her Title IX claim against UConn, i.e., that plaintiff's athletic grant-in-aid was terminated under circumstances giving rise to an inference of discrimination.[2]**

With respect to the fourth prong of the *prima facie* standard, plaintiff alleges that UConn and UConn individual defendants subjected her to different disciplinary actions and sanctions from male student-athletes; that male student-athletes engaged in similar acts of unsportsmanlike conduct without any impact on their athletic grant-in-aid; and that male student-athletes engaged in "more inappropriate" conduct than she did without having their athletic grant-in-aid revoked. (Complaint, ¶¶ 62-63) (Ex. 48 Radwan Depo. pp. 225:9-230:18).

The party asserting a selective enforcement claim must point to evidence that students of the opposite sex in "circumstance sufficiently similar to his own" were treated more favorably. Yu, 97 F. Supp. 3d at 480. It is not sufficient to cite to instances where male and female students were disciplined differently if the circumstances surrounding their discipline were not similar. Id.

Within the context of Title VII (and the Equal Protection Clause), the Second Circuit has defined the similarly situated standard as follows:

> an employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct. . . . The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. In other words, the comparators must be similarly situated to the plaintiff in all material respects.

> Ruiz, 609 F.3d at 493-94; *see also* Raspardo, 770 F.3d at 126.

Plaintiff is unable to present evidence of comparators-- male student-athletes who were

---

[2] Ruiz v. County of Rockland, 609 F.3d 486, 49 (2d Cir. 2010).

similarly situated to her in all material aspects.  There are no male student-athletes who made an obscene gesture on national television at the conclusion of competition from 2013 to 2016; nor are there any male student-athletes who were reprimanded by the AAC for their behavior during this period of time.  [SOF ¶ 44].

Plaintiff alleges in her complaint that the following male student-athletes were comparators who did not have their athletic grant-in-aid cancelled: ████████████████  ████████████████████████████████████████████████████  ████████████████████████████████████████████████████  ████████████████████████ ██████████ ████████████████████████████ For the reasons that follow, no reasonable jury could find that these male student-athletes were similarly situated to plaintiff in all material respects; therefore plaintiff fails to meet the fourth prong of the *prima facie* <u>McDonnell Douglas</u> standard.







"To be considered similarly situated, an individual must have been treated more favorably by the same decisionmaker that dealt with the plaintiff." <u>Russell v. New York University</u>, 1:15-cv-

2185-GHW, 2017 WL 3049534 *32 (S.D.N.Y. July 17, 2017) (plaintiff's Title VII claim against NYU failed, in part, because plaintiff failed to create an inference of discrimination by comparison to a male employee ("comparator") because the comparator no longer reported to the same supervisor as plaintiff when it was discovered that comparator engaged in arguably similar behavior as plaintiff); *see also* <u>Baity v. Kralik</u>, 51 F. Supp. 3d 414, 447 (S.D.N.Y. 2014) (plaintiff failed to create an inference of discrimination by comparison to another employee because no reasonable jury could find that a comparator employee identified by plaintiff was similarly situated because different decision-makers were involved in comparative employment decisions).

David Benedict ("AD Benedict") was the UConn Athletic Director in Fall 2016; he was appointed to that position effective March 21, 2016. [SOF ¶ 150]. AD Benedict was not even aware that AD Manuel cancelled plaintiff's athletic athletic grant-in-aid until she filed the present case against UConn and UConn individual defendants on or about December 19, 2016. [SOF ¶ 151]. "Because intent is the critical issue [in disparate treatment cases], only a comparison between persons evaluated by the same decision-maker is probative of discrimination." <u>Smith v. Xerox Corp.</u>, 196 F.3d 358, 370-71 (2d Cir. 1999), o*verruled on alternate grounds by* <u>Meachem v. Knolls Atomic Power Lab</u>, 461 F.3d 134, (2d. Cir. 2006); *see also* <u>Conway v. Microsoft</u>, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) (Plaintiff alleged he was subject to discriminatory discipline based on his race and gender. The comparator identified by plaintiff was not similarly situated, in part, because co-employee reported to a different supervisor and comparator's alleged misconduct was investigated by his supervisor. The plaintiff's supervisor was unaware of the comparator's behavior or what discipline the comparator received). An employer's intent to discriminate is "evaluated by reference to the decision-maker actually ordering the adverse employment action. . . ." <u>Woodman v. WWOR-TV, INC.</u>, 411 F.3d 69, 89 (2d Cir. 2005). Accordingly, there is no inference of discrimination based on sex that may be raised by AD Manuel's decision to cancel plaintiff's athletic grant-in-aid and Mr. Benedict's decisions relating to athlete discipline.





████████████████████████████████

████████████████

Ms. Radwan fails to identify any male comparators and is therefore unable to satisfy the fourth prong of the *prima facie* standard necessary to demonstrate that she was subject to discrimination on the basis sex in violation of Title IX.

### 2. Plaintiff cannot meet the fourth prong of the *prima facie* standard under the Equal Protection Clause as that claim relates to Leonidas Tsantiris.

With regard to plaintiff's Equal Protection claim against Coach Tsantiris, she fails to meet the fourth prong of the *prima facie* standard because she cannot identify any male student-athletes over which Coach Tsantiris had any authority, let alone ability, to make recommendations regarding their discipline or athletic grant-in-aid.

Coach Tsantiris was the women's soccer coach at the time plaintiff was a member of the team. Coach Tsantiris had only coached women's soccer at UConn from 1981 to December, 2017 when he retired. Coach Tsantiris only had authority over the members of the women's soccer team. [SOF ¶ 8]. He had no authority to discipline student-athletes who were not members of the women's soccer team. [Id.]. Plaintiff only alleges that the different, less punitive discipline issued to male student-athletes for more serious misconduct demonstrates that Ms. Radwan was discriminated because of her sex. [Complaint, ¶¶ 62-63] [Ex. 48 Radwan Depo. p. 225:16-23]. These allegations are insufficient to raise an inference that Coach Tsantiris discriminated against plaintiff on the basis of sex because Coach Tsantiris was not involved with any decision that related to disciplining male student-athletes. Woodman v. WWOR-TV Inc. 411 F.3d at 89; Smith v. Xerox, 196 F.3d at 370-71.

Coach Tsantiris had no authority to determine what discipline, if any, the male student-athletes identified in plaintiff's complaint should receive. [SOF ¶ 8]. Nor did Coach Tsantiris have any personal involvement with the disciplinary matters that involved the male student-athletes identified in plaintiff's complaint. [SOF ¶ 8]. Accordingly, none of the male student-

athletes that plaintiff identifies in her complaint are comparators whose different treatment from her may raise an inference that Coach Tsantiris discriminated against plaintiff on the basis of sex under the Equal Protection Clause of the Fourteenth Amendment.  Under the facts of the present case, "to be similarly situated, a player must have dealt with the same coach, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their [coach's] treatment of them for it." Heike, 519 Fed. Appx. at 920.

### 3. Plaintiff cannot meet the fourth prong of the *prima facie* standard under the Equal Protection Clause as that claim relates to AD Manuel.

With regard to plaintiff's Equal Protection claim against AD Manuel, the football players that she identifies as comparators (Complaint, ¶¶ 68, 69, 70) did not engage in the alleged "misconduct" when AD Manuel was the UConn athletic director. [SOF ¶¶ 6, 150].  Beginning in March 7, 2016, AD Manuel was no longer the Athletic Director at UConn and had no authority to make decisions about whether the UConn athletic department should impose any type of discipline on these student-athletes. [Id.].  Accordingly, the three football players identified in plaintiff's complaint, as discussed *supra*, *at pp. 11-15*  are not comparators, and any difference in discipline that they may have received when David Benedict was Athletic Director from discipline that  plaintiff received cannot raise an inference that AD Manuel discriminated against her on the basis of her sex.

As to the remaining male student-athletes that plaintiff identifies in her complaint, they are not comparators for the reasons articulated *supra, at p. 9-11,* and therefore, plaintiff fails to raise a *prima facie* case of discrimination based on sex against AD Manuel.

**4. In the event the court concludes that plaintiff has stated a *prima facie* case, there is no evidence that UConn or its employees' (Coach Tsantiris and AD Manuel) stated basis for terminating plaintiff's athletic grant-in-aid was pretext; i.e., the reason given was false, and that the real reason was discrimination based on sex.**

The custom and practice of UConn Athletic Department when a student-athlete's athletic grant-in-aid is cancelled for disciplinary reasons (under both AD Manuel and AD Benedict) is that the student's coach makes a recommendation to the team's assigned sport administrator and then the recommendation is brought to the athletic director for final decision. [SOF ¶¶ 53, 152] Only if the athletic director agrees with the coach's rationale for cancelling athletic grant-in-aid for disciplinary reasons is the final decision made to cancel aid. [SOF ¶¶ 53, 152]

In the present case, Coach Tsantiris recommended to SA Eskin and then to AD Manuel (with SA Eskin's support) that Ms. Radwan's athletic grant-in-aid should be cancelled because of her behavior at the end of the UConn-USF AAC championship game, and AD Manuel made the final decision that plaintiff's athletic grant-in-aid could be cancelled for serious misconduct. [SOF ¶¶ 64-67]. Plaintiff's behavior violated a women's soccer team rule and UConn Student-Athlete Code. [SOF ¶¶ 22, 26, 34]. Her behavior reflected poorly on the UConn women's soccer program and UConn. [SOF ¶¶ 32, 34]. The incident took away from the team celebration. [SOF ¶¶ 32, 34, 58]. Coach Tsantiris and UConn had to immediately focus on plaintiff's obscene gesture that was broadcast live on ESPNU. [SOF ¶¶ 30, 33-37]. The women's soccer team had not advanced to the NCAA tournament in 4 years; it was the first time since 2004 that the team won a conference tournament championship; and plaintiff's behavior diverted UConn and the coaches' attention from this achievement. [SOF ¶ ¶ 29, 34]. Coach Tsantiris immediately issued a formal apology on behalf of UConn and the women's soccer team. [SOF ¶ 37]. Following the apology, the UConn Athletic Department communicated with the AAC about Ms. Radwan's conduct whereby the AAC determined that Ms. Radwan violated the AAC Code of Conduct that resulted in the AAC letter of reprimand against Ms. Radwan. [SOF ¶¶ 39-43]. Plaintiff was advised of the AAC letter of reprimand on November 11, 2014. [SOF ¶ 43].

Plaintiff alleges in her complaint, contrary to her sex discrimination claim, that her athletic grant-in-aid was cancelled because Coach Tsantiris wanted to free up athletic grant-in-aid money to offer to ███████████, a Notre Dame women's soccer player who expressed interest in transferring to UConn in December 2014. [Complaint, ¶ 40]. Although the defendants deny these allegations, even if this were true, cancelling plaintiff's athletic grant-in-aid so that it could be offered to another female student-athlete undermines any inference that the true reason defendants cancelled her athletic grant-in-aid was because of her sex. *See* White v. Pacifica Found., 973 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) ("The fact that Plaintiff was replaced by a member of the same protected class further undermines any inference of discriminatory intent."); and cases cited therein.

While plaintiff disagrees with UConn's decision to cancel her athletic grant-in-aid, she cannot show that her athletic grant-in-aid was terminated because of gender discrimination. Absent such a showing, there is no basis for the court to second guess UConn's and AD Manuel's decision (and Coach Tsantiris recommendation) to cancel plaintiff's athletic grant-in-aid. *See* Wood v. Strickland, 420 U.S. 308, 326 (1975)(overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982) which changed qualified immunity test, making it an easier standard) ("It is not the role of the federal courts to set aside the decisions of school administrators which the court may view as lacking a basis in wisdom or compassion . . . and § 1983 was not intended to be a vehicle for federal-court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees."); Heike, 519 Fed. Appx. at 918 ("It may be appropriate to give coaches somewhat more deference than ordinary employers. But any such leeway comes from the broad range of legitimate, nondiscriminatory reasons a coach may have for deciding who plays, how much they play, and whether they stay on the team from year to year, not any special per se rule applicable to college coaches")*, see also* Doe v. University of Denver, Civil Action No. 16-cv-00152-PAB-KMT, 2018 WL 1304530 *12 (D. Colorado, Mar. 13, 2018). Absent impermissible discrimination or violation of a constitutional right, the court "should refrain from second-guessing the disciplinary

decisions made by school administrators." <u>Davis v. Monroe Cty. Bd. Of Educ.</u>, 526 US. 629, 648 (1999)*; see also* <u>Montana v. First Federal Savings & Loan Ass'n</u>, 869 F.2d 100, 106 (2d Cir. 1989) (*the district court is not to act as a "roving commission to review business judgement").*

**C. Plaintiff's § 1983 claims against Mona Lucas alleging Equal Protection Clause violation must be dismissed because Ms. Lucas had no personal involvement.**

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." <u>Shomo v. City of New York</u>, 579 F.3d 176, 184 (2d Cir.2009). As articulated in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009), "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through his own individual actions, has violated the Constitution."

"[I]n disparate treatment cases brought pursuant to § 1983, liability for an Equal Protection Clause violation . . . requires personal involvement by a defendant, who must act with discriminatory purpose." <u>Raspardo</u>, 770 F.3d at 125. "Individual liability under § 1983 for disparate treatment requires us to examine each individual defendant's actions to determine whether [they] treated the plaintiff[] disparately on the basis of sex." <u>Id.</u>

There is no evidence (or even an allegation) that Ms. Lucas had any personal involvement with the decision to cancel plaintiff's athletic grant-in-aid because she showed her middle finger to the ESPNU camera on November 9, 2014. [SOF ¶ 79]. *See* <u>Ashcroft</u>, 556 U.S. at 682 (claimant "needs to allege more by way of factual content to 'nudg[e]' his claim . . . 'across the line from conceivable to plausible'"). Accordingly, judgment must enter for Ms. Lucas on plaintiff's Equal Protection claim.

**II. PLAINTIFF'S PROCEDURAL DUE PROCESS CLAIM AGAINST UCONN INDIVIDUAL DEFENDANTS FAILS BECAUSE HER ATHLETIC GRANT-IN-AID WAS NOT A PROTECTED PROPERTY INTEREST; AND IN THE ALTERNATIVE, PLAINTIFF WAS PROVIDED ALL THE PROCESS SHE WAS DUE WHEN HER ATHLETIC GRANT-IN-AID WAS CANCELLED; AND AD MANUEL AND COACH TSANTIRIS HAD NO PERSONAL INVOLVEMENT IN THE ALLEGED VIOLATION OF PLAINTIFF'S PROCEDURAL DUE PROCESS RIGHTS.**

**A. Plaintiff's athletic grant-in-aid was not a protected property interest.**

Plaintiff claims that UConn individual defendants violated her procedural due process rights because no hearing was held regarding her cancelled athletic grant-in-aid. [Complaint, ¶¶ 109, 111] Plaintiff's procedural due process claim fails because her athletic grant-in-aid was not a protected property interest.

To succeed on a claim of deprivation of procedural due process under the Fourteenth Amendment, a plaintiff must establish that state action deprived her of a "protected property interest" and that the procedures followed by the State were constitutionally deficient. *See* Victory v. Pataki, 814 F.3d 47, 59 (2d Cir. 2016). Plaintiff alleges, "[t]he Plaintiff's contract with Defendant UConn created a property interest both in its protection against cancellation absent serious misconduct or other conditions and in the completion of its terms."[5] [Complaint, ¶ 103.] As a matter of law, the grant-in-aid agreement did not create a protected property interest. Property interests that are protected by the Due Process Clause of the Fourteenth Amendment are created or defined by "existing rules or understandings that stem from an independent source such as state law. . . . Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). Thus, when determining whether a plaintiff has a claim of entitlement, courts focus on the applicable statute, contract or regulation that purports to establish it." Gizzo, 44 F. Supp. 3d 374, 381 (S.D.N.Y. 2014); *see also* Martz v. Inc. Vill. of Valley Stream, 22 F.3d 26, 30 (2d Cir. 1994).

---

[5] Judge Thompson recently held in Macellaio v. Semple, Civil No. 3:12CV1674 (AWT) 2014 WL 3836867 (D. Conn. Aug. 4, 2014) that even within the context of prison procedures, when a state law specifies procedures it does not create a "federally protected due process entitlement to specific state-mandated procedures." Id. at *2. *See, e.g.,* Bell v. McAdory, 820 F.3d 880, 884 (7th Cir. 2016)("Although the Due Process Clause sometimes requires procedures, as a matter of federal law, when state statues and regulations define substantive entitlements, it does not treat state procedural requirements as property interest in their own right.")

The purported source of plaintiff's alleged protected property interest in this case is the grant-in-aid agreement, or contract.[6] Not every contract benefit rises to the level of a constitutionally protected property interest. Ezekwo v . NYC Health and Hopsitals Corp., 940 F. 2d 775 (2d Cir. 1991). "It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state actor into a federal claim." Id. at 782; see also Costello v. Town of Fairfield, 811 F.2d 782, 784 (2d Cir. 1987).

Ordinary or routine contracts do not, by themselves, give rise to a protected property interest. Gizzo, 44 F. Supp. 3d. at 385, and cases cited therein.[7] "The Second Circuit has held that, where a complaint alleges the breach of an ordinary contract, 'the right to payment on such a contract does not rise to the level of a constitutionally protected property interest.'" Res. Servs., LLC v. City of Bridgeport, 590 F. Supp. 2d 347, 358 (D. Conn. 2008), quoting Martz, 22 F.3d at 31. A distinguishing characteristic of a contract that gives rise to a protectable property interest is that the contract "protects its holder from the state's revocation of a status, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits [Goldberg v. Kelly, 397 U.S. 254 (1970)], or permanence in the case of tenure [Roth], or sometimes both." Gizzo, 44 F. Supp. 3d, at 385, quoting S&D Maintenance, 844 F.2d at 966); see also Walentas v. Lipper, 862 F.2d 414, 418-19 (2d. Cir. 1988) ("Here, . . . as in S & D Maintenance, we need not definitively resolve the question whether the contractual rights asserted . . . are of the kind protectable under section 1983, because they had not in any event achieved that concreteness of entitlement required by Roth and its progeny.") Lastly,

---

[6] Plaintiff alleges, "[t]he Plaintiff's contract with Defendant UConn created a property interest both in its protection against cancellation absent serious misconduct or other conditions and in the completion of its terms." (Complaint, ¶ 103.)

[7] In the event that plaintiff asserts that she had a protected property interest to participate in UConn's women's soccer team, this claim fails as well. A student-athlete does not have a constitutionally protected interest in participating in interscholastic sports. See, e.g., Immaculate Heart Cent. Sch. v. New York State Pub. High Sch. Athletic Ass'n, 797 F. Supp. 2d 204, 217 (N.D.N.Y. 2011) (citing cases); see also Karmanos v. Baker, 816 F.2d 258, 260 (6th Cir. 1987) (holding plaintiff did not have a constitutionally protected right to participate in intercollegiate athletics); Graham v. Nat'l Collegiate Athletic Ass'n, 804 F.2d 953, 959 (6th Cir. 1986); and Awrey v. Gilbertson, 833 F. Supp. 2d 738, 742 (E.D. Mich. 2011).

"[e]mployment contracts receive special treatment." <u>Gizzo</u>, 44 F. Supp. 3d at 385-86 and cases cited therein. *See* <u>Grasson v. Board of Educ.</u>, 24 F. Supp. 3d 136, 151 (2014).

Applying these principles to the facts of the present case, as a matter of law, plaintiff's grant-in-aid funds for spring 2015 are not a protected property interest. Plaintiff's interest in UConn's compliance with the grant-in-aid agreement was that she would not be required to pay for her cost of attendance at UConn for spring 2015. This is a purely monetary interest.  It is unlike the plaintiff's interest in <u>Goldberg v. Kelly</u>, (entitlement to welfare benefits conferred by statute) and <u>Board of Regents v. Roth</u>, (tenured status in public employment).  Nor is plaintiff's interest in the grant-in-aid for spring 2015 similar to a property interest in the employment context that "arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship without cause." <u>S&D Maintenance</u>, 844 F.2d at 967. *See* <u>Contiguous Towing, Inc. v. State</u>, 202 F. Supp. 3d 269, 275-76 (E.D.N.Y. 2016).

**B. Even if the due process clause is implicated in this case, the defendants provided the plaintiff all the process that was due.**

Nonetheless, even if the court were to hold that the grant-in-aid agreement was a protected property interest, the Connecticut state law breach of contract process that was available to plaintiff to resolve her contract dispute with UConn would have provided sufficient procedural due process. <u>Lujan v. G&G Fire Sprinklers, Inc.</u>, 532 U.S. 189, 196-97 (2001)*; see also* <u>DeMartino v. New York Department of Labor</u>, 712 Fed. Appx. 24, 26 (2017); <u>Tucker v. Darien Bd. Of Education</u>, 222 F. Supp. 2d 202, 206 (D. Conn. 2002).

Plaintiff is now time-barred from filing a breach of contract claim against UConn. Pursuant to Conn. Gen. Stat. § 4-160, a claim must be filed within one year of the alleged breach. At the very latest, plaintiff would have been required to file this claim by February 2016. Notwithstanding, plaintiff had a reasonable period of time to file her claim (one year) and cannot claim a due process violation because her claim is now time barred. *See* <u>Giglio v. Dunn</u>, 732

F.2d 1133, 1135 n. 1 (2d Cir. 1984) (Plaintiff, a tenured teacher resigned. New York State law provided a procedure whereby a tenured teacher could challenge the voluntary nature of their resignation. Court held plaintiff was not deprived of due process because he failed to use the procedure. Further, that he may be time barred from the procedure did not provide him with a legitimate claim that he was denied due process.)

Moreover, plaintiff was provided with the procedural process specified in the grant-in-aid agreement and NCAA by-laws. Plaintiff was provided notice that her grant-in-aid agreement was being terminated because of serious misconduct and she was provided an opportunity to be heard. [SOF ¶¶ 80-81]. "The core [of due process] is the right to notice and a meaningful opportunity to be heard." LaChance v. Erickson, 522 U.S. 262, 266 (1998). Plaintiff failed to timely request a hearing as specified in the termination letter and UConn policies and procedures, and her hearing request was denied. [Complaint ¶ 44, Ex. Q, ¶ 45; Answer ¶¶ 44,45; SOF ¶¶ 80-82, 109-110]. See Milo v. University of Vermont, No. 2:12-cv-124, 2013 WL 4647782 *10 (D. Vt. Aug. 29, 2013) (male hockey player failed to request a hearing to challenge his dismissal from the team, failed to demonstrate that he was denied due process).

Lastly, NCAA Bylaws (2014-15) would have prohibited UConn Financial Aid from giving plaintiff any relief even if a hearing had been held and she had successfully appealed her cancelled athletic grant-in-aid. NCAA bylaw 15.02.7 provides in relevant part: "The period of award begins when the student-athlete receives any benefits as a part of the student's grant-in-aid on the first day of classes for a particular academic term, or the first day of practice, whichever is earlier, and continues until the conclusion of the period set forth in the financial aid agreement." Also, NCAA Bylaw 15.01.1.1 provides in relevant part: "Financial Aid to Attend Another Institution. An institution may not provide financial aid to a student-athlete to attend another institution, except as specifically authorized by NCAA legislation."

Plaintiff's untimely request for hearing was made on the same day that she cancelled her enrollment from UConn and the day after she sought a release from her National Letter of Intent to UConn. [SOF ¶ 108]. Plaintiff was no longer enrolled at UConn on January 16, 2015, when

her request to cancel her enrollment was processed by Student Affairs. [SOF ¶¶ 101-102]. On January 22, 2015, plaintiff accepted the written athletic grant-in-aid offer from Hofstra. Plaintiff's first day of class at Hofstra was January 27, 2015, and was the beginning of her grant-in-aid award term at Hofstra. [SOF ¶¶ 103, 105]. Moreover, NCAA bylaws would have prohibited UConn from providing financial aid to plaintiff to attend Hofstra. Accordingly, under these circumstances, NCAA bylaws would have prohibited plaintiff from receiving any relief even if a hearing had been held and she successfully appealed her cancelled athletic grant-in-aid.

**C. AD Manuel and Coach Tsantiris were not personally involved with plaintiff's claim of alleged procedural due process rights violation.**

As discussed *supra*, in order to state a cognizable claim under § 1983, plaintiff must allege and ultimately prove "a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." Warren v. Pataki, 823 F.3d 125, 136 (2d Cir. 2016).

With regard to AD Manuel and Coach Tsantiris, plaintiff does not allege (nor is there any evidence) that they had personal involvement in plaintiff's claim that her procedural due process rights were violated. [SOF ¶ 114]. Ms. Lucas was the UConn employee that denied Ms. Radwan's request for hearing because her hearing request was untimely. [SOF ¶ 113]. Thus, on this additional basis, plaintiff's procedural due process claim under § 1983 must be dismissed against AD Manuel and Coach Tsantiris.

**III. PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM AGAINST UCONN INDIVIDUAL DEFENDANTS FAILS BECAUSE PLAINTIFF DID NOT ENGAGE IN PROTECTED SPEECH; AND WITH REGARD TO MONA LUCAS, PLAINTIFF HAS FAILED TO ALLEGE THAT SHE HAD ANY PERSONAL INVOLVEMENT IN PLAINTIFF'S ALLEGED VIOLATION OF HER FIRST AMENDMENT RIGHTS**

A plaintiff asserting a First Amendment retaliation claim must advance non-conclusory evidence establishing: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection

between the protected speech and the adverse action." <u>Garcia v. S.U.N.Y. Health Scis., Ctr.</u>, 280 F.3d 98, 106-07 (2d Cir. 2001).

The First Amendment protects symbolic or expressive conduct in addition to actual speech. <u>Church of American Knights of the Ku Klux Klan v. Kerik</u>, 356 F.3d 197, 205 (2d Cir. 2004). The relevant inquiry is whether plaintiff, a member of the UConn women's soccer team, showing her middle finger to the ESPNU camera while she was on the soccer field constituted expressive conduct that can be protected under the First Amendment. *See* <u>NYC C.L.A.S.H. v. City of New York</u>, 315 F. Supp. 2d 461, 476 (S.D.N.Y. 2004).

In determining whether particular conduct is sufficiently expressive to implicate the First Amendment, therefore the test is whether "[an] intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." <u>Id.</u> at 476-77, quoting <u>Texas v. Johnson</u>, 491 U.S. 397, 404 (1989). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies, and that party must advance more than a mere 'plausible contention' that its conduct is expressive." <u>Kerik</u>, 356 F. 3d at 205, quoting <u>Clark v. Community for Creative Non-Violence</u>, 468 U.S. 288, 293 n. 5 (1984).

Based upon the facts alleged in plaintiff's complaint and asserted at her deposition, plaintiff's act of showing her middle finger to the ESPNU camera is not protected speech because she concedes she did not intend to show her middle finger and, therefore, she could not have intended to express or convey a message through her conduct. [Complaint ¶ 14; Ex. 48 Radwan Depo. p. 187:6-11][SOF ¶ 30]. Indeed, in plaintiff's verified complaint, she alleges that she "inadvertently in celebration showed her middle finger to an ESPNU camera." [Complaint, ¶ 14]. Plaintiff does not even allege that her conduct conveyed a message where the likelihood "was great" that it "would be understood by those who viewed it." <u>NYC C.L.A.S.H.</u>, 315 F. Supp. 2d at 476-77. Even if plaintiff intended to show her middle finger to the ESPNU camera, a reasonable person watching her on TV, the internet or in person would not understand to whom she was directing her conduct or the message she was conveying.

With regard to Mona Lucas, plaintiff has failed to allege any facts (or produce any evidence) that Ms. Lucas had personal involvement in the alleged retaliation against her because of her conduct-- a requirement necessary for plaintiff to prevail on her First Amendment retaliation claim.  Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir.2005); *see also* Farid v. Ellen, 593 F.3d 233, 249 (2d Cir.2010). AD Manuel and Coach Tsantiris were the UConn employees who recommended and decided that plaintiff's athletic grant-in-aid should be cancelled because of plaintiff's serious misconduct. [SOF ¶¶ 64-66].  Thus, on this additional basis, plaintiff's First Amendment retaliation claim brought pursuant to § 1983 must be dismissed against Ms. Lucas.

## IV. PLAINTIFF'S BREACH OF CONTRACT CLAIM AGAINST UCONN INDIVIDUAL DEFENDANTS FAILS AS A MATTER OF LAW AND PLAINTIFF'S NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM IS BARRED BY STATUTORY IMMUNITY AS PROVIDED IN CONN. GEN. STAT. § 4-165

### A. As a matter of law, plaintiff's breach of contract claim against UConn individual defendants fails because only UConn was a party to the grant-in-aid agreement with plaintiff.

Plaintiff brings a breach of contract claim against all defendants: UConn, AD Manuel, Coach Tsantiris and Ms. Lucas.  After the court's ruling on the Motion to Dismiss [Dkt. 29], these claims remain only against AD Manuel, Coach Tsantiris and Ms. Lucas in their individual capacities.  As a matter of law, the breach of contract claim fails against all defendants.  Only parties to contracts are liable for their breach, "[t]hus, as a general rule, [an action] for breach of contract may not be maintained against a person who is not a party to the contract. . . ." (Citations omitted.) FCM Group, Inc. v. Miller, 300 Conn. 774, 798 (2011); *see also* East Point Systems, Inc. v. Maxim, CIVIL ACTION NO. 3:13-cv-00215(VAB), 2016 WL 1118237 *7 (D. Conn. March 22, 2016)(Bolden, J.).  Accordingly, only UConn could be liable for an alleged breach of contract claim which must be presented to the Claims Commissioner pursuant to Conn. Gen. Stat. § 4-141, et seq. None of the UConn individual defendants were parties to the grant-in-aid agreement; Ms. Lucas and Coach Tsantiris signed the agreement as UConn employees. [SOF

¶ 17; Complaint, Ex. A and C]. *See, e.g.*, Whitlock's, Inc. v. Manley, 123 Conn. 434, 437 (1937) ("[i]f a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone, unless credit has been given expressly and exclusively to the agent, and it appears that it was clearly his intention to assume the obligation as a personal liability . . ."). Only UConn is a party to the grant-in-aid with plaintiff. The breach of contract claim against UConn individual defendants fails as a matter of law.

## B. Plaintiff's Claim of Negligent Infliction of Emotional Distress Against UConn Individual Defendants is Barred by Statutory Immunity Provided in Conn. Gen. Stat. § 4-165

Plaintiff's negligent infliction of emotional distress claim, is barred by statutory immunity as provided in Conn. Gen. Stat. § 4-165.[8] The Connecticut Supreme Court held in Miller v. Egan, 265 Conn. 301, 319 (2003), that state employees may not be held personally liable for their negligent actions performed within the scope of their employment. "[Conn. Gen. Stat.] § 4-165 makes clear that the remedy available to plaintiffs who have suffered harm from the negligent actions of a state employee who acted in the scope of his or her employment must bring a claim against the state . . . namely, chapter 53 of the General Statutes, which governs the office of the claims commissioner." Id. at 319-20; *see also* Conn. Gen. Stat. §§ 4-141 through 4-165c. Accordingly, plaintiff's negligent infliction of emotional distress claim is barred by Conn. Gen. Stat. § 4-165. Elliott v. City of Hartford, No. 3:09CV00948(AWT), 2011 WL 1045451, at *5 (D. Conn. March 17, 2011) (Thompson, J.) (dismissing plaintiff's claim of negligent infliction of emotional distress as it is barred by Conn. Gen. Stat. § 4-165); and Ziemba v. Lynch, No. 3:11cv974 (SRU), 2013 WL 5232543, at *8 (D. Conn. Sept. 17, 2013)(Underhill, J.).

## V. QUALIFIED IMMUNITY FOR SECTION 1983 CLAIMS

---

[8] Connecticut General Statutes Sec. 4-165(a) provides, in relevant part: "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused by the discharge of his duties or within the scope of his employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter."

As alternative grounds for dismissal of plaintiff's § 1983 claims, the Court should conclude that the UConn individual defendants are entitled to the protection of qualified immunity under the circumstances of this case.  Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights — it is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation. Garcia v. Does, 779 F.3d 84, 91, 97 (2d Cir. 2015).  Qualified immunity protects government officials unless the official 1) violated a statutory or constitutional right that 2) was clearly established at the time of the challenged conduct. Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015), citing Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012).  To determine whether the defendants are entitled to qualified immunity the court is not required to decide first whether there is a constitutional violation before deciding whether the statutory or constitutional right is clearly established. Pearson v. Callahan, 555 U.S. 223, 236 (2009).  The court can conduct the analysis in the order it choses, either by first determining whether plaintiff has shown a constitutional violation, or by first determining whether any purported constitutional right was clearly established. Id. at  232. If the court determines that either one is not satisfied, it need not reach the other. Id. at 236.

"Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Coollick v. Hughes, 699 F.3d 211, 221 (2d Cir. 2012).  Even if a right is clearly established, a state official is entitled to qualified immunity if it was objectively reasonable for him to believe that his conduct was lawful. Gonzalez v. City of Schenectady, 728 F.3d at 154; see also Raspardo, 770 F.3d at 113 ("Answering this second inquiry  [whether a right was clearly established] requires determining whether a reasonable official would understand that his conduct violated the constitutional right in question.").  Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  As a result, qualified immunity "***protects all but the***

*plainly incompetent* or those who knowingly violate the law." (Emphasis added)*."*

Messerschmidt v. Millender*, __ U.S. __, 132 S. Ct. 1235, 1244 (2012).

Accordingly, a defendant is entitled to qualified immunity if "(1) the defendant's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for the defendant[s] to believe that [their] actions were lawful at the time of the challenged act." Tooly v. Schwaller, 919 F.3d. 165, 172 (2d Cir. 2019).

"Qualified immunity thus shields government officials from liability when they make 'reasonable mistakes' about the legality of their actions . . .  and 'applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' Pearson, 555 U.S. at 231." Sudler v. City of New York, 689 F.3d 159, 174 (2d Cir. 2012).  "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." Doninger v. Niehoff, 642 F.3d 334 at 345 (2nd Cir. 2011).

Whether a right is clearly established at the time the defendants acted depends upon whether: "(1) [the right] was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit confirmed the existence of the right, and (3) reasonable defendant[s]  would have understood that [their] conduct was unlawful. Id.; *see also* Wilson v. Layne, 526 U.S. 603, 615-17 (1999).

Whether the Defendants are entitled to qualified immunity is determined by looking at the law as it existed at the time of the Defendant's actions or decisions.  Even if plaintiff could prove a *prima facie* Equal Protection claim for sex discrimination, a First Amendment claim and Procedural Due Process claim against the defendants, they are entitled to qualified immunity. The subjective motivation of the official is irrelevant to this inquiry.  Anderson v. Creighton, 483 U.S. 635 at 641(1987).  In a situation in which officials of reasonable competence could disagree on the legality of the defendant's actions, the official is entitled to qualified immunity.  Lennon

v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995); Weg v. Macchiarola, 995 F.2d 15, 18 (2d Cir. 1993).

"Moreover, when faced with a qualified immunity defense, a court should consider the specific scope and nature of a defendant's qualified immunity claim. That is, a determination of whether the right issue was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition." Doninger, 642 F.3d at 345, quoting Saucier, 533 U.S. at 201.

Summary judgment is encouraged as a device for disposing of claims barred by such immunity in order to relieve government officials of the burdens of litigation. Harlow, 457 U.S. at 818; Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Once a trial is held, it is too late to vindicate the important purpose of qualified immunity that is, allowing the official to avoid standing trial. Mitchell v. Forsyth, 472 U.S. 511, 527 (1985); Mozzochi v. Borden, 959 F.2d 1174, 1177-78 (2d Cir. 1992).

As discussed in prior sections and incorporated by reference herein, this Court should conclude that Plaintiff cannot show that she suffered a violation of any constitutional right and, the Court need not proceed beyond the first prong of this inquiry. Williams v. Town of Greenburgh, 535 F.3d 71, 78 (2d Cir. 2008); *see also* Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074, 2083, (2011). A review of the record demonstrates that Plaintiff cannot show that she suffered a violation of any constitutional right and, therefore, the Court need not proceed beyond the first prong of this inquiry. *See* Huth v. Haslun, 598 F.3d 70, 73 (2d Cir. 2010). Notwithstanding, defendants are also entitled to qualified immunity based on the second prong of this inquiry.

**A. Mona Lucas**

With regard to Mona Lucas, plaintiff has failed to allege or produce evidence that Ms. Lucas had personal involvement in the decision related to disciplining the plaintiff for showing her middle finger to the ESPNU camera at the conclusion of UConn-USF's AAC championship game. The undisputed facts demonstrate that Ms. Lucas had no involvement at all with the

decision to cancel plaintiff's athletic grant-in-aid. [SOF ¶ 79]. Coach Tsantiris recommended to SA Eskin and AD Manuel that plaintiff's athletic grant-in-aid be cancelled for serious misconduct, and AD Manuel made the final decision that plaintiff's athletic grant-in-aid should be cancelled. [SOF ¶¶ 64-67]. Plaintiff received formal notice of her cancelled athletic grant-in-aid via email from Annie Fiorvanti with an attached letter from the Office of Financial Aid containing Mona Lucas's signature, signed on her behalf by an authorized representative. [SOF ¶¶ 80-81]. Ms. Lucas had no knowledge about plaintiff's behavior, or that Coach Tsantiris recommended and that AD Manuel made the final decision that Ms. Radwan's athletic grant-in-aid should be cancelled at the time that the Financial Aid letter was emailed to plaintiff. [SOF ¶¶ 79-80]. Accordingly, Mona Lucas had no personal involvement with plaintiff's alleged claim that her alleged First Amendment and Equal Protection rights were violated and is entitled to qualified immunity. Raspardo, 770 F.3d at 127.

Ms. Lucas is also shielded by qualified immunity against plaintiff's claim that she violated plaintiff's procedural due process rights. Even if the court determines that plaintiff had a protected property interest in her grant-in-aid agreement and that Connecticut state law breach of contract process that was available to plaintiff was insufficient procedural due process, qualified immunity shields Ms. Lucas against the plaintiff's procedural due process claim for denying plaintiff's untimely request for a hearing. Ms. Lucas did not violate plaintiff's clearly established procedural due process right. *See discussion supra, pp. 20-24.*

Moreover, it was objectively reasonable for Ms. Lucas to deny plaintiff's untimely request for a hearing. No case exists in the Second Circuit that requires college administrators to provide alterative procedures to a plaintiff who has failed to request a hearing within the specified time frame. Milo, 2013 WL 4647782 * *6,*10 (Plaintiff hockey player was dismissed from the team. Under the UVM Student Athletes Code of Conduct, plaintiff could have requested a hearing to appeal the dismissal within three business days. Plaintiff had notice of the appeal procedure and did not request a hearing. Plaintiff's § 1983 due process claim fails because he did not avail himself of the process provided for challenging a dismissal from the team); *see*

*also* <u>Tooly v. Schwaller</u>, 919 F.3d at 175 ("No case, in this Circuit or elsewhere, that had been cited to us has held that, where the defendant provides an opportunity for the plaintiff to receive due process at a meeting and the plaintiff, even for potentially valid reasons, fails to appear, the defendant must provide alternative procedures.") Ms. Lucas inquired with UConn Athletic Compliance staff about Ms. Radwan's untimely request and after this consultation determined that no hearing was required to be held. [SOF ¶ 109].

## B. Coach Tsantiris and AD Manuel

Objectively, Coach Tsantiris would not have suspected that his actions could violate any established constitutional right when he recommended canceling plaintiff's athletic grant-in-aid because of her behavior-- showing her middle finger to the ESPNU camera at the conclusion of the UConn-USF AAC championship game –which violated Women's Soccer Team rules, UConn Student-Athlete rules, AAC conference rules and the disruption caused by her behavior. [SOF ¶¶ 22, 26, 30, 33-37, 39-44, 53, 62(a), 64-68, 69]. Nor could AD Manuel have reasonably suspected that he could violate any of plaintiff's constitutional rights by approving Coach Tsantiris' recommendation and making the final decision to cancel plaintiff's scholarship for serious misconduct. [SOF ¶¶ 31, 32, 53, 66, 67].

### 1. First Amendment Claim

At the time of Coach Tsantiris's recommendation and AD Manuel's final decision relating to plaintiff's athletic grant-in-aid, it was not clearly established that the First Amendment protected the plaintiff's conduct (a student-athlete inadvertently showing her middle finger to a television camera at the conclusion of her college team's game while dressed in her school team uniform on the playing field) that reflected poorly on the UConn women's soccer team and the UConn. <u>Donniger</u>, 642 F.3d at 353-54. In December 2014, no case broadly held that under any and all circumstances, a student-athlete showing their middle finger while wearing their uniform and representing the University on the playing field has expressed protected speech.

Even if the court determines that the plaintiff's conduct was protected speech, Coach Tsantiris and AD Manuel are entitled to qualified immunity because any First Amendment right

that may have been violated here was not clearly established at the time of defendants acts, and it would not have been clear to a reasonable school official that their conduct was unlawful. Id. at 353.

The Second Circuit recently discussed the confusing state of law that governs restrictions on student free speech: "The law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges. The relevant Supreme Court cases can be hard to reconcile, and courts often struggle to determine which standard applies in any particular case." Id. at 353-54. Speech restrictions in elementary school, middle school and high school are governed by: Tinker v. DesMoines Independent Community School Dist., 393 U.S. 503 (1969)[9] (students silently protested Vietnam War by wearing black armbands to high school; school officials sought to suspend students; student's speech in school can be regulated if it threatens substantial disruption to the work and discipline of the school); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685–86 (1986) (upholding the disciplining of a high school student for a sexually explicit speech at a school assembly);[10] Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988) (upholding the censorship of a high school newspaper where it was "reasonably related to legitimate pedagogical concerns"); and Morse v. Frederick, 551 U.S. 430 (2007) (student suspension from school for displaying a banner that was perceived to encourage drug use). Even if the court holds that plaintiff's conduct was protected speech, it is unclear in the Second Circuit (and other Circuits) whether a university student's free speech could be restricted by University Officials in a manner that is governed by these cases.

---

[9] "It is not entirely clear whether Tinker's rule (as opposed to other potential standards) applies to all student speech not falling within the holding of Fraser, Hazelwood, or Morse." Donninger v. Niehoff, 642 F.3d 334, 353-54(2d Cir. 2011).

[10] See also R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist., 645 F.3d 533, 542 (2d Cir. 2011), ("Although the Supreme Court has not clarified the extent to which the Fraser doctrine applies in contexts beyond the facts of that case—specifically, beyond those situations in which a student speaker at a school assembly uses lewd language, see Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 677—we have not interpreted Fraser as limited either to regulation of school-sponsored speech or to the spoken word"); Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 214 (3d Cir.2001) ("To summarize: Under Fraser, a school may categorically prohibit lewd, vulgar, or profane language."); Doninger v. Niehoff, 527 F.3d 41, 49 (2d Cir. 2008) (stating that a student's off-campus Internet posting calling school administrators "douchebags" could have been prohibited under Fraser if it had occurred on-campus).

In <u>Doninger</u>, the Second Circuit noted that based upon Supreme Court precedent, public school students in elementary through high school could be "subject to regulation different from that permissible for adults in non-school settings." <u>Id.</u> at 354.; s*ee also* <u>Fraser</u>*,* 478 U.S. at 682, 106 S. Ct. 3159 ("It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school.").

With regard to University restrictions placed on student speech, the Third Circuit in <u>DeJohn v. Temple Univ.</u>, observed that "there is a difference between the extent that a school may regulate student speech in a public university setting as opposed to that of a public elementary or high school," and then the court examined University policy/ regulation that restricted student speech under the <u>Tinker</u> standard.  <u>DeJohn v. Temple Univ.</u>, 537 F.3d 301, 315 (3d Cir. 2008); see also <u>Hosty v. Carter</u>, 412 F.3d 731 (7th Cir. 2005) (individual college defendants entitled to qualified immunity for restrictions placed on college newspaper because of uncertainty of First Amendment analytical framework in public universities. "But even if student newspapers at high schools and colleges operate under different constitutional frameworks, as both the district judge and our panel thought, it greatly overstates the certainty of the law to say that any reasonable college administrator had to know that rule." <u>Id.</u> at 738.)

Accordingly, it was objectively reasonable for a government official in the Defendants' position of College coach and College Athletic Director to believe that plaintiff's behavior was not protected speech and even it was protected speech, that they were permitted to discipline the plaintiff's behavior under then existing case law.

It would be objectively reasonable for Mr. Manuel and Coach Tsantiris to conclude that Ms. Radwan's inappropriate gesture was obscene/lewd and punishable because it violated a team rule and the Student-Athlete Rules, it happened while plaintiff was clearly representing UConn and its women's soccer team (<u>Fraser</u>) and that the obscene gesture was disruptive to the degree required under <u>Tinker</u> as her conduct happened on television, was circulated extensively throughout the media and social media, required coach to issue a press release apologizing for

the behavior, required the UConn Athletic Department to respond to the AAC about the behavior and the AAC issued a letter of reprimand to plaintiff. [SOF ¶¶ 30, 37, 39-43].

"[I]f the court determines that the only conclusion a rational jury could reach is that reasonable defendants would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officials is appropriate. And *this* is the concern of qualified immunity doctrine." (Emphasis in original.) Donninger, 642 F.3d at 349.

### 2. Equal Protection

No clearly established right of the plaintiff has been violated as there is no evidence that any of the UConn individual defendants intentionally discriminated against her on the basis of gender. This finding alone would end the qualified immunity inquiry. *See* Bizzaro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005). Even if the court were to hold that summary judgment should not enter on the merits of the Equal Protection claim, Coach Tsantiris and AD Manuel are still entitled to qualified immunity. Given the case law as it existed in 2014 and as it still exists, it was objectively reasonable for Coach Tsantiris to believe that recommending to AD Manuel that plaintiff's athletic grant-in-aid should be cancelled because of her conduct at the end of the UConn-USF AAC championship game did not violate violate plaintiff's right to Equal Protection. Similarly, it was objectively reasonable for AD Manuel to believe that approving Coach Tsantiris's recommendation to cancel plaintiff's athletic grant-in-aid was not discriminating against the plaintiff on the basis of her sex. Coach Tsantiris' recommendation and AD Manuel's final decision to cancel plaintiff's athletic grant-in-aid were consistent with UConn athletic department custom and practice for cancelling a student-athlete's athletic grant-in-aid. Moreover, it was objectively reasonable for AD Manuel to believe that he was not violating the plaintiff's right to Equal Protection by only considering cancelling a student- athlete's athletic grant-in-aid when the athlete's coach recommended cancelling the athletic grant-in-aid.

### 3. Procedural Due Process Claim

With regard to plaintiff's procedural due process claim, Coach Tsantiris and AD Manuel are entitled to qualified immunity because there are no alleged facts or undisputed evidence that

demonstrates that they had any personal involvement with plaintiff's alleged claim that her Procedural Due Process rights were violated. <u>Ayers v. Coughlin</u>, 780 F.2d at 210.

**CONCLUSION**

Based upon the foregoing grounds, the defendants are entitled to summary judgment on all plaintiff's claims.

DEFENDANTS

WILLIAM TONG
ATTORNEY GENERAL


BY:    <u>*/s/* Rosemary M. McGovern</u>
Rosemary M. McGovern
Assistant Attorney General
Federal Bar No. ct19594
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5160
Fax: (860) 808-5084
Rosemary.McGovern@ct.gov

## <u>CERTIFICATION</u>

I hereby certify that on November 1, 2019, a copy of the foregoing *Memorandum of Law in Support of Defendants' Motion For Summary Judgment* was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

<u>/s/ Rosemary M. McGovern</u>
(#ct19594)
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5160
Fax: (860) 808-5084
Email: Rosemary.McGovern@ct.gov