## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NORIANA RADWAN | : | CIVIL ACTION NO. 3:16-CV-02091 (VAB) |
| PLAINTIFF, | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | NOVEMBER 1, 2019 |
| BOARD OF TRUSTEES, WARDE | : | |
| MANUEL, LEONARD TSANTIRIS, | : | |
| AND MONA LUCAS, INDIVIDUALLY, | : | |
| DEFENDANTS | : | |

## <u>INDEX TO SUMMARY JUDGMENT EXHIBITS</u>

Exhibit 1.     Affidavit of Paul McCarthy (With Exhibits 2 and 3)

Exhibit 2.         May 12, 2015 email with Weekly Spreadsheet

Exhibit 3.         February 16, 2016 Affidavit of Paul McCarthy

Exhibit 4.     Affidavit of Neal Eskin (With Exhibits 5-10)

Exhibit 5.         Nov. 10, 2014 12:22 pm email from Corum to Eskin

Exhibit 6.         Nov. 10, 2014 letter from Corum to Ferris

Exhibit 7.         Nov. 11, 2014 1:38 pm email from Ferris to Corum

Exhibit 8.         Nov. 11, 2014 2:32 pm email from Corum to Ferris

Exhibit 9.         Dec. 21, 2014 4:55 pm email from plaintiff to Manuel

Exhibit 10.         Dec. 23, 2014 email from plaintiff to Eskin

Exhibit 11.     Affidavit of Kimberly Hill (With Exhibit 12)

Exhibit 12.         2014-15 Student Code

Exhibit 13.     Affidavit of Ann Fiorvanti (With Exhibits 14-22)

Exhibit 14.         Feb. 10, 2014 National Letter of Intent

Exhibit 15.         NO EHXIBIT 15

Exhibit 16.         Aug. 4, 2014 Verification of documents received

Exhibit 17.         Dec. 22, 2014 Email from Fiorvanti to plaintiff, with attachments: letter by Athletics Compliance and UConn Financial Aid Hearing Procedures

Exhibit 18.         Dec. 22, 2014 Email from Cretors to plaintiff with attached letter to plaintiff from Lucas

Exhibit 19.         Jan. 13, 2015 NLI release request

Exhibit 20.          Transfer Eligibility Questionnaire

Exhibit 21.          Coach Diaco's deletion of Blackwell from football roster

Exhibit 22.          Coach Diaco's letter canceling Blackwell's grant-in-aid

Exhibit 23.     Affidavit of Margaret Rodriguez (With Ex. 24-32)

Exhibit 24.          Nov. 10, 2014 1:34 am email from Plaintiff to Rodriguez

Exhibit 25.          Nov. 10, 2014 12:50 pm email from Plaintiff Rodriguez

Exhibit 26.          Nov. 20, 2014 email from Plaintiff Rodriguez

Exhibit 27.          Letter from Plaintiff

Exhibit 28.          November 27, 2014 emails between Rodriguez and Plaintiff

Exhibit 29.          Dec. 2, 2014 email from Rodriguez

Exhibit 30.          Dec. 21, 2014 7:48 pm email from Plaintiff to Tsantiris, cc
                     Rodriguez and Manuel

Exhibit 31.          Dec. 22, 2014 1206 pm email from Rodriguez

Exhibit 32.          Screen shots of text messages between Rodriguez and Plaintiff

Exhibit 33.     Affidavit of Mona Lucas (Exhibits referred to are part of her June 17, 2019
                     deposition in this matter.)

Exhibit 34.     Affidavit of Douglas Gnodtke

Exhibit 35.     Affidavit of David Benedict

Exhibit 36.     Affidavit of Raymond Reid

Exhibit 37.     Affidavit of Maureen Armstrong (With Ex. 38)

Exhibit 38.          Screen shot of Dean of Student's records for online cancellation

Exhibit 39.     Affidavit of Amy Crim (With Ex. 40)

Exhibit 40.          Jan. 11, 2015 and Jan. 13, 2015 emails between Plaintiff and Res
                     Life and Amy Crim

Exhibit 41.     Affidavit of Zachary Shaw

Exhibit 42.     Affidavit of Leonidas Tsantiris

Exhibit 43.          UConn Women's Soccer contract for 2014

Exhibit 44.          Year-end meeting notes Dec. 2014, redacted

Exhibit 45.          Dec. 28, 2014 email from plaintiff to Tsantiris

Exhibit 46.     Manuel Deposition Excerpts

Exhibit 47.     Tsantiris Deposition Excerpts

Exhibit 48.     Radwan Deposition Excerpts

Exhibit 49.     Lucas Deposition Excerpts

Exhibit 50.   Riddiough Deposition Excerpts

Exhibit 51.   Cocks Deposition Excerpts

Exhibit 52.   Affidavit of Jessica Eads, Hofstra University, with exhibits attached.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NORIANA RADWAN<br>PLAINTIFF, | : CIVIL ACTION NO. 3:16-CV-02091 (VAB)<br>:<br>: |
| v. | : |
| UNIVERSITY OF CONNECTICUT<br>BOARD OF TRUSTEES, WARDE<br>MANUEL, LEONARD TSANTIRIS,<br>AND MONA LUCAS, INDIVIDUALLY,<br>DEFENDANTS | : October 9, 2019 |

## <u>AFFIDAVIT OF PAUL McCARTHY</u>

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I am currently employed at the University of Mississippi as the Senior Associate General Counsel/Athletics Compliance Officer.

3. I was employed in the University of Connecticut ("UConn") Department of Athletics from August 2006 until May, 2016; from March, 2012 until 2016, I was the Deputy Director of Athletics/Chief of Staff to Athletic Director Warde Manuel ("Athletic Director Manuel") and I reported directly to Athletic Director Manuel.

4. As part of my duties in the position of Deputy of Athletics/Chief of Staff in 2012 through May 2016, I was the assigned Sport Administrator for men's basketball and men's soccer.

5. In 2014-15, Kevin Ollie ("Coach Ollie") was UConn men's basketball coach.

6. In 2014-15, Ray Reid ("Coach Reid") was UConn men's soccer coach.

UConn SJM Exhibit 1

7. In 2014-15, as Sport Administrator to men's basketball and men's soccer, I was the designated senior administrator representing the Athletic Director's office to provide management oversight and assistance to the sport programs ; Coaches Ollie and Reid communicated to me directly relating to sport program administrative matters but, like all other UConn coaches, the direct supervisor was the Athletic Director Manuel.

8. During 2014-15, on a bi-weekly basis, Kim Hill of the Office of Community Standards ("Community Standards") would forward to me a spreadsheet that was generated and updated throughout the academic year by Community Standards that contained information relating to student athletes alleged to have violated The Responsibilities of Community Life: The Student Code ("The Student Code"); the spreadsheet included the following information: Community Standards case number, student i.d,, student name, sport, incident date, incident time, incident location, brief description of alleged behavior, code violations and sanctions (if any), and case managed by (either Community Standards or Residential Life).

9. I would forward the information in the above-described spreadsheet to other Sport Administrators so that they would share the information with the coaches of the student athletes listed in the spreadsheet. The purpose of sharing this information was to make sure that the coach was aware that a member of their team was alleged to have engaged in conduct that violated the Student Code and to have the coach be aware of the student's obligation to meet with Community Standards to

resolve the outstanding violations, for example, attend administrative conferences, hearings, etc.

10. In 2014 and at all times Warde Manuel was the UConn Athletic Director, the process for cancelling a student athlete's grant-in-aid for disciplinary reasons began with the student athlete's coach making a recommendation to the Sport Administrator and then the recommendation was brought to Athletic Director Manuel for final decision; the grant-in-aid would only be cancelled if Athletic Director Manuel agreed with the rationale provided by the coach and/or Sport Administrator.

11. Similarly, in 2014 and at all times Warde Manuel was the UConn Athletic Director, the process for cutting a student athlete from a team for disciplinary reasons began with the student athlete's coach making a recommendation to the Sport Administrator and then the recommendation was brought to Athletic Director Manual for final decision; the student athlete would only be cut from the team if Athletic Director Manual agreed with the rationale provided by the coach and/or Sport Administrator.



UConn SJM Exhibit 1

## Women's Soccer Rules in 2015-2016

20. On November 2, 2105, I was contacted by Elizabeth Vitullo, Compliance and Public
    Information Specialist in UConn's Office of Audit, Compliance and Ethics regarding a
    request for documents made under the Connecticut Freedom of Information Act by
    Attorney Greg Tarone in a letter dated October 19, 2015 that requested, "an
    opportunity to inspect or obtain copies of records regarding rules governing player
    conduct of all NCAA division I sports teams at the University of Connecticut, except
    for men's basketball . . . ."

21. On February 16, 2016, I attested in an affidavit, the steps that I took to determine
    what written rules existed for 2015-2016 UConn NCAA Division I teams and
    provided Elizabeth Vitullo with a copy of all written team rules so that they could be
    provided to Attorney Tarone. Attached hereto as Exhibit 3 is a true and accurate
    copy of my February 16, 2016 affidavit, which is also Exhibit H to plaintiff's
    complaint.

22. UConn women's soccer did not have written team rules for 2015-16. See Exhibit 3, ¶
    12.

23. I have read the above statements and they are true and accurate to the best of my
    knowledge.

_____
Paul McCarthy

STATE OF Mississippi )
                     )      ss:_____
COUNTY OF Lafayette  )


Sworn and subscribed before me on this __9th__ day of October, 2019.


_____
Commissioner of the Superior Court or Notary Public

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 126510
MICHELLE JENNINGS
Commission Expires
Jan. 17, 2023
LAFAYETTE COUNTY

| | |
|---|---|
| **From:** | Hill, Kim |
| **To:** | Mccarthy, Paul; Brown, Scott; Tripp, Ellen |
| **Cc:** | Geller, Alisa; Hill, Kim |
| **Subject:** | Athletic Conduct Update |
| **Date:** | Tuesday, May 12, 2015 11:04:39 AM |
| **Attachments:** | 1415 athlete update.xlsx |

Good morning,

Please see the attached report outlining our contact with student athletes. Please let me know if there are any questions.

Best,
Kim

Kimberly Hill
Associate Director – Community Standards
University of Connecticut
233 Glenbrook Rd. Unit 4119
Storrs, CT 06269
(t) 860-486-8402
(f) 860.486.8409
kimberly.hill@uconn.edu

UConn SJM Exhibit 2

| Case Number | ID | First Name | Last Name | Sport | Incident Date | Incident Time | Location | Brief Description | Decision | Sanctions | Case Managed By | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ██████ | ▬ | | ▬ | |
| ▬ | ▬ | ▪ | ▬ | ▬ | ▬ | ▬ | ▬ | ██████ | ▬ | ▬ | ▬ | |
| ▬ | ▬ | ▪ | ▬ | ▬ | ▬ | | ▪ | ██████ | ▬▬ | ▬ | ▬ | |
| ▬ | ▬ | ▬ | ▪ | ▬ | ▬ | ▬ | ▬ | ██████ | ▬ | | ▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ██████ | ▬ | | ▬ | |
| ▬ | ▬ | ▪ | ▬ | ▬▬▬ | ▬ | ▬ | ▬ | █████ | ▬ | | ▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ██████ | ▬▬ | ▪ | ▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ██████ | ▬ | | ▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ██████ | ▬ | | ▬ | |
| ▬ | ▬ | ▪ | ▪ | ▬ | ▬ | ▬ | ▬ | ██████ | | | ▬ | |
| ▬ | ▬ | ▪ | ▬ | ▬ | ▬ | ▬ | ▬ | █████ | ▬ | | ▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬▬ | ▬ | ▬ | ▬ | ▬▬ | ▬▬ | ▬ | ▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | | ▬ | ▬▬ | ▬▬ | ▬ | ▬ | |
| ▬ | ▬ | ▪ | ▪ | ▬▬ | ▬ | | ▬ | ▬▬ | ▬▬ | ▪ | ▬▬ | |
| ▬ | ▬ | ▪ | ▪ | ▬▬ | ▬ | ▬ | ▬ | ▬▬ | ▬▬ | | ▬▬ | |
| ▬ | ▬ | | ▬ | ▬▬ | ▬ | ▬ | ▬▬ | █████ | ▬ | | ▬▬ | |
| ▬ | ▬ | ▬ | ▪ | ▬▬▬ | ▬ | ▬ | ▬ | ▬▬ | ▬▬ | ▪ ▬ ▬ | ▬▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | | ▬ | ▬▬ | █████ | ▬▬ | ▬ | |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | | ▬ | ▬▬ | █████ | ▬▬ | ▬ | |
| ▬ | ▬ | ▪ | ▬ | ▬ | ▬ | | ▬ | ▬▬ | █████ | | ▬ | |
| ▬ | ▬ | ▬ | ▪ | ▬ | ▬ | | ▬ | ▬▬ | █████ | ▬▬ | ▬ | |
| ▬ | ▬ | ▬ | | ▬ | ▬ | | ▬ | ▬ | █████ | ▬ | ▬ | |

UConn SJM Exhibit 2

UConn SJM Exhibit 2

UConn SJM Exhibit 2

UConn SJM Exhibit 2

14. Theft - Respons ble

To  t

Wa n ng                                              L v ng
You  Values Wo kshop

Commun ty Standa ds

UConn SJM Exhibit 2

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014199301 | 2077738 | Evan | B andon | Men's Soccer | 4/15/2015 | 12 00 PM | UConn Co-op | Student ...pped pages out of a text book and attempted to leave the co-op with them w thout pay ng fo  the  tem. | 1A Theft - Respons ble | We n ng, J. v ng You  Values Wo kshop | Commun ty Standa ds | |

UConn SJM Exhibit 2

| From: | Mccarthy, Paul |
|---|---|
| To: | Cretors, Angie |
| Subject: | FW: Athletic Conduct Update |
| Date: | Tuesday, May 12, 2015 4:22:41 PM |
| Attachments: | 1415 athlete update.xlsx |

Angie-

FYI.

**From:** Hill, Kim
**Sent:** Tuesday, May 12, 2015 11:05 AM
**To:** Mccarthy, Paul; Brown, Scott; Tripp, Ellen
**Cc:** Geller, Alisa; Hill, Kim
**Subject:** Athletic Conduct Update

Good morning,

Please see the attached report outlining our contact with student athletes. Please let me know if there are any questions.

Best,
Kim

Kimberly Hill
Associate Director – Community Standards
University of Connecticut
233 Glenbrook Rd. Unit 4119
Storrs, CT 06269
(t) 860-486-8402
(f) 860.486.8409
kimberly.hill@uconn.edu

UConn SJM Exhibit 2

**STATE OF CONNECTICUT
FREEDOM OF INFORMATION COMMISSION**

| | | |
|---|---|---|
| IN THE MATTER OF A COMPLAINT BY | : | DOCKET NO. FIC 2015-742 |
| | : | |
| GREGORY TARONE, | : | |
|     COMPLAINANT | : | |
| | : | |
| VS. | : | |
| | : | |
| OFFICE OF AUDIT, COMPLIANCE AND | : | |
| ETHICS, STATE OF CONNECTICUT, | : | |
| UNIVERSITY OF CONNECTICUT; AND | : | |
| STATE OF CONNECTICUT, UNIVERSITY | : | |
| OF CONNECTICUT, | : | |
|     RESPONDENTS | : | FEBRUARY 16, 2016 |

## <u>AFFIDAVIT</u>

I, Paul McCarthy, being over the age of eighteen years and believing in the obligation of an oath, do hereby declare and attest as follows:

1.    I have been employed in the Department of Athletics at the University of Connecticut since August of 2006, and have served as its Deputy Director of Athletics/Chief of Staff since October of 2011.

2.    On November 2, 2015, I was contacted by Elizabeth Vitullo, Compliance and Public Information Specialist in the University's Office of Audit, Compliance and Ethics, regarding a request for documents made under the Connecticut Freedom of Information Act by Attorney Gregory Tarone in a letter dated October 19, 2015.

3.    As stated in his letter, Attorney Tarone requested "an opportunity to inspect or obtain copies of public records regarding rules governing player conduct of all NCAA division I sports teams at the University of Connecticut, except for men's basketball . . . ."

1

UConn SJM Exhibit 3

4.    The University of Connecticut 2015-2016 Student-Athlete Handbook provides, in

pertinent part, that:

> Each coach has his/her own very specific team rules covering everything from conduct to
> dress code. Again, *if your coach has written team rules*, you may wish to keep them in
> the back of this Handbook.  (Emphasis added.)

*****

> However, there are general rules that apply to all student-athletes:
> - Always present a positive image; don't do anything to embarrass yourself, the team,
>   your family or the University;
> - Understand the importance of being punctual; be on time for every commitment;
> - Be prepared to give 100% both mentally and physically in the classroom, as well as
>   on the playing field;
> - Do not consume alcoholic beverages on team trips, at athletic events or at events
>   sponsored by the Division. Be aware that Connecticut law prohibits anyone under 21
>   from consuming alcoholic beverages.
> - Do not use tobacco products of any kind including electronic cigarettes while
>   participating in practice or competition or while representing the University in any
>   capacity. Tobacco use is prohibited at these times, and the Division, in concern for
>   your health, discourages its use at any time. Use of tobacco products at practice or
>   competition is a violation of NCAA rules and must be reported.

*****

> All UConn students are subject to the University of Connecticut Student Code including
> the "Responsibilities of Community Life," which is distributed at the beginning of the fall
> semester. This code applies to behavior of students while on or off University premises or
> while involved in off-campus University activities. In addition, you as a student-athlete
> are expected to abide by the Student Code of Conduct.

> In addition, each student-athlete is subject to all rules and regulations that are required for
> individual participation on a specific team. While these rules may be particular to each
> team, they are presented to the student-athlete by the coaching staff with the full support
> of the athletic administration.

*University of Connecticut 2015-2016 Student-Athlete Handbook*, pages 4 and 5.

5.    The 2013-2014 and 2014-2015 Student-Athlete Handbooks contained these same

provisions.

UConn SJM Exhibit 3

6.    Ms. Vitullo requested that I make inquiries to determine whether the Department of Athletics maintained documents responsive to Attorney Tarone's records request.

7.    At the University of Connecticut, members of the Department of Athletics senior staff serve as Sport Administrators for the NCAA Division 1 teams, and, in that capacity, work with the coaches to provide support and assistance with administrative activities including, but not limited to, budgeting, scheduling, and arranging transportation. The Sport Administrators are appointed by the Director of Athletics to perform these functions and to act as intermediaries between the Director of Athletics and the respective coaching staffs of the assigned sport(s) programs.

8.    I currently serve as the Sport Administrator for men's basketball and men's soccer.

9.    The Sport Administrator group meets bi-weekly (or approximately two times per month). I placed Attorney Tarone's FOIA request on the agenda of the meeting of the Sports Administrators to be held on November 3, 2015. At that meeting, I distributed copies of Attorney Tarone's FOIA request and asked that each Sport Administrator obtain and provide to me copies of any written rules governing player conduct relating to the sports for which he/she serves as Sport Administrator.

10.    I was provided copies of team rules relating to the following NCAA Division I sports, which are in effect for the 2015-2016 academic year:

Men's Baseball;
Women's Cross-Country/Track and Field;
Women's Field Hockey;
Women's Ice Hockey;
Women's Lacrosse;
Women's Softball; and
Women's Volleyball.

UConn SJM Exhibit 3

11.    I provided copies of the rules listed in paragraph 10 above to Ms. Vitullo so that she could provide them to Attorney Tarone.

12.    I was advised by the Sport Administrators that there are currently no written rules relating to the following NCAA Division I sports:

> Women's Basketball;
> Men's Cross-Country;
> Men's Football;
> Men's Golf;
> Men's Ice Hockey;
> Women's Rowing;
> Women's Soccer;
> Men's Swimming and Diving;
> Women's Swimming and Diving;
> Men's Tennis;
> Women's Tennis: and
> Men's Track and Field.

13.    As the Sport Administrator for Men's Basketball and Men's Soccer. I can confirm that there are currently no written rules relating to those sports.

14.    I advised Ms. Vitullo that there were no written rules relating to the sports listed in paragraphs 12 and 13 above, so that she could so inform Attorney Tarone.

15.    Within the past five (5) days I reached out to. and obtained confirmation from, the Sport Administrators that the sports listed in paragraph 10 above are the only sports for which written "team rules" exist.

16.    It is my understanding that copies of the rules for the sports identified in paragraph 10 above were provided to Attorney Tarone by Ms. Vitullo on or about January 5, 2015, and that he was, at that time, advised that there were no additional team rules responsive to his request.

Paul McCarthy

4

UConn SJM Exhibit 3

**STATE OF CONNECTICUT**    :

                               :    **ss:**    **Town of Mansfield**

**COUNTY OF TOLLAND**      :

      Did personally appear before me Paul McCarthy, a person known to me, and having been sworn, affixed in my presence the above attestation on this the 16th day of February, 2016.

                                      _____

                                      Notary Public

                                      My Commission Expires:_____

                                            CHRISTENE G. COOPER

                                               *NOTARY PUBLIC*

                                      MY COMMISSION EXPIRES AUG. 31, 2018

UConn SJM Exhibit 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NORIANA RADWAN                 :   CIVIL ACTION NO. 3:16-CV-02091 (VAB)
PLAINTIFF,                        :
                                   :
     v.                             :

UNIVERSITY OF CONNECTICUT    :   OCTOBER _____, 2019
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

## AFFIDAVIT OF NEAL ESKIN

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I am currently employed at the University of Connecticut ("UConn") Athletic Department as a Senior Associate Athletic Director.

3. In 2014, and at all times alleged, I was employed at UConn as a Senior Associate Athletic Director in the Athletic Department and I was the assigned Sport Administrator for women's soccer.

4. In 2014 to the present, I report directly to the UConn Athletic Director.

5. As Sport Administrator to women's soccer, I had day-to-day program oversight over the women's soccer team; Coach Leonidas Tsantiris reported to me directly relating to day-to-day matters but he, like all other coaches, was overseen by the Athletic Director. This was the case under both Athletic Director Warde Manuel ("Athletic Director Manuel") and Athletic Director David Benedict ("Athletic Director Benedict").

6. At all times relevant to the complaint, UConn team rules were presented by the team's head coach to the Sport Administrator for review and consideration.

7. For the 2014 season, Coach Tsantiris, with the assistant coaches Margaret Rodriguez and Zac Shaw, developed team rules for the women's soccer team; I reviewed and approved those rules.

8. The 2014 season was the first time that Coach Tsantiris developed written team rules for the women's soccer team that were entitled "UConn Women's Soccer Contract"; he developed written team rules for the players because the previous few seasons had not been successful and he attributed part of the team's lack of success to the players' and team's lack of discipline. A true and accurate copy of UConn Women's Soccer Contract for 2014 is attached to Ex. 42 Tsantiris Aff'd, Ex. 43.

9. I was with the UConn women's soccer team at the American Athletic Conference ("AAC") Championship game against University of South Florida ("USF") at USF on November 9, 2014; I received from Michael Enright (Associate Director for Athletics for Communications) a message on my phone with a screen shot of plaintiff showing her middle finger to the ESPNU camera while the team was still celebrating at the end of the championship game; I immediately showed the screen shot to Coach Tsantiris.

10. While still at the USF field, I was in constant communication with Michael Enright and Debbie Corum (UConn Senior Woman Administrator ("SWA"))("SWA Corum") about UConn Athletic Department and Coach Tsantiris' response to plaintiff's

behavior; we were all involved with determining what discipline the plaintiff should receive for her behavior and we assisted with issuing Coach Tsantiris' press release apologizing for the plaintiff's behavior on behalf of UConn, the women's soccer team and the UConn Athletic Department.

11. On November 10, 2014, plaintiff came to the Athletic Department office seeking to meet with Athletic Director Manuel who was out of the office; I met with her at that time and she apologized to me for her behavior.

12. Coach Tsantiris advised me that he was planning to meet with plaintiff on a future date to discuss the incident, her suspension and her future on the team.

13. SWA Corum spoke to Ellen Ferris, AAC Associate Commissioner, ("Assoc. Commissioner Ferris") about the plaintiff showing her middle finger to the ESPNU camera at the end of the UConn-USF women's soccer game on the morning of November 10, 2014; Assoc. Commissioner Ferris sent SWA Corum a follow-up email after their conversation on November 10, 2014 at 9:52 a.m., advising that the AAC believed that plaintiff's behavior was a potential violation of the AAC Code of Conduct and requested information about the incident and corrective measures that UConn took. A true and accurate copy of SWA Corum's email dated November 10, 2014 at 12:22 p.m., forwarding Assoc. Commissioner Ferris email to me is attached hereto as Exhibit 5, pp. 2-3.

14. SWA Corum requested in her November 10, 2014 at 12:22 p.m. email to me that I assist her in providing Assoc. Commissioner Ferris the information she requested. See Exhibit 5, p. 2, referenced above in paragraph 13.

15. A true and accurate copy of my November 10, 2014 at 1:05 p.m. email to SWA Corum summarizing the events of November 9, 2014 in USF relating to the plaintiff's behavior and UConn Athletic Department response are attached to this affidavit as Exhibit 5, p. 1.

16. On November 10, 2014, SWA Corum sent a letter overnight mail to Assoc. Commissioner Ferris in response to her inquiry about the plaintiff's behavior on November 9, 2014, (showing her middle finger to the ESPNU camera), that Included my email to SWA Corum, Ex. 5, p. 1-2. The letter advised that plaintiff was indefinitely suspended from all team activities including the NCAA tournament; and that Coach Tsantiris would be meeting with the plaintiff to discuss her future on the team. Athletic Director Manuel, Coach Tsantiris, the plaintiff and I were copied on SWA Corum's November 10, 2014 letter to Assoc. Commissioner Ferris and a true and accurate copy of this letter is attached hereto as Exhibit 6.

17. On November 11, 2014 at 1:38 p.m. Exhibit 7), Assoc. Commissioner Ferris emailed SWA Corum the AAC's response to their inquiry about plaintiff's behavior, with a copy to me, Athletic Director Manuel, and Coach Tsantiris. The AAC determined that plaintiff made an obscene gesture to the ESPNU camera and that "[a]lthough she indicated to the coach that she 'was caught in the heat of the moment,' it is a clear violation of the Conference Code of Conduct"; that UConn Athletic Department took the following corrective action: once informed about the incident, the coach met with plaintiff to discuss her inappropriate behavior; the coach immediately indefinitely suspended plaintiff from all team activities, including the NCAA tournament; and that

UConn released a statement apologizing for plaintiff's inappropriate gesture within a half-hour of the completion of the game.

18. The November 11, 2014 at 1:38 p.m. email from Assoc. Commissioner Ferris to SWA Corum (Exhibit 7) also advised that the AAC Commissioner, Michael Aresco, issued a letter of reprimand to plaintiff that was attached to the email to be shared with the plaintiff; and the email requested a response from SWA Corum advising the AAC whether it accepted or rejected the AAC's findings/penalty with regard to the plaintiff.

19. A true and accurate copy of Assoc. Commissioner Ferris November 11, 2014 at 1:38 p.m. email to SWA Corum and the AAC Commissioner's letter of reprimand to plaintiff is attached hereto as Exhibit 7, p. 1-2, 4.

20. On November 11, 2014 at 2:32 p.m., SWA Corum responded to Assoc. Commissioner Ferris email (Ex. 8, p. 1-2) with a copy to me, Athletic Director Manuel, and Coach Tsantiris that UConn accepted the letter of reprimand to plaintiff; that Athletic Director Manuel and SWA Corum met with plaintiff about an hour earlier and Athletic Director Manuel informed her that she received a letter of reprimand from the AAC Commissioner for violating the Conference Code of Conduct.

21. A true and accurate copy of SWA Corum's November 11, 2014 at 2:32 p.m. email is attached hereto as Exhibit 8, p. 1.

22. With the exception of plaintiff, the AAC Commissioner did not reprimand any other UConn student-athlete from 2013 to October 4, 2019. I verified this information with the Assoc. Commissioner Ferris on October 4, 2019.

23. In 2014 and at all times Warde Manuel was Athletic Director at UConn, the process for cancelling a student-athlete's grant-in-aid for disciplinary reasons began with the student-athlete's coach making a recommendation to the Sport Administrator and then the recommendation was brought to Athletic Director Manuel for final decision; the grant-in-aid would only be cancelled if Athletic Director Manuel agreed with the rationale provided by the coach and/or the Sport Administrator.

24. Coach Tsantiris reported to me that he believed that plaintiff's behavior on November 9, 2014, (showing her middle finger to the ESPNU camera) was sufficient to constitute serious misconduct under the NCAA bylaws and that this was a basis to recommend to Athletic Director Manuel that plaintiff's grant-in-aid should be cancelled for Spring 2015. I supported this recommendation.

25. Coach Tsantiris, Athletic Director Manuel and I met at the end of the season in December, 2014 and discussed, among other matters, cancelling Ms. Radwan's scholarship; Athletic Director Manuel wanted Coach Tsantiris and I to confirm with UConn Athletics for Compliance Services ("Athletics Compliance ") staff that plaintiff's grant-in-aid could be cancelled for serious misconduct under NCAA bylaws.

26. I consulted with Julie Purcell and Angie Cretors, Athletics Compliance staff  and they confirmed that plaintiff's conduct was a sufficient basis to cancel her grant-in-aid for serious misconduct under the NCAA bylaws; Mr. Manuel then made the final decision and accepted Coach Tsantiris' recommendation that Ms. Radwan's scholarship should be cancelled for serious misconduct.

27. On December 21, 2014 at 4:55 p.m., plaintiff emailed Athletic Director Manuel with a copy to me stating that she had just received a phone call from Coach Tsantiris informing her that the grant in aid for the Spring Semester was being removed; a true and accurate copy of this email is attached hereto as Exhibit 9.

28. I did not respond to this email.

29. I received an email from plaintiff on December 23, 2014 seeking my assistance to have Coach Tsantiris reconsider his decision, and with regard to her obscene gesture to the ESPNU camera, she stated that "[a]lthough I regret this lapse of judgement [sic] very much, I do not believe that it is 'serious misconduct' worthy of terminating my scholarship mid year." A true and accurate copy of this email is attached hereto as Exhibit 10.

30. I did not respond to this email.

_Neal Eskin_
Neal Eskin

STATE OF _CONNECTICUT_ )
                          )   ss: _Storrs_
COUNTY OF _Tolland_       )

Sworn and subscribed before me on this _22nd_ day of October, 2019.

_Maureen A. O'Connor_

Commissioner of the Superior Court or Notary Public

Commission Expires   6/30/21

| From: | Eskin, Neal |
|---|---|
| To: | Corum, Deborah |
| Subject: | RE: URGENT: UConn Women"s Soccer Game on November 9, 2014 |
| Date: | Monday, November 10, 2014 1:05:47 PM |
| Attachments: | Image007.png |
| | Image009.png |
| | Image010.png |
| | Image011.png |
| | Image012.png |
| | Image013.png |

Thanks, Deb.

Within 15 minutes of the conclusion of the AAC women's soccer championship game, I was contacted by Senior Associate AD/Communications, Mike Enright, about a postgame incident which was caught by ESPNU cameras. One of the UConn student-athletes had made an obscene gesture to the camera and it was receiving some attention by social media. No one on site in Tampa, including the coaching staff or myself, was aware of this incident until Mike phoned. He sent us a screen shot of the gesture which identified the student-athlete as freshman Noriana Radwan.

Immediately upon learning of the incident, Coach Tsantiris questioned the student-athlete. The student-athlete indicated that she "was caught in the heat of the moment", that she was "trying to do the peace sign", and she apologized. Coach Tsantiris indicated to the student-athlete that she would disciplined for the incident which reflects poorly on the UConn women's soccer program, our university and the conference.

Within one hour of the conclusion of the game, UConn issued a statement about the incident --- which was shared with the Conference office as well. Here is the statement which was issued:

**UConn Athletic Communications -- November 9, 2014 -- Statement From Len Tsantiris**
**Statement From Women's Soccer Coach Len Tsantiris**

**"The University of Connecticut and its women's soccer program would like to apologize for an inappropriate gesture a UConn student-athlete made to an ESPNU camera following today's American Athletic Conference championship game. In particular, we apologize to the American Athletic Conference, our opponent and host school USF and to the members of the television audience. The gesture showed poor judgment and sportsmanship and does not represent what we want our program and University to stand for. The issue has already been addressed by the coaching staff to the student-athlete. The student-athlete has been indefinitely suspended from all team activities, including participation in UConn's upcoming NCAA tournament games."**

Today, the student-athlete stopped by the Athletic Director's office. She personally apologized to me, indicating that she "never intended for this to occur", that her actions were not malicious and that she "did not intend to do anything to take away from the positive feeling about the championship for her teammates." She said the incident is "not what I am and what I am about." From my view, she seemed very remorseful about the incident and the negative attention she brought to herself, her team and UConn --- and she hopes her Coach will provide her an opportunity to learn from it. She also set up a meeting to see Athletic Director Warde Manuel tomorrow. (Warde is out of the office today.)

I also know that Coach Tsantiris will be meeting with the student-athlete to further discuss the incident, the suspension and the student-athlete's future with the team.

This sums up my first-hand knowledge and observations about the incident. If you need anything else, or if you'd like to talk to Coach Tsantiris or any of the assistants for additional perspective, I'm here to be of

assistance.

Thanks.

Neal

---

**From:** Corum, Deborah
**Sent:** Monday, November 10, 2014 12:22 PM
**To:** Eskin, Neal
**Subject:** FW: URGENT: UConn Women's Soccer Game on November 9, 2014
**Importance:** High

Neal,
Per our discussion this morning, this is the official notice from the Conference. Will you please forward me the documents you indicated that you had....The information on the athlete, the punishment imposed by Lenny and anything else that you think will be helpful?



**Debbie Corum**
**Senior Associate Director of Athletics / SWA & Sports Administration**
**University of Connecticut | Division of Athletics**
2111 Hillside Road, Unit 1078
Storrs, Connecticut 06269
Phone: 860-486-6054
Fax: 860-486-3300

UConnHuskies.com | Facebook | Twitter | YouTube

---

**From:** Ellen Ferris [mailto:EFerris@theamerican.org]
**Sent:** Monday, November 10, 2014 9:52 AM
**To:** Corum, Deborah
**Cc:** Jim Siedliski
**Subject:** URGENT: UConn Women's Soccer Game on November 9, 2014
**Importance:** High

Debbie,

As we discussed this morning, after the November 9 women's soccer game between the University of Connecticut and the University of South Florida, a potential violation of the American Athletic Conference Code of Conduct occurred.  The Conference Code of Conduct states the following:

> Student-Athletes, individuals employed by or associated with a member institution, and game officials shall conduct themselves with honesty and good sportsmanship. Their actions shall at

UConn SJM Exhibit 5

all times reflect the high standards of honor and dignity that characterize participation in competitive sports in the collegiate setting.

Individuals shall exhibit respect and courtesy toward game officials, student-athletes, coaches, team personnel, athletic administrators, Conference office staff members and spectators. Individuals shall refrain from personal conduct that may incite spectators.

We have a video of a University of Connecticut women's soccer student-athlete making an obscene gesture to the ESPNU camera at the conclusion of the game. We believe this action is a potential Code of Conduct violation, and I am asking you to provide me any information the Institution may have about the incident (including the name of the individual involved as well as a description of what occurred and why). While we already have a copy of the statement issued by Coach Len Tsantiris, we would like your response also to include any corrective measures already taken or measures planned to be taken.

Please **respond to this request by 5:00 pm Eastern tomorrow. November 11**. The full Code of Conduct is attached for your convenience.

Let me know if you have any questions,
Ellen



**Ellen M. Ferris**
**Associate Commissioner, Governance &**
**Compliance**
**American Athletic Conference**
15 Park Row West 3rd Floor | Providence, RI 02903
Office: 401-272-9108 ext. 116 | Mobile: 401-569-6822
eferris@theamerican.org | www.TheAmerican.org
**#AMERICANRISING**

# UCONN

## ATHLETICS

November 10, 2014

Ellen Ferris
Associate Commissioner
American Athletic Conference
15 Park Row West
Third Floor
Providence, Rhode Island  02903

Dear Ellen:

As confirmation of our phone call earlier today, and to respond to your subsequent email, the following actions have been taken to address the unsportsmanlike conduct of a University of Connecticut student athlete following yesterday's American Conference Women's Soccer Championship match.

After winning the match and during the postgame celebration, Noriana Radwan, a freshman, made an obscene gesture toward an ESPNU camera. Neither the coaching staff, nor the sport administrator, witnessed this action; however, it was soon brought to their attention via a phone call from Mike Enright, Senior Associate Athletic Director for Communications. Mike had seen some comments on twitter and called Neal Eskin, Senior Associate Athletic Director and the sport administrator, who was with the team. Neal informed the head coach, Len Tsantiris, who took immediate action. After discussing the incident with Noriana, Coach Tsantiris indefinitely suspended her from all team activities, including the NCAA tournament, effective immediately.

UConn Communications then released a statement to ESPN, the American Conference communications staff, and to certain local media outlets within an hour of the completion of the match. The statement is attached.

Also attached is an email from Neal Eskin, summarizing yesterday's event and stating that Coach Tsantiris will be meeting with the athlete to discuss her future with the team.

On behalf of all associated with the women's soccer program, we apologize to Commissioner Aresco, the staff, and the member institutions for the negative reflection this incident created for the conference championship. We also believe that no further punitive action should be taken against the student-athlete as the coach and administrative staff acted quickly and appropriately.

Sincerely,

Debbie P. Corum

Debbie P. Corum
Senior Associate Athletic Director
2095 Hillside Road, Unit 1173
Storrs, CT 06269-1173

PHONE 860-486-2725
FAX 860-486-3300

www.UConnHuskies.com

An Equal Opportunity Employer

UConn SJM Exhibit 6

Copy:          Warde Manuel, Director of Athletics
                  Len Tsantiris, Head Coach, Women's Soccer
                  Neal Eskin, Senior Associate Athletic Director
                  Noriana Radwan, Student-Athlete

Enclosures:   Neal Eskin email
                  UConn Communications Release

| | |
|---|---|
| **From:** | Ellen Ferris |
| **To:** | Corum, Deborah |
| **Cc:** | Jim Siedliski; Manuel, Warde; Eskin, Neal; Tsantiris, Leonidas |
| **Subject:** | RE: URGENT: UConn Women''s Soccer Game on November 9, 2014 |
| **Date:** | Tuesday, November 11, 2014 1:38:13 PM |
| **Attachments:** | image002.png<br>image003.png<br>image004.png<br>image005.png<br>image006.png<br>UConn - WSO - Radwan Conduct Letter.pdf |

HI Debbie,

This email serves as the Commissioner's Report regarding the sportsmanship matter involving women's soccer student-athlete Noriana Radwan that occurred after the November 9, 2014 game against the University of South Florida. The Conference office staff has concluded its review, and we agree with your conclusions and accept the institution's actions to address her behavior.

Radwan made an obscene gesture to the ESPNU camera. Although she indicated to the coach that she "was caught in the heat of the moment," it is a clear violation of the Conference Code of Conduct.

The Conference office staff noted that the institution took the following corrective actions:

1. Once informed that the incident occurred, the coach met with the Radwan to discuss her inappropriate behavior.
2. The coach indefinitely suspended Radwan from all team activities, including the NCAA tournament, effective immediately.
3. UConn Communications released a statement to ESPN, the American Athletic Conference communications staff and to certain local media outlets within an hour of the completion of the match apologizing for Radwan's inappropriate gesture.

The Conference office commends the institution's coach and administrative staff for their timely and appropriate actions; however, as is typical in cases where an individual makes an obscene gesture, the Commissioner has issued a letter of reprimand to Radwan (see attached letter for you to share with her).

Per our policy, **please respond to this email to indicate a formal acceptance or objection to the matter**. In the event that the institution believes the finding and/or penalty (e.g., letter of reprimand) is inappropriate or excessive in nature, an appeal may be initiated by that Director of Athletics and/or designee (e.g., SWA). The **intent to appeal must be filed in writing to the Commissioner within 24 hours of receiving the Commissioner's report**. If the institution accepts the findings and penalty, then, per the policy, this matter will be communicated with all the Conference's Athletic Directors and Senior Woman Administrators via ShareFile.

UConn SJM Exhibit 7

We appreciate your assistance with this matter, and please let me know if you have any questions.

Ellen



**Ellen M. Ferris**
**Associate Commissioner, Governance & Compliance**
**American Athletic Conference**
15 Park Row West 3rd Floor | Providence, RI 02903
Office: 401-272-9108 ext. 116 | Mobile: 401-569-6822
eferris@theamerican.org | www.TheAmerican.org
**#AMERICANRISING** 🔲🔲🔲🔲

---

**From:** Ellen Ferris
**Sent:** Monday, November 10, 2014 9:52 AM
**To:** Corum, Deborah
**Cc:** Jim Siedliski
**Subject:** URGENT: UConn Women's Soccer Game on November 9, 2014
**Importance:** High

Debbie,

As we discussed this morning, after the November 9 women's soccer game between the University of Connecticut and the University of South Florida, a potential violation of the American Athletic Conference Code of Conduct occurred. The Conference Code of Conduct states the following:

> Student-Athletes, individuals employed by or associated with a member institution, and game officials shall conduct themselves with honesty and good sportsmanship. Their actions shall at all times reflect the high standards of honor and dignity that characterize participation in competitive sports in the collegiate setting.
>
> Individuals shall exhibit respect and courtesy toward game officials, student-athletes, coaches, team personnel, athletic administrators, Conference office staff members and spectators. Individuals shall refrain from personal conduct that may incite spectators.

We have a video of a University of Connecticut women's soccer student-athlete making an obscene gesture to the ESPNU camera at the conclusion of the game. We believe this action is a potential Code of Conduct violation, and I am asking you to provide me any information the institution may have about the incident (including the name of the individual involved as well as a description of what occurred and why). While we already have a copy of the statement issued by Coach Len Tsantiris, we would like your response also to include any corrective measures already taken or measures planned

to be taken.

Please respond to this request by 5:00 pm Eastern tomorrow, November 11. The full Code of Conduct is attached for your convenience.

Let me know if you have any questions,
Ellen



**Ellen M. Ferris**
**Associate Commissioner, Governance &**
**Compliance**
**American Athletic Conference**
15 Park Row West 3rd Floor | Providence, RI 02903
Office: 401-272-9108 ext. 116 | Mobile: 401-569-6822
eferris@theamerican.org | www.TheAmerican.org
**#AMERICANRISING**

UConn SJM Exhibit 7

November 11, 2014

**AMERICAN**
ATHLETIC CONFERENCE

Debbie Corum
Senior Associate Director of Athletics/Sport Administration & SWA
University of Connecticut
2095 Hillside Road Unit 1173
Storrs, CT 06269

Dear Debbie,

Thank you for your prompt reply to our inquiry regarding the actions by University of Connecticut women's soccer student-athlete Noriana Radwan, which occurred after the conclusion of your game versus the University of South Florida on November 9, 2014. After reviewing the available video and the institution's response, we agree with your determination that Ms. Radwan violated the Conference Code of Conduct by making an obscene gesture to the ESPNU camera while celebrating following the game.

This gesture is a clear violation of the Conference Code of Conduct as outlined in the 2014-15 American Athletic Conference Policy Manual:

> Student-Athletes, individuals employed by or associated with a member institution, and game officials shall conduct themselves with honesty and good sportsmanship. Their actions shall at all times reflect the high standards of honor and dignity that characterize participation in competitive sports in the collegiate setting.

> Individuals shall exhibit respect and courtesy toward game officials, student-athletes, coaches, team personnel, athletic administrators, Conference office staff members and spectators. Individuals shall refrain from personal conduct that may incite spectators.

Ms. Radwan is hereby reprimanded for the described actions. Subsequent actions of this nature by this player may result in further sanctions. I also want to commend the University of Connecticut coach and administrative staff for their timely and appropriate actions.

Sincerely,

Michael L. Aresco
Commissioner

cc:    Warde Manual, Athletic Director, University of Connecticut
       Len Tsantiris, Head Women's Soccer Coach
       Neal Eskin, Senior Associate Athletic Director
       Jim Siedliski, Associate Commissioner

Radwan V. UConn
UConn Responsive ESI Documents March 4, 2019

0086

UConn SJM Exhibit 7

**From:** Eskin, Neal
**To:** Corum, Deborah; Manuel, Warde
**Subject:** RE: URGENT: UConn Women's Soccer Game on November 9, 2014
**Date:** Tuesday, November 11, 2014 2:43:29 PM
**Attachments:** Image001.png
Image003.png
Image004.png
Image005.png
Image006.png
Image007.png

Thanks, Deb and Warde --- for meeting with Noriana. She was quite remorseful when I spoke to her yesterday --- and I commended her for taking the initiative to meet. The Covey quote is certainly appropriate for this situation.

Neal

**From:** Corum, Deborah
**Sent:** Tuesday, November 11, 2014 2:32 PM
**To:** Ellen Ferris
**Cc:** Manuel, Warde; Eskin, Neal; Tsantiris, Leonidas; Jim Siedliski (jsiedliski@theamerican.org)
**Subject:** RE: URGENT: UConn Women's Soccer Game on November 9, 2014

Dear Ellen,

We appreciate the expediency of your reply and accept the letter of reprimand to Noriana Radwan per your email below. Warde and I met with Noriana an hour ago and as part of the conversation, he informed her that she had received a letter of reprimand from the Commissioner for violating the Conference Code of Conduct. He also notified her that should she breach this policy in the future, that this reprimand could be used to indicate that she receive more substantial penalties. Warde shared a quote with her that sums up the lesson for her: "The proactive approach to a mistake is to acknowledge it instantly, correct and learn from it." (Stephen Covey). We believe that Noriana has learned from this experience as she is being proactive in acknowledging her mistake and is trying to correct the harm that was done. She is remorseful and took it upon herself to approach Warde to express her apologies. She has learned a valuable the lesson the hard way but we hope that now we can all put this behind us and move on to winning a national championship in women's soccer.
Debbie Corum



**Debbie Corum**
**Senior Associate Director of Athletics / SWA & Sports Administration**
**University of Connecticut | Division of Athletics**
2111 Hillside Road, Unit 1078
Storrs, Connecticut 06269

UConn SJM Exhibit 8

Phone: 860-486-8054
Fax: 860-486-3300

UConnHuskies.com | Facebook | Twitter | YouTube

**From:** Ellen Ferris [mailto:EFerris@theamerican.org]
**Sent:** Tuesday, November 11, 2014 12:25 PM
**To:** Corum, Deborah
**Cc:** Jim Siedliski; Manuel, Warde; Eskin, Neal; Tsantiris, Leonidas
**Subject:** RE: URGENT: UConn Women's Soccer Game on November 9, 2014

Hi Debbie,

This email serves as the Commissioner's Report regarding the sportsmanship matter involving women's soccer student-athlete Noriana Radwan that occurred after the November 9, 2014 game against the University of South Florida. The Conference office staff has concluded its review, and we agree with your conclusions and accept the institution's actions to address her behavior.

Radwan made an obscene gesture to the ESPNU camera. Although she indicated to the coach that she "was caught in the heat of the moment," it is a clear violation of the Conference Code of Conduct.

The Conference office staff noted that the institution took the following corrective actions:

1. Once informed that the incident occurred, the coach met with the Radwan to discuss her inappropriate behavior.
2. The coach indefinitely suspended Radwan from all team activities, including the NCAA tournament, effective immediately.
3. UConn Communications released a statement to ESPN, the American Athletic Conference communications staff and to certain local media outlets within an hour of the completion of the match apologizing for Radwan's inappropriate gesture.

The Conference office commends the institution's coach and administrative staff for their timely and appropriate actions; however, as is typical in cases where an individual makes an obscene gesture, the Commissioner has issued a letter of reprimand to Radwan (see attached letter for you to share with her).

Per our policy, **please respond to this email to indicate a formal acceptance or objection to the matter**. In the event that the institution believes the finding and/or penalty (e.g., letter of reprimand) is inappropriate or excessive in nature, an appeal may be initiated by that Director of Athletics and/or designee (e.g., SWA). The **intent to appeal must be filed in writing to the Commissioner within 24 hours of receiving the Commissioner's report**. If the institution accepts the findings and penalty, then, per the policy, this matter will be communicated with all the Conference's Athletic Directors and Senior Woman Administrators via ShareFile.

We appreciate your assistance with this matter, and please let me know if you have any questions.

Ellen



**Ellen M. Ferris**
**Associate Commissioner, Governance &**
**Compliance**
**American Athletic Conference**
15 Park Row West 3rd Floor | Providence, RI 02903
Office: 401-272-9108 ext. 116 | Mobile: 401-589-6822
eferris@theamerican.org | www.TheAmerican.org
**#AMERICANRISING** 🅕🅞🅥🅓

---

**From:** Ellen Ferris
**Sent:** Monday, November 10, 2014 9:52 AM
**To:** Corum, Deborah
**Cc:** Jim Siedliski
**Subject:** URGENT: UConn Women's Soccer Game on November 9, 2014
**Importance:** High

Debbie,

As we discussed this morning, after the November 9 women's soccer game between the University of Connecticut and the University of South Florida, a potential violation of the American Athletic Conference Code of Conduct occurred.  The Conference Code of Conduct states the following:

Student-Athletes, individuals employed by or associated with a member institution, and game officials shall conduct themselves with honesty and good sportsmanship. Their actions shall at all times reflect the high standards of honor and dignity that characterize participation in competitive sports in the collegiate setting.

Individuals shall exhibit respect and courtesy toward game officials, student-athletes, coaches, team personnel, athletic administrators, Conference office staff members and spectators. Individuals shall refrain from personal conduct that may incite spectators.

We have a video of a University of Connecticut women's soccer student-athlete making an obscene gesture to the ESPNU camera at the conclusion of the game.  We believe this action is a potential Code of Conduct violation, and I am asking you to provide me any information the institution may have about the incident (including the name of the individual involved as well as a description of what occurred and why).  While we already have a copy of the statement issued by Coach Len Tsantiris, we would like your response also to include any corrective measures already taken or measures planned

to be taken.

Please **respond to this request by 5:00 pm Eastern tomorrow, November 11**. The full Code of Conduct is attached for your convenience.

Let me know if you have any questions,
Ellen



**Ellen M. Ferris**
**Associate Commissioner, Governance &**
**Compliance**
**American Athletic Conference**
15 Park Row West 3rd Floor | Providence, RI 02903
Office: 401-272-9108 ext. 116 | Mobile: 401-569-6822
eferris@theamerican.org | www.TheAmerican.org
**#AMERICANRISING**

| From: | Noriana Radwan |
|---|---|
| To: | Athletics - Director |
| Cc: | Eskin, Neal |
| Subject: | Noriana Radwan |
| Date: | Sunday, December 21, 2014 4:55:03 PM |

Dear Warde,

This is Noriana Radwan. I just received a phone call from coach Lenny informing me that I have been suspended from the team and that my scholarship for the spring has been removed. Needless to say, I am shocked and devastated. The last time I spoke to Coach Lenny was during the year-end evaluation less than two weeks ago, in which we talked about the spring season and his expectations of me and how I should be performing in the Spring to maximize my impact on the team. I walked away after that meeting excited and looking forward to a brighter future with the team. Now out of nowhere, I get a phone call saying that I am off the team in Spring. Not only that, but my scholarship has been suspended and he told me that he does not want me at UConn at all, not only as an athlete, but as a student. I was told that I might not even need to take classes the upcoming semester, but if I want to then I am to do so at my local community college in New York and not at UConn.

After arriving back from Tampa, I spoke with you and Neil and delivered my most sincere apology. Everyone accepted it, and Warde, you told me that you have no intention of pulling scholarship. I talked to my mentors, coaches, teachers, and teammates, who all felt that this was a minor lapse of judgement and is no way punishable by getting kicked off the team, let alone putting my entire scholarship at risk. I have read the athletic handbook and it states that scholarships are good for one year. Everyone acknowledges that the incident in Tampa does not constitute a violation of behavioral misconduct deserving of pulling away a scholarship mid-year and destroying my athletic and academic future. Anyone who knows me knows very well that I have absolutely no behavioral issues and that act does not reflect who I am. I always knew that UConn was the school I wanted to attend and I rejected all other offers, for I felt like UConn is where I belonged and where I am going to make my dreams come true. Now, a mere month before the second semester, it all gets taken away from me.

I feel as though I am being banished from my home. I have already registered for classes and have everything set up for next semester. I do not know where to go so late in the registration process. I am not going to take a semester off and give up earning college credits. The road to my degree is long and I always planned on starting and finishing at UConn. I have no desire to take classes anywhere else. This semester has not been the easiest for me, and despite trying to adjust to the balancing act of soccer and schoolwork, I managed to end my first semester with an acceptable 2.5 GPA.

I desperately need your help. Coach Lenny told me not to involve anyone, but I have no other options. The consequences of his decision are catastrophic to my future. I know that it is not in your control to get me back on the team in the Spring and that it is coach's decision, but my family does not have any money to support me going anywhere else, and I need to keep my one year scholarship that was guaranteed to me for the rest of the spring. Please get back to me as soon as possible, as time is of the essence. Thank you for your time and consideration.

Noriana Radwan
nornor100@aim.com

UConn SJM Exhibit 9

From:   Noriana Radwan
To:     Eskin, Neal
Subject:    Noriana Radwan
Date:   Tuesday, December 23, 2014 12:38:54 PM

Hi Neal,

I appreciate it very much if you can help me out. I thank you very much for all your effort in getting coach's decision reconsidered. I want to tell you all that UCONN and the women's soccer program means to me. It has always been the school I wanted to attend and there was simply no other university like it. It is perfect for my major and it is where I wanted to be even after I get my undergraduate degree. I love all its facilities and everything it has to offer and simply put, I could not picture myself anywhere else. Soccer is my whole life. I have grown to love my teammates like they are family and all the other athletes that I have known here. I trust the coaching staff and the athletic trainer and I am always eager to learn from them.

Now, I feel as if my whole life has been turned upside down. One minute I was excited and ready to come back in the Spring and turn my game around, and the next minute everything changes with one phone call. I have my classes already registered, my cleats ordered, and everything back at my dorm. This is my worst nightmare and I feel like I am being completely ostracized and banished from not only the soccer team, but the university as a whole. I know I have not been given a fair enough chance to prove myself. I only play a few minutes the whole season. I made a mistake in Tampa and I regretted it very much and I apologized profusely. Although I regret this lapse of judgement very much, I do not believe that it is a "serious misconduct" worthy of terminating my scholarship mid year. I have accepted my punishment of suspension but I was also told that I am coming back in the Spring when Coach Lenny met with my in the player evaluation two weeks ago. I have apologized many times in person and in writing to my coaches as well as my teammates. I wrote all three coaches a long letter of apology and remorse, and that most of all, I was going to come back in the spring better than ever ready to deliver and make a big impact to the team. This decision has destroyed my life. Even if I was unfortunate enough to not continue as a Husky past the spring, I can deal with that decision (although it would truly be devastating) better because I would have time to set my affairs in order, in both academics and athletics. Now, I do not know where to go and what to do, and I have less than a month to figure it out. I am unable to consider other options.

Neal, the psychological and emotional agony is overwhelming and I feel injustice has fallen upon me. Thank you again and I look forward to hearing form you.

Noriana Radwan
nornor100@aim.com

UConn SJM Exhibit 10

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NORIANA RADWAN<br>PLAINTIFF, | :   CIVIL ACTION NO. 3:16-CV-02091 (VAB)<br>:<br>: |
| v. | : |
| UNIVERSITY OF CONNECTICUT<br>BOARD OF TRUSTEES, WARDE<br>MANUEL, LEONARD TSANTIRIS,<br>AND MONA LUCAS, INDIVIDUALLY,<br>DEFENDANTS | :   OCTOBER _23_, 2019 |

### AFFIDAVIT OF KIMBERLY HILL

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I am currently employed at the University of Connecticut ("UConn") as an Associate Compliance Officer with the Office of University Compliance.

3. In 2014, and at all times alleged, I was employed at UConn as the Associate Director of Community Standards ("Community Standards").

4. Community Standards is responsible for investigating student behavior alleged to have violated Responsibilities of Community Life: The Student Code ("The Student Code"), adjudicating violations of The Student Code and determining appropriate sanctions when a student is found to have violated The Student Code.

5. A true and accurate copy of The 2014-15 Student Code is attached hereto as Exhibit 12.

1

UConn SJM Exhibit 11

6.  Community Standards maintains a database containing data of all students who were referred for alleged violations of The Student Code, and includes among other information: whether the student is a UConn intercollegiate athlete; a description of the incident including date, time and location; adjudication decision; any sanction(s) a student received; and whether UConn's Office of Residential Life or Community Standards managed the case. Community Standards generates a variety of reports from this database.

7.  Exhibit Y to plaintiff's complaint is a spreadsheet that contains data from Community Standards database that only relates to student-athletes who were adjudicated for violations of The Student Code and it contains the following information: file id, student id, student's name, athletic team, incident date, incident location, incident description, charges-findings and sanctions; Exhibit Y to plaintiff's complaint is a redacted copy of Community Standards spreadsheet relating to all student-athletes during 2014-15 academic year who were found to have violated The Student Code and the sanction they received.

8.  A spreadsheet similar to Exhibit Y ("Community Standards/Athletics Spreadsheet") was generated and updated on a weekly basis throughout the academic year by Community Standards and provided to the Athletic Department; in 2014 through 2018, as a part of my duties at Community Standards, I was responsible for emailing to the Athletic Department on a weekly basis, an updated spreadsheet of student-athletes alleged to have violated The Student Code.

2

9.  Community Standards/Athletics Spreadsheet included the following information about the student-athlete: Community Standards case number, student i.d,, student name, sport, incident date, incident time, incident location, brief description of the alleged behavior, code violations and sanctions (if any), and case managed by (either Community Standards or The Office of Residential Life).

10. Community Standards/Athletics Spreadsheet usually did not include information relating to students who were alleged to have violated The Student Code where the allegations were minor in nature, e.g., a student being in possession of a candle in their room that was discovered during routine health and safety inspections of the residence hall.

11. Community Standards/Athletics Spreadsheet did not include reports of alleged sexual misconduct—that information was provided to the Athletic Department verbally and if an alleged violation of sexual misconduct was substantiated, Community Standards provided the Athletic Department documentation of their findings.

12. In 2014-15, there were two reports of alleged sexual assaults by student-athletes to Community Standards; both alleged incidents resulted in a finding of no violation of The Student Code and therefore, did not result in sanctions being issued.

UConn SJM Exhibit 11

13. I reviewed Community Standards records and determined the following with regard to ███████

████████████████████████████████████████████████████████████████████

14. I reviewed Community Standards Records and determined the following with regard to ███████

████████████████████████████████████████████████████████████████████

4



15. I reviewed Community Standards Records and determined the following with

regard to 

UConn SJM Exhibit 11



16. I reviewed Community Standards Records and determined the following with

regard to



6

17. I reviewed the Community Standards' records and determined that there were

no reports received regarding **Noriana Radwan**'s behavior showing her middle

finger to the ESPNU camera on November 9, 2014, at the conclusion of the

UConn-USF American Athletic Conference championship women's soccer game

18. I reviewed the Community Standards' records and determined that there were

no reports received regarding

7

██████████████████████████████████████

19. I reviewed the Community Standards' records and determined that there were

no reports received regarding ████████████████████████████████

████████████████████████████████

Kimberly Hill

STATE OF _Connecticut_ )
                       )   ss: _Storrs_
COUNTY OF _Tolland_    )


Sworn and subscribed before me on this _23rd_ day of October, 2019.


~~Commissioner of the Superior Court or~~ Notary Public

**JANE BENOIT-BEAN**
NOTARY PUBLIC
State of Connecticut
My Commission Expires
June 30, 2020

8

## EXHIBIT S

### University of Connecticut
*Responsibilities of Community Life: The Student Code*

**"We never educate directly, but indirectly by means of the environment. Whether we permit chance environments to do the work, or whether we design environments for the purpose makes a great difference." (John Dewey 1933, p. 22).**

#### Preamble
Admission to the University of Connecticut means acceptance into a new and special kind of community - an academic community. With acceptance comes a responsibility to uphold and build upon the values and the traditions that have served to define and to strengthen this community over time. New students are welcomed as partners in a fellowship of learning and personal growth. Membership in the University of Connecticut academic community should be considered a privilege and an honor by those students who are invited to join.

The "spirit of inquiry" lies at the heart of our community. It is the realization that the act of learning is essential to personal growth. The desire to know and the willingness to explore require the strength to resist the false promises of shortcuts and substitutes in the process of learning. The spirit of inquiry is the passion and the patience to commit oneself to a continual journey toward understanding.

Incorporating the spirit of inquiry into one's life as a student is not easy. It calls for curiosity, stamina, vulnerability, honesty, grace, courage, and integrity. A student needs to look beyond comfortable assumptions in search of new perspectives and seek the very information that might change his or her mind. To adopt the spirit of inquiry is to consciously decide to explore opportunities that may be hidden in contradictions. Facing the unfamiliar, making decisions on the value as well as on the meaning of new information, reflecting on the "how" and the "why" of personal choices, and accepting responsibility for one's actions are all part of this process.

The spirit of inquiry can only flourish in an environment of mutual trust and respect, and that environment cannot be limited to the classroom or to the lab. Each member of the community must have the opportunity to participate fully in the process of learning and understanding if the community as a whole is to remain strong and vital. Therefore, all members must accept responsibility for creating an environment that promotes individual growth and builds community through the safe, respectful exchange of diverse thought, opinion, and feeling.

Unfortunately, a few students may abuse the freedom inherent in such an environment. Students who breach the trust that has been extended to them by the University community shall be held accountable for their actions. *Responsibilities of Community Life: The Student Code* describes the process for addressing such matters. It rests on the principles of individual development, community involvement, and fairness. Therefore, whenever appropriate, it encourages alternative methods of dispute resolution.

#### Introduction
The University of Connecticut seeks to balance the needs and the rights of the individual with the welfare of the community as a whole. Students are expected to conduct themselves in a manner that is consistent with the values embraced by the University community and reflected in its various policies, contracts, rules and regulations, including those contained herein.

This document is intended to describe the types of acts that are not acceptable in an academic community as well as the general process by which they will be addressed (including the types of sanctions that may be imposed). Procedural rules consistent with the provisions of this code will be developed as necessary from time to time so that fundamental fairness may prevail.

Students do not lose their rights as citizens of or visitors in this country when they become members of the University community. Conversely, they do not shed their responsibilities. For example, the University supports a student's freedom of expression and expects that freedom to be exercised by the student in a manner that does not violate the law or University policy.

Maintaining a balance between the individual and the community is a continual process that requires insight, sensitivity, and diligence on the part of each member of the University. Students are encouraged to become involved in University programs and services that promote this effort. For more information on these and other opportunities, please contact Community Standards.

**Part I: Student Conduct Authority**

The University of Connecticut *Responsibilities of Community Life: The Student Code* (*The Student Code*) was approved by the Board of Trustees on April 11, 2000. It is administered under the direction of the Office of the Provost and Executive Vice President for Academic Affairs (Provost). The Vice President for Student Affairs shall coordinate recommendations from members of the University community regarding suggested revisions to *The Student Code*, and shall present proposed substantive changes to the Student Life Committee of the Board of Trustees for consideration by the full Board.

**Part II: Definitions**

The following selected terms are defined in an effort to facilitate a more thorough understanding of *The Student Code*. This list is not intended to be a complete list of all the terms referenced in *The Student Code* that might require interpretation or clarification. The Director of Community Standards or designee shall make the final determination on the definition of any term found in *The Student Code*.

1. **"Administrative hearing officer", "hearing body" or "student conduct officer"** means a University staff member who is authorized to determine the appropriate resolution of an alleged violation of *The Student Code*, and/or to impose sanctions or affect other remedies as appropriate. Subject to the provision in this code, an administrative hearing officer as well as a student conduct officer is vested with the authority to, among other duties, investigate a complaint of an alleged violation of *The Student Code*; decline to pursue a complaint; refer identified disputants to mediation or other appropriate resources; establish *The Student Code* alleged violations regarding a respondent; approve an administrative agreement/conflict resolution form developed with a respondent; conduct an administrative hearing; impose sanctions; approve sanctions recommended by another hearing body; chair and/or advise a hearing or Probation Review Committee; and conduct an appellate review.

2. **"Appellate body"** means any person or persons authorized by the Provost, Vice President for Student Affairs, or designee to conduct a review of a decision reached by a hearing body.

3. **"Business day"** means any day, Monday through Friday, that the University is open.

4. **"Complainant"** means any person who believes that s/he has been a victim of another student's misconduct. If the complainant is a student, that student will have the same rights under *The Student Code* as are provided to the respondent, even if another member of the University community referred or reported the allegation itself.

5. **"Designee"** refers to a staff or faculty member who has responsibility for implementing the student conduct process or administering the student conduct system, in part or in whole.

6. **"Director of Community Standards"** refers to that person in Student Affairs, designated by the Provost to be responsible for the overall coordination of the University student conduct system, including the development of policies, procedures, and education and training programs. The Director of Community Standards may serve as an administrative hearing officer, student conduct officer, and/or an appellate body. As used in this document, "Director of Community Standards" includes his or her designee.

7. **"Hearing Board/Committee advisor"** means an administrative hearing officer who observes a hearing body or the Probation Review Committee throughout the hearing/meeting and during the hearing body's/committee's private deliberations for the purpose of providing information and interpretations relative to the University student conduct system and *The Student Code*.

8. **"Incident database"** means the electronic database used to track an incident and the response taken.

9. **"Instructor"** means any faculty member, teaching assistant, or any other person authorized by the University to provide educational services (e.g., teaching, research, or academic advising).

10. **"May"** is used in the permissive sense.

11. **"Member of the University community"** includes any person who is a student, instructor, or University staff member; any other person working for the University, either directly or indirectly (e.g., private enterprise on campus); or any person who resides on University premises. A person's status in a particular situation shall be determined by the Director of Community Standards.

12. **"Policy"** is defined as the written regulations, standards, and student conduct expectations adopted by the University and found in, but not limited to, *The Student Code*; *The On-Campus Housing Contract*; the *University of Connecticut*

UConn SJM Exhibit 12

*Responsibilities of Community Life: The Student Code*

*Policy Against Discrimination, Harassment, and Related Interpersonal Violence*; graduate and undergraduate catalogs; and other publicized University notices.

13. **"Probation Review Committee"** shall review University Probation removal petitions upon the request of a student or registered student organization at least six months after the student is placed on University Probation. The Probation Review Committee shall typically consist of at least two University community members. Generally, a Probation Review Committee shall have an advisor. Probation Review Committees do not conduct hearings of alleged violations.

14. **"Referring party"** means any person who submits an allegation that a student violated *The Student Code*.

15. **"Report"** means any allegation of alleged misconduct against a student or student organization. Report is used interchangeably with "complaint" in this document.

16. **"Respondent"** means any student accused of violating *The Student Code*.

17. **"Shall"** and **"Will"** are used in the imperative sense.

18. **"Student"** means any person admitted, registered, enrolled, or attending any University course or University conducted program; any person admitted to the University who is on University premises or University-related premises for any purpose pertaining to his or her registration or enrollment.

19. **"Student conduct file"** means the printed/written/electronic file which may include but is not limited to incident report(s), correspondence, academic transcript, witness statements, and student conduct history.

20. **"Student organization"** means an association or group of persons that has complied with the formal requirements for University recognition by the Department of Student Activities.

21. **"Support person"** means any person who accompanies a respondent or complainant for the limited purpose of providing support and guidance. A support person may not directly address the hearing body, student conduct officer(s), question witnesses, or otherwise actively participate in the student conduct process, including hearings.

22. **"University"** means the University of Connecticut.

23. **"University official"** includes any person employed by the University to perform administrative, instructional, or professional duties.

24. **"University premises"** includes all land, buildings, facilities, and other property in the possession of or owned, used, or controlled by the University, either solely or in conjunction with another entity.

25. **"Witness"** means any individual who has direct knowledge of an incident. Character witnesses are not part of the student conduct process.

### Part III: Proscribed Conduct

*The Student Code* applies to students and to their registered organizations. Unless otherwise noted, use of the term "student" in this document shall apply to the student as an individual and to a registered student organization as a single entity, as applicable. Registered student organizations may be held accountable either through Department of Student Activities' policies or *The Student Code*. The officers or the leaders of a particular registered student organization usually will be expected to represent the organization during the student conduct process. Nothing in this code shall preclude holding certain members of an organization accountable for their individual acts committed in the context of or in association with the organization's alleged violation of *The Student Code*.

Individual accountability is a cornerstone of *The Student Code*. Normally, the influence of drugs and/or alcohol on a student's judgment or behavior will not be accepted as a mitigating factor with respect to the resolution of an act of misconduct.

### A. Jurisdiction of the University

1. Each student shall be responsible for his/her conduct from the time of admission through the actual awarding of a degree, even though conduct may occur before classes begin or after classes end, as well as during the academic year and during periods between terms of actual enrollment (and even if his/her conduct is not discovered until after a degree is awarded). *The Student Code* shall apply to a student's conduct even if the student withdraws from the University while a student conduct matter is pending.

UConn SJM Exhibit 12

2. The University may apply *The Student Code* to students whose misconduct has a direct and distinct adverse impact on the University community, its members, and/or the pursuit of its objectives regardless of where such conduct may occur. The following examples describe the kinds of off-campus acts that might be addressed through the University student conduct system. They are illustrative in intent and they should not be regarded as all-inclusive: driving under the influence of alcohol or drugs; physical/sexual assault; sale/distribution of illegal substances; and malicious destruction of property. Should the Director of Community Standards reasonably determine that a particular alleged act of off-campus misconduct falls within the jurisdiction of the University, the case will be referred to the University student conduct system.

3. University student conduct proceedings may be instituted against a student without regard to the pendency of civil or criminal litigation in court or criminal arrest and prosecution resulting from the same or related conduct. Proceedings under *The Student Code* may be carried out prior to, simultaneously with, or following civil or criminal proceedings off-campus at the discretion of the Director of Community Standards. Determinations made or sanctions imposed under *The Student Code* shall not be subject to change because criminal charges arising out of the same facts giving rise to violation of University rules were dismissed, reduced, or resolved in favor of or against the defendant in the criminal matter.

**B.  Conduct Rules and Regulations**

As members of the University community, students have an obligation to uphold *The Student Code* as well as to obey federal, state, and local laws. The Director of Community Standards or designee shall make the final determination on what constitutes a potential violation of *The Student Code* and shall establish the specific behavioral violation(s) as appropriate.

The following list of behaviors is intended to represent the types of acts that constitute violations of *The Student Code*. Although the list is extensive, it should not be regarded as all-inclusive. All community members are responsible for knowing and observing all University policies and procedures.

1.  Violation of the *Academic Integrity in Undergraduate Education and Research* policy (Appendix A).

2.  Disruptive behavior which is defined as participating in or inciting others to participate in the disruption or obstruction of any University activity, including, but not limited to: teaching, research, events, administration, student conduct proceedings, the living/learning environment, or other University activities, on or off-campus; or of other non-University activities when the conduct occurs on University premises; or of the living environment, on or off-campus.

3.  Harming behavior which includes, but is not limited to, the true threat of or actual physical assault or abuse and also includes harassment. For the purposes of *The Student Code,* bullying is considered a form of harassment.

    Harassment is the severe or repeated use by one or more students of a written, verbal, or electronic expression, or a physical act or gesture, or any combination thereof, directed at another individual that has the effect of: causing physical or emotional harm to the individual or damage to the individual's property; placing the individual in reasonable fear of harm to the individual and/or his/her property; or infringing on the rights of other University community members to fully participate in the programs, activities, and mission of the University.

    Bullying means the repeated use of a written, oral or electronic communication, or a physical act or gesture by one or more individuals, repeatedly directed at another individual that: (i) causes physical or emotional harm or damage to property, (ii) places the target of such behavior in reasonable fear of harm to self, or of damage to property, (iii) creates a hostile environment or otherwise infringes on the rights of such individual or (iv) substantially disrupts the education process. Bullying shall include, but not be limited to, a written, oral or electronic communication or physical act or gesture based on any actual or perceived differentiating characteristic, such as race, color, religion, ancestry, national origin, gender, sexual orientation, gender identity or expression, socioeconomic status, academic status, physical appearance, or mental, physical, developmental or sensory disability, or by association with an individual or group who has or is perceived to have one or more of such characteristics.

    In determining whether an act constitutes harassment, Community Standards will consider the full context of the conduct, giving due consideration to the protection of University climate, individual rights, freedom of speech, academic freedom and advocacy. Not every act that might be offensive to an individual or a group constitutes harassment and/or a violation of *The Student Code*.

UConn SJM Exhibit 12

4.  Violation of the *University of Connecticut Policy Against Discrimination, Harassment, and Related Interpersonal Violence.*

5.  Endangering behavior which includes, but is not limited to, conduct that threatens or endangers the health or safety of any person including one's self.

6.  Hazing, defined as an act which endangers the mental or physical health or safety of a student, or which destroys or removes public or private property for the purpose of initiation, admission into, affiliation with, or as a condition for continued membership in a group or organization. The express or implied consent of the victim will not be a defense. Apathy and/or acquiescence in the presence of hazing are not neutral acts; they are violations of this rule.

7.  Misuse of alcohol and/or other drugs including but not limited to:
    a.  *Illegal consumption, possession, proximity.* Possession of alcohol is limited to persons 21 years of age or older. If an individual is under 21 years of age that person is not permitted to consume alcohol or carry alcohol on their person on or off University property.
    b.  *Strength of alcohol.* Any alcohol that is stronger than 80 proof is not permitted on University of Connecticut property except where approved for academic purposes of the University.
    c.  *Serving, distributing or obtaining alcohol.* Serving, distributing to or obtaining alcohol for any individual who is under 21 years of age is prohibited. Allowing a person under the age of 21 to consume alcohol is prohibited. Providing alcohol to a person who is visibly intoxicated and or pressuring others to use alcohol is prohibited.
    d.  *Public consumption.* No alcohol is to be consumed in public areas and open containers of alcohol are not permitted in public areas on University property except in designated locations such as a restaurant or bar where the permittee assumes all liability of properly monitored events. "Public areas" are defined as any area that could be used for general use including but not limited to stairways, hallways, lounges, bathrooms, dining halls, arenas, library, academic and administration buildings, and outside buildings on University property.
    e.  *Location for consumption.* Alcohol can only be consumed on University of Connecticut property where there is a liquor permit to serve alcohol or as defined by University policies such as the On-Campus Housing Contract. A consumer can only ingest alcohol at the event location.
    f.  *Alcohol procurement.* Alcohol may not be purchased with University funds or Trustee student organizations.
    g.  *Tap systems.* No tap systems to administer alcohol may be used on University property except by a licensed permittee.
    h.  *Drinking games and paraphernalia.* Drinking games involving alcohol are prohibited. Paraphernalia used to administer drinking games or assist the user in ingesting alcohol at a fast rate are a violation of University policy.
    i.  *Common source containers.* Common source containers containing alcohol are prohibited. This includes but is not limited to, kegs, beer balls, and/or punch bowls being used to serve alcohol.
    j.  *Off-campus functions.* All Registered Student Organizations (RSOs) must participate in the Student Activities Off Campus Event Registration process. RSOs must register off-campus events and subsequently receive risk management advising. Law School student organizations must assure compliance with Law School Off-Campus Social Event Guidelines.
    k.  *Driving under the influence.* Driving under the influence of alcohol and/or drugs is prohibited.
    l.  *Illegal drugs and paraphernalia.* Possession of illegal drugs, including marijuana, is prohibited. Possession of drug paraphernalia is prohibited on University of Connecticut property.
    m.  *Medications.* Prescription drugs are permitted on University of Connecticut property if accompanied by an authentic medical prescription. Use of legal medication outside the parameters of the medical authorization is prohibited.
    n.  *Selling, distributing or manufacturing drugs.* Sale, distribution, or manufacturing of controlled substances or illegal drugs, including marijuana, except as expressly permitted by law is prohibited.

8.  Use, possession, or distribution of firearms, weapons, facsimile of weapons, fireworks, explosives, or dangerous chemicals.

9.  Uncooperative behavior which includes, but is not limited to, uncooperative behavior and/or failure to comply with the directions of, providing false information, and/or failure to identify oneself to University officials or law enforcement officers acting in the performance of their duties.

UConn SJM Exhibit 12

10. The setting of or participation in unauthorized fires; the unauthorized or improper possession, use, removal, or disabling of fire safety equipment and warning devices; failure to follow standard fire safety procedures; or interference with firefighting equipment or personnel.

11. Assisting another person in the commission, or attempted commission, of a violation of *The Student Code*. This includes hosting a non-student who commits a violation.

12. Violation of published University policies, rules or regulations.

13. Violation of the *On-Campus Housing Contract*.

14. Theft which includes, but is not limited to, attempted or actual theft of property or services.

15. Forcible entry and/or unauthorized presence in University-owned buildings or property. Reasonable notice of authority, or lack thereof, shall be given.

16. Unauthorized possession, duplication, or misuse of University property or other personal or public property, including but not limited to records, electronic files, telecommunications systems, forms of identification, and keys.

17. Damage or misuse of property which includes, but is not limited to, attempted or actual damage to or misuse of University property or other personal or public property.

18. Violation of federal, state or local law.

19. Abuse of the University student conduct system, including but not limited to:
    a. Disruption or interference with the orderly conduct of a student conduct proceeding.
    b. Falsification, distortion, or misrepresentation of information to a student conduct officer or hearing body.
    c. Influencing or attempting to influence another person to commit an abuse of the student conduct system.
    d. Attempting to discourage an individual's proper participation in, or use of, the student conduct system.
    e. Attempting to intimidate or retaliate against a member of the hearing body or any other participant prior to, during, and/or after a student conduct proceeding.
    f. Institution of a student conduct code proceeding in bad faith.
    g. Failure to comply with the sanction(s) imposed under *The Student Code*.

**Part IV: Student Conduct Policies**
  **A.  Allegations**
    1. Any person may file a report concerning alleged misconduct of any student or registered student organization. Reports shall be prepared in writing, either by the individual reporting the conduct or by the staff member collecting a verbal referral, and directed to the Director of Community Standards. Complaints regarding alleged misconduct by a student or registered student organization at a regional campus shall be directed to the Associate Vice Provost or designee at that campus. A report should be submitted as soon as possible after the alleged misconduct takes place.

    2. The Director of Community Standards or designee shall determine if a complaint alleges or addresses a potential violation of *The Student Code* and will notify the respondent of such allegations. The decision to continue a matter through the conduct process is the decision of the Director of Community Standards or designee.

    3. Generally, the Director of Community Standards or designee will assign a student conduct officer(s) to the case who will investigate and schedule administrative conferences with the respondent(s) and other individuals as deemed necessary and appropriate.

  **B.  Administrative Conferences and Investigations**
    1. The administrative conference is a meeting between a respondent and a student conduct officer to review a complaint/incident, explain the student conduct process, and review possible options for resolving the matter. There may be multiple administrative conferences as an incident is investigated.

    2. A fair and impartial investigation will be conducted by the student conduct officer. The respondent and complainant, if applicable, may provide information in person and/or submit a written account, provide the names of incident

UConn SJM Exhibit 12

witnesses for possible interviews with the student conduct officer, provide witness statements and any documentation that may be relevant to the facts of the incident. The student conduct officer will make a reasonable effort to obtain supporting documentation regarding the incident from other University entities or other resources.

Upon completion of the investigation, the student conduct officer, applying a preponderance of the evidence standard, will determine if any violations of *The Student Code* occurred.

3. After reviewing the incident and the investigation with the respondent and complainant, if any, the student conduct officer will determine whether the case may be resolved by way of an administrative agreement/case resolution form or an administrative hearing. A student who agrees to resolve any violation(s) without an administrative hearing shall have no right to appeal.

4. Either party may request an administrative hearing. If the resolution will be through an administrative hearing, the complainant, if any, will have the same rights as the respondent as indicated in *The Student Code*. The student conduct officer or hearing body will, in writing, disclose to the alleged victim of any crime of violence, non-forcible sex offense, or sexual harassment the results of the conduct matter regarding factual determination(s) and sanction(s) that specifically pertain to the alleged victim.

C. **Administrative Hearing Bodies**
   The Director of Community Standards will assign either an administrative hearing officer(s) or an academic misconduct hearing board to conduct an administrative hearing depending on the nature of the matter.

   1. **Administrative hearing officers:** The Director of Community Standards designates and trains administrative hearing officers annually. Administrative hearing officers are University officials. They may conduct hearings on any type of alleged violation of *The Student Code*. Administrative hearing officers may impose any sanction as appropriate. Typically, a hearing will consist of one or two administrative hearing officers.

   2. **Academic misconduct hearing board:** Academic misconduct hearing boards for undergraduate academic integrity issues shall typically consist of two faculty members, two students, and one hearing advisor. They may conduct hearings on any alleged violation regarding *Academic Integrity in Undergraduate Education and Research* (Appendix A). The board may impose any sanction as appropriate. Academic consequences are determined by the instructor.

D. **Administrative Hearing**
   Generally, an administrative hearing brings several people together in an effort to allow for the full consideration of an allegation that a student has violated *The Student Code*. The hearing participants may include the investigating student conduct officer(s), respondent(s), complainant(s), witnesses, the member(s) of the hearing body, a hearing advisor, and a support person for each respondent or complainant.

   All participants are expected to be respectful of each other's purpose in the hearing process and to conduct themselves according to the direction of the hearing body. In an effort to be as fair as possible to the respondent and complainant, if applicable, student conduct procedures may be modified. Community Standards may modify the procedures after taking into consideration the support and privacy needs of the parties and/or other potential hearing participants. This may include, but is not limited to, alteration of the hearing room setup, use of multiple rooms and video-conferencing equipment, or other electronic means.

   1. Normally, an administrative hearing will be conducted within fifteen (15) business days of an investigation report being submitted to Community Standards.

   2. The respondent and complainant, if applicable, shall each have the right to:
      a. Be notified of all alleged violations by means of the address (University e-mail, residence hall address, or permanent address) provided by the student via the Registrar's Office. Typically, this will be done via e-mail which will provide a link to the documentation.
      b. Review the completed investigation report, which includes all supporting documentation.
      c. Be informed about the hearing process.
      d. A reasonable period of time to prepare for a hearing.
      e. Request a delay of a hearing due to extenuating circumstances. The decision to grant or deny any such request is within the discretion of the hearing body.

UConn SJM Exhibit 12

   f. Be notified of the proposed information to be presented and to know the identity of witnesses who have been called by the hearing body to speak at the hearing or provide written information for the hearing when such information is known by the Director of Community Standards prior to the hearing.

   g. Be accompanied by a support person during the portions of the hearing in which the student is participating. A student should select a support person whose schedule allows attendance at the scheduled date and time for the administrative hearing because delays will not be allowed due to the scheduling conflicts of a support person.

   h. Be present at the pertinent stages of the hearing process as indicated by the Director of Community Standards or designee. The deliberations of the hearing body are private.

   i. Submit a written response to the investigation report prior to the hearing. The decision to not present information is not an admission of responsibility.

   j. Propose witnesses for the hearing in accordance with procedures outlined below.

   k. Respond to statements and other information presented at the hearing.

   l. Present a personal or community impact statement to the hearing body upon a finding of "Responsibility".

   m. Following the hearing, the hearing body shall advise the respondent in writing of its determination and of the sanction(s) imposed, if any. The hearing body will disclose to the alleged victim of any crime of violence, non-forcible sex offense, or sexual harassment the results of the hearing, in writing, regarding factual determination(s) and sanction(s) that specifically pertain to the alleged victim.

3. An administrative hearing shall be conducted by a hearing body in accordance with the procedures listed below. When a University official serves as the sole member of the hearing body, that official may also be referred to as the "chair". Specific hearing bodies may adopt additional procedures that are not inconsistent with the provisions of *The Student Code*.

   a. Formal rules of process, procedure, and/or technical rules of evidence, such as are applied in criminal or civil court, are not used in these proceedings.

   b. A hearing shall be conducted in private.

   c. Admission of any person into the hearing room shall be at the discretion of the chair of the hearing body. The chair shall have the authority to discharge or to remove any person whose presence is deemed unnecessary or obstructive to the proceedings.

   d. When a hearing involves more than one respondent, the Director of Community Standards or designee may, at his or her discretion, permit the administrative hearings concerning each student to be conducted either separately or jointly.

   e. If a respondent or complainant, after receiving notification, does not appear for a hearing, the hearing will proceed without the student.

   f. Except as directed by the chair, the support person shall limit his/her role in a hearing to that of a consultant to the respondent or complainant.

   g. The identity of any witnesses, along with a summary of information expected to be provided by the witness, must be provided to the hearing chair at least two business days before the hearing. The hearing chair may elect not to permit one or more witnesses to participate in the hearing if the information they are expected to provide is not relevant to any material issue; is deemed unnecessarily redundant of other information already in the record; and/or they were interviewed in connection with the investigation and the information they are expected to provide is already captured in the investigation report. The party proposing a witness is responsible for any communications with the witness regarding attendance at the hearing. The hearing body may request the attendance of witnesses not proposed by the parties. The hearing body cannot compel the attendance of witnesses at the hearing.

   h. The respondent, complainant, investigating student conduct officer, and any witnesses will provide information to and answer questions from the hearing body. Questions may be suggested by the investigating student conduct officer, respondent and/or complainant to be answered by each other or by other witnesses. This will be conducted by the hearing body with such questions directed to the chair, rather than to the individuals directly. This method is used to preserve the educational tone of the hearing and to avoid creation of an adversarial environment. Questions of whether potential information will be received shall be resolved at the discretion of the chair.

   i. Pertinent records, exhibits, and written statements should be provided during the investigation stage of the process. Any additional information may be accepted for consideration by the hearing body at its discretion as long as such information was provided in accordance with *The Student Code*. Information presented by a student during a hearing that indicates a potential violation of *The Student Code* may be investigated at a future time.

   j. The hearing body will review the final investigation report to determine whether the investigation was conducted in a fair, impartial, and reliable manner; the information is sufficient to support the factual findings, and there is a rational basis, applying a preponderance of the evidence standard for the recommended findings

UConn SJM Exhibit 12

*Responsibilities of Community Life: The Student Code*

regarding a potential violation of *The Student Code*. In conducting this hearing, the hearing body may accept or reject the investigating student conduct officer's findings in whole or in part.

k. When a student respondent has been found "Responsible" on any violation, the hearing body shall review the student's academic transcript and student conduct history, hear impact statements by the respondent, complainant, and investigating student conduct officer, and impose the appropriate sanction(s). Character references and/or letters of support are not accepted.

l. Following the hearing, the hearing body shall advise the respondent in writing of its determination and of the sanction(s) imposed, if any. The hearing body will disclose in writing to the alleged victim of any crime of violence, non-forcible sex offense, or sexual harassment the final results of the conduct matter that specifically pertain to the alleged violation.

m. All procedural questions are subject to the final decision of the chair or the hearing board advisor of the hearing body.

4. All administrative hearings will be recorded and the University will maintain the audio recordings as required by Connecticut state law. All such recordings are the property of the University. Participants are prohibited from making their own recording. Upon written request, a respondent or complainant may review the audio recording and make appropriate arrangements for it to be transcribed on University premises. Arrangements for a transcriber and all associated costs involved in the transcription will be the responsibility of the requesting individual.

**E. Sanctions**

1. The following sanctions may be imposed, individually or in various combinations, on any student found to have violated *The Student Code*. Please note this is not an exhaustive list of sanctions:

   a. **Warning:** A notice that the student has violated University policy and a warning that another violation will likely result in a more severe sanction which could include University Probation, University Suspension or University Expulsion.

   b. **University Probation:** University Probation is an indefinite period of time where the student is given the opportunity to modify unacceptable behavior, to complete specific assignments, and to demonstrate a positive contribution to the University community in an effort to regain student privileges within the University community. After six months from being placed on University Probation, the student may apply for a review of the student's probationary status. The student will need to meet with the Probation Review Committee and demonstrate significant contributions, both of an academic and co-curricular nature, to the University community. The Probation Review Committee will determine if the student will continue on University Probation or if the University Probation is lifted. The decision of the committee is final and not subject to appeal. If it is decided that University Probation will continue, the student may re-apply in six months after the committee's decision. Due to the student's conduct history there is the possibility of University Suspension or University Expulsion if the student is found responsible for a subsequent violation.

   c. **University Suspension:** University Suspension is separation from the University for a designated period of time after which the student shall be eligible to apply for readmission to the University. Readmission to the University is not guaranteed. Conditions for consideration of readmission may be specified. A student's reacceptance into his/her school or college is at the discretion of the school or college. A student who is on suspension is prohibited from participating in any University activity or program. The individual may not be in or on any University owned or leased property without securing prior approval from the Director of Community Standards or designee. A notation of "Suspension" shall be placed on the student's official transcript until graduation. However, the student may petition the Director of Community Standards for earlier removal of the notation upon completion of the suspension. The University of Connecticut will not accept credits earned at another institution during a period of suspension.

   d. **University Expulsion:** University Expulsion is permanent separation from the University. A student who has been expelled is prohibited from participating in any University activity or program. The individual may not be in or on any University owned or leased property. A permanent notation of "Expulsion" shall be placed on the student's transcript.

   e. **Additional Sanctions:** The following may be given in conjunction with any of the above:

      i. **Loss of Privileges:** Denial of specified privileges for a designated period of time.

      ii. **Restitution:** Compensation for loss of or damage to property or services rendered. This may take the form of appropriate service and/or monetary or material replacement.

      iii. **Removal from Housing:** Separation of the student from University approved housing for a designated period of time after which the student shall be eligible to return. Removal may include loss of dining privileges. Conditions for readmission may be specified.

      iv. **UConn Compass:** The UConn Compass program has a sanction component which is designed to promote student engagement through co-curricular involvement. UConn Compass facilitators will assist

Page 9

UConn SJM Exhibit 12

students in designing a customized involvement plan based on their individual interests and academic plans.
- v. **Educational Initiatives**: Projects; participation in health or safety programs (the student may be required to pay a fee); service to the University or to the larger community; seminars; and other assignments as warranted.

2. The following sanctions may be imposed upon registered student organizations:
  a. Those sanctions listed above in Part IV, E.1, "a" through "e".
  b. **Loss of Recognition**: Loss of all University privileges for a designated period of time. Loss of recognition for more than two consecutive semesters requires an organization to reapply for University recognition. Conditions for future recognition may be specified.

3. Aggravated Violations: If a student is responsible for violation of any University policy that is directed toward an individual or group due to race, ethnicity, ancestry, national origin, religion, gender, sexual orientation, gender identity or expression, age, physical or mental disabilities, including learning disabilities, intellectual development disorders, and past/present history of a mental disorder, the student conduct officer or hearing body may enhance the sanctions.

## F. Appeals

1. A decision reached through the administrative hearing process may be appealed by the respondent(s) or complainant(s) to the next level of student conduct authority within five (5) business days of the decision. All appeals shall be in writing and shall be delivered to the designated appellate body via the mechanism identified by Community Standards. The decision reached as a result of an administrative conference may not be appealed.

2. Except as required to explain the basis of new information, an appeal shall be limited to a review of the student case file. The audio recording of the administrative hearing shall be available for the appellate body for review as necessary. The review shall be for one or more of the following purposes:
  a. To determine whether the administrative hearing was conducted in conformity with prescribed procedures giving the complainant and investigating student conduct officer a reasonable opportunity to prepare and to present information that *The Student Code* was violated, and giving the respondent a reasonable opportunity to prepare and to present a response to those allegations.
  b. To determine whether the sanction(s) imposed were appropriate for the violation(s) of *The Student Code* which the student was found responsible.
  c. To consider new information, sufficient to alter a decision, or other relevant facts not brought out in the original hearing, because such information and/or facts were not known to the person appealing at the time of the original administrative hearing.

3. If an appeal is granted by the appellate body, the matter shall either be referred to the original hearing body for re-opening of the administrative hearing to allow reconsideration of the original determination or the appellate body will determine any change in sanctions. If an appeal is denied, the matter shall be considered final and binding upon all involved.

## G. Accommodations for Students with Disabilities

1. By federal law, a person with a disability is any person who: 1) has a physical or mental impairment; 2) has a record of such impairment; or 3) is regarded as having such an impairment, which substantially limits one or more major life activities such as self-care, walking, seeing, hearing, speaking, breathing, or learning.

2. A student requesting an accommodation in regard to an administrative conference, hearing, or probation review meeting must follow the appropriate process for requesting an accommodation through the Center for Students with Disabilities. The Center for Students with Disabilities will make a determination regarding the request and notify the appropriate parties.

3. Reasonable accommodations depend upon the nature and degree of severity of the documented disability. While the Americans with Disabilities Act of 1990 requires that priority consideration be given to the specific methods requested by the student, it does not imply that a particular accommodation must be granted if it is deemed not reasonable and other suitable techniques are available.

## Part V: Interim Administrative Action

The Provost or designee may impose an interim "University Suspension", an interim "Removal from Housing," an interim "Loss of Recognition", and/or other necessary restrictions on a student prior to student conduct resolution on the student's

UConn SJM Exhibit 12

alleged violation. Such action may be taken when, in the professional judgment of a University official, a threat of imminent harm to persons or property exists.

Interim administrative action is not a sanction. It is taken in an effort to protect the safety and well-being of the respondent, of the complainant, of others, of the University, or of property. Interim administrative action is preliminary in nature; it is in effect only until there is a resolution of the student conduct matter.

**Part VI: Maintenance and Review of Student Conduct Files**
Student conduct files are maintained separately from any other academic or official file at the University by the Director of Community Standards or designee. Generally, information from the files is not released without the written consent of the student. However, certain information may be provided to individuals within or outside the University who have a legitimate legal or educational interest in obtaining it. Please refer to the federal Family Educational Rights and Privacy Act of 1974, as amended.

The sanctions of "Suspension" and "Expulsion" will be noted on the student's official transcript. A suspension will be noted until graduation or four (4) years following the end of the period of suspension, whichever occurs first. An expulsion will be noted permanently.

A student conduct file is maintained chronologically by incident date and then by respondent name. A student may have more than one file. Generally, a student conduct file, including related documents, will be kept for seven (7) years from the date of the incident. This may include electronic and hard copy files. The student conduct file of an expelled student shall be retained indefinitely. Audio recordings of administrative hearings are used for appellate purposes only and are not part of the student conduct file. Audio recordings are generally retained until the end of the appeal process. Information contained in the incident database is maintained for seven (7) years from the date of the incident with the exception of expelled students. That information is retained indefinitely.

**Part VII: Interpretation and Revision**
1. Any question of interpretation regarding *The Student Code* shall be referred to the Director of Community Standards or designee for final determination.

2. *The Student Code* shall be reviewed at least every three (3) years under the direction of the Vice President for Student Affairs. Substantive revisions shall be approved by the Board of Trustees.

UConn SJM Exhibit 12

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

NORIANA RADWAN : CIVIL ACTION NO. 3:16-CV-02091 (VAB)
PLAINTIFF, :
:
     v. :
:
UNIVERSITY OF CONNECTICUT : OCTOBER 23, 2019
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

**AFFIDAVIT OF ANN FIORVANTI**

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I am currently employed as the Associate Director of Athletics for Compliance at the University of Connecticut ("UConn").

3. The Office of Athletic Compliance ("Athletics Compliance") is responsible for ensuring that UConn is abiding by the National Collegiate Athletic Association's ("NCAA") rules and regulations.

4. I have held this position since July 2017. My duties include overseeing the daily operation of Athletics Compliance.

5. My prior position was Assistant Director of Athletics for Compliance and I held that position from July 2013 to July 2017; in that position my duties included general support for the daily operations of Athletics Compliance.

6. To date, I have been employed at Athletics Compliance for 8 years and 6 months.

1

UConn SJM Exhibit 13

7. In 2014, Angie Cretors was the UConn Senior Associate Director of Athletics for NCAA Rules Education and Compliance Services, and I reported directly to her.

8. In 2014 and at all times alleged in plaintiff's complaint, UConn was a non-autonomous member of the NCAA Division I and was subject to the NCAA bylaws for Division I non-autonomous members.

9. In 2014 and at all times alleged in plaintiff's complaint, UConn was a member of the American Athletic Conference ("AAC") and was subject to the AAC bylaws, rules, policies and code of sportsmanship.

10. On February 10, 2014, Noriana Radwan (hereinafter "plaintiff" or "Ms. Radwan") signed a National Letter of Intent (hereinafter "NLI") certifying her intent to enroll at UConn and participate in women's soccer; a true and accurate copy of plaintiff's NLI is attached hereto as Exhibit 14.

11. On February 10, 2014, plaintiff signed a financial aid agreement with UConn that provided that: she would receive full-out-of-state athletic grant-in-aid hereinafter "athletic grant-in-aid" or "scholarship") for her participation in women's soccer during 2014-15 academic year; and the athletic grant-in-aid may be immediately reduced or cancelled during the term of the award if she engaged in serious misconduct that brings substantial disciplinary penalty; the financial aid agreement was also signed by Mona Lucas and Coach Tsantiris. A true and accurate copy of this financial aid agreement is attached to plaintiff's complaint, Ex. C.

2

**NCAA Certification and Student-Athlete Handbook**

12. For academic year 2014-15, all UConn student-athletes, including the plaintiff, were subject to obligations and responsibilities that were contained in the Student-Athlete Handbook of 2013-14 ("Student-Athlete Handbook").  These obligations and responsibilities were in addition to the Student Code of Conduct that applied to all students at UConn. UConn student-athletes are subject to these additional obligations because they enjoy privileges that other students do not and they are responsible for requirements that do not apply to other students, i.e., athletic eligibility requirements, media relations, team travel rules, complimentary admissions, drug testing, etc. A true and accurate copy of the Student-Athlete Handbook is attached to plaintiff's Complaint as Exhibit G.

13. Annually, all UConn student-athletes, including the plaintiff, were required to comply with the certification process specified in NCAA bylaws 12.7 and 14.4 in order to be eligible to participate in intercollegiate athletics; Athletics Compliance was responsible for conducting the certification process and required student-athletes to submit requested information, provided student-athletes with information and required student- athletes to sign and verify documents.

14. On August 4, 2014, plaintiff completed the certification process described above; as part of the certification process, plaintiff electronically signed "Verification of Documents Received" that the Student-Athlete Handbook was available online via uconnhuskies.com and that she understood that the Student-Athlete Handbook "explains my obligations and responsibilities as a student-athlete at the University

3

of Connecticut . . . I consent that it is my obligation to read and understand the Student-Athlete Handbook." A true and accurate copy of plaintiff's electronically signed verification of document received-Student-athlete Handbook is attached hereto as Exhibit 16.

15.  The Student-Athlete Handbook contains a student-athlete code of conduct that specifies that unsportsmanlike behavior will not be tolerated, which includes: "using obscene or inappropriate language or gestures to officials, opponents, team members or spectators. . . violating generally recognized intercollegiate athletic standards or the value and standards associated with the University as determined by your head coach and approved by the Athletic Director." Exhibit G to plaintiff's complaint, Student- Athlete Handbook, p. 5.

**Notice of Cancelled Grant-in-Aid**

16. The custom and practice of Athletics Compliance and Financial Aid Services relating to cancelling a student-athlete's grant-in-aid was that Athletics Compliance would prepare a cancellation letter for Mona Lucas's signature; Ms. Lucas would sign the letter, or it would be signed on her behalf by Ms. Lucas's authorized representative; Financial Aid Services would provide Athletics Compliance with the signed cancellation letter and then Athletics Compliance would send the letter to the student via email and U.S. mail.

17. On December 22, 2014, I emailed plaintiff a letter dated December 22, 2014, that was signed by Kimberly Campbell (an authorized representative of Mona Lucas) on behalf of Mona Lucas; the letter was prepared by Athletics Compliance; also

UConn SJM Exhibit 13

attached to the email was the UConn Financial Aid Hearing Procedures. A true and accurate copy of the December 22, 2014 email and attachments are attached hereto as Exhibit 17.

18. The December 22, 2014 letter, Exhibit 17, advised plaintiff that her athletic grant-in-aid for spring semester was cancelled because of serious misconduct; that she could request a hearing if she felt that the cancelled aid was unfair or unjustified; and the letter referred to and included UConn policies and procedures for conducting the required hearing and the deadline which a student-athlete may request a hearing.

19. On December 22, 2014, Angie Cretors provided plaintiff via email a letter permitting her to contact other institutions about the possibility of transferring, a true and accurate copy of this email is attached hereto as Exhibit 18.

20. Ms. Radwan submitted her NLI release request on January 13, 2015, which triggered an automated email from NLI to Warde Manuel and Angie Cretors on January 13, 2015 regarding Ms. Radwan's request for release; a true and accurate copy of this NLI email to Angie Cretors and Warde Manuel is attached hereto as Exhibit 19.

21. On or about January 8, 2015, Alyssa Morales Assistant Director of Athletics /Compliance, Hofstra University sent to the attention of Angie Cretors, a transfer eligibility questionnaire regarding Noriana Radwan; Kristen Hagris, UConn Assistant Director of Compliance completed the form on January 21, 2014 and

UConn SJM Exhibit 13

provided it to Hofstra University; a true and accurate copy of this document is attached hereto as Exhibit 20.

22. The Transfer Eligibility Questionnaire for plaintiff, Exhibit 20, provided information regarding the academic and athletic eligibility of the plaintiff and granted her the use of the one-time transfer exception for immediate eligibility at her next institution.

**Student-athletes Other than Plaintiff**



6

UConn SJM Exhibit 13



_____
Ann Fiorvanti

STATE OF _Connecticut_ )
                        ) ss: _STORRS /MANSFIELD_
COUNTY OF _TOLLAND_ )


Sworn and subscribed before me on this _23_ day of October, 2019.

_____
Commissioner of the Superior Court or Notary Public

**EVAN D. FEINGLASS**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2020

UConn SJM Exhibit 13



NATIONAL LETTER of INTENT

2014-2015

Name of Prospective Student-Athlete **RADWAN**                **NORIANA**
　　　　　　　　　　　　　　　　Last　　　　　　　　　　　　　First　　　　　Middle Initial

Permanent Address **WAPPINGERS FALLS**　　**NY**　　12590　　　US
　　　　　　　　　City　　　　　　　　　State　　　Postal Code　　Country

Prospective Student-Athlete's NCAA ID ____1307378362____　　Date of Birth _____
*(must be registered with the NCAA Eligibility Center and on the Institutional Request List)*

Submission of this NLI has been authorized by:

SIGNED _____　　　　　2/5/2014
　　　Director of Athletics (or designee)　　　　　Date Issued to Prospective Student-Athlete

**WOMEN'S SOCCER**
　　　Sport

**For Institutional Use Only:**
Two-year college transfer ☐
Two-year college expected graduation date _____
(if required to graduate)

This is to certify my decision to enroll at _____**University of Connecticut**_____
　　　　　　　　　　　　　　　　　　　　　　　　Name of Institution

I certify that I have read all terms and conditions included in this document. I have discussed them with the coach and/or other staff representatives of the institution named above, and I fully understand, accept and agree to be bound by them. I understand that signing this NLI is voluntary and I am not required to sign the NLI to receive athletics aid and participate in intercollegiate athletics. Additionally, I give my consent to the signing institution, to disclose to authorized representatives of its athletics conference (if any), the NCAA and the NLI Office any documents or information pertaining to my NLI signing. Further, I give my consent to the NLI Office to disclose my name and personally identifiable information from my education records to a third party (including but not limited to the media) as necessary to correct any inaccuracies reported by the media or related to my NLI signing, without such disclosure constituting a violation of my rights, including my rights under the Family Educational Rights and Privacy Act.

If I falsify any part of this NLI, or if I have knowledge that my parent or legal guardian falsified any part of this NLI, I understand I shall forfeit the first year of my athletics competition at any NLI participating institution.

My signature on this NLI nullifies any agreements, oral or otherwise, which would release me from the conditions stated within this NLI.

SIGNED _____　　2/10/14　　3:10 pm
　　　Prospective Student-Athlete Signature　　Signing Date (Mth/Day/Yr)　　Time (Circle - A.M. / P.M.)
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Do not sign prior to 7:00 a m
Parent/ legal guardian signature required if prospective student-athlete　　(local time) on the initial
has not reached his or her 21st birthday.　　　　　　　　　　　　　　signing date.

SIGNED __K. Radwan__　　　　　　　　　2/10/14　　3:10 pm
(Check one) ☑ Parent or ☐ Legal Guardian Signature　Signing Date (Mth/Day/Yr)　　Time (Circle - A.M. / P.M.)
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Do not sign prior to 7:00 a m.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(local time) on the initial
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　signing date.

__Khaled Radwan__　　　(845) 440 3447　　　nornor100@aim.com
Print Name of Parent/Legal Guardian　Telephone Number (including area code)　Email Address

NLI

Copyright © National Letter of Intent

Rev. 10/01/2013

UConn SJM Exhibit 14



## 2014-15
Administered by the NCAA on behalf of the Collegiate Commissioners Association (CCA).

**Do not sign prior to 7 a.m. (local time) on the following dates or after the final signing date listed for each sport.**

| SPORT (Place an "X" on the proper line.) | INITIAL SIGNING DATE | FINAL SIGNING DATE |
|---|---|---|
| ___ Basketball (Early Period) | November 13, 2013 | November 20, 2013 |
| ___ Basketball (Regular Period) | April 16, 2014 | May 21, 2014 *(Division I)* |
| | | August 1, 2014 *(Division II)* |
| ___ Football (Midyear JC Transfer) | December 18, 2013 | January 15, 2014 |
| ___ Football (Regular Period) | February 5, 2014 | April 1, 2014 |
| ___ Field Hockey, Soccer, Men's Water Polo | February 5, 2014 | August 1, 2014 |
| Track and Field/Cross Country | | |
| ___ All Other Sports (Early Period) | November 13, 2013 | November 20, 2013 |
| ___ All Other Sports (Regular Period) | April 16, 2014 | August 1, 2014 |

### IMPORTANT - READ CAREFULLY

It is important to read this entire document before signing it. One copy is to be retained by you and the other copy is to be returned to the institution, which will file a copy with the appropriate conference office. **It is permissible to transmit copies by facsimile or electronically.** The National Letter of Intent (NLI) is a voluntary program with regard to both institutions and prospective student-athletes. No prospective student-athlete or parent is required to sign the NLI for a prospective student-athlete to receive athletics aid and participate in intercollegiate athletics.

1. **Initial Enrollment in Four-Year Institution.** This NLI applies only to prospective student-athletes who will be entering four-year institutions for the first time as full-time students. It is permissible for 4-2-4 transfer student-athletes to sign the NLI provided a previous valid NLI does not apply. The terms of the previous NLI are satisfied if a student-athlete graduates from the two-year college.

2. **Financial Aid Requirement.** At the time I sign this NLI, I must receive a written offer of athletics financial aid for the entire 2014-15 academic year from the institution named in this document. The offer must list the terms, conditions and amount of the athletics aid award. (A midyear football two-year college transfer student-athlete must receive a written offer of athletics financial aid for the remainder of the 2013-14 academic year. If the institution does not renew the athletics aid for the following academic year, the student-athlete must be released of the NLI). In order for this NLI to be valid, my parent/legal guardian and I must sign the NLI and I must also sign the offer of athletics aid (see institutional policy for parent/legal guardian signature) prior to submission to the institution named in this document, and any other stated conditions must also be met. If the conditions stated on the financial aid offer are not met, this NLI shall be declared null and void.

   - **Professional Sports Contract.** If I sign a professional sports contract in the sport in which I signed the NLI, I remain bound by the NLI in all sports, even if NCAA rules prohibit the institution named in this document from providing me with athletics financial aid.

3. **Provisions of Letter Satisfied.**

   a. **One-Year Attendance Requirement.** The terms of this NLI shall be satisfied if I attend the institution named in this document for one academic year (two semesters or three quarters) as a full-time student.

   b. **Two-Year College Graduation.** After signing this NLI while in high school and if I later attend a two-year college, the terms of this NLI will be satisfied if I graduate from the two-year college.

4. **Basic Penalty.** I understand that if I do not attend the institution named in this document for one full academic year and I enroll in another institution participating in the NLI program, I may not compete in intercollegiate athletics until I have completed one full academic year in residence at the latter institution. Further, I understand I shall be charged with the loss of one season of intercollegiate athletics competition in all sports. This is in addition to any seasons of competition used at any institution.

5. **Early Signing Period Penalties.** Prospective student-athletes who will participate in football are prohibited from signing an NLI during the early signing period. A prospective student-athlete who signs an NLI during the early period in a sport other than football will be ineligible for practice and competition in football during the first year of enrollment at an NLI member institution and shall forfeit one season of competition in football. In circumstances where a prospective student-athlete's primary sport is not football, but anticipates participating in football, the prospective student-athlete should delay signing an NLI until either the football signing period or during the regular signing period for all other sports.

6. **Release Request and Appeal Process.** In the event I wish to be released from my NLI obligation, the NLI release request and appeal process information can be reviewed on the NLI Web site at www.national-letter.org. I understand that the NLI Policy and Review Committee has been authorized to issue interpretations, settle disputes and consider petitions for complete release from the provisions of the NLI when extenuating circumstances are determined to exist and the signing institution denies my request for release. I further understand the Committee's decision may be appealed to the NLI Appeals Committee, whose decision shall be final and binding.

2014-15 - 1

UConn SJM Exhibit 14

7.   **Letter Becomes Null and Void.** This NLI shall be declared null and void if any of the following occur:

    a.   **Admissions Requirement.** This NLI shall be declared null and void if the institution named in this document notifies me in writing that I have been denied admission or, by the opening day of classes in fall 2014, has failed to provide me with written notice of admission, provided I have submitted a complete admission application. It is my obligation to provide, by request, my academic records and an application for admission to the signing institution. If I fail to submit the necessary academic credentials and/or application to determine an admission decision prior to September 1, the NLI office per its review with the institution will determine the status of the NLI.

    If I am eligible for admission, but the institution named in this document defers my admission to a subsequent term, the NLI will be declared null and void; however, this NLI remains binding if I defer my admission.

    b.   **Eligibility Requirements.** This NLI shall be declared null and void if, by the opening day of classes in fall 2014, I have not met NCAA initial eligibility requirements; NCAA, conference or institution's requirements for athletics financial aid; or two-year college transfer requirements, provided I have submitted all necessary documents for eligibility determination.

        (1)   This NLI shall be rendered null and void if I become a nonqualifier (per NCAA Bylaw 14.3). This NLI remains valid if I am a partial qualifier per NCAA Division II rules unless I do not meet the institution's policies for receipt of athletics aid.

        (2)   It is my obligation to register with and provide information to the NCAA Eligibility Center. If I fail to submit the necessary documentation for an initial-eligibility decision and have not attended classes at the signing institution, the NLI office per its review with the institution will determine the status of the NLI.

        (3)   This NLI shall be rendered null and void if I am a midyear football two-year college transfer and I fail to graduate from two-year college at midyear, if required per NCAA, conference or institutional rules. The NLI remains binding for the following fall term if I graduated, was eligible for admission and financial aid and met the two-year college transfer requirements for competition for the winter or spring term, but chose to delay my admission.

    c.   **One-Year Absence.** This NLI shall be declared null and void if I have not attended any institution (two-year or four-year) for at least one academic year, provided my request for athletics financial aid for a subsequent fall term is denied by the signing institution. *Service in active duty with the U.S. armed forces or an official church mission for at least 12 months can use the One-Year Absence to null and void the NLI.* I may still apply this provision if I initially enrolled in an NLI member institution but have been absent for at least one academic year. To apply this provision, I must file with the appropriate conference office a statement from the director of athletics that such athletics financial aid will not be available for the requested fall term.

    d.   **Discontinued Sport.** This NLI shall be declared null and void if the institution named in the document discontinues my sport.

    e.   **Recruiting Rules Violation.** If eligibility reinstatement by the NCAA student-athlete reinstatement staff is necessary due to NCAA and/or conference recruiting rules violations, the institution must notify me that I have an option to have the NLI declared null and void due to the rules violation. It is my decision to have the NLI remain valid or to have the NLI declared null and void, permitting me to be recruited and not be subject to NLI penalties.

8.   **Recruiting Ban After Signing.** I understand all participating conferences and institutions are obligated to respect my signing and shall cease contact with me and my family members after my signing this NLI which includes me and my family members not initiating contact with athletic staffs at other institutions. Any contact in excess of an exchange of a greeting is not permitted regardless of the conversation. The conversation does not have to result in recruiting discussion for a recruiting ban violation to occur. I shall notify any coach who contacts me that I have signed an NLI. Once I enroll in the institution named in this document, the NLI Recruiting Ban is no longer in effect and I shall be governed by applicable NCAA bylaws.

9.   **7-Day Signing Deadline.** If my parent/legal guardian and I do not sign this NLI and accompanying offer of athletics aid within 7 days after the date of issuance (noted on the signing page) it will be invalid. The 7-day signing deadline does not apply if the NLI is received on the last day of a signing period (e.g., August 1). In this case, the 7-day signing deadline only applies if there are 7 days remaining for the signing period. Additionally, the institution must file the NLI with its conference office within 14 days of the date of final signature; otherwise, the NLI is invalid.

10.   **Statute of Limitations.** I am subject to the NLI penalty if I do not fulfill the agreement; however, if I do not attend an NLI member institution to fulfill the agreement or penalty and four years has elapsed since my signing date, the NLI is no longer binding. Therefore, this NLI is in full force and effect for a period of four years, commencing with the date I sign this NLI.

11.   **Coaching Changes.** I understand I have signed this NLI with the institution and not for a particular sport or coach. If a coach leaves the institution or the sports program (e.g., not retained, resigns), I remain bound by the provisions of this NLI. I understand it is not uncommon for a coach to leave his or her coaching position.

12.   **Coaching Contact Prohibited at Time of Signing.** A coach or an institutional representative may not hand deliver this NLI off the institution's campus or be present off campus at the time I sign the NLI per NCAA rules. This NLI may be delivered by express mail, courier service, regular mail, e-mail or facsimile. An NLI submitted to an institution electronically is permissible.

**It is important to read more information about the NLI at www.national-letter.org.**

Copyright © National Letter of Intent                    Rev.10/01/2013                    2014-15 - 2

UConn SJM Exhibit 14



*Athletics Compliance*
## VERIFICATION OF DOCUMENTS RECEIVED

### Student-Athlete Handbook & Student Code

*I realize and agree that the privileges of participating in athletics at the University of Connecticut is dependent upon, but not limited to, adherence to the statements contained in the Student Code.*
*UConn Division of Student Affairs Student Code: http://www.dos.uconn.edu/student_code.htm.*

*I understand that violations of this University of Connecticut Student Code may render my participation and financial aid package null and void.*

*I hereby certify that I have read, understand, and will observe the statements contained in the Student Code for the entire period of time that I am a student-athlete at the University of Connecticut. I have had the opportunity to ask questions and receive explanation for any statements that I do not understand.*

*I have been made aware that the Student-Athlete Handbook is available online via the uconnhuskies.com website and understand that it is a reference that explains my obligations and responsibilities as a student-athlete at the University of Connecticut. Current policies and procedures for student-athletes are contained in this document which includes such issues as:*
- *NCAA, Conference, and Institutional requirements for participation in athletics and how to report NCAA violations*
- *Renewal and non-renewal of athletics grant-in-aid, as well as grievance procedures*
- *Social networking guidelines (i.e. Facebook, Twitter, Pinterest)*
- *Academic and eligibility requirements and expectations*
- *University hazing policy*
- *Available counseling (mental/emotional, alcohol & substance dependency, eating disorders, etc.)*

*I consent that it is my obligation to read and understand the Student-Athlete Handbook.*

*I have agreed to the above provisions and the requirements of the Student Code and Student-Athlete Handbook.*

| | |
|---|---|
| *Harianne Andrews* | 08/04/2014 |
| Student-Athlete Signature | Date: |
| ▮▮▮▮ | *Signature Here...* |
| Student-Athlete Age | Parent/Guardian Signature (if under 18) |

### UCONN Consent to Use of Image

*I hereby authorize the University of Connecticut, the applicable conference or its agents or licensees to make copies of, use, and distribute, directly or through a third party, any photographic or other images taken in conjunction with my participation on a University of Connecticut intercollegiate athletic team. I also authorize the University of Connecticut or its agents or licensees to use my name and any relevant biographical or statistical information in connection with the photographs or images.*

| | |
|---|---|
| *Harianne Andrews* | 08/04/2014 |
| Student-Athlete Signature | Date: |
| ▮▮▮▮ | *Signature Here...* |
| Student-Athlete Age | Parent/Guardian Signature (if under 18) |

## UCONN

UConn SJM Exhibit 16

| | |
|---|---|
| **From:** | Fiorvanti, Ann |
| **To:** | "NORIANA.RADWAN@UCONN.EDU" |
| **Cc:** | Lucas, Mona; Tsantiris, Leonidas |
| **Subject:** | 2014-2015 Athletic Grant-In-Aid Award Cancellation Letter |
| **Date:** | Monday, December 22, 2014 1:52:22 PM |
| **Attachments:** | Radwan.pdf |
| | UConn - Financial Aid Hearing Procedures.pdf |

Hi Noriana,

Please find attached your 2014-2015 Athletic Grant-In-Aid Award Cancellation Letter.  If you have any questions, please let me know.

Thank you,
Annie



**Annie Fiorvanti**
**Assistant Athletic Director for Compliance Services**
University of Connecticut | 2095 Hillside Road U-1173 | Storrs, CT 06269
Office: 860.486.1652 | Fax: 860.486.2245 | uconnhuskies.com



Division of Enrollment Planning and Management
**Student Financial Aid Services**
* **Financial Aid**
* Scholarships
* Student Employment

December 22, 2014

Noriana Radwan
70 Holly Loop
Wappingers Falls, NY 12590

PS #: 2082747

Dear Noriana,

This letter is to inform you that upon recommendation of the Division of Athletics and the application of NCAA Bylaw 15.3.4. (Reduction or Cancellation Permitted), your Full Athletics Grant-in-aid will be cancelled for the remainder of the 2014-2015 academic year due to a serious misconduct issue. This decision is in accordance with the NCAA Constitution, the Conference, and institutional regulations that apply.

If you feel that the cancellation of the aid is unfair or unjustified, you can request a hearing as provided by NCAA regulations. A copy of UConn's established policies and procedures for conducting the required hearing, including the deadline by which a student-athlete must request such a hearing are included with this letter. To make this request, contact my office in writing within fourteen business days of the receipt of this letter. A hearing will be scheduled for you with the Financial Aid Appeals Committee.

Sincerely,

*Mona Lucas (lc)*

Mona L. Lucas, M.Ed.
Director of Student Financial Aid Services

cc:     Coach Tsantiris
        Athletic File

233 GLENBROOK ROAD, UNIT UNIT 4116
STORRS, CT 06269-4116
PHONE 860.486.2819
FAX 860.486.6629
financialaid@uconn.edu
financialaid.uconn.edu

*An Equal Opportunity Employer*

UConn SJM Exhibit 17

**University of Connecticut – Financial Aid Hearing Procedure**

Per Bylaw 15.3.2.3, the institution's regular financial aid authority shall notify the student-athlete in writing of the opportunity for a hearing when institutional financial aid based in any degree on athletics ability is to be reduced or cancelled during the period of the award, or is reduced or not renewed for the following academic year.

The University of Connecticut has set the following procedures related to a hearing request:

- The student-athlete will receive written notification of the reduction/cancellation/non-renewal of their athletic aid, and is informed that upon request, they will be provided with a hearing by an institutional entity outside of the university's athletics department or its faculty athletics committee. Along with written notification, they will receive a copy of the institution's established policies and procedures for conducting the required hearing.
- The student-athlete will have **14 business days** from the date on the notification letter to submit a written request for a hearing to the Director of Student Financial Aid Services.
- The Director of Student Financial Aid Services will serve as the chair of the hearing, and will select two institutional staff members to serve on the hearing committee. Please note that an athletics department staff member and/or the faculty athletics representative may be a member of the committee as long as they are a standing member for all financial aid hearings related to reductions/cancellations/non-renewals of a student-athlete's financial aid. In addition to the committee, a representative from the Office of Athletic Compliance will be present strictly from an NCAA rules perspective, and the financial aid liaison to the Division of Athletics will also be present as a resource.
- The hearing will take place within **15 business days** of receipt of the student-athlete's written request for a hearing. The chair will contact all participants to arrange a time, date, and location for the hearing. Along with the committee members, the coach and sport administrator will be invited, as well as the student-athlete. Requests for additional individuals to attend must be presented to the chair within 2 business days of the hearing. The chair reserves the right to approve the participation of other individuals that they deem necessary to the conduct of the hearing. All participants will be notified via email with the confirmed meeting details.

On the day of the hearing, the chair will follow the below process:

- *Introduction:*
  - The committee chair will call the meeting to order and introduce the members of the hearing committee and their affiliations.
  - Following introduction of the committee, any coaches or sport administrators who are present will introduce themselves.
  - The student-athlete who is present will then introduce himself/herself along with any representative of the student-athlete's interest who is also in attendance.
    - *Note:* if a student-athlete cannot be present at the hearing, they do have the option to submit a written statement or participate via phone.

- o   After introductions, the committee chair will make any necessary announcements.
- *Opening Statements:*
  - o   The committee chair reviews the purpose and organization of the hearing, and explains the voting procedures used by the committee to the student-athlete. In addition, they will confirm the timeline regarding notification of results to all parties.
  - o   The representative from the Office of Athletic Compliance will review the NCAA rules related to reduction/cancellation/non-renewal of athletics aid.
  - o   The student-athlete or his/her representative will first provide an opening statement, followed by the representative from the institution. An opening statement should be brief, providing only information regarding the nature of the case and the position of each party and generally should not include any specific information that will be reviewed during the consideration of the individual positions.
- *Review of the Positions:*
  - o   The student-athlete will present any relevant information pertaining to why their athletic aid should not be reduced/cancelled/non-renewed. There is no time limit on the discussion as the purpose of the hearing is to provide each party an opportunity to present all information that it deems important for the committee to review in its consideration.
  - o   The institution is then provided an opportunity to explain the reason for reducing/cancelling/non-renewing the student-athlete's athletics aid. The same consideration should be granted to the representative of the institution as was granted to the student-athlete.
  - o   Each party may be allowed to respond to the other party's statements at the discretion of the committee. Additionally, the committee members may ask questions at any time during the discussion. Any involved party may be questioned on any relevant issue.
  - o   If the institution or any involved individual wishes to ask a question of the other party, that question should be directed to the committee, which will then decide if the question is appropriate and will direct it to the appropriate individual.
- *Closing Statements:*
  - o   After the discussion of all relevant information, the committee may hear closing statements from both parties.
  - o   The student-athlete makes his/her statement first, followed by the institution. Similar to opening statements, closing statements are not intended to discuss the details of the case. This provides an opportunity for each party to summarize the discussions that occurred during the hearing and to provide a brief statement regarding the case.
  - o   At the conclusion of the closing statements the parties will be excused and the committee will deliberate until reaching a decision.

Once a decision is reached, the committee chair will notify the student-athlete and the institution of said decision. Response will be provided via email within **5 business days** of the hearing. The Office of Compliance will proceed by completing the appropriate documentation, if any. The committee's decision is final.

| From: | Cretors, Angie |
| --- | --- |
| To: | NORIANA.RADWAN@UCONN.EDU |
| Cc: | Rodriguez (Tletjen), Margaret; Tsantiris, Leonidas; Fiorvanti, Ann |
| Subject: | Permission to Contact |
| Date: | Monday, December 22, 2014 2:25:00 PM |
| Attachments: | Radwan.pdf |
| | image001.png |

Hi Noriana –

Attached is your permission to contact institutions about the possibility of transferring. Just so you are aware, the American Athletic Conference does have a specific rule regarding transferring within the conference. The policy is below:

**INTRA-CONFERENCE TRANSFER POLICY**
A student-athlete may transfer from one American institution to another American institution and participate in any sport provided that:
1. Prior to competing for or receiving athletically related financial aid from the second Conference institution, the student-athlete serves a year in residency at the second Conference institution [two full semesters or three full quarters (which shall be determined in accordance with NCAA rules associated with transfers)]. During such year of residency, the student-athlete is permitted to practice pursuant to NCAA practice eligibility rules. Further, a transfer student-athlete admitted after the 12th class day may not utilize that semester for the purpose of establishing residency.
2. The student-athlete shall be charged with the loss of one (1) season of eligibility (in all sports).
3. There are no exceptions or waivers to this policy.

Please note, that this policy does **not** apply if you transfer outside the American Athletic Conference.

Lastly, due to the fact that you signed an NLI, you will need to request a release via the NCAA Eligibility Center.

Please let me know if you have any questions.

Thanks-
Angie



UConn SJM Exhibit 18

Angie Cretors
Senior Associate Director of Athletics – NCAA Rules Education and Compliance Services
University of Connecticut

UConn SJM Exhibit 18



# UCONN
## ATHLETICS

December 22, 2014

To whom it may concern:

A student-athlete at the University of Connecticut may have an interest in transferring to your institution.  In accordance with NCAA Bylaw 13.1.1.3, the University of Connecticut is hereby granting permission to speak with **Noriana Radwan** in the sport of **Women's Soccer** to pursue potential transfer possibilities.

Should you need additional information, please feel free to contact me.


Sincerely,
Angie Cretors
Senior Associate Director of Athletics - Compliance
(860) 486-1211
Angie.cretors@uconn.edu



www.UConnHuskies.com
An Equal Opportunity Employer

2095 Hillside Road, Unit 1173
Storrs, CT 06269-1173

UConn SJM Exhibit 18

**From:** Rodriguez (Tietjen), Margaret
**Sent:** Tuesday, January 13, 2015 6:58 PM
**To:** Cretors, Angie <angie.cretors@uconn.edu>
**Subject:** RE: One of your institution's NLI signees has submitted an NLI release request

Oh yes of course. I assumed we granted her the complete release already. Yes we are releasing her nli

Margaret Rodriguez
Assistant Coach
UConn Soccer
(O) 860-486-3459
(C) 860-617-5428
(F) 860-486-0525
www.uconnhuskies.com

UConn SJM Exhibit 19

-------- Original message --------
From: "Cretors, Angie" <angie.cretors@uconn.edu>
Date: 01/13/2015 5:28 PM (GMT-05:00)
To: "Rodriguez (Tietjen), Margaret" <margaret.rodriguez@uconn.edu>
Subject: RE: One of your institution's NLI signees has submitted an NLI release request

It allows her to play rather than have her sit out. We usually grant them the complete release.

Sent via the Samsung Galaxy S™ III, an AT&T 4G LTE smartphone

-------- Original message --------
From: "Rodriguez (Tietjen), Margaret" <margaret.rodriguez@uconn.edu>
Date: 01/13/2015 5:26 PM (GMT-05:00)
To: "Cretors, Angie" <angie.cretors@uconn.edu>
Subject: RE: One of your institution's NLI signees has submitted an NLI release request

Not sure im aware of what that means. She is going to Hofstra I would assume on $. No longer a part of uconn and socce so what does it mean to release an nli?

Do we gain/lose anything from releasing it?

Margaret Rodriguez
Assistant Coach
UConn Soccer
(O) 860-486-3459
(C) 860-617-5428
(F) 860-486-0525
www.uconnhuskies.com

-------- Original message --------
From: "Cretors, Angie" <angie.cretors@uconn.edu>
Date: 01/13/2015 5:08 PM (GMT-05:00)
To: "Rodriguez (Tietjen), Margaret" <margaret.rodriguez@uconn.edu>
Subject: Fwd: One of your institution's NLI signees has submitted an NLI release request

Are we releasing from nli?

Sent via the Samsung Galaxy S™ III, an AT&T 4G LTE smartphone

-------- Original message --------
From: nli@ncaa.org

UConn SJM Exhibit 19

Date: 01/13/2015 5:06 PM (GMT-05:00)
To: "Manuel, Warde" <warde.manuel@uconn.edu>,"Cretors, Angie" <angie.cretors@uconn.edu>
Subject: One of your institution's NLI signees has submitted an NLI release request

Director of Athletics and Compliance Office:

This is to inform you that **Noriana Radwan** (NCAA ID: **1307378362**, SPORT: **Women's Soccer**) has submitted an NLI release request. Please go to the member institution portal located in LSDBi in order to login to view and to complete the NLI release request which requires a decision of a complete release, no release or lifting the NLI recruiting ban. Please note this process has to be completed within 30 days of receipt of this email by the director of athletics or designee. The NLI office will grant a complete release for failure to comply with this 30-day response deadline. Should you need an extension or have questions, please contact the NLI Office at 317/223-0706 or NLI@ncaa.org.

You can click here to view the pending NLI release request. This link may take you to the NCAA Connect login page if you have not already entered LSDBi today.

For assistance, you can go to NLI Release Tutorial

UConn SJM Exhibit 19

Hofstra University Athletic Compliance – Transfer Eligibility Questionnaire



To: Angie Cretors, Senior Associate Director/Compliance, UCONN
From: Alyssa Morales, Assistant Director of Athletics/Compliance, Hofstra University
Date: 1/8/2015
Re: Noriana Radwan—W. Soccer student-athlete

The student listed above has requested permission to contact Hofstra University and is interested in participating in our intercollegiate athletics program. In order to review the student-athlete's eligibility under NCAA rules, we ask your assistance in responding to the following questions:

**Does your institution grant permission to contact the student per Bylaw 13.1.1.3?**  (Yes) No

1.  Please indicate the terms in which the student attended your institution (at full-time status). **Fall 2014**

2.  Has the student previously transferred from one four-year institution to another four-year institution?  Yes (No)
LIST PREVIOUS INSTITUTION(S): _____

3.  Has the student received any athletically related financial aid (e.g. grant-in-aid)?  (Yes) No
3a. IF YES, during how many academic years (for any period of time) did the student receive athletically related aid? **Fall '14**

4.  Was the student certified as a final academic qualifier by the NCAA Eligibility Center?  (Yes) No

5.  Was the student certified as a final amateurism qualifier by the NCAA Eligibility Center?  (Yes) No

6.  As of the day this form is completed, is the student in good academic standing?  (Yes) No

7.  As of the day this form is completed, is the student meeting progress toward degree requirements?  (Yes) No

8.  As of the day this form is completed, would the student be eligible to compete if he/she continued at your institution next term?  (Yes) No

9.  Did the student participate (practice or competition) in athletics at your institution?  (Yes) No
9a. IF YES to 9, during any academic year was participation for less than 14 days?  Yes (No)
9b. IF YES to 9a, during which academic years was participation for less than 14 days?

10. What sport(s) was this student a participant in? **W. Soccer**

11. The number of seasons of competition utilized: **1**

12. Did this student sign a National Letter of Intent with your school?  (Yes) No
12a. IF YES, for what academic year was the NLI signed? **2014-15**

13. Has the student-athlete been granted a waiver by the NCAA or Conference (e.g., hardship, ASS)?  Yes (No)
13a. IF YES, type of waiver that was granted: _____

14. Does your institution agree to grant the student an exception to the transfer residence requirement?  (Yes) No

15. Are you aware of any other exceptions or waivers of transfer rules for which the student is eligible?  Yes (No)
15a. IF YES, Bylaw associated with exception or waiver type:

Please return this competed form via facsimile to 516.463.7514 or email to Ariel.Pesante@hofstra.edu.
Thank you for your attention to this request.

Name: **Kristen Hargis**          Title: **Asst. Dir. Compliance**
Signature: *(signature)*          Date: **1/21/14**

UConn SJM Exhibit 20



UConn SJM Exhibit 21



Division of Enrollment Planning and Management
**Student Financial Aid Services**
* Financial Aid
* Scholarships
* Student Employment



UConn SJM Exhibit 22

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NORIANA RADWAN<br>PLAINTIFF, | : CIVIL ACTION NO. 3:16-CV-02091 (VAB)<br>:<br>: |
| v. | : |
| UNIVERSITY OF CONNECTICUT<br>BOARD OF TRUSTEES, WARDE<br>MANUEL, LEONARD TSANTIRIS,<br>AND MONA LUCAS, INDIVIDUALLY,<br>DEFENDANTS | : OCTOBER $\underline{25}$, 2019 |

## AFFIDAVIT OF MARGARET RODRIGUEZ

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I am presently the University of Connecticut ("UConn") women's soccer team head coach. I have held this position since January 2, 2018. I was the interim head coach from November 2017 through December 31, 2017.

3. In 2014, and at all times alleged in the complaint, I was employed as UConn assistant coach to women's soccer. I held that position from January 2008 to November 2017; at all times I was an assistant coach, Leonidas Tsantiris ("Coach Tsantiris") was head coach of UConn women's soccer team ("team").

4. Before the Fall 2014 soccer season began, Coach Tsantiris decided that he wanted to implement written team rules and wanted the rules to be the basis of a contract between each team member and the team. This was the only year that Coach Tsantiris had written rules and required team members to sign a team contract. All team members signed the team contract, including the plaintiff.

1

5. I kept a copy of each athlete's signed team contract. At some point after 2014-15, I discarded all but 2 team members signed copies. I just recently discovered in my office 2 contracts signed by plaintiff's teammates.

6. I was present on November 9, 2014, when the plaintiff showed her middle finger to the EPSNU camera at the end of the UConn-USF American Athletic Conference ("AAC") championship game.

7. Coach Tsantiris indefinitely suspended the plaintiff from all team activities because of her behavior on November 9, 2014.

8. My flight back to Connecticut was delayed on November 9, 2014, and I flew back on November 10, 2014. Coach Tsantiris remained in Florida after the game for a recruiting commitment.

9. On November 10, 2014, I received 2 emails from plaintiff at 1:34 a.m. and 12:50 p.m., apologizing for her behavior at the end of the UConn-USF championship game. A true and accurate copy of these emails are attached as Exhibits 24 and 25.

10. Plaintiff explained the following about her behavior in her November 10, 2014 email at 1:34 a.m., Ex.24: "It was an impulsive move and my senses did not kick in until it happened. I was in the heat of the moment, and I don't know why that was my first move. Unfortunately, by the time I realized it was a huge mistake, it was too late. It was never my intention to bring about so much attention to me or the school. I understand that I completely misrepresented the program and the institution. That kind of unsportsmanlike behavior is not what I stand for . . ."

2

11. The team advanced to the 2014 NCAA women's soccer tournament ("tournament") by winning the AAC championship game.

12. The team won the first tournament game played on November 15, 2014, at UConn.

13. The team lost the second tournament game played on November 22, 2014 at Penn State.

14. On November 20, 2014, plaintiff emailed me advising that she left Coach Tsantiris and me a letter on our desk. A true and accurate copy of this email is attached hereto as Exhibit 26. A true and accurate copy of plaintiff's letter to Coach Tsantiris, Coach Shaw and me referenced in Exhibit 26 is attached hereto as Exhibit 27.

15. Plaintiff's letter, attached as Exhibit 27, among other things, apologizes for her actions on November 9; and states the following about her behavior: "When the camera turned to me, the first thing I thought to do was throw my hands in the air and some sort of victory sign. Sadly, I had a terrible lapse in judgment in which I should have used more discretion. Whether this game had been aired on television or not, my gesture was obscene and inappropriate."

16. Regarding her future on the team, plaintiff wrote in her letter, "I cannot imagine not being part of this program and I hope this issue will not result in a permanent suspension from the team. Therefore, if I am permitted to return, I promise to come back a completely different player." She also wrote, "During my suspension,

3

I have been working on my fitness so that if I am allowed to return I will be in excellent shape." Id.

17. I replied to plaintiff's email, Exhibit 26, on November 20, 2014 at 1:00 p.m., and advised her that I did not get her letter before the team left for Penn State. A true and copy of my reply email is attached hereto as Exhibit 26.

18. I did not discuss with plaintiff what her future on the team would be from November 9 through the NCAA tournament games because I was busy handling my coaching obligations with the team in preparation for the NCAA tournament games and I did not want to be distracted further from that responsibility because of plaintiff's behavior on November 9.

19. After the Penn State loss, Coach Shaw and I returned to Connecticut with the team on or about November 22, 2014. Coach Tsantiris did not return to UConn with the team, he went to Florida to check out recruits and remained there until after Thanksgiving.

20. UConn was on Thanksgiving recess from November 23 through November 29, 2014.

21. I flew out to Oregon on November 23, 2014 to celebrate Thanksgiving with family. I did not go to my office until I returned to UConn after Thanksgiving recess.

22. Plaintiff emailed Coach Tsantiris, Coach Shaw and me on Thanksgiving Day, November 27, 2014; I replied to plaintiff on November 27, 2014, advising her that I had not gone back to my office yet to read her letter of November 20, 2014,

UConn SJM Exhibit 23

Exhibit 26. A true and accurate copy of plaintiff's November 27, 2014 email and my reply are attached hereto as Exhibit 28.

23. On or about December 2, 2014, I forwarded an email to all members of the women's soccer team, including the plaintiff, that I received from Megan Hastillo, UConn Assistant Director of Equipment, dated November 20, 2014. Ms. Hastillo requested that each team member provide their shoe request and size for the next year; In my email to the team, I asked the team members to email the requested information directly to Ms. Hastillo by Thursday, December 4, 2014. A true and accurate redacted copy of my email dated December 2, 2014, forwarding Ms. Hastillo's email dated November 20, 2014 is attached hereto as Exhibit 29. The redactions are the team member's email addresses (except for the plaintiff) which are protected from disclosure under FERPA.

24. Each team member met individually with Coach Tsantiris, including plaintiff on or about the first week of December 2014 for an end-of-season meeting.

25. I met with Plaintiff after her end-of-season meeting with Coach Tsantiris in December 2014. During this meeting, plaintiff asked me what was going to happen with her regarding her future on the team. I told her that I did not know, but that Coach Tsantiris was very upset about her behavior on November 9, 2014.

26. I observed that in the weeks following November 9 2014, Coach Tsantiris grew more upset about plaintiff's behavior because coaches, alumni and fans talked to him more about plaintiff's behavior than the fact that the team won the AAC championship.

5

27. Also during December 2014, prior to the final decision to cancel plaintiff's athletic-grant-in-aid, I spoke to plaintiff on the phone-- she went home after her final exams. During this call, I advised plaintiff that her grant-in-aid award was for only one year, and that even if she were permitted to remain on the team for Spring 2015, it was very likely that her grant-in-aid would not be renewed for 2015-16 because of her conduct on November 9, 2014, and because she was not fit during the Fall 2015.

28. During this conversation in December 2014, plaintiff told me that she would not be able to afford to stay at UConn if her athletic grant-in-aid was cancelled for Spring 2015 or not renewed for 2015-16.

29. Also during this conversation, I advised plaintiff that since athletic grant-in-aid was necessary for her to attend college, it would be in her best interest to attempt to transfer to another school for Spring 2015, so that she would have an opportunity to be awarded athletic grant-in-aid from another school's women's soccer team. If she waited until the end of Spring 2015, there would be limited opportunity for her to secure athletic grant-in-aid money because at that late date, other schools most likely would have already committed all their athletic grant-in-aid to other women's soccer recruits. I also advised plaintiff that the other coaches and I would assist her with finding another school she could transfer to where she could join their soccer program and be happy.

30. In December 2014, at some point after the conversation I had with plaintiff referenced in ¶¶ 27-29, I talked to Coach Tsantiris about plaintiff's future on the

6

team. I consulted Julie Purcell, UConn Athletics for Compliance Services, and was advised that plaintiff's athletic grant-in-aid could be cancelled because of the plaintiff's serious misconduct, i.e, showing her middle finger to the ESPNU camera on November 9, 2014.

31. Prior to December 21, 2014, Coach Tsantiris recommended cancelling plaintiff's scholarship to Neal Eskin and Warde Manuel. They supported Coach Tsantiris' recommendation and then the final decision was made to cancel plaintiff's athletic gran-in-aid. I agreed with this decision.

32. Coach Tsantiris advised me on December 21, 2014, that he called plaintiff to tell her that her athletic grant-in-aid was cancelled for Spring 2015 and that she was no longer on the team.

33. I talked to plaintiff and her father shortly after Coach Tsantiris informed plaintiff that her athletic grant-in-aid would be cancelled for Spring 2015. I told plaintiff that the other coaches and I would help her transfer and find a new college (for Spring 2015) where she could play soccer and be happy.

34. Plaintiff copied me and UConn Athletic Director Warde Manuel on an email to Coach Tsantiris on December 21, 2014 at 7:48 p.m. A true and accurate copy of this email is attached hereto as Exhibit 30. This email, Exhibit 30, requested Coach Tsantiris to reconsider his decision to cut her from the team and to take away her athletic grant-in-aid.

UConn SJM Exhibit 23

35. I replied to plaintiff's email referenced above, Exhibit 30, on December 22, 2014, at 12:06 p.m. with a copy to Coach Shaw and Coach Tsantiris on this email. A true and accurate copy of this email is attached hereto as Exhibit 31.

36. I advised plaintiff in my email referenced above Exhibit 31, that we (the Athletic Department and Coaching Staff) were moving forward with cancelling her aid for the spring semester based on her misconduct.

37. I further explained in my December 22, 2014 email (Exhibit 31) that "Canceling your aid is serious but your obscene gesture at the championship game was serious as well and was an embarrassment to the University and UConn women's soccer program. You were informed immediately after the incident that you will be suspended indefinitely and were told by Zac (Coach Shaw), in your meeting with him, that this incident could impact your scholarship."

38. I also advised plaintiff in my December 22, 2014 email (Exhibit 31) that she could return to UConn in Spring 2015 to take the classes for which she was already registered, but that she would not be provided financial assistance from women's soccer.

39. Lastly, I advised plaintiff in my December 22, 2014 email (Exhibit 31) that if she wished to transfer, as she mentioned in her email dated December 21, 2014 (Exhibit 30), then the other coaches and I would help her find another soccer program.

40. I assisted the plaintiff with finding a soccer program that she could transfer to for Spring 2015. I contacted Central Connecticut State University where my sister,

8

Jennifer Prozzo is an assistant coach; University of Miami head coach Mary Francis Monroe; and Northeastern University head coach Tracey Leone.

41. Attached hereto as Exhibit 32 is a true and accurate copy of screen shot text messages between plaintiff and me from December 22, 2014 through January 13, 2015, relating to plaintiff's efforts (and my efforts to assist her) to transfer from UConn to a new school where she could join their soccer program in Spring 2015.

42. Plaintiff confirmed via text message to me on January 9, 2015, that she was transferring to Hofstra University. (Exhibit 32, p. 14-15)

43. Plaintiff's scholarship was not cancelled for the purpose of freeing up athletic grant-in-aid for a Notre Dame women's soccer player who was considering transferring to UConn.

Margaret Rodriguez

STATE OF Connecticut )
                          ) ss: Storrs / Mansfield
COUNTY OF Tolland )

Sworn and subscribed before me on this 25th day of October, 2019.

Commissioner of the Superior Court or Notary Public

EVAN D. FEINGLASS
NOTARY PUBLIC
MY COMMISSION EXPIRES JULY 31, 2020

9

| From: | Noriana Radwan |
|---|---|
| To: | Rodriguez (Tietjen), Margaret |
| Date: | Monday, November 10, 2014 1:34:42 AM |

Hi Mags,

I am emailing you now because I heard that your flight got delayed and you may not be in your office tomorrow.  Therefore, I wanted to reach out to you as soon as possible.

   I understand that this apology  in no way excuses my actions.  However, I wanted to say that I am truly sorry for the way I acted after the game.  It was an impulsive move and my senses did not kick in until it happened. I was in the heat of the moment, and I don't know why that was my first move.    Unfortunately, by the time I realized it was a huge mistake, it was too late.  It was never my intention to bring about so much attention to me or the school.  I understand that I completely misrepresented the program and the institution. That kind of unsportsmanlike behavior is not what I stand for and does not reflect who I am as a person.  I realize that it was completely inappropriate and uncalled for, and for that I am truly sorry. I hold myself accountable for my actions but I wanted to make it clear that I did not mean to deflect any of the team's spotlight onto me by such a careless and reckless action.  I did the best damage control I could and got people to take down the picture as well as deactivating my social media account.  The program and the team means everything and more to me, and there is nothing I would love more than to be a part of it.  I have made it part of my goals here to be as supportive as I can no matter what, and in my excitement, I did the opposite.  I did not mean to cause any commotion and headache. I extended my apology out to the team, and I will continue to extend it to coach and Zac, as well as the administrative team who was there.  I have made a terrible mistake, but I hope you can accept my sincere apology. Please let me know if there is anything I could do.


Noriana Radwan
nornor100@aim.com

UConn SJM Exhibit 24

| | |
|---|---|
| **From:** | Noriana Radwan |
| **To:** | Rodriguez (Tietjen), Margaret |
| **Subject:** | Follow up |
| **Date:** | Monday, November 10, 2014 12:50:20 PM |

Hi again,

Following up on my last email, I wanted to tell you that I stopped by the office today incase any of the coaching staff was in. I spoke to Zac and then immediately went to Gampel and spoke to Neil. I also set up an appointment with Warde tomorrow to issue my apology to him as well. I was hoping I could sit down with you as well and apologize face-to-face. I was also wondering if could tell me what is the best way I could get in touch with coach and let him know that I would like to speak to him as well. I was thinking of making a phone call just incase. Thanks again and I'm sorry to hear about the inconvenience of your flight.

Noriana

Sent from my iPhone

UConn SJM Exhibit 25

| | |
|---|---|
| **From:** | Rodriguez (Tietjen), Margaret |
| **To:** | nornor100@aim.com |
| **Subject:** | RE: Good Luck/ Letter |
| **Date:** | Thursday, November 20, 2014 1:00:15 PM |

Hi Nor,

I did not make it to the office this morning. I will get the letter when we return. I know this is a hard time for you and I'm thinking of you. We will bring back the 2 wins and advance to the elite eight. Thanks for keeping in touch and I will touch base when we get back.

Mags


Margaret Rodriguez
Assistant Coach
UConn Soccer
(O) 860-486-3459
(C) 860-617-5428
(F) 860-486-0525
www.uconnhuskies.com



-------- Original message --------
From: Noriana Radwan <nornor100@aim.com>
Date: 11/20/2014 12:12 PM (GMT-05:00)
To: "Rodriguez (Tietjen), Margaret" <margaret.rodriguez@uconn.edu>
Subject: Good Luck/ Letter


Hi Mags,

I just wanted to bid you, Coach, Zac, and the team good luck on the game tomorrow and I hope that it ends in a positive result. While I would love to attend, I already tried finding rides to the game but no one is making the drive. I really wish I could be there but unfortunately I can't make it work. I'm not sure if you made it to your office this morning, but I left you and Coach a letter on your desks for when you come back. It is just me keeping you updated on the past events and how I am feeling thus far. Let me know when you read it. Thanks again and good luck! Hope to see you next week!


Noriana Radwan
nornor100@aim.com

UConn SJM Exhibit 26

Dear Coach Lenny, Coach Mags, and Coach Zac,

Two weeks ago, the team achieved such an amazing award that was made possible by the hard work of everyone involved, including the three of you. As an injured player on the sidelines, I wanted nothing more than to see our team succeed and I became increasingly excited as we were getting closer to this goal. During our final celebration, I was overwhelmed with pure happiness due to what we had accomplished. When the camera turned to me, the first thing I thought to do was throw my hands in the air and do some sort of victory sign. Sadly, I had a terrible lapse in judgment in which I should have used more discretion. Whether this game had been aired on television or not, my gesture was obscene and inappropriate. I should have handled myself better in such a high-pressure environment. It is what I expect of myself and it is what you all expect of me. I take full responsibility for my actions and I have no one to blame but myself. I knew I made a mistake as soon as it happened, and I hope you all recognized this.

I know what this program stands for and I know there are certain expectations for the way we must act in order to represent the school. I signed a contract promising that I would uphold this behavior. I know as a division-1 student athlete, my actions reflect upon the school. That is why I have always tried to govern myself in the best way possible, and always maintain a positive attitude towards the team and the program that I love. I am truly sorry that my action two Sundays ago conveyed the opposite. I promise that this is not who I am and not what I stand for. Unfortunately, this situation caught fire with the media and people made assumptions about my character based on a split-second decision. While hurtful, it taught me a very important lesson: looks are everything. No one who read any articles about me or saw any videos really knew or cared about my true intentions. I realized I may have looked very malicious to some, and also very stupid. For that, I am ashamed at myself for the trouble I put myself in and all the stress I put on each of you and the school as a whole. I understand why you had to take immediate action and I am extremely apologetic that my action forced you to do damage control. I know this incident has caused a lot of unnecessary trouble. Most of all, I am sorry that I deflected the spotlight away from my team during one of their biggest achievements, not only this particular season, but in the past 10 years.

I want to do everything in my power to make this right again and regain my status as a member of the team. Soccer is my life and it has always been a part of who I am. I love this team and all of you as coaches. I cannot imagine not being part of this program and I hope this issue will not result in a permanent suspension from the team. Therefore, if I am permitted to return, I promise to come back a completely different player. I want to be one that you can count on off and on the field. I understand that per my scholarship, I should have been a bigger help to the team than I was. If given the opportunity, I want to utilize this spring to prove to you who I can really be and develop exponentially as a player and a person. I believe in myself and my abilities and I recognize my potential. I am willing to go to great lengths to become this

UConn SJM Exhibit 27

player for you and the team. During my suspension, I have been working on my fitness so that if I am allowed to return I will be in excellent shape. I will continue to get touches on the ball and participate in any play I can over the upcoming break. I am fully committed. Soccer means everything to me and I cannot imagine myself anywhere else but UConn.

I am learning my lesson and taking away the positives from this situation. I know that this type of incident will NEVER happen again, and I will only govern myself as a model student-athlete from now on and for the rest of my career. I will not do anything else to bring negative attention to you as a coaching staff, the team, program and institution. I will continue to support my team at Penn State this weekend and I wish them the best of luck. I am honored to even say I am a Husky and I want nothing more than to watch us play to our potential. I hope all of you can accept my sincere apologies and I hope to hear from you again at the end of the semester.

Sincerely,

Noriana Radwan

| | |
|---|---|
| **From:** | Rodriguez (Tietjen), Margaret |
| **To:** | nornor100@aim.com |
| **Subject:** | RE: Happy Thanksgiving |
| **Date:** | Thursday, November 27, 2014 3:37:49 PM |

Happy Thanksgiving Noriana! I'm in Oregon I left Sunday so I have not been in the office yet to read your letter.  I just wanted to let you know that I didn't forget about you.

Mags


Margaret Rodriguez
Assistant Coach
UConn Soccer
(O) 860-486-3459
(C) 860-617-5428
(F) 860-486-0525
www.uconnhuskies.com




-------- Original message --------
From: Noriana Radwan <nornor100@aim.com>
Date: 11/27/2014 10:00 AM (GMT-08:00)
To: "Rodriguez (Tietjen), Margaret" <margaret.rodriguez@uconn.edu>,"Shaw, Zac" <zac.shaw@uconn.edu>,"Tsantiris, Leonidas" <leonidas.tsantiris@uconn.edu>
Subject: Happy Thanksgiving


Dear Coach, Mags, and Zac,

Happy Thanksgiving from our family to yours!

Noriana

Sent from my iPhone

UConn SJM Exhibit 28



www.UConnHuskies.com

**From:** Rodriguez (Tietjen), Margaret
**Sent:** Tuesday, December 02, 2014 11:51 AM
**To** ███████████████████████████████████████████
███████████████████████████████████
Noriana Radwan (nornor100@aim.com) <nornor100@aim.com>; ███
███████████████████████████
**Cc:** █████████████████████████████████████████
███████████████████████████████;
███████████████████████████████
**Subject:** FW: Soccer Footwear Catalog
**Importance:** High

Please see attached catalog and send the below info to megan.hastillo@uconn.edu  by
Thursday! ! Read email below as well

Shoe type-
Men's or Women's-
Style Number-
Color (3 digit number)-
Size-

Margaret Rodriguez
Assistant Coach
UConn Soccer
(O) 860-486-3459
(C) 860-617-5428
(F) 860-486-0525
www.uconnhuskies.com

-------- Original message --------

From: "Hastillo, Megan" <megan.hastillo@uconn.edu>
Date: 11/20/2014 10:07 AM (GMT-05:00)
To: "Rodriguez (Tietjen), Margaret" <margaret.rodriguez@uconn.edu>
Subject: FW: Soccer Footwear Catalog

Forgot to attach.

Megan Hastillo, E.M.,C
UConn Assistant Director of Equipment
2111 Hillside Road
Storrs, CT 06269
Work: (860) 486-4261
Fax: (860) 486-2300



From: Hastillo, Megan
Sent: Thursday, November 20, 2014 10:07 AM
To: Rodriguez (Tietjen), Margaret
Subject: Soccer Footwear Catalog

Hey Mags.

Attached is the soccer footwear catalog. I would like to have the athletes come see me next
week to write down what shoe and size they would like for next year. Think we can get that
together? We can talk after your wins this weekend!

Megan Hastillo, E.M.,C
UConn Assistant Director of Equipment
2111 Hillside Road
Storrs, CT 06269
Work: (860) 486-4261
Fax: (860) 486-2300



| | |
|---|---|
| **From:** | Noriana Radwan |
| **To:** | Tsantiris, Leonidas |
| **Cc:** | Rodriquez (Tietjen), Margaret; Athletics - Director |
| **Subject:** | Noriana Radwan |
| **Date:** | Sunday, December 21, 2014 7:48:53 PM |

Dear coach Len,

I'm writing to you asking please reconsider your of removing me from the team and taking away my scholarship for the spring. The ramification of this is devastating to me and my future. Taking away a scholarship is a very serious act. I've studied the student athlete and I sincerely don't believe that done anything that would be considered a violation of the scholarship agreement.

When you evaluated me two weeks ago, you discussed your expectations of my performance in the spring season. You stated , "I want you to come back and play hard and make an impact on the team". You have not expressed to me that I was at jeopardy of losing my spot on the team and my scholarship before the end of May.  I've been very excited since our meeting and has been working so hard on daily basis to get myself ready.

Now, with no other communication, I'm shocked to have received your phone with no further justification just dismissing me from the team and taking away my scholarship. Further, you've advised me "to not attend UConn" in the spring, but if I must go to school, to "take classes at a community college"? This doesn't sound appropriate to me.

Therefore, please advise what has transpired over the course of the last few days since your last meeting with me for player evaluation at the conclusion of the season and today's phone call which appears so arbitrary and completely unexpected?

I spoke to coach Mags, she informed me that my scholarship will not be up for renewal in May, but what I don't understand is how does this effect my scholarship for the spring?

I'm looking forward to hearing back from you, and if your decision is final, then please note that I will be appealing this so I can have my chance to finish up my classes in May and then las coach Mags indicated I'll look to transfer for fall 2015.  Thank you and I'm looking forward to hearing back from you.

Noriana Radwan
nornor100@aim.com

Noriana Radwan
nornor100@aim.com

UConn SJM Exhibit 30

| From: | Rodriguez (Tietjen), Margaret |
| To: | Noriana Radwan |
| Cc: | Tsantiris, Leonidas; Shaw, Zac |
| Subject: | RE: Noriana Radwan |
| Date: | Monday, December 22, 2014 12:06:45 PM |
| Attachments: | image002.png |

Hi Noriana,

I wanted to let you know that we received your email and our decision is final. We are moving forward with cancelling your aid for the spring semester based on misconduct. We understand that canceling your aid is serious but your obscene gesture at the championship game was serious as well and was an embarrassment to the University and UConn women's soccer program. You were informed immediately after the incident that you will be suspended indefinitely and were told by Zac, in your meeting with him, that this incident could impact your scholarship.

After reviewing your situation with the coaching staff and administration, we stand by our decision to cancel your aid with immediate effect. If you wish to stay at UConn this spring and continue to take the classes that you are registered for than you are more than welcome to do so, but we will not be able to help you financially.   Coach brought up the option of taking classes back home in order to offer you an alternative. He thought this could be a less expensive for you .  If you wish to transfer, as you mentioned in your email, then we will do what we can to help you find a program.

In the next day or so you will receive an e-mail from our compliance department notifying you in writing that we will be cancelling your aid. Along with that, you will receive information on a financial aid hearing procedure if you still wish to appeal our decision and go down that road.  Please call Coach if you have any questions or concerns.

Sincerely,
Mags


Margaret Rodriguez
Assistant women's soccer coach
University of Connecticut
2111 Hillside rd. unit 1078
Storrs, CT 06269
(O)  860-486-3459
(M) 860-617-5428
(F)   860-486-0525

UConn SJM Exhibit 31

  

**Mags**

Dec 22, 2014, 7:45 PM

Hi, I mentioned to my sister at CCSU that you have your release and they are interested in talking with you. They need an attacking CM and a goal scorer.

That might be a great fit for you! Email ur release to her if u are interested and she will contact you. Her email addreas is Prozzojea@ccsu.edu. we wi

ll try to help you any way we can!!

Great I am interested but is this for the spring semester?

It could be if you want. Your going to have explore that with them. Ill inquire on my end as well to see if they can get a transfer in for spring still o

UConn SJM Exhibit 32



k? We have rolling admissions foe transfers which thy may as well

iMessage

3:48

‹ 203          M          ⓘ
             Mags

Okay thank you

Dec 23, 2014, 1:22 PM

Lenny will be calling you back todat. I saw ur email to neal and have spoken to your dad. I am sorry with your situation but our decision is final with t

he scholarship this spring moving

UConn SJM Exhibit 32

Twd. He will talk to you about some things. It sounds like staying at uconn is important to you.

Jan 3, 2015, 9:07 PM

Hi just checking in. My sis and Mic really enjoyed meeting with you. Jen said you were great!  They are very interested.  If u have Any questions please

let me know how I can help.

Great. I really enjoyed the visit to central Connecticut and meeting with Jen and Mick, they were awesome. Unfortunately for me it

iMessage

UConn SJM Exhibit 32

  

**Mags**

really boils down to affordability now so I'm waiting to hear back from them on Monday along with a couple other schools about offers...I'll keep you posted

Jan 4, 2015, 11:23 AM

Ok great. I know they are looking into some things for you that will help you...

Ok great. I know they are looking into some things for you that will help you...

Are you doing OK?

I'm doing alright I guess, just applying for more schools and trying to get it in touch with more colleges.

Ok. I know that's sort of a
ridiculous question for me to ask

UConn SJM Exhibit 32



ridiculous question for me to ask but I care abt u and want to make sure u r ok. Its hard I'm sure and emotional but its goi



**3:48**

203    **M**    (i)

Mags

ng to work out. A lot of schols are interested.  I know jen or mic will be calling you today....... I do think that's a great fit.

Jan 4, 2015, 1:08 PM

Yeah it's pretty difficult but I am trying to make a change. I hope everything works out too thank you. I'll be waiting on the call

UConn SJM Exhibit 32

Jan 4, 2015, 3:04 PM

Jens calling you now

Jan 6, 2015, 1:37 PM

Hi. I know ccsu offered you a great offer and u were visiting pitt. Any thoughts as to where you want to go?

Hi Mags, ccsu is a great school and option for me and I loved Pitt as well.  I have other really good offers from them as well as Hofstra and Albany I'm also going to be in contact with Miami today so i can

iMessage

  

      

3:49

UConn SJM Exhibit 32





**Mags**

offers from them as well as Hofstra and Albany I'm also going to be in contact with Miami today so i can get all my offers in order. I'm going to further discuss it with my parents when my dad gets home as finances are definitely going to be a factor. I'm not too sure what my decision will be yet but as soon as I know I will be in contact with CCSU and all the other universities

All good options!! Of course I'm biased for my sister but I'm also genuinely looking out for u and all those schools are a good fit for u. Schools start

up now or in a week so don't delay things too much. Fyi I talked to miami...I'm close to head coach. Your grades are not good enough to get in and thy do

not have money. Follow through

UConn SJM Exhibit 32

with them on your own but she reached out to me the other day to chat and I told her $ is important for u and she inquire

  iMessage 

      

3:49 

‹ 203   M   Mags   ⓘ

chat and I told her $ is important for u and she inquire

d abt ur gpa because miami is a really good school academically and hard to get into

I know time is definitely of the essence. I heard Miami was concerned about my GPA and if they do not have money then it

May 18, 2018 Radwan Supp RFP Responses                    013

UConn SJM Exhibit 32

won't be an option for me most likely. I was supposed to hear from her today. Other than that, I'll just continue to weigh my options and I'll probably have a final answer by the end of today and max tomorrow because I'm supposed to visit albany then. I will keep you posted. Thanks for looking out!

Jan 9, 2015, 8:34 PM

Hi. I think I heard via simon you are headed to hofstra. Great guy! Good luck. Not sure if u did this but please email? livingoncampus@uconn.edu? stating t

  iMessage 

      

3:49

UConn SJM Exhibit 32

  

**Mags**

Hi. I think I heard via simon you are headed to hofstra. Great guy! Good luck. Not sure if u did this but please email? livingoncampus@uconn.edu? stating t

hat you will be transferring so you don't get charged for your room at somepoint.?

Thank you! I'm looking forward to a good season with him. And no I didn't but I'll do it right away

Jan 13, 2015, 2:37 PM

Hope you are well. You need to officially withdraw from UConn. Please visit office of registra to officially withdraw.

Go to Dean of students office to cancel enrollment

I'm doing good thanks. Do I cancel via email or phone call? I'm away from my laptop so I don't know

  iMessage 

      



3:49

  

Mags

hat you will be transferring so you don't get charged for your room at somepoint.?

Thank you! I'm looking forward to a good season with him. And no I didn't but I'll do it right away

Jan 13, 2015, 2:37 PM

Hope you are well. You need to

UConn SJM Exhibit 32

officially withdraw from UConn. Please visit office of registra to officially withdraw.

Go to Dean of students office to cancel enrollment

I'm doing good thanks. Do I cancel via email or phone call? I'm away from my laptop so I don't know what it looks like

To officially withdraw you must do it in person. That's what it says on line. Call the office student affairs 860-486-3426



Sent from my iPhone

UConn SJM Exhibit 32

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

NORIANA RADWAN                     : CIVIL ACTION NO. 3:16-CV-02091 (VAB)
PLAINTIFF,                         :
                                   :
        v.                         :
                                   :
UNIVERSITY OF CONNECTICUT          : OCTOBER $23$, 2019
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

**AFFIDAVIT OF MONA LUCAS**

1. I am over the age of eighteen (18), I understand and appreciate the obligations of

   an oath and the following statements are based upon my personal knowledge.

2. I am currently employed at the University of Connecticut ("UConn") as Assistant

   Vice President for Enrollment Policies and Strategic Initiative. I have held this

   position since Spring 2017.

3. In 2014 and at all times alleged in plaintiff's complaint, I was employed at UConn

   as the Director of Student Financial Aid Services ("Financial Aid").

4. At all times relevant to plaintiff's complaint, Suzanne Pare ("Ms. Pare")  was my

   assistant.

5. I was not in the office on December 22 through 26, 2014; and January 1 through

   6.

6. Attached to portions of my deposition in this matter dated June 17, 2019 (Exhibit

   49) are true and accurate copies of Financial Aid emails relating to plaintiff's

   request for a financial aid hearing to appeal her cancelled athletic grant-in-aid:

1

UConn SJM Exhibit 33

a. Exhibit 7 (referred to in Ex. 49 Lucas Depo. Excerpts pp. 39:10-40:14). One-page email dated January 5, 2015 from Suzanne Pare, writing on behalf of Mona Lucas, to Noriana Radwan advising that Ms. Lucas was out of the office.

b. Exhibit 9 (referred to in Ex. 49 Lucas Depo. Excerpts p. 42:1-15). Three-page email chain that consist of the following email:

   i. January 5, 2015 email from Ms. Pare to plaintiff asking whether she will be seeking a hearing and advising plaintiff that I am away from UConn and unable to respond to emails; Ms. Pare also requests in the email that if plaintiff already submitted a hearing request to forward it to her so that Financial Aid Services can promptly act on her request;

   ii. February 6, 2015 email reply from plaintiff to Ms. Pare stating that she wants a hearing and that she sent me a request for hearing on January 14, 2015

   iii. February 12, 2015 email reply from Ms. Pare to plaintiff advising her that attached is a letter from me that denied her request for hearing that was sent U.S. mail to her home address;

   iv. February 13, 2015 email reply from plaintiff to Ms.Pare and me advising that she received the January 29, 2015 letter denying her request for hearing yesterday; asking whether this ends her ability to have a hearing.

   v. February 16, 2015 email from Ms. Pare forwarding to Julie Purcell and me the email chain described above in ¶ 6(b)(i.–iv).

2

c. Exhibit 11 (referred to in Ex. 49 Lucas Depo. Excerpts pp. 45:22-47:10). One page letter dated January 29, 2015 from Mona Lucas to Noriana Radwan denying Ms. Radwan's request for hearing as untimely.

d. Exhibit 13 (referred to in Ex. 49 Lucas Depo. Excerpts pp. 48:21-49:4). One page email chain consisting of the following two emails:

i.  January 23, 2015 9:23 am email from Julie Purcell to Mona Lucas regarding Ms. Radwan's appeal request.

ii January 23, 2015 9:36 am email from Mona Lucas to Kimberly Midolo.

e. Exhibit 16 (referred to in Ex. 49 Lucas Depo. Excerpts pp. 57:21-58:25). Two-page email chain that consists of the following emails:

i.  January 20, 2015 email from Kimberly Campbell to Julie Purcell advising that plaintiff's request for hearing was received;

ii. January 23, 2015 email reply from Julie Purcell to me with a copy to Kimberly Campbell advising that plaintiff's request for hearing was untimely pursuant to the financial aid hearing procedures and that UConn Athletics for Compliance Services ("Athletics Compliance") believes that plaintiff's request should be denied;

iii. January 23, 2015 email reply from me to Julie Purcell with a copy to Ms. Pare, Kimberly Campbell, Dianne Beer, confirming that the plaintiff's request for hearing may be denied because it was submitted after the deadline;

3

iv. January 23, 2015 email reply from Julie Purcell to me with a copy to

Ms. Pare, Kimberly Campbell, Diane Beer, confirming that

plaintiff's request for hearing was filed after the time period to

request a hearing lapsed.

Mona Lucas

STATE OF _Connecticut_  )
                        )   ss: _Storrs_
COUNTY OF _Tolland_     )

Sworn and subscribed before me on this _23rd_ day of October, 2019.

~~Commissioner of the Superior Court or~~ Notary Public

JANE BENOIT-BEAN
NOTARY PUBLIC
State of Connecticut
My Commission Expires
June 30, 2020

4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

NORIANA RADWAN     :   CIVIL ACTION NO. 3:16-CV-02091 (VAB)
PLAINTIFF,               :
                           :
     v.                    :

UNIVERSITY OF CONNECTICUT   :   OCTOBER   16 , 2019
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

## AFFIDAVIT OF DOUGLAS GNODTKE

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I am currently employed at the University of Michigan as Executive Associate Director of Athletics and Chief of Staff, and I have held this position since March 14, 2016.

3. In 2014, I was employed at the University of Connecticut ("UConn") as Senior Associate Director of Athletics. As part of my responsibilities in this position, I was the Sports Administrator assigned to football, men's and women's ice hockey. I held this position from June 27, 2012 to approximately March 11, 2016.

4. In Fall 2015, Football Coach, Bob Diaco, ("Coach Diaco") reported to me and I reported directly to UConn Athletic Director Warde Manuel. ("Athletic Director Manuel")

5. ███████████████████████████████████████████████

6. 

7. I was present at this game.

8.

9.

10.

Douglas Gnodtke

STATE OF Michigan )

COUNTY OF Washtenaw )        ss:_____

Sworn and subscribed before me on this ___16___ day of October, 2019.

Janet L. Hinz
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF Washtenaw
My Commission Expires July 18, 2024
Acting in the County of  Washtenaw  Commissioner of the Superior Court or Notary Public

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NORIANA RADWAN<br>PLAINTIFF, | : | CIVIL ACTION NO. 3:16-CV-02091 (VAB) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | OCTOBER _22_, 2019 |
| BOARD OF TRUSTEES, WARDE | | |
| MANUEL, LEONARD TSANTIRIS, | | |
| AND MONA LUCAS, INDIVIDUALLY, | | |
| DEFENDANTS | | |

## AFFIDAVIT OF DAVID BENEDICT

1. I am over the age of eighteen (18) and I understand and appreciate the obligations of an oath, and the following statements are based upon my personal knowledge.

2. I am presently the University of Connecticut ("UConn") Athletic Director. I have held this position since March 21, 2016.

3. I was not aware that Noriana Radwan's scholarship was cancelled by Warde Manuel for serious misconduct until Ms. Radwan filed her complaint in this action on or about December 19, 2016.

4. The Athletic Department is comprised of twenty-four (24) intercollegiate athletic teams and employs approximately two hundred (200) staff.

5. As Athletic Director, I oversee the entire Athletic Department. Administratively the Athletic Department is setup as follows: eleven (11) of Athletic Department administrators who are sports administrators assigned to several athletic teams; the sports administrators have day-to-day program oversight for their assigned

UConn SJM Exhibit 35

teams; coaches report directly to their assigned sports administrator on day-to-day matters. However, each coach ultimately reports to me.

6. Decisions relating to cancelling a student-athlete's athletic grant-in-aid for disciplinary reasons begins with the student's coach making a recommendation to the Sports Administrator and then the recommendation is brought to me for my consideration and final decision. If I agree with the reasoning behind cancelling the grant-in-aid and it complies with National Collegiate Athletic Association bylaws, then I will make the final decision to cancel the scholarship.

7. I give substantial weight to the recommendation of the coach and sport administrator in making the final decision.  Those individuals are best-positioned to evaluate the student athletes because they are expected to and do have frequent interactions with their student athletes, continually assess their student athletes against various criteria, and have integral and in-depth knowledge of the information and circumstances necessary to any consideration of whether to reduce or eliminate financial aid.



9.

David Benedict

STATE OF Connecticut )
                        )   ss:_____
COUNTY OF Tolland )

Sworn and subscribed before me on this 22nd day of October, 2019.



Commissioner of the Superior Court or Notary Public

EVAN D. FEINGLASS
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2020

UConn SJM Exhibit 35

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

NORIANA RADWAN
PLAINTIFF,

v.

UNIVERSITY OF CONNECTICUT
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

:   CIVIL ACTION NO. 3:16-CV-02091 (VAB)
:
:
:
:
:   OCTOBER **28**, 2019

**AFFIDAVIT OF RAYMOND REID**

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an

    oath and the following statements are based upon my personal knowledge.

2. I am currently employed as the University of Connecticut ("UConn") head coach for

    men's soccer; I have been employed in this position from 1997 to the present.



3.

4.

5.

1

UConn SJM Exhibit 36

6.

7.

8.

_____
Raymond Reid

STATE OF _CONNECTICUT_ )
                       )  ss: STORRS / MANSFIELD
COUNTY OF _TOLLAND_    )

Sworn and subscribed before me on this 28ᵗʰ day of October, 2019.

**EVAN D. FEINGLASS**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2020

_____
Commissioner of the Superior Court or Notary Public

2

UConn SJM Exhibit 36

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

NORIANA RADWAN                          : CIVIL ACTION NO. 3:16-CV-02091 (VAB)
PLAINTIFF,                              :
                                        :
    v.                                  :
                                        :
UNIVERSITY OF CONNECTICUT               : OCTOBER $24$, 2019
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

## AFFIDAVIT OF MAUREEN ARMSTRONG

1. I am over the age of eighteen (18) and I understand and appreciate the
   obligations of an oath and the following statements are based upon my personal
   knowledge.

2. I am currently employed at the University of Connecticut ("UConn") as Associate
   Dean of Students. I have held this position since April 2017.

3. The Dean of Students maintains an online cancellation database of student's
   request to cancel their enrollment. I examined the online cancellation database
   to determine if plaintiff made a request in January 2015 to cancel her enrollment
   at UConn and determined that:

   a. On January 14, 2015, plaintiff submitted a request to cancel her enrollment for
   Spring 2015 at UConn by submitting an online request to the UConn Dean of
   Students whereby she advised that she was transferring to a different university.

   b. On January 16, 2015, the Dean of Students processed plaintiff's cancellation
   request. A true and accurate screen shot of Dean of Student's records from the

online cancellation database reflecting plaintiff's online cancellation request and the

processed date is attached hereto as Exhibit 38; it is also referred to in Ex. 48 Ms.

Radwan's Depo. pp. 37:14-39:11, Ex. 4.

Maureen Armstrong

STATE OF _Connecticut_ )
                                              )  ss:  _Storrs/ Mansfield_
COUNTY OF _Tolland_ )


Sworn and subscribed before me on this _24th_ day of October, 2019.

Commissioner of the Superior Court or Notary Public

SANDRA CYR
NOTARY PUBLIC OF CONNECTICUT
My Commission Expires 8/31/2023

UConn SJM Exhibit 37

Online Cancellation Screenshot – Exhibit 38 to Summary Judgment



## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NORIANA RADWAN                   :   CIVIL ACTION NO. 3:16-CV-02091 (VAB)
PLAINTIFF,                       :
                                 :
      v.                         :
                                 :
UNIVERSITY OF CONNECTICUT        :   OCTOBER 22, 2019
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

### AFFIDAVIT OF AMY CRIM

1.  I am over the age of eighteen (18), I understand and appreciate the obligations

    of an oath and the following statements are based upon my personal

    knowledge.

2.  I am currently employed at the University of Connecticut ("UConn") as Associate

    Director of Housing Services. In 2014, and at all times alleged, I was employed

    at UConn as Interim Director of Housing Services.

3.  On January 11, 2015, plaintiff contacted UConn residential life via email to

    advise that she would be transferring (from UConn) for Spring 2015 and does

    not want to be charged for UConn housing as she will no longer be living in the

    UConn dorm that she occupied in Fall 2014. A true and accurate copy of

    plaintiff's email is attached hereto as Exhibit 40; it is also referred to in Ex. 48

    Ms. Radwan's Depo. pp. 24:25-26:24, Ex. 2.

4. On January 13, 2015, I replied to plaintiff's email advising her that her housing assignment was cancelled. A true and accurate copy of my email response is attached hereto as Exhibit 40.

Amy Crim

STATE OF _Connecticut_ )
                          )   ss:   _Storrs_
COUNTY OF _Tolland_ )

Sworn and subscribed before me on this _22nd_ day of October, 2019.

Mary Elizabeth Rouse

Commissioner of the Superior Court or Notary Public

**MARY ELIZABETH ROUSE**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES DEC. 31, 2020

| | |
|---|---|
| **From:** | Crim, Amy |
| **To:** | "nornor100@alm.com"; "NORIANA.RADWAN@UCONN.EDU" |
| **Cc:** | Fiorvanti, Ann |
| **Subject:** | Sp15 Housing Cancellation |
| **Date:** | Tuesday, January 13, 2015 2:10:22 PM |
| **Importance:** | High |

Noriana Radwan
2082747

Noriana,

Based on your email below your Spring 2015 housing application/assignment have been cancelled. At this time, you still show in the system as an enrolled student. Please be sure to cancel through the Dean of Students office. Until that is processed, it will show as a 50% cancellation fee. This cancellation forfeits all guarantees for future on-campus housing. We are advising all students who cancel and lose their housing guarantee to plan on living off-campus if they return to the Storrs campus in the future. Based on projected enrollment growth, we don't think we will be able to make many (if any) offers to the housing waiting list in the future.

Move-Out Reminders - By January 15, 2015
Please make arrangements to vacate your fall housing assignment by 5:00pm on Thursday January 15, 2015.
1. Call The Front Desk at (860) 486-9000 to schedule an express check-out.
2. Remove all belongings and return room to original condition.
3. Return keys to The Front Desk staff.

Good luck,
Amy

Amy Joy Crim
Interim Director for Housing Services
626 Gilbert Road Ext. Unit 1022
Storrs, CT 06269-1022
(860)486-2926

Facebook: http://facebook.com/UConnResLife or search for "UConn Residential Life"
Twitter: @UConnResLife - http://twitter.com/UConnResLife

----Original Message-----
From: Noriana Radwan [mailto:nornor100@aim.com]
Sent: Sunday, January 11, 2015 10:35 AM
To: ResLife - Living On Campus
Subject: Leaving room

To whom this may concern,

My name is Noriana Radwan and I am a former member of the women's soccer team. I spent the first semester living in Hale room 425 but I will be transferring this semester. I am emailing you to avoid any charges since I will no longer be living there. Thank you!!

Noriana Radwan

Sent from my iPhone



DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE:          RPTR

UConn SJM Exhibit 40
UConn SJM Exhibit 39

| From: | Crim, Amy |
|---|---|
| To: | "nornor100@aim.com"; "NORIANA.RADWAN@UCONN.EDU" |
| Cc: | Fiorvanti, Ann |
| Subject: | Sp15 Housing Cancellation |
| Date: | Tuesday, January 13, 2015 2:10:22 PM |
| Importance: | High |

Noriana Radwan
2082747

Noriana,

Based on your email below your Spring 2015 housing application/assignment have been cancelled. At this time, you still show in the system as an enrolled student. Please be sure to cancel through the Dean of Students office. Until that is processed, it will show as a 50% cancellation fee. This cancellation forfeits all guarantees for future on-campus housing. We are advising all students who cancel and lose their housing guarantee to plan on living off-campus if they return to the Storrs campus in the future. Based on projected enrollment growth, we don't think we will be able to make many (if any) offers to the housing waiting list in the future.

Move-Out Reminders - By January 15, 2015
Please make arrangements to vacate your fall housing assignment by 5:00pm on Thursday January 15, 2015.
1.  Call The Front Desk at (860) 486-9000 to schedule an express check-out.
2.  Remove all belongings and return room to original condition.
3.  Return keys to The Front Desk staff.

Good luck,
Amy

Amy Joy Crim
Interim Director for Housing Services
626 Gilbert Road Ext. Unit 1022
Storrs, CT 06269-1022
(860)486-2926

Facebook: http://facebook.com/UConnResLife or search for "UConn Residential Life"
Twitter: @UConnResLife - http://twitter.com/UConnResLife

-----Original Message-----
From: Noriana Radwan [mailto:nornor100@aim.com]
Sent: Sunday, January 11, 2015 10:35 AM
To: ResLife - Living On Campus
Subject: Leaving room

To whom this may concern,

My name is Noriana Radwan and I am a former member of the women's soccer team. I spent the first semester living in Hale room 425 but I will be transferring this semester. I am emailing you to avoid any charges since I will no longer be living there. Thank you!!

Noriana Radwan

Sent from my iPhone



DEFENDANT'S EXHIBIT NO. 2 FOR IDENTIFICATION DATE: 5-2-18 RPTR:

UConn SJM Exhibit 40

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NORIANA RADWAN         :   CIVIL ACTION NO. 3:16-CV-02091 (VAB)
PLAINTIFF,          :
                      :
     v.             :

UNIVERSITY OF CONNECTICUT   :  October 16 _____, 2019
BOARD OF TRUSTEES, WARDE
MANUEL, LEONARD TSANTIRIS,
AND MONA LUCAS, INDIVIDUALLY,
DEFENDANTS

### AFFIDAVIT OF ZACHARY SHAW

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I am presently the Clarkson University women's soccer team head coach; I have held this position since May 2019.

3. In 2014, and at all times alleged in the complaint, I was employed as UConn assistant coach to women's soccer; I held that position from 2011 to December 2017; at all times I was an assistant coach, Leonidas Tsantiris ("Coach Tsantiris") was head coach of UConn women's soccer team ("team").

4. Before the Fall 2014 soccer season began, Coach Tsantiris decided that he wanted to implement written team rules and wanted the rules to be the basis of a contract between each team member and the team, I assisted Coach Tsantiris with developing the team rules. This was the only year that Coach Tsantiris had written rules and required team members to sign a team contract.

UConn SJM Exhibit 41

5. I was present on November 9, 2014, when the plaintiff showed her middle finger to the EPSNU camera at the end of the UConn-USF American Athletic Conference ("AAC") championship game.

6. Coach Tsantiris indefinitely suspended the plaintiff from all team activities because of her behavior on November 9, 2014.

7. The team advanced to the 2014 National Collegiate Athletic Association ("NCAA") women's soccer tournament ("tournament") by winning the AAC championship game.

8. The team won the first NCAA tournament game played on November 15, 2014, at UConn.

9. The team lost the second NCAA tournament game played on November 22, 2014 at Penn State.

10. I did not discuss with plaintiff what her future on the team would be from November 9 through the NCAA tournament games because I was busy handling my coaching responsibilities with the team in preparation for the tournament games.

11. After the Penn State loss, I returned to Connecticut with the team on or about November 22, 2014.

12. I met with plaintiff at the end of November, 2014, prior to Thanksgiving, and I discussed her behavior following the November 9, 2014 AAC conference championship game. Plaintiff did not appreciate how serious her behavior was on November 9. I explained to her that Coach Tsantiris remained upset about her

behavior, that her behavior was serious and that as a consequence it could impact her athletic grant-in-aid.

13. Coach Tsantiris talked with Coach Rodriguez and me in December 2014 about whether plaintiff's athletic grant-in-aid should be cancelled because of her behavior on November 9, 2014.

14. I agreed with Coach Tsantiris' recommendation to cancel plaintiff's athletic grant-in-aid for Spring 2015; we wanted to reinforce that plaintiff's behavior was not acceptable and we wanted this message to be clear to the team and to the athletes that we were recruiting.

15. I assisted plaintiff with finding a new school that she could transfer to and join their soccer team for Spring 2015 by contacting Hofstra University Coach, Simon Riddiough, and the women's soccer coaches at University of Pittsburgh and State University of New York at Albany.

Zachary Shaw

STATE OF New York    )
                     )   ss: Potsdam
COUNTY OF St. Lawrence )

Sworn and subscribed before me on this ___16___ day of October, 2019.

Marjorie Measham

Commissioner of the Superior Court or Notary Public

Marjorie Measham
Notary Public State of New York
No. 01ME6322164
Qualified in St. Lawrence County
Commission Expires 3/24/2023

UCONN SJM Exhibit 41

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NORIANA RADWAN<br>PLAINTIFF, | : | CIVIL ACTION NO. 3:16-CV-02091 (VAB) |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT<br>BOARD OF TRUSTEES, WARDE<br>MANUEL, LEONARD TSANTIRIS,<br>AND MONA LUCAS, INDIV7IDUALLY,<br>DEFENDANTS | : | OCTOBER 28, 2019 |

## AFFIDAVIT OF LEONIDAS TSANTIRIS

1. I am over the age of eighteen (18), I understand and appreciate the obligations of an oath and the following statements are based upon my personal knowledge.

2. I was born in Greece and came to the United States in 1968 and I am a naturalized U.S. citizen.

3. English is my second language. I am fluent in both Greek and English.

4. I was employed as the University of Connecticut ("UConn") women's head soccer coach from 1981 to 2017. I retired in December 2017.

5. The only UConn student-athletes that I had authority over were members of the women's soccer team.

6. I could not discipline or recommend discipline of student-athletes who were not members of the women's soccer team.

7. At all times relevant to plaintiff's complaint, I reported directly to UConn Sports Administrator, Neal Eskin ("SA Eskin") and Athletic Director Warde Manuel ("AD Manuel") was my direct supervisor.

1

UConn SJM Exhibit 42

8. Margaret Rodriguez ("Coach Rodriguez") and Zac Shaw ("Coach Shaw") were my assistant coaches in 2014 and at all times relevant to the plaintiff's complaint.

9. Beginning on or about August 4, 2014, Noriana Radwan ("plaintiff") was a freshman on the UConn women's soccer team during Fall 2014.

10. My coaching staff and I recruited plaintiff to join the UConn women's soccer team while plaintiff was in high school. She committed to attending UConn by signing a National Letter of Intent and UConn Financial Aid Agreement ("Financial Aid Agreement") on February 10, 2014.

11. Pursuant to the Financial Aid Agreement, plaintiff was awarded a full out-of-state athletic grant-in-aid for academic year 2014-15 ("grant-in-aid" or "scholarship"); the Financial Aid Agreement provided, among other things, that pursuant to National Collegiate Athletic Association ("NCAA") bylaws, plaintiff's athletic grant-in-aid could be cancelled or reduced during the term of the award if she engaged in serious misconduct that brings substantial disciplinary penalty.

12. Plaintiff signed the Financial Aid Agreement, and on behalf of UConn, Mona Lucas (director of UConn Financial Aid Services) and I signed it.

13. Members of the UConn women's soccer team were required to comply with the UConn Student-Athlete Code of Conduct.

14. For Fall 2014 season, I developed team rules with Assistant Coaches Rodriguez and Shaw, and these rules were reviewed and approved by SA Eskin.

15. The 2014 season was the first time that I developed written team rules for the women's soccer team that was entitled "UConn Women's Soccer Contract."  I

UConn SJM Exhibit 42

developed written team rules for the players because the previous few seasons had not been successful and I attributed part of the team's lack of success to the player's and team's lack of discipline. I required each women's soccer player to sign acknowledgement that they received the team rules and agreed to them. The athletes were given an opportunity to read the document and ask questions. A true and accurate copy of the UConn Women's Soccer contract for 2014 is attached hereto as Exhibit 43.

16. The UConn Women's Soccer Contract requires, among other things, the athletes to comply with all University, Athletic Department and Women's soccer program rules concerning conduct and behavior.

17. The acknowledgment of receipt and agreement page of the UConn Women's Soccer contract also provides, "Should I fail to meet any of the criteria described in this contract, in addition to any future requirements that may be made known to me, I accept and understand that I may be sanctioned, suspended, and/or released from the UConn Women's Soccer program at any time. I understand that the coaching staff will constantly evaluate my academic, athletic, and social contributions to the team, and will be the judge of whether any of the above penalties should be imposed." Exhibit 43.

18. Plaintiff signed the acknowledgment of receipt and agreement to the UConn Women's Soccer Contract on or about August 4, 2014.

UConn SJM Exhibit 42

**November 9, 2014 UConn-USF AAC Championship Game**

19. UConn women's soccer team won the American Athletic Conference ("AAC") tournament championship game against the University of South Florida ("USF") on November 9, 2014; the game was played at USF. It was the first time since 2004 that UConn women's team won a conference tournament championship and the first time since 2010 that the team qualified for an invitation to the NCAA tournament.

20. The AAC championship game was televised live on ESPNU.

21. SA Eskin was on the field with the team at the conclusion of the game. He showed me a screen shot on his phone of the plaintiff showing her middle finger to the television camera during the team's celebration on the field. I learned shortly after this that plaintiff's gesture was broadcast live and that it was being widely circulated on social media.

22. After SA Eskin showed me the image of the plaintiff, I immediately talked to her about her behavior and I told her that she was suspended indefinitely from all team activities, including participating in the NCAA tournament because of her behavior.

23. SA Eskin advised me that the UConn Athletic Department wanted to issue a statement from me apologizing that the plaintiff showed her middle finger to the ESPNU camera.

24. With the assistance of SA Eskin and other UConn Athletic Department staff, UConn Athletic Department issued a press release from me apologizing for the

UConn SJM Exhibit 42

plaintiff's behavior on behalf of UConn, the women's soccer team and the UConn

Athletic Department; the apology was extended to the AAC, USF, UConn's

opponent, and to the members of the television audience. A true and accurate

copy of this press release is attached as Exhibit D to plaintiff's complaint.

25. I felt that the plaintiff's behavior was devastating. The program had just

successfully turned around in the 2014 season from having unsuccessful seasons

in 2011, 2012 and 2013. My assistants and I changed the program in 2014 by

instituting written team rules, the team won 11 regular season games, won the

AAC championship, qualified for the NCAA tournament and then immediately I

had to focus on plaintiff's behavior—showing her middle finger to the ESPNU

camera. No other player in my then 34 years as UConn head coach had behaved

this way. I felt that plaintiff's behavior was a blow to the team, the program and

UConn.

26. I did not travel back with the team from USF on November 9, 2014, because I had

a recruiting-related commitment in Tampa Bay, Florida the next day.

27.  I returned to UConn on either November 10 or 11, 2014.

28. On or about November 11, 2014, 1:38 p.m., I received an email from Ellen Ferris,

AAC Associate Commissioner Governance & Compliance, advising that the AAC

determined that plaintiff violated the Conference Code of Conduct for showing her

middle finger to the ESPNU camera and that they issued a letter of reprimand to

the plaintiff for her conduct. A true and accurate copy of this email with

attachments is attached to Ex. 4 Neal Eskin Aff'd, Ex. 7.

UConn SJM Exhibit 42

29. UConn's first game of the NCAA tournament was a home game on Saturday, November 15, 2014 against the University of New Hampshire; UConn won this game.

30. UConn's second game was on Friday, November 21, 2014 against Penn State; UConn lost this game; this was the end of the team's season.

31. All of UConn was on Thanksgiving recess from November 23, 2014 through November 29, 2014, and I was out-of-state during this time.

32. After the UConn-USF game when plaintiff was indefinitely suspended from all team activities, I was not able to talk to plaintiff until the beginning of December 2014 when I had individual player meetings with each member of the women's soccer team.

33. There were several reasons why I was not able to talk to plaintiff during November about her obscene gesture on November 9, 2014: I did not travel back with the team on November 9, 2014; I was busy getting the team ready for the NCAA tournament games that were held on November 15 and 21; after the November 21, 2014 game at Penn State, I traveled to Boca Rotan, Florida to recruit high school players during UConn's Thanksgiving break; and I didn't return to UConn until the beginning of December 2014.

34. When I was recruiting high school players at Boca Rotan, Florida at the end of November 2014, other college coaches that were recruiting at the same location teased me about the plaintiff's behavior by showing me the middle finger.

UConn SJM Exhibit 42

35. While I was coaching, I held end of the season meetings with each player to advise them about what they needed to work on for the next semester and year; I kept brief notes from each of these meetings for the purpose of assessing the feedback I gave the athletes to how they performed the following semester and year. I wrote these notes after each player meeting; attached hereto as Exhibit 44 is a true and accurate copy of the year end meeting notes from December 2014 with the names of all players redacted, except for the plaintiff's name.

36. I advised plaintiff at her end of the season meeting in December 2014 that I would make a decision at the end of the semester about her indefinite suspension from the team, and that regardless of her future on the team, she needed to work on her fitness and school work for the upcoming year.

37. Plaintiff apologized to me at the end of season meeting for her behavior at the conclusion of the of AAC championship game.

38. I did not tell plaintiff at the end of the season meeting that I was considering recommending to my superiors that her scholarship should be cancelled and that she should be cut from the team because she still had final exams to take and I realized that it could be devastating for her to learn this before her exams. I didn't want this to distract plaintiff from her final exams.

39. I wrote on the end of the year meeting notes next to plaintiff's name the following: "(school be fit) serious misconduct decision the end of semester". See Exhibit 44.

UConn SJM Exhibit 42

40. I waited until the end of the semester, December 2014, to recommend to SA Eskin and AD Manuel that plaintiff's scholarship should be cancelled for serious misconduct—showing her middle finger to the ESPNU camera.

41. In December 2014, I talked to my assistant coaches about cancelling plaintiff's grant-in-aid because she showed her middle finger to the ESPNU camera; they supported cancelling the plaintiff's scholarship.

42. SA Eskin supported my recommendation that plaintiff's scholarship should be canceled and then we brought this recommendation to AD Manuel for approval.

43. SA Eskin, AD Manuel and I met at the end of the season meeting in December 2014 and discussed, among other matters, cancelling plaintiff's scholarship for serious misconduct because she showed her middle finger to the ESPNU camera at the end of the AAC championship game; AD Manuel made the final decision that plaintiff's scholarship could be cancelled for serious misconduct.

44. SA Eskin and Coach Rodriguez confirmed with Athletics Compliance that plaintiff's scholarship could be cancelled for serious misconduct under the NCAA bylaws and so advised me.

45. On December 21, 2014, I called plaintiff on her cell phone to tell her that her grant-in-aid was being cancelled because of serious misconduct, i.e., showing her middle finger to the ESPNU camera, and that she was no longer on the women's soccer team because of her behavior on November 9, 2014. I also told plaintiff that if she needed help transferring to another school's soccer team that the assistant coaches and I could help by talking to other school's coaches about her.

UConn SJM Exhibit 42

46. In the evening of December 21, 2014, plaintiff sent me an email copied to Coach Rodriguez and AD Manuel asking me to reconsider the decision to cancel her scholarship and remove her from the team. A true and accurate copy of this email is attached to Ex. 23 Margaret Rodriguez Aff'd, Ex. 30.

47. I did not respond to plaintiff's email referred to above as Exhibit 30. On behalf of myself and Assistant Coach Shaw, Assistant Coach Rodriguez replied to plaintiff's email (Exhibit 30), with a copy to me and Assistant Coach Shaw; Assistant Coach Rodriguez advised plaintiff, among other things, that: "After reviewing your situation with the coaching staff and administration, we stand by our decision to cancel your aid with immediate effect." A true and accurate copy of this email is attached to Ex. 23 Margaret Rodriguez Aff'd, Ex. 31.

48. On December 22, 2014, I received a copy of an email from Ann Fiorvanti, UConn Assistant Athletic Director for Athletics for Compliance Services, to plaintiff that included a letter from Mona Lucas, UConn Director of Financial Aid Services, advising plaintiff that her athletic grant-in-aid was to be cancelled for the remainder of the 2014-15 academic year "due to a serious misconduct issue," and UConn Financial Aid Procedures. A true and accurate copy of Ann Fiorvanti's email to plaintiff dated December 22, 2014 with attachments is attached to Ex. 13 Ann Fiorvanti Aff'd, Ex. 17.

49. I spoke to plaintiff several times during the last week of December 2014 after she received notice that her scholarship was being cancelled for 2015. Plaintiff advised me of the different Division I soccer programs she was interested in

UConn SJM Exhibit 42

transferring to, including State University of New York at Albany and Hofstra University.

50. On or about the end of December 2014, I spoke to Simon Riddiough, Hofstra women's soccer head coach, about plaintiff. Coach Riddiough was already familiar with plaintiff because he had attempted to recruit her when she was in high school. Because he was familiar with plaintiff, I did not have to provide him with a lot details about her strengths, but I reinforced that that she was an excellent left-footed player. I also mentioned that in the upcoming year, plaintiff would need to improve academically and that she would need to improve her physical fitness.  Overall, I recommended that plaintiff would be a good addition to his program.

51. I also spoke to women's soccer coaches at State University of New York at Albany and advised them that plaintiff would be a good fit for their program and I gave plaintiff a favorable recommendation to these coaches.

52. Attached hereto as Exhibit 45 is a true and accurate copy of an email sent from plaintiff to me dated December 28, 2014, providing me with a list of schools' coaches that she contacted and inquiring whether there were other schools that I thought may be interested in having her transfer for the purpose of joining their women's soccer team.

53. I had no involvement with the determination of whether plaintiff could have a hearing to challenge her cancelled athletic grant-in-aid for Spring 2015.

UConn SJM Exhibit 42

54. I did not recommend cancelling plaintiff's scholarship for the purpose of freeing up

a scholarship for ███████████ ████████████████████████

███████████████████████████

_____
Leonidas Tsantiris

STATE OF _FLORIDA_ )
                    ) ss: TARPON SPRINGS
COUNTY OF _PINELLAS_ )

Sworn and subscribed before me on this __28__ day of October, 2019.

_____
Commissioner of the Superior Court or Notary Public

MICHELE M. SAKSA
Notary Public, State of Florida
Commission# GG 172486
My comm. expires Jan. 23, 2022

UConn SJM Exhibit 42

# UConn Women's Soccer 2014 Contract

- I will be fit according to the UConn Women's Soccer team standards.

- Each semester, I will strive to have a GPA of 3.0 or higher.

- I will work as hard as I can on both sides of the field, defending and attacking. I will fight for every play to the end.

- I will wear only Nike and University issued equipment during practice, games, lift and team travel.

- I will comply with all University, Athletic Department and Women's Soccer program rules concerning conduct and behavior.

- I will have a positive attitude and positive impact on the team.

- I will have 100% on time attendance for the following;
    1. Class
    2. Tutoring Sessions
    3. Study Hours / learning groups
    4. CPIA meetings
    5. Medical appointments
    6. Practice
    7. Coach and Team meetings

- I will communicate with all professors of any missed time due to games and travel. I will also communicate with my coaching staff of any missed class due to an illness or something else that is un- related to soccer.

- Should I become dissatisfied with any aspect of UConn Women's Soccer, the Division of Athletics, and or the University, I pledge to notify Coach Tsantiris of such discontent personally in a timely fashion. I will not engage teammates in negative communication regarding any of the aforementioned entities.

- I will be a part of a culture in which loyalty, leadership, honesty, integrity, dignity, and discipline are valued.

**UConn Women's Soccer 2014 Contract (cont'd)**

I have read the above statements for UConn Women's Soccer. I will use this contract as a reference point during my UCONN soccer career. I understand the commitment of the coaching staff. I accept that I will be solely responsible for my success or failure, and I will rely on the coaching staff for help in reaching my academic, athletic, and social goals.

I also realize that I will have further commitments to the program and the coaching staff that will be made known throughout this semester. I will enthusiastically accept any and all responsibilities that will always be presented in the program's best interest first and in the individual's best interest second. I trust the coaching staff to assign those responsibilities in good faith.

I understand the program is bigger than any one person, and that I am wholly committed to doing whatever is asked of me to further the quest of making UConn Women's Soccer the best program it can possibly be. I will protect the program's sound reputation, respect its heritage, and embrace its tradition with my behavior and work ethic.

I hereby commit to do all possible in my power to make the UConn Women's Soccer program better every day of my career. I will do this by investing in myself academically, athletically, and socially.

Should I fail to meet any of the criteria described in this contract, in addition to any future requirements that may be made known to me, I accept and understand that I may be sanctioned, suspended, and/or released from the UConn Women's Soccer program at any time. I understand that the coaching staff will constantly evaluate my academic, athletic, and social contributions to the team, and will be the judge of whether any of the above penalties should be imposed.

I make this commitment under no duress or pressure. I commit of my own free will and enthusiastically and passionately sign below indicating my total commitment to UConn Women's Soccer and the requirements and expectations delineated above.


Student Athlete Signature _____ Date _____

            Print Name _____


Head Coach Signature _____ Date_____

UConn SJM Exhibit 43

Fall 2014   Fall -

Organization, vocal. Tactics -
Physical. Fighting. (good Tacti's get Health
responsi. Dont Quit by E! etc your
keep up (work slowly.)                    strength
~~Hard~~ Keep Working Hard be positive

Skills, Tactics -

Shooting work be Fit.

(work Consistent.) practice games

work Consistent.) practice gains

Move aggressive, More, Physical.)

(IV1) Defensly clearing.
get Healthy get Fit
Tactics Composure (Skills)
Norma — (School be fit) Senior Misconduct decisions
Fitness be involved play simple    avoid Scans
             both feet
(Clearing - Simple Playing.
tactics - Composure -
good job Keep it up
get Healthy
Keep it up / work Crossing
Push Yourself all The Time.

——Original Message——
From: Noriana Radwan <nomor100@aim.com>
To: leonidas.tsantiris <leonidas.tsantiris@uconn.edu>
Sent: Sun, Dec 28, 2014 12:19 pm
Subject: Highlight Video

Hi Coach,

I made a highlight video from this season that I will be sending to other coaches. Please send it to other coaches so they would know who I am.  I have contacted these schools so far.  If there are any other schools that you think may be interested, please let me know.

Rutgers
U Miami
Drexel
Stony Brook
U Albany
Binghamton
Central Connecticut
Northeastern
Elon
Hofstra
Pittsburgh
Villanova
Maryland
Iona
American

https://www.youtube.com/watch?v=IgbeNvgKI2c&feature=youtu.be

Noriana Radwan
nomor100@aim.com

UConn SJM Exhibit 45

**Warde Manuel**
**05/29/2019**

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF CONNECTICUT

3

4    NORIANA RADWAN,

5                Plaintiff,

6        -vs-            Civil Action No. 3:16-cv-02091

7    UNIVERSITY OF CONNECTICUT BOARD OF

8    TRUSTEES, WARDE MANUEL, LEONARD TSANTIRIS,

9    and MONA LUCAS, individually,

10               Defendants.

11   _____/

12

13   Pages 1 - 115

14

15        THE VIDEOTAPED DEPOSITION OF WARDE MANUEL

16        Taken at 1000 South State Street

17        Ann Arbor, Michigan

18        Commencing at 10:10 a.m.

19        Wednesday, May 29, 2019

20        Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR

21

22

23

24

25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

UConn SJM Exhibit 46

**Warde Manuel**
05/29/2019                                              Page 5

```
 1      Ann Arbor, Michigan

 2      Wednesday, May 29, 2019

 3      About 10:10 a.m.

 4                          *   *   *

 5             VIDEOGRAPHER:  We're now on the record.

 6      This is the videotaped deposition of Warde Manuel

 7      being taken in Ann Arbor, Michigan.  Today is

 8      May 29th, 2019.  The time is 10:10 a.m.

 9             Would the attorneys please identify

10      themselves and the court reporter please swear in the

11      witness.

12             MR. KLEIN:  Jonathan J. Klein for the

13      plaintiffs.

14             MS. MCGOVERN:  Rosemary McGovern, Assistant

15      Attorney General State of Connecticut, for the

16      defendants.

17                          *   *   *

18                      WARDE MANUEL,

19             having been first duly sworn,

20             was examined and testified as follows:

21                          *   *   *

22                      EXAMINATION

23      BY MR. KLEIN:

24      Q.  Good morning, Mr. Manuel.  I'm Jonathan Klein.  I

25          represent Noriana Radwan, the plaintiff in this case,
```



**Warde Manuel**
05/29/2019                                          Page 12

1        back here to work and finish my Ph.D.  I started

2        working here part time --

3   Q.   When you say here, you mean the University of

4        Michigan?

5   A.   Yes, sir, University of Michigan.  Started working

6        here part time as a special assistant to the athletic

7        director and to the executive staff.  And then that

8        was in the summer of 1996.  And in February of 1998,

9        I started a full-time job as assistant athletic

10       director here.  Then I got -- I went from then to

11       2005 and became the athletic director at the

12       University of Buffalo.  I was there for six and a

13       half years until March of 2012, when I became the

14       athletic director at Connecticut, until March of 2016

15       when I came here as the athletic director at the

16       University of Michigan.

17  Q.   Can you describe the duties of the athletic director

18       at UConn during the time you were there?

19  A.   Well, you oversee -- I had 24 sports there, budget of

20       about 75 to 80 million at the time, I think, when I

21       started.

22  Q.   How many student athletes approximately?

23  A.   I want to say about 750, 700, 750 athletes; staff of

24       about 185, 200.  And, you know, you manage -- as

25       athletic director, you manage it all.  You manage the



1    extent already.  But what did you do in reviewing,

2    for example, team rules to make sure that male and

3    female student athletes were treated equally and had

4    equal opportunities?

5  A.  Well, anything we had in a general sense for all our

6      student athletes, whether it was the student athlete

7      handbook or things we would put out in terms of

8      e-mails or policies or things like that, you know, I

9      was involved with.  I won't say every minutia of

10     everything in the handbook related to, you know,

11     anything that I could say that, you know, I

12     wordsmithed exact details.  But the general sense of

13     what we put out to our student athletes I was

14     involved with.  The rules for the teams individually

15     were left up to the coaches for the most part.  The

16     sports administrators reviewed any issues or concerns

17     that came or any concerns about a rule that a coach

18     was thinking about implementing.  They may have

19     brought to my attention for a discussion to make sure

20     it didn't get out of -- you know, it wasn't out of

21     line with a current policy or expectation that I had.

22     But for the most part, the sports administrators for

23     each of the sports were the ones who reviewed any

24     rules that were being put out by the coaches.

25  Q.  And those sports administrators were the people you

UConn SJM Exhibit 46

1    Q.   You mentioned five teams right now.  Earlier you

2         mentioned that four of the coaches were direct

3         reports to you.  The one you didn't mention earlier

4         was the men's soccer coach.  Is there a reason why he

5         was not a direct report to you?

6    **A.   I don't remember the reason.  It's just it wasn't --**

7         **it wasn't the way it was structured I don't believe**

8         **when I walked in.  He reported to someone else, and I**

9         **didn't change it when I got there.**

10   Q.   Are you able to say how much of your time percentage

11        wise was devoted to any particular sport?

12   **A.   No.**

13   Q.   Who was your direct report who dealt with the women's

14        soccer team?

15   **A.   Neal Eskin.**

16   Q.   And that wasn't the only team that he was responsible

17        for, was it?

18   **A.   No.  He had women's basketball.  I'm trying to think**

19        **what else did Neal had.  I don't remember all his**

20        **other sports, but I know he had women's basketball,**

21        **women's soccer.  I know I was mumbling just now.  I**

22        **was trying to think of the outlay of what he had.**

23        **Maybe both tracks.  But Neal had women's soccer,**

24        **women's basketball.**

25   Q.   When did you first hear of Noriana Radwan?



1        context, that it happened after the game, after we

2        had won.  But I don't remember exactly beyond those

3        kind of descriptives or what I was looking at exactly

4        what the exchange was at the time.

5   Q.   And how did you initially react to seeing that image

6        and getting this information?

7   A.   Well, I was -- it was an embarrassing image of not

8        only her but for the team, for the university.  I

9        would have been -- I was confused as to why after

10       winning the championship one of our players would do

11       that toward the camera.  And it was something that we

12       needed to get to the coaches to have a conversation

13       with her immediately because it was unnecessary,

14       completely unnecessary to do something like that and

15       to publically embarrass yourself and your team and

16       the university in that manner.

17  Q.   Did you call anyone?

18  A.   I don't remember if I called anybody specifically.

19       No.

20  Q.   Did you speak with Coach Tsantiris?

21  A.   I don't know if I spoke with coach directly or if I

22       got a message to him through someone else directly.

23       I don't remember exactly at that time that I saw it

24       immediately if I did anything specifically to reach

25       out to him.  I do not believe I did.  I believe I

**Warde Manuel**
05/29/2019                                          Page 30

1          worked either through one of my administrators who

2          would have been around me to get a message to him.

3          You know, it could have been Mike Enright.  It could

4          have been Debbie Corum.  It could have been -- I

5          don't know.

6     Q.   What message --

7     A.   Paul.

8     Q.   I'm sorry.  Paul?

9     A.   Paul McCarthy.

10    Q.   And what message did you convey through one of those

11         people?

12    A.   Well, that that gesture was inappropriate and needs

13         to not be repeated by her or anybody.

14              You know, at the time you see an image -- I

15         may have seen the video.  You know, you don't know if

16         that's something that somebody is going to continue

17         to do or not, so you want it to immediately stop.

18    Q.   Okay.  When did you first see the video?

19    A.   At some point shortly after.  I saw the still image

20         whenever the video was captured or sent, or they can

21         download it.  So I don't remember if it was exactly

22         that day or if it was the next day, but it was within

23         24 hours.  I remember seeing it pretty quickly after

24         it happened.  But I don't remember how quickly it was

25         either on Twitter or on the web, versus somebody had



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100
UConn SJM Exhibit 46

1        to capture it and put it in that context for me.

2   Q.   Did you have a different impression of the incident

3        from viewing the video than you had had from seeing

4        the still photo?

5   A.   **No.**

6   Q.   And what term or terms would you use to characterize

7        that incident?

8   A.   **Embarrassing, unnecessary.**

9   Q.   Would you use the word unsportsmanlike?

10  A.   **In a general sense, yes.  That is disrespectful to**

11       **the competition that occurred.  I didn't get into her**

12       **mind and her rationale.  But it is unsportsmanlike in**

13       **the sense that it's disrespectful to the competition**

14       **that you just engaged in to yourself and to the other**

15       **team that participated with it.  But at the time, I**

16       **didn't, you know, get into that sort of sense of**

17       **unsportsmanlike because to me it was just more of a**

18       **reflection of her, her team, this university.  But in**

19       **the general sense of how I see unsportsmanlike**

20       **behavior, yeah, that is.**

21  Q.   Did you receive any complaint about it from the

22       opposing coach?

23  A.   **Not to my knowledge, no.**

24  Q.   From any opposing players?

25  A.   **Not to my knowledge, no.**



1          I remember that from back then.

2    Q.    Just for clarifying on the record, what this exhibit

3          is, the first part of this e-mail string is from

4          Ellen Ferris, associate commissioner for governance

5          and compliance at the American Athletic Conference

6          who had e-mailed Deborah Corum on Monday,

7          November 10th, 2014.  And then Deborah Corum also on

8          November 10th, 2014, that afternoon forwarded this to

9          you with a note saying that Neal -- that's Neal

10         Eskin, correct?

11   A.    Correct.

12   Q.    -- and she were working on providing the necessary

13         information to the conference regarding yesterday's

14         incident because basically the conference wanted to

15         know what are you doing about it, right?  Is that a

16         fair description?

17   A.    Correct.

18   Q.    In the e-mail from Deborah Corum to you, she says,

19         thank you for informing me during yesterday's

20         basketball game, as I had an e-mail from Ellen Ferris

21         last night and a call with her at 8:00 a.m. this

22         morning and I would have been "blindsighted" by this

23         if you had not brought me up to speed.  It was also

24         helpful to see the video.  Silly me, I was trying to

25         keep Mel Greenberg from seeing it and forgot about

UConn SJM Exhibit 46

1      the fans behind this -- behind us.  Thanks for

2      catching me on that.

3                   What is she referring to about --

4   A.  Well, as of yesterday, I think I was refreshed that

5      we may have been at a basketball game.  And so I sit

6      usually -- almost virtually 100 percent of the time I

7      was sitting court side on the -- underneath the

8      basket on the court and could see into the stands and

9      probably saw her and may have signaled to her or got

10     a message to her that, hey, you know, people around

11     you can see this video and this -- what we're sending

12     and talking about.  So just, you know, be cognizant

13     of eyes, you know, on the situation.  So it was

14     probably that she was referring to.

15  Q.  Who is Mel Greenberg?

16  A.  Must have been one of the donors at UConn.  I don't

17     remember exactly if it was a donor.  I remember the

18     name, but I don't remember if he was a long time

19     season ticket holder or a significant donor or both.

20  Q.  So Ms. Corum was not with you court side.  She was

21     how far away from you?

22  A.  She would have been sitting in the stands.  I don't

23     know.  100 feet maybe.

24  Q.  Okay.  All right.  You can just leave the original

25     there for now.  Okay?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

UConn SJM Exhibit 46

```
 1        where students don't play in a game, and there are
 2        many student athletes who have gone through UConn, go
 3        through here, and they don't start.  They may play in
 4        their career, but they're not a significant
 5        contributor to the game, the game day or the
 6        competition.  They may be a significant contributor
 7        in practice in many ways but not really be a person
 8        who plays a lot of minutes in games.
 9    Q.  How would -- what was the protocol or procedure for
10        deciding whether or not to terminate or not renew a
11        student athlete's grant-in-aid when it was based on
12        some disciplinary issue?
13    A.  It would have been the same -- it's the same as I
14        described.  The coach with the sports administrator,
15        and normally it would be brought to my attention that
16        there was agreement or some -- you know, if there was
17        disagreement, the sports administrator can certainly
18        disagree with the coach's decision or rationale.  And
19        it would be brought to me either by the sports
20        administrator or by the coach or it could be by the
21        compliance person who would be dealing with filling
22        out the paperwork on a removal of the scholarship.
23    Q.  But you would be the ultimate decisionmaker?
24    A.  Ultimately, yes, it would come to me for a final
25        either okay or to say it's not -- you know, we're not
```

**Warde Manuel**
05/29/2019                                              Page 58

1          going to pull the scholarship based on the rationale

2          that I see, or further conversation is necessary.

3     Q.   Was there a different standard or different procedure

4          that applied in the disciplinary context for deciding

5          whether to terminate or not renew a scholarship

6          midyear?

7     A.   Not -- no.  Nothing I would say would be vastly

8          different.  I mean, it depends on the context and on

9          the situation that's there.  But normally it follows

10         about the same, you know, procedure where it is

11         vetted by the coach through the sports administrator

12         to me, and those kind of discussions and decisions

13         are made.

14    Q.   I think you said you were at UConn from 2012 to 2016.

15    A.   '16.  Yeah.  March to March.  March of 2012 to March

16         16th of 20 -- of 2016.  Sorry.

17    Q.   During that time, if you can tell me, how many

18         student athlete grants-in-aid were terminated in the

19         middle of the year?

20    A.   I do not remember, sir.

21    Q.   Do any come to mind other than Noriana Radwan?

22    A.   There was a young man who was a football player

23         who -- he lost his scholarship, you know, shortly

24         after I got there.  So it wouldn't have been midyear.

25         It would have been the winter semester.  Lost his



**Warde Manuel**
05/29/2019                                          Page 59

```
 1        scholarship because of a fight, and it was determined
 2        that the university suspended him for a year.  So he
 3        lost his scholarship and didn't return.  I can't -- I
 4        don't know -- no others, you know, come to mind off
 5        the top of my head.  There could be others certainly
 6        if I was -- if you have, you know, some sense of it,
 7        it may refresh my memory.  But right now, that's the
 8        one that comes to mind.
 9    Q.  Do you remember any details about the fight incident
10        that led to that, whether it was on campus, off
11        campus, during --
12    A.  It was either on or around campus.  And apparently,
13        you know, he -- it was figured that he either
14        instigated the fight or he was continued to fight or
15        some significant level that the university suspended
16        him.
17    Q.  Do you know if he was criminally charged?
18    A.  I do not remember, no.  To my knowledge, no.  But I
19        don't -- I can't say that with 100 percent certainty.
20        But to my knowledge, no.
21    Q.  On or about December 19th, 2014, Coach Tsantiris
22        called Noriana Radwan on the phone and told her that
23        her grant-in-aid was being terminated.  Did you order
24        him to terminate her grant-in-aid?
25    A.  No.  Order?  No.
```



1   Q.   Okay.  Did you consult with him or did he consult

2        with you about that decision before he told her about

3        that?

4   A.   **Sorry.  I thought you were finished.  I don't**

5        **remember if it was Len or Neal, but I believe it was**

6        **both that we had the conversation about -- and the**

7        **rationale and why he wanted to remove it.  And I**

8        **supported the rationale that was presented to me.**

9   Q.   This was almost six weeks after the incident, after

10       she had been reprimanded by the conference, after you

11       had your meeting with her.  What changed?

12  A.   **I don't -- I can't speak to what changed.**

13  Q.   What was the rationale that was presented to you for

14       the coach and/or Neal wanting to terminate her

15       grant-in-aid?

16  A.   **It would have been the coach.  It wouldn't have been**

17       **Neal making the argument.  He would have presented**

18       **the argument if it was him, but I believe it was**

19       **both.**

20  Q.   So what did he present to you?  What was the

21       argument?

22  A.   **To my memory, it was not only that issue, but there**

23       **were issues and things that he was dealing with with**

24       **her on the team that -- before the incident that sort**

25       **of compounded everything to him wanting to remove her**



HANSON RENAISSANCE
COURT REPORTERS & VIDEO   *hansonreporting.com*
313.567.8100

UConn SJM Exhibit 46

**Warde Manuel**
**05/29/2019**                                              Page 67

```
1         were any other incidents.

2    A.   Right.  I agree.

3    Q.   Did you ever suggest to him that taking her

4         scholarship away might be overkill?

5    A.   I do not recall.  No.

6    Q.   Did you try to talk him out of it?

7    A.   I don't really -- in these meetings with coaches, I

8         never really try to -- I try to understand their

9         thought process.  Rather than talk them out of it, I

10        want to understand what brought them to this point to

11        make this decision.  And so it's not -- ultimately

12        not a talking out because if I don't believe their

13        rationale is appropriate, then I don't approve it.

14   Q.   So the fact that you approved it is an indication

15        that you agreed with whatever his rationale was?

16   A.   I agreed with it enough to approve the fact that he

17        can move forward and remove the scholarship.  Yes,

18        sir.

19   Q.   And he couldn't have done that without your approval,

20        right?

21   A.   Well, certainly he could have said it.  It doesn't

22        mean it --

23   Q.   It wouldn't have happened without your approval?

24   A.   Yeah.  I mean, it could have been immediately -- in

25        my career, coaches have made decisions about, you
```



1       know, different things where I've reversed their

2       decision.

3    Q.   Did you have to sign off on anything to indicate your

4         approval?

5    **A.   I don't remember that.**

6    Q.   Okay.  Procedurally --

7    **A.   There probably is a form.  And I don't know if it**

8       **needs my signature or a designee in that sense, which**

9       **could be a sports administrator or whatever.  But I**

10      **don't -- I don't remember if I actually signed**

11      **something or if there was something that needed to be**

12      **signed by me or an administrator.  My guess is yes,**

13      **but I don't -- I don't recall.**

14   Q.   All right.  Did the coach discuss with you whether

15      and how he should assist or not assist Noriana with

16      finding another women's soccer program to transfer

17      to?

18   **A.   I don't recall that conversation.  No.**

19   Q.   Did you recall if he said anything to you regarding

20      whether she would be treated differently depending on

21      whether she appealed her termination or didn't appeal

22      her termination of the grant-in-aid?

23   **A.   No, sir.**

24   Q.   Before approving the coach's recommendation to

25      terminate her grant-in-aid, did you consult with



**Warde Manuel**
05/29/2019                                              Page 70

1    A.   I don't remember, but I don't think I did.

2    Q.   Did you respond to her in any fashion?

3    A.   **Personally, I do not remember responding to her after**

4         **the decision was made to remove the scholarship.  No.**

5    Q.   Okay.  This is what I just -- what I would describe

6         as kind of an impassioned plea to you not to do this

7         or not to let this happen.

8                   MS. MCGOVERN:  Objection to form.

9                   MR. KLEIN:  Just my observation.

10   BY MR. KLEIN:

11   Q.   So I'm wondering why you did not respond at all.

12                  MS. MCGOVERN:  Objection to form.

13   BY MR. KLEIN:

14   Q.   Can you explain?

15   A.   **Because there's a process by which the appeal goes to**

16        **the office of financial aid, to my recollection.  And**

17        **they handle any appeals and removals of scholarship,**

18        **whether it's at the end of the year or the middle of**

19        **the year.  So it wasn't something that at that point**

20        **in time I was going to change.  And the process was**

21        **through the office of financial aid, which could**

22        **overturn the decision to remove the scholarship.**

23   Q.   Did you provide a copy of this to the office of

24        financial aid?

25   A.   **I don't -- I don't recall if I did or if anybody did**



1        **reaction to the student and what they do, the**

2        **behavior they exhibit and our reaction to it.**

3    Q.   Let me ask you about some other incidents regarding

4        student athletes. ████████████████████████████████



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

UConn SJM Exhibit 46



**Warde Manuel**
05/29/2019                                    **Page 103**

1      scholarships comes from the financial aid office?

2                  MR. KLEIN:  Objection to the form.  But you

3      can answer.

4                  **THE WITNESS:  Correct.**

5  BY MS. MCGOVERN:

6  Q.   Do you have any knowledge with regard to whether this

7       letter, again referring to Exhibit A, if it would

8       have been sent to Ms. Radwan via e-mail in addition

9       to it being sent U.S. Mail?

10 **A.   I have no knowledge of that, no.**

11 Q.   Okay.  Okay.  And again sticking with Exhibit A, the

12      notice to Ms. Radwan indicates that her scholarship

13      is being cancelled because of serious misconduct,

14      correct?

15 **A.   Correct.**

16 Q.   Okay.  And did Ms. Radwan showing her middle finger

17      to the television camera at the conclusion of the

18      UConn championship game against USF constitute

19      serious misconduct?

20                 MR. KLEIN:  Objection to the form.  You can

21      answer.

22                 **THE WITNESS:  You know, I think in my --**

23      **you know, as I tried to state earlier, it is --**

24      **there's a range of what -- you know, misconduct to**

25      **serious misconduct to those kind of things.  And so I**



1       would say it was a significant breach.  I don't

2       know -- you know, as I said to Mr. Klein, it's hard

3       for me to draw a line in the sand what it is.  It was

4       highly unacceptable.  There are many different words.

5       Maybe I would have used that back then because of the

6       impact and viewing the video and seeing the image

7       that it was indeed a serious misconduct issue.  But,

8       again, I don't -- when you start to put adjectives

9       and adverbs in front of things, it just makes it --

10      it's harder to define.  So I probably agreed with

11      this, that --

12              Here's how I would answer the question.  At

13      the time, I probably did agree that it was a serious

14      misconduct issue.

15  BY MS. MCGOVERN:

16  Q.   Okay.  I'm finished with that.

17              I would like to look at Exhibit 6 and

18      Exhibit 8.  All right.  Take me a second.  I'm sorry.

19      I want Exhibit 9 instead, not 8.

20  A.   I remember.

21  Q.   Okay.  So actually, let's just focus on Exhibit 9.

22  A.   Okay.

23  Q.   And just for the record, this is an e-mail that --

24      it's an e-mail chain.  It begins with Debbie Corum

25      sending an e-mail to Ellen Ferris at the American



**Warde Manuel**
05/29/2019                                        **Page 115**

```
 1                    CERTIFICATE OF NOTARY PUBLIC

 2     STATE OF MICHIGAN )

 3                      )

 4     COUNTY OF LENAWEE )

 5          I, Trisha Cameron, Certified Shorthand Reporter

 6     and Notary Public in and for the State of Michigan, do

 7     hereby certify that the witness whose attached

 8     deposition was taken before me in the above cause was

 9     first duly sworn or affirmed to testify to the truth,

10     the whole truth, and nothing but the truth; that the

11     testimony contained herein was by me reduced to writing

12     in the presence of the witness by means of Stenography;

13     afterwards transcribed by means of computer-aided

14     transcription; and that the deposition is a true and

15     complete transcript of the testimony given by the

16     witness to the best of my ability.  I further certify I

17     am not connected by blood or marriage with any of the

18     parties, their attorneys or agents; that I am not an

19     employee of either of them; and that I am not

20     interested directly, indirectly, or financially in the

21     matter of controversy.

22                      _____

23                      Trisha Cameron, RDR, RMR, CRR, RPR, CSR

24                      Notary Public, Lenawee County, Michigan

25                      My Commission Expires 5-24-24
```

1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
 3   * * * * * * * * * * * *
 4   NORIANA RADWAN,         *
 5          Plaintiff,  *
 6      VS.               *      Case No. 3:16-cv-02091
 7   UNIVERSITY OF         *
     CONNECTICUT BOARD OF
 8   TRUSTEES, ET AL.,     *
 9          Defendants. *
10   * * * * * * * * * * * *
                                Bridgeport, CT
11                              June 3, 2019
                                9:58 a.m.
12

                           — — —
13
                 DEPOSITION OF LEONIDAS TSANTIRIS
14                         — — —
15
     APPEARANCES:
16
         FOR THE PLAINTIFF:
17            JONATHAN J. KLEIN
              BY:  JONATHAN J. KLEIN, ESQUIRE
18                 60 Lyon Terrace, 3rd Floor
                   Bridgeport, CT 06604
19                 Phone:  (203) 330-1900
                   Fax:  (203) 330-1526
20                 E-Mail:  jjkesq@hotmail.com
                       - and -
21            GREGORY J. TARONE
              BY:  GREGORY J. TARONE, ESQUIRE
22                 5020 Route 9W, Suite 104
                   Newburgh, NY 12550
23                 Phone:  (845) 527-5424
                   Fax:  (845) 563-0461
24                 E-Mail:  greg@taroneesq.com
25                     - Cont'd -
```

4

1                    (Whereupon, the Second Re-Notice of

2     Deposition was premarked as Plaintiff's Exhibit A for

3     Identification.)

4                         THE COURT REPORTER:  Counselors,

5     as far as stipulations for today?

6                         MR. KLEIN:  Usual stipulations.

7                         MS.  McGOVERN:  Agreed.

8                         MR. KLEIN:  Does the witness want

9     to read and sign?

10                        MS. McGOVERN:  Yes.

11

12    Thereupon:

13        LEONIDAS TSANTIRIS, stating his address as 1624

14    Treasure Drive, Tarpon Springs, Florida 34689, as being

15    first duly sworn, as hereinafter certified, was examined

16    and testified as follows:

17    DIRECT EXAMINATION BY MR. KLEIN:

18                Q.    Good morning, Mr. Tsantiris.  My name

19    is Jonathan Klein.  And I'm the attorney who represents

20    the Plaintiff in this case, Noriana Radwan.

21                    There are four named Defendants in this

22    case; University of Connecticut, Warde Manual, you, and

23    Mona Lucas.

24                    Do you understand that?

25                A.    Yeah.

17

1    talking about.  But when you say the women's team, you

2    mean the women's soccer team, correct?

3              A.    Women's soccer team, yes.

4              Q.    Okay.

5              A.    So '81 I started in late August.  I

6    think it was pre-season at that time.  I was supposed to

7    do half of the year.  It was a part-time job just to do

8    it fall.  And then they would evaluate, we go from there.

9                    At the end of -- beginning of the

10   spring, I think in March, I got the job in '82 full time.

11             Q.    Full time?

12             A.    At UConn, yeah.

13             Q.    Did you have any other duties at UConn

14   other than coaching soccer?

15             A.    Yes.  At the beginning I did.  I did

16   recreation.  I was assistant to the recreation director.

17   I was in charge -- the head of the intermural program.

18   So I was doing -- I believe the first time was

19   volleyball.  Yeah, it was volleyball.  The tournament

20   volleyball students, I did that.

21             Q.    Was that men or women or both?

22             A.    Both.  Then I also teach classes.  I

23   taught soccer, of course.  I taught a couple of other

24   sports.  I think it was racquetball was one.  And I'm not

25   sure if it was -- what's the other sport that you go over

23

1   Toner and everybody, I had to win.  And we did win.  But

2   we were the only team that was winning when Lou Perkins

3   came in.

4           Q.     The only team at UConn?

5           A.     Yes.  In the 90s.  '87 we were in the

6   Final 4.  We were in the Final 8.  We missed one game to

7   go to the Final 4.  We've been there several times.

8                  So what he did, he took meetings of,

9   very rare for an athletic director to take a female coach

10  to his office, and tell me, Lenny, what do you need?  I

11  said, what?  What I need?  It was the first time, you

12  know, it didn't happen right away.  But we got the

13  scholarships eventually.  We got the full-time assistant

14  coach.  And we compete.  We were in the Finals in '90.

15  We were in the Final 4 in '94.  We were in the Finals in

16  '97.

17          Q.     Was this Division I at this point?

18          A.     Yeah.  Yeah.  And we were in the Finals

19  in 2003, the final game.  But, you know, that's when they

20  were starting to pay attention.  Not everybody.  Certain

21  people.  That's when the Big Ten, Big 12, the Pac-10, the

22  ACC started getting the programs aboard, women's soccer.

23          Q.     Okay.

24          A.     So in the '90s it was developing by 15

25  to 20 percent a year, the number of teams that were

25

1    talking progressively and we got to mid-90's.

2               You remained as the women's soccer coach

3    at UConn until when?

4               A.    I retired 2017.

5               Q.    So at the end of the 2017 season?

6               A.    Yeah, the end of the season.  Yes.

7               Q.    Okay.  And during the time you coached

8    women's soccer at UConn, did you receive any training or

9    education with respect to the requirements of Title IX or

10   compliance with Title IX?

11              A.    Yes.  The department as a whole.  We

12   have one time a year they come in and they talk about

13   Title IV, sexual harassment and all that stuff from the

14   state.

15              Q.    Okay.

16              A.    So that's -- that's...

17              Q.    That was once a year beginning when?

18              A.    Before the school started.

19              Q.    I mean, beginning around what year?  I

20   mean, beginning around what year did that --

21              A.    I don't remember what year.  But I

22   remember we do have those.  I can't tell you what year.

23              Q.    Okay.

24              A.    I don't remember.  But we do have it.

25              Q.    I'm sorry.  The training was provided

29

1    my team.

2        Q.    Would it be fair to say that you

3    regarded UConn as a premium program in the Nation?

4        A.    Yeah.  We're in the top 10 in the

5    country for 25 years --

6        Q.    Okay.

7        A.    -- so on.  And we're in the finals.

8    But lately we didn't.  And I had to figure out why.

9              So when I went and saw this, I

10   thought he was going to tell me they were going to go a

11   different direction.  And I told him, if we don't do

12   well, I'm walking out.  Because those days I would just

13   take -- I mean, I've been there a long time.  I was only

14   one year at a time.  I would sign a contract for one

15   year.  Before it was four or five years.  But one year.

16   Because I didn't know when.  And at that time I had to

17   look and see what we need to do to improve the program.

18   That's it.

19       Q.    So that's at the end of the 2013

20   season?

21       A.    Yes.

22       Q.    Okay.  So I think you indicated,

23   correct me if I'm wrong, that for the 2014/2015 season,

24   there were written rules put into place for the first

25   time at the school?

30

1          A.     Yes.

2          Q.     And who created those rules?

3          A.     We went through.  We put them together,

4   the coaching staff.  The program, Neal Eskin, which was

5   the representative of our program, associate athletic

6   director.  He looked over if it would comply with the

7   state ethics, with the student handbook, and so on and so

8   forth, and the other things that we want to put in.  And

9   it was okay by them, by the athletic department, and we

10  put it in.

11         Q.     So you with your coaching staff --

12         A.     Coaching staff.

13         Q.     -- drafted the rules?

14         A.     Yup.

15         Q.     Who was your coaching staff at the

16  time?

17         A.     At the time it was Margaret Rodriguz

18  and Zack Saaw.

19         Q.     Can you just spell the name for the

20  reporter?

21         A.     Zack Saaw, S-a-a-w.

22         Q.     What was the purpose of putting written

23  rules into effect?

24         A.     We had to change the program.  We had

25  to change the attitude of things.  I missed the boat.

31

1    That was the point.

2             Q.    In what respect?  What do you mean?

3             A.    Because kids were different those days.

4    They were different and I didn't pick it up soon enough.

5    It wasn't -- they were on their own.  They were in their

6    own beat.  They would not be -- they have to have written

7    rules and discipline in order to reach our options or our

8    goals.

9             Q.    So are you saying they didn't have

10   enough self-discipline without these rules?

11            A.    Self-discipline, team discipline, and

12   so on and so forth.  And I had to do that.  And I had to

13   step in and the coaches, and they had to sign down.  Read

14   those things in front of them.  Although, we talk about

15   them, it's not any different from what we talk, but it

16   wasn't in front of them, and they didn't sign before.

17            Q.    Meaning that season they did sign?

18            A.    They did sign.

19            Q.    So everybody got a copy of the rules?

20            A.    Yes.

21            Q.    And had to sign?

22            A.    They read it.

23            Q.    Okay.

24            A.    We gave them time to read it and they

25   signed it.

32

1          Q.    Signed acknowledging that they read it?

2          A.    Yes.

3          Q.    Okay.

4          A.    That was the thing, we had to change

5    the program according to -- well, myself and the athletic

6    department, we had to go back to winning ways and we had

7    to go back to be more responsible.  There were a lot of

8    things.

9                    For example, I give you examples.

10   Somebody is doing rehab work, you're supposed to do your

11   rehab work so you get back to the team soon enough.  So

12   they were missing appointments.  Or they had an

13   appointment with a professor and they didn't go.  Or they

14   missed class.  So those were in there.  There were

15   consequences if you do that.

16         Q.    Okay.

17         A.    And people -- I was in touch with

18   academic advisor, the trainer, and all that.  And the

19   academic advisor I'm sure is in touch with professor

20   because I can't be in touch with professor.

21         Q.    Was there one academic advisor to the

22   team?

23         A.    Well, not to one team.  But two or

24   three teams.

25         Q.    Okay.

34

1                    (Discussion off the record.)

2                    MR. KLEIN:  May I have this

3      marked, please.

4                    (Whereupon, the UConn Women's Soccer

5      2014 Contract was marked as Plaintiff's Exhibit B for

6      Identification.)

7              Q.    We're back on the record.  Coach, let

8      me show you what's been marked as Plaintiff's Exhibit B.

9      This was a document that was just handed to me before we

10     went on the record by your attorney who reminded me that

11     this document was an exhibit during Noriana Radwan's

12     deposition back 13 months ago.

13                   This is a two-page document.  And it's

14     headed UConn Women's Soccer 2014 Contract.

15                   Have you seen this document before?

16             A.    Excuse me?

17             Q.    Have you seen this before?

18             A.    Yes.

19             Q.    Is this what you were referring to when

20     you talk about team rules?

21             A.    This is what we did in 2014.  Yes, team

22     rules and that the players have to read everything and

23     sign it.

24             Q.    Okay.  And the second page of this

25     document, if you would turn to that.  Would it be fair to

35

1    say that's the page on which the players are supposed to

2    acknowledge receipt --

3              A.    Yes.

4              Q.    -- in agreement, etc.?

5              A.    Yeah.

6              Q.    Okay.  The document that was provided

7    by the Defendants at Ms. Radwan's deposition last year,

8    this is a copy of it.  So the second page is blank.  It's

9    not signed by you, it's not signed by Ms. Radwan.

10              It was my understanding at the time that

11   the Defendants did not have a copy that was signed by

12   her.  Am I stating that correctly?

13              MS. McGOVERN:  That's correct.

14   None of the contracts that were signed by any of the

15   student-athletes, including Ms. Radwan, was retained.

16   The lawsuit was filed two years after these were

17   originally signed.  There was no notice that a lawsuit

18   was going to be filed.

19              MR. TARONE:  But there was a

20   record of this?

21              MS. McGOVERN:  These had been

22   retained but not kept.

23              MR. TARONE:  But there was a

24   record of written rules of the soccer game?

25              MS. McGOVERN:  Based on the

UConn SJM Exhibit 47

36

1    testimony of Coach Tsantiris these were the written

2    rules.

3                        MR. TARONE:  Okay.  Thank you.

4                        MR. KLEIN:  Okay.

5              Q.     Do you recall as you sit here today

6    whether Ms. Radwan in particular actually received and

7    signed this?

8              A.     Everyone.  I believe my assistant coach

9    collect everything.  We gave them time to read and make

10   sure they understand everything, if they had questions.

11   And everybody signed, she collected them --

12             Q.     And --

13             A.     -- and kept them.

14             Q.     At what point in time would that have

15   happened?

16             A.     That was during -- in August.  I don't

17   know what day, but it was in August.

18             Q.     At the beginning of the season?

19             A.     Yes.  Yes.

20             Q.     Okay.  Do you know if Warde Manuel

21   approved the final version of this?

22             A.     Yes.  I couldn't do it without.  They

23   had to approve everything.

24             Q.     Okay.

25             A.     Everything I did, the athletic Director

39

```
1            A.    14 is for all four years.  I mean, you

2    have 14 scholarships and you got about 25 to 30 players.

3    So you have to nickle and dime.

4            Q.    Okay.

5            A.    Always you're looking how you're going

6    to receive this, how you're going to help this kid.

7    Because a lot of kids come with no money at all.  And we

8    had starters with no money on the team.

9            Q.    Okay.

10           A.    They start them in, they play for 90

11   minutes starting on the team.

12           Q.    Were there any freshman starters on the

13   team that year?

14           A.    I have to look.  I'm sure.  I have to

15   look.  It's tough getting old.  I can't remember things.

16   But I'm sure.  We bring talented kids in.  There might

17   have been.  But I'm not -- I can't be specific.

18           Q.    Okay.  Let's focus on November 9th,

19   2014.  That day the UConn women's soccer team won the

20   American Athletic Conference Championship game in

21   Florida, correct?

22           A.    Yes.

23           Q.    Who was the opponent?

24           A.    South Florida.

25           Q.    Okay.  And did that qualify the team to
```

UConn SJM Exhibit 47

40

1    go to the NCAA tournament?

2              A.    Yes.

3              Q.    And did you become aware of an incident

4    following the game involving Noriana Radwan?

5              A.    Yeah.  I mean, nobody noticed this.  I

6    was talking with Neal Eskin, the sports administer.  He

7    was congratulating us.  And we were talking about things.

8    And all of a sudden he gets a message from UConn, the

9    sports info, and we see the picture.

10             Q.    Okay.  And that was the first time you

11   were aware of the incident?

12             A.    That was the first time.

13             Q.    Did you see a still picture or a video?

14             A.    I don't remember.  I saw the picture.

15             Q.    And what did you see?

16             A.    I seen the whole team celebrating and

17   the finger.

18             Q.    Okay.  Noriana with her middle finger?

19             A.    Yeah.

20             Q.    Who transmitted this to you and Neal

21   Eskin?

22             A.    The sports information.  It was

23   everywhere on ESPN.  ESPN knew, I believe.  It was live

24   coverage.

25             Q.    Okay.

41

1          A.     So at the end the kids were celebrating

2     and the camera was following them.  And this happens.

3          Q.     So what was your immediate reaction to

4     that?

5          A.     Well, we changed the program.  We had

6     14 or 15 wins.  We won.  We're going to the NCAA's

7     finally after things are working, the kids celebrating

8     and this happens.  Devastating.  How?  What am I going to

9     say?

10          Q.     Well, why was it devastating to you?

11          A.     Well, to me it was devastating.  That

12     never happened before.  Ever.  34 years, 45 years

13     coaching.  34.  That was my 34th year at UConn.

14          Q.     Okay.

15          A.     Never.

16          Q.     So you felt it was devastating, but I'm

17     not understanding devastating.  I mean, obviously you

18     weren't happy about it.  But what do you mean by

19     devastating?  Devastating in what way?

20          A.     You work so hard to do and something

21     like this happens and everybody sees it, you know.  And

22     then I go recruiting and my colleagues are pointing the

23     finger to me.

24          Q.     Did that happen?

25          A.     Yes.  I get e-mails.

45

1          Q.      And what, if anything, did you do at

2     that time when you were on the field after the game and

3     you saw this?  Did you speak to Noriana?

4          A.      We spoke.  I didn't want to interfere

5     with the celebrations of the other kids.  I don't

6     remember when I talked.  But we talked I'm sure before

7     they got on the bus.  That was -- and then we -- I don't

8     know if I told her she was suspended then from any

9     activity going forward that year from the team.

10         Q.      So it's fair to say that you suspended

11    her immediately?

12         A.      Yes.

13         Q.      Okay.  At that time when you informed

14    her that she was suspended, did you have any kind of a

15    discussion with her about what had happened?

16         A.      I don't remember what we talked.  But

17    I'm sure we said, something is going to come out, you

18    know.  I need to know what happened.

19         Q.      Well, when you first approached her

20    about this, do you recall what was the first thing you

21    said to her?

22         A.      I don't remember.

23         Q.      Okay.  Were you yelling at her?

24         A.      No.  I don't think so.  I think I was

25    very upset.  I know that.  But it was something we

46

1    couldn't deal with it right there.  It's done.  I have to

2    think about it.

3              Q.    But you did deal with it right there,

4    you suspended her on the spot.  Right?

5              A.    Yeah.  Yeah.  Because -- yeah.

6              Q.    And then you told her she was suspended

7    for how long?

8              A.    Indefinitely.

9              Q.    Okay.  Did you or anyone else on behalf

10   of the team conduct any investigation as to what lead up

11   to this or the surrounding circumstances when it was

12   captured on TV?

13             A.    I'm not aware of.  I'm sure if the

14   athletic department did, I'm sure.

15             Q.    Okay.

16             A.    Because they had to agree with what I

17   did; suspending a player.  They had to agree.  So I'm

18   sure they talked to the Conference office and yeah.  It's

19   according to, you know.

20             Q.    When you say they, you mean Warde

21   Manuel?

22             A.    Warde or Neal.  Or Debbie.

23             Q.    Deborah Corum?

24             A.    Yes.

25             Q.    What was --

47

1          A.     They probably communicated with the

2    Conference office.

3          Q.     Okay.  And how would you characterize

4    the incident which she was seen on camera raising her

5    middle finger?

6          A.     How?

7          Q.     Yes.  How do you characterize that?

8    What kind of conduct is that in your mind?

9          A.     The whole picture; the team

10   celebrating, the team doing so well, changing the program

11   and something like that happens.  How you characterize

12   it?  There's no words.

13         Q.     But I'm looking for words.

14         A.     Yeah.  I said, I was devastated.

15         Q.     Okay.  Did it spoil the celebration?

16         A.     Spoil everything for me.

17         Q.     Okay.  Would it be fair to say you

18   considered that to be unsportsmanlike or poor

19   sportsmanship?

20             MS. McGOVERN:  Objection to form.

21         A.     I can't -- I'm telling you how I felt.

22         Q.     Okay.

23         A.     I'm not a judge.

24         Q.     Okay.  Did you take it personally?

25             MS. McGOVERN:  Objection to form.

48

```
 1              A.     I believe it was a blow to the team --

 2              Q.     Okay.

 3              A.     -- and to the program and to the

 4      University.  That's what it was.

 5              Q.     All right.  You didn't see it happen as

 6      it happened, correct?

 7              A.     No.

 8              Q.     Okay.  Did anyone on the field come

 9      over and tell you that they had seen it as it happened?

10              A.     I don't remember.

11              Q.     Okay.  Did the opposing coach come over

12      and say, hey, do you know what your player just did?

13              A.     Don't remember if that, you know.

14              Q.     Okay.  Did you get a complaint from any

15      members of the coaching staff or players from South

16      Florida?

17              A.     I have to look.  If there's any

18      complaints, it would go to the athletic department.

19              Q.     I'm not talking about written

20      complaints.  I'm talking, did someone rush over to you

21      right when it happened and say, hey, you know, what's the

22      matter with your player or something to that effect?

23              A.     I don't know if they talked to my

24      assistants.  I have no idea.

25              Q.     Nobody talked to you?
```

51

1    expressed?

2          A.    That it was not something that we want

3    to have on the team or a situation where embarrassing the

4    program, the school, the athletic department.  And my

5    feeling was that we probably won't keep this player most

6    likely.

7          Q.    We're talking now in December these are

8    your thoughts?

9          A.    Yes.

10              MR. KLEIN:  Let's mark this as

11   Plaintiff's C.

12              (Whereupon, the e-mail was marked as

13   Plaintiff's Exhibit C for Identification.)

14         Q.    Showing you what's been marked as

15   Plaintiff's Exhibit C.  It's an e-mail to Deborah Corum

16   dated November 10th, 2014 at 1:05 p.m.

17              It doesn't look like you're copied on

18   this, but in the body of this in the bold type it shows

19   what is a statement from Len Tsantiris, the women's

20   soccer coach.  And then in quotation marks there's a

21   paragraph there, which is a statement that indicates you

22   issued on November 9th.

23              Did you issue that statement?

24         A.    Which statement are you talking about?

25         Q.    The one in bold type on that page.  It

52

1    states in quotation marks, "The University of Connecticut

2    and the women's soccer program would like to apologize

3    for an inappropriate gesture a UConn student-athlete

4    made --

5               A.    Yes, we did.

6               Q.    I'll just finish reading.  "Made to an

7    ESPNU camera following today's American Athletic

8    Conference championship game.

9               In particular, we apologize to the

10   American Athletic Conference, our opponent and host

11   school USF, and the members of the television audience.

12   The gesture showed poor judgement and sportsmanship and

13   does not represent what we want our program and

14   University to stand for.  The issue has already been

15   addressed by the coaching staff to the student-athlete.

16   The student-athlete has been indefinitely suspended from

17   all team activities, including, participation in UConn's

18   upcoming NCAA tournament games."

19               Did you issue that statement?

20               A.    Yes.

21               Q.    And did you issue that statement in

22   writing or orally?

23               A.    No.  It was oral.  Yeah.  They came in

24   to, I believe, I don't know if it was Neal Eskin.  But we

25   had to put something out.

53

1          Q.     How --

2          A.     And they -- I said how I felt, what

3     we're doing about it, and that was put out.

4          Q.     When you made this oral statement, were

5     you being interviewed by someone?

6          A.     That I don't remember.

7          Q.     So how was this statement put out?

8     That's what I'm trying to understand.

9          A.     The athletic department put out the

10    statement.  I can't put out a statement like this coming

11    from me.  The athletic department send this out --

12         Q.     Okay.

13         A.     -- after they consult with me.  I

14    believe it was Neal Eskin or Debbie, I'm not sure which

15    one it was.

16         Q.     Okay.

17         A.     And with my assistant coaches that's...

18         Q.     So the quoted language here on this

19    document, the quoted language, that paragraph in bold,

20    are these your words or did someone at UConn write this?

21         A.     No.  It's my words.  It's my words.

22    It's what I want to be done, yeah.

23         Q.     Did she apologize to you?

24         A.     She apologized to me and the assistant

25    coaches, I believe.  Yes.

55

1    for a club there in Tampa.  Then I came back the next

2    day, I believe.

3          Q.    Okay.  After you suspended her the day

4    of the incident, when was the next time you met with her

5    face-to-face?

6          A.    At the meeting when I meet all the

7    players.

8          Q.    Which is when?

9          A.    I don't remember the date.  But it's

10   early December.  Before exams usually I meet with the

11   players.

12         Q.    But after the NCAA tournament was over?

13         A.    Yes.

14         Q.    You lost the first game of that

15   tournament?

16         A.    No.  We lost the -- What was it?  We

17   lost, I think, the third game.

18         Q.    Okay.

19         A.    Yeah.

20         Q.    All right.

21         A.    I think.  Yeah.  Is that right?

22         Q.    So it was after that you had this

23   meeting with the players?

24         A.    I'm not sure.  I know we had -- Did we

25   have a game at UConn?  Then we played Penn State.  I

56

1    believe we lost to Penn State.  Yeah, I think so.  So it

2    might be the second game.

3              Q.    Okay.  Did you know that within two

4    days after the incident that she met with Warde Manuel?

5                    MS. McGOVERN:  Objection to form.

6              A.    No.

7              Q.    You did not know that?

8              A.    No.

9              Q.    So Mr. Manual did not tell you that he

10   had met with her?

11             A.    I don't remember telling me.  Maybe

12   Neal told me because Warde was a lot of times in-and-out.

13   I see Neal l a lot because that's the sports administer.

14   I don't remember if he mentioned to me.  I don't

15   remember.

16             Q.    Who did you direct the report to?

17             A.    Neal.

18             Q.    Okay.  And Neal reported to Warde?

19             A.    Yes.

20             Q.    Are you aware that the American

21   Athletic Conference took disciplinary action against

22   Noriana for this incident?

23             A.    I don't know if they did or not.  I

24   might have seen something in paper or Neal might brought

25   to my attention.

57

1              MR. KLEIN:  May I have this marked

2    as D.

3              (Whereupon, the e-mail was marked as

4    Plaintiff's Exhibit D for Identification.)

5         Q.    I'm showing you Exhibit D.  This is an

6    e-mail dated November 11th, 2014 at 12:25 p.m.  So two

7    days after the incident from Ellen Ferris at the American

8    Athletic Conference to Debbie Corum.

9              It indicates that Warde Manuel, Neal Eskin

10   and you were CC'd on this.

11        A.    Yeah.  I remember.  I did get this.

12        Q.    Okay.

13        A.    Sorry about that.  Yeah.

14        Q.    Okay.

15        A.    Yeah, I did.

16        Q.    And this talks about the corrective

17   action that the Conference is saying that UConn took.  It

18   commended the coach and the administrative staff for

19   taking action.

20              So you do remember hearing that from the

21   Conference?

22        A.    Yes.  I remember this (Indicating).

23        Q.    Okay.

24        A.    Yeah, I received this (Indicating).

25        Q.    Okay.  And what do you recall was the

58

1   disciplinary action that the Conference took with respect

2   to Noriana?

3           A.      I don't know.

4           Q.      Okay.  At about this time, did you make

5   any recommendations to the Conference as to what, if any,

6   disciplinary action you thought was appropriate?

7           A.      I never talked to the Conference.

8           Q.      Did you make at or about this time, you

9   know talking about within two days after the incident

10  happened, did you make any recommendations to Neal Eskin

11  or to Warde Manuel about what, if anything, other than

12  the indefinite suspension would be appropriate as

13  disciplinary action?

14          A.      No.  I don't remember doing anything --

15          Q.      Okay.

16          A.      -- about that.  No.

17          Q.      All right.  So beyond suspending her

18  from the team, you know within that two days after the

19  incident, what, if anything, else were you planning to do

20  in the way of discipline?

21          A.      You know, I had to take -- if I had to

22  make a drastic decision, which the way I was too

23  emotional at that time.  I, had to wait and weigh the

24  whole situation and figure out what I will do.

25          Q.      Okay.  At some time within, you know,

59

1    the next few weeks after this incident happened while she

2    was under suspension, did you have a meeting with her to

3    talk about the following semester or the following year

4    and what your expectations were of her?

5            A.    We had a meeting.  And I meet with

6    every player.  And plain and simple one or two things

7    that they need to do.  And I note it down so I can

8    compare year to year and semester to semester.

9                  And, yeah, we talked that she's go to

10   do well in school because she wasn't -- she was

11   borderline.

12           Q.    Academically?

13           A.    Yes.  And we talk about fitness because

14   she was not fit.  We talk about those two things.  And

15   the other thing we talk, I don't remember, but I know

16   probably we talk about a few minutes.  But I also -- the

17   basic things I put down.  I said, the final decision will

18   be at the end of the semester.

19           Q.    The final decision about what?

20           A.    About her.

21           Q.    About her indefinite suspension?

22           A.    Yeah.

23           Q.    This meeting with her and other members

24   of the team took place approximately when?

25           A.    Its got to be first week in December.

64

1          A.     Not at that time, no.  No.

2          Q.     So how did you leave things with her at

3    the end of this meeting?

4          A.     We left it.  I didn't want to say

5    anything even though it was in the back of my mind.

6    Exams are coming up.  You know, it's a situation that I'm

7    not very happy with.  And it's a devastating decision for

8    a young person before exams.  So I didn't want to say

9    anything at that point.  I mean, I could have done that

10   too.

11         Q.     Done what?

12         A.     Cut it totally from the team.  November

13   9 you're done.  Leave.  Then what about her scholarship

14   and her academics?  She would lose everything.

15         Q.     Did you have the authority to cut her

16   from the team?

17         A.     No, I didn't have the authority.  But

18   if the athletic director has the authority, I could have

19   recommend that.

20         Q.     Okay.

21         A.     But I didn't.

22         Q.     For cutting a player from the team, who

23   was the decisionmaking authority?

24         A.     Well, it comes from me.

25         Q.     A recommendation?

65

1          A.     Yeah.   Then it goes to the athletic

2     director.   He makes the final decision.

3          Q.     Okay.

4          A.     But I didn't want to do that.   At the

5     end of the semester, after exams, we evaluate everything

6     and then we make the decision.

7          Q.     Okay.   So if I understand you

8     correctly, between November 9th, the day of the incident

9     in Florida, and the meeting with all the players

10    individually in early December before exams, you did not

11    have any face-to-face contact with Noriana Radwan?

12         A.     No.

13         Q.     Okay.   Did you have any telephone

14    conversations with her in between?

15         A.     Don't remember having a phone

16    conversation.

17         Q.     Okay.   I notice in all the documents

18    that have been produced in this case, there are a number

19    of documents in which you were copied on e-mails.   I

20    don't remember seeing any documents in which you sent any

21    e-mails.

22               Are you not an e-mail guy?

23         A.     No.   No.   No.

24         Q.     You're not?

25         A.     I'm not a high tech guy.   My assistant

71

1  this letter was addressed to Debbie Corum and not to Ms.

2  Radwan.  And I see you were copied, Warde Manuel was

3  copied on the letter --

4          A.    Yes.

5          Q.    -- and so were you and so was Neal

6  Eskin and another individual who's an associate

7  commissioner of the Conference.

8                  MS. McGOVERN:  Still the same

9  Exhibit F?

10                 MR. KLEIN:  Yes.

11                 MS. McGOVERN:  Okay.  Sorry.

12         Q.    Do you know if and when this letter was

13 presented to Noriana?

14         A.    No.  I don't know.

15                 MR. KLEIN:  Off the record.

16             (Discussion off the record.)

17         Q.    We're back on the record.  During the

18 2014/2015 season, was there any sort of procedure or

19 protocol that was in place for terminating a

20 student-athlete's grant before the end of the school

21 year?

22         A.    For that year?

23         Q.    Yes.

24         A.    It's for every year there's a

25 procedure, yes.

72

1          Q.     Can you tell me what that procedure is?

2          A.     It comes from the athletic department

3     to the financial aid office, I believe.  A compliance is

4     involved.  The people that are involved would be coach,

5     sports administer, athletic director, compliance officers

6     and financial aid officer.

7          Q.     Okay.  When you say compliance

8     officer --

9          A.     The compliance office we have is for

10    the NCAA Rules and Regulations.  So we got to go

11    according to everything.

12         Q.     Okay.

13         A.     So, yeah, there's a procedure for that.

14    Yes.

15         Q.     All right.  And if I understand you

16    correctly, the ultimate decisionmaker for terminating a

17    student-athlete's grant-in-aid in mid-year was the

18    athletic director?

19         A.     Yes.  You got -- Yes.

20         Q.     Okay.  Do you recall a telephone

21    conversation with Noriana, in which, you informed that

22    her grant-in-aid was being terminated?

23         A.     Yes.

24         Q.     Okay.  Do you remember when that phone

25    call took place?

73

```
 1              A.     I don't remember the date.  But it was

 2     after exams.  I know that.

 3              Q.     Okay.

 4              A.     At the end of the semester.

 5              Q.     Okay.

 6              A.     Yes.

 7              Q.     If I told you it was on or about

 8     December 21st, would that seem about right?

 9              A.     Yes.  Probably.  Yeah.

10              Q.     Before Christmas?

11              A.     Yes.

12              Q.     Okay.  And where were you when you made

13     this phone call to her?

14              A.     Definitely I was in Connecticut.  I

15     believe either at the office or I was at home.  I don't

16     really remember.

17              Q.     Okay.

18              A.     But, yes, it was -- I remember I made

19     the call, yes.

20              Q.     So you called her.  Where was she?  Did

21     you call her at home, on her cell phone or --

22              A.     I think it was her cell phone, I

23     believe.

24              Q.     Okay.

25              A.     Yeah.
```

74

1          Q.     And what did you tell her in this phone

2    call?

3          A.     That we are not going to renew -- she's

4    not going to have a scholarship in the spring.  That its

5    terminated from the team.  And that was about it.

6                 And that if she needed help to find

7    another school, that we will communicate with some of the

8    coaches, and we go from there.  I don't know if I ask her

9    which schools she's interested in.  I know we talked some

10   schools that are close-by; Albany.  We talk to Hofstra.

11   We talked.  There's another school we talk Upstate, New

12   York.  I don't remember the name.

13         Q.     But these were other schools that were

14   talked about during the phone conversation where you

15   informed her that her --

16         A.     No.

17         Q.     -- scholarship --

18         A.     No.  I said, we're going to reach out

19   and talk to the coaches.

20         Q.     Did you tell her during this phone

21   conversation that she had any right to appeal this

22   decision?

23         A.     I don't remember.

24         Q.     Okay.  What was her reaction when you

25   told her her scholarship was being terminated?

105

1              A.     I don't remember specifics.  But we

2      would talk about.  Because once you start your clock, you

3      want to continue taking courses because you have to have

4      certain courses until your first year and second year,

5      you know, in order to play.  So I don't know if I -- I

6      don't remember what exactly was said.  But I'm sure I

7      recommend that she goes to school in the spring and not

8      lose the semester.

9              Q.     Okay.  But that would have to be

10     somewhere else?

11             A.     Yes.

12             Q.     Okay.

13             A.     It's up to her.

14             Q.     Right.

15             A.     Yeah.

16             Q.     And what, if anything, did you tell her

17     either during that conversation or later about whether

18     and under what circumstances you might be able to help

19     her transfer?

20             A.     We talk.  And, I think, I don't know if

21     she also talks with the assistant coaches, when we tried,

22     we were talking to some schools.  I know we talked to --

23     I talked to Albany and so did Zack.  And we talked to

24     Hofstra.

25             Q.     Who did you speak to at Hofstra?

UConn SJM Exhibit 47

106

1          A.     We spoke with the coach.  I believe

2    initially we talked to him.

3          Q.     Do you remember the coach's name?

4          A.     Simon.

5          Q.     Okay.

6          A.     I don't know his last name.

7          Q.     Riddo (Phonetic) is that how it's

8    pronounced?

9          A.     Something.

10         Q.     Okay.  Do you know when this

11   conversation took place?

12         A.     When?

13         Q.     Yes.

14         A.     I think it was after we talk that part,

15   like, between Christmas and New Years, I believe.

16         Q.     And this conversation was by phone?

17         A.     By phone and also on the recruiting

18   trail.  Because there's a lot of things going on at that

19   time between Christmas and New Years.  I talk to some

20   coaches on the recruiting trail.

21         Q.     What did you tell him about Noriana?

22         A.     The truth.  He knew.

23         Q.     Meaning what?

24         A.     Meaning what happened.  And, you know,

25   I did exactly what I supposed to do, tell him the truth,

107

1   what kind of a player she was --

2           Q.      Uh-huh.

3           A.      -- and what she did.  He knew what she

4   did.

5           Q.      He already knew about the incident?

6           A.      Of course.  Yeah.

7           Q.      And you told him that you had cut her

8   from the team.  Right?

9           A.      Yes.

10          Q.      And terminated her scholarship?

11          A.      (Affirmative nod).

12          Q.      What was his reaction to hearing that?

13          A.      I don't remember exactly.  But we ask

14  him also if he had -- if he can give some financial

15  support.  And he says he's going to work on it.  He

16  didn't tell me amounts or anything.  But the indication

17  was that he's interested.  I know that he did recruit her

18  before.

19          Q.      Did you have any discussion with him in

20  which he indicated why he was willing to have her play

21  for his team knowing about this incident --

22          A.      No.

23          Q.      -- even though you didn't want her?

24          A.      No.  We didn't discuss that.  He knew

25  about it.  I didn't want to go further.

108

```
1              Q.    Okay.

2              A.    All I told him, what she did, what kind

3    of a player I felt she is, and academically and

4    athletically.  And that was it.

5              Q.    Okay.

6              A.    Yeah.

7              Q.    At any point in time did you discuss

8    with Noriana her right to appeal the termination of her

9    grant-in-aid?

10             A.    That I don't believe.  I don't think.

11   There's a letter that goes out.  That's NCCA Rules and

12   Regulations that goes out from the compliance.  And they

13   go to the student.  I don't know that procedure.  But

14   they have to reply or to have a hearing.  I don't know

15   what kind of committee it would be.  They have to do, I

16   don't know how many days --

17             Q.    Okay.

18             A.    -- and they have to appeal.

19             Q.    Do you know what person or what body is

20   the appellate authority?

21             A.    It's the compliance sends the letter.

22   Because it's an NCAA rule.

23             Q.    Who hears the appeal, do you know?

24             A.    That I don't know.

25             Q.    Okay.
```

128

1                    C E R T I F I C A T E
2

3    UNITED STATES DISTRICT COURT
4    DISTRICT OF CONNECTICUT
5

6         I, ASHLEY L. JUSINO, Court Reporter and Notary
     Public within and for the State of Connecticut, duly
7    commissioned and qualified, do hereby certify that
     pursuant to Notice, LEONIDAS TSANTIRIS, the deponent
8    herein, was by me first duly sworn to testify to the
     truth, the whole truth and nothing but the truth of his
9    knowledge touching and concerning the matters in
     controversy in this case; that he was thereupon
10   carefully examined upon his oath and his testimony
     reduced to writing by me; and that the deposition is a
11   true record of the testimony given by the witness.
12        I further certify that I am neither attorney
     or counsel for, nor related to or employed by, any of
13   the parties to the action in which this deposition is
     taken, and further that I am not a relative or employee
14   of any attorney or counsel employed by the parties
     thereto or financially interested in the action.
15
          IN WITNESS WHEREOF, I have hereunto set my
16   hand this _17th_ day of _June_____, 2019, at
     Norwalk, Connecticut.
17
18                              _Ashley L. Jusino_
19                              _____
                                Ashley L. Jusino, CSR
                                Notary Public
20                              State of Connecticut
21
22   My Commission Expires:
     December 31, 2019
23   No. 529
24
25

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3    - - - - - - - - - - x

4    NORIANA RADWAN,            |

5              Plaintiff,       | Civil Action No.
                                  No. 3:16-CV-02091
6         vs.                   |

7    UNIVERSITY OF CONNECTICUT  |
     BOARD OF TRUSTEES, ET AL.,   May 2, 2018
8                               |
              Defendants.
9    - - - - - - - - - - x

10

11

12            <u>DEPOSITION OF NORIANA RADWAN</u>

13

14         Taken before Lynne Stein, CSR 110, a
     Notary Public within and for the State of
15   Connecticut, pursuant to Notice and Federal
     Rules of Civil Procedure, at the Office
16   of the Attorney General, 55 Elm Street,
     Hartford, Connecticut, on May 2, 2018,
17   commencing at 10:04 a.m.

18

19

20

21

22

23         FALZARANO COURT REPORTERS, LLC
                4 Somerset Lane
24            Simsbury, CT 06070
                860.651.0258
25       www.falzaranocourtreporters.com

UConn SJM Exhibit 48

```
 1              (Deposition commenced:  10:04 a.m.)

 2

 3              NORIANA RADWAN, Deponent, of

 4         70 Holly Loop, Wappingers Falls, New York

 5         12510, being first duly sworn by the Notary

 6         Public, was examined and testified, on

 7         her oath, as follows:

 8

 9                   (Defendant's Exhibit 1:

10                    Marked for Identification.)

11

12              MS. McGOVERN:  I'm Rosemary

13         McGovern, representing University of

14         Connecticut and defendants Manuel, Tsantiris,

15         and Lucas.

16                   Just for clarification, who is

17         going to be defending the deposition today?

18              MR. KLEIN:  I will.

19

20                   DIRECT EXAMINATION

21

22    BY MS. McGOVERN:

23         Q    Ms. Radwan, have you ever had your

24    deposition taken before?

25         A    No.
```

UConn SJM Exhibit 48

```
1    branch of industrial engineering.  Deals with the

2    body and ergonomics, essentially.

3         Q    Have you already applied to graduate

4    schools?

5         A    Yes.

6         Q    You transferred to Hofstra in the spring

7    of 2015, correct?

8         A    Yes.

9         Q    You've been a member of the women's

10   soccer team from spring 2015 to the present?

11        A    Yes.

12        Q    Isn't it true that Hofstra had recruited

13   you while you were still in high school, to join

14   their soccer team?

15        A    Yes.

16        Q    What was the nature of the discussions

17   you had with them?

18        A    I had almost really no contact with

19   them.  They emailed me my junior year of high

20   school and wanted to go forward with recruiting.

21   But from that time I was injured, and I had already

22   had my heart set on UConn when I came back from

23   injury, so I didn't really have any contact with

24   them.  I don't even think I emailed them back.

25        Q    If I understand your testimony, the
```

UConn SJM Exhibit 48

```
1     extent of their recruitment of you was that they
2     sent you an email --
3          A     Uh-hum.
4          Q     -- expressing an interest to having you
5     come --
6          A     When I was in high school, yes.
7          Q     Fast forward to January 2015.  When you
8     transferred to Hofstra, as I understand, you
9     received for the spring semester 37 percent of a
10    full grant-in-aid scholarship to attend.
11         A     Yeah.  Three-quarters of a full
12    scholarship.
13         Q     Because it was for a single semester?
14    As I understand, it was designated as 37 percent --
15         A     Yeah.
16         Q     -- is that right?
17         A     Uh-hum.
18         Q     When was your first day of classes at
19    Hofstra in the spring semester, approximately?
20         A     I believe it was like the 27th of
21    January.
22         Q     Did you move into campus prior to that
23    date?
24         A     Yeah.  That weekend before.
25         Q     Okay.  All right.
```

UConn SJM Exhibit 48

```
 1        Q     Okay.  But you didn't really understand
 2   the reason that he gave you specifically for your
 3   decreased playing time?
 4        A     Personally, he did not give me an exact
 5   reason why I was getting decreased.  But he said
 6   they found a system that worked better.
 7        Q     Is it fair to say you found his
 8   explanation less than satisfying?
 9        A     I would say that it's what I expected,
10   that he -- most coaches, they put people in
11   positions based on what they think is going to work
12   out, and that was his decision.  So I found
13   that's -- I did my best and worked really hard and
14   I played well in practices, but in the games,
15   that's what he chose.
16        Q     So there was no injury that you
17   experienced during the season?
18        A     Only small injuries in preseason.  Took
19   me out of one or two practices, but, no.
20        Q     So you moved out from UConn, moved your
21   stuff out in the beginning of January?
22        A     Yes.
23        Q     In fact, it was January 5th that you
24   moved all of your stuff out of your dorm room?
25        A     Yes.
```

UConn SJM Exhibit 48

1          Q     You cleaned all the stuff out of the

2     women's locker room that was devoted to the women's

3     soccer team at the Field House on campus?

4          A     Yes.

5          Q     There came a time when you, in January,

6     contacted Residential Life to let them know you

7     were not going to be returning to campus?

8          A     Yes.

9          Q     Okay.  And you did this because if you

10    hadn't informed them you would have been billed for

11    housing for the spring semester?

12         A     Yeah.  Formality just to let them know.

13    You're supposed to let them know.  Every year you

14    sign housing for a year, but if you can't, you have

15    to let them know.

16         Q     Because otherwise you would have been

17    billed for the spring semester, correct?

18         A     From what I know.  I don't know what the

19    consequences would have been.

20         Q     What do you mean, you don't know?

21         A     I don't know if they would have -- how

22    much they would have billed me or what actions they

23    would have taken at the time.  I just let them

24    know.

25         Q     Okay.  So you sent notice to Residential

UConn SJM Exhibit 48

```
1    Life.  It was January 11, 2015.  That sounds right?

2         A     From what I remember, yes.

3         Q     Okay.  And you received a confirmation

4    email from an employee of Residential Life so

5    informing you that your request had been processed

6    on January 13th.  Isn't that right?

7         A     I honestly don't remember.

8         Q     Okay.  I just want to show you what's

9    been marked as Exhibit 1.

10               Have you seen this document before?

11        A     Can I look at the second page?

12        Q     Oh, yeah.  Go ahead.

13        A     Yes, I think so.

14        Q     This is the Notice of Deposition

15   informing you that your attendance here is

16   requested to provide testimony under oath.

17        A     Okay.

18        Q     Is that right?

19        A     Yeah.

20        Q     Okay.

21               MS. McGOVERN:  I'd like to have

22         this marked as Exhibit 2.

23

24               (Defendant's Exhibit 2:

25                Marked for Identification.)
```

Falzarano Court Reporters, LLC

UConn SJM Exhibit 48

1    BY MS. McGOVERN:

2         Q     Take a moment to look at this, okay, and

3    I'll ask you some questions.

4         A     (Perusing document.)

5         Q     All set?  Okay.  I'm going to ask you

6    some questions about it.

7               Just focusing on the bottom of the

8    email, or the bottom of the page rather, where it

9    says "General Email," it states "From Noriana

10   Radwan," right?

11        A     Yes.

12        Q     And next to that is, I believe, your

13   personal email account that you used,

14   *nornor100@aim.com*?

15        A     Yes.

16        Q     It was sent Sunday, January 11, 2015,

17   right?

18        A     Uh-hum.

19        Q     And it's to, it says, ResLife Living On

20   Campus?

21        A     Yes.

22        Q     And it says "Subject, Leaving room."  Is

23   that right?

24        A     Yes.

25        Q     And you write, "To Whom This May

UConn SJM Exhibit 48

```
 1    Concern.  My name is Noriana Radwan and I'm a

 2    former member of the women's soccer team.  I spent

 3    the first semester living in Hale, room 425, but I

 4    will be transferring this semester.  I am emailing

 5    you to avoid any charges since I will no longer be

 6    living there.  Thank you.  Noriana Radwan."

 7          Does it say that?

 8    A    Yes.

 9    Q    Do you recall sending this message to

10    Residential Life so informing them of the contents

11    in here?

12    A    Yes.

13    Q    If you look at the top of the page, it

14    says "From Amy Crim," or "Crim, Amy," correct?

15    A    Yes.

16    Q    Underneath that it says "To," and it

17    lists your email address, nornor100@aim.com?

18    A    Yes.

19    Q    It also lists your email address at

20    UConn, nornor.radwan@uconn.edu?

21    A    Yes.

22    Q    It's cc'd to Ann Fiorvanti?

23    A    Yes.

24    Q    Do you know who Ann Fiorvanti is?

25    A    No.
```

UConn SJM Exhibit 48

```
 1              as Exhibit 3.

 2

 3                   (Defendant's Exhibit 3:

 4                    Marked for Identification.)

 5

 6   BY MS. McGOVERN:

 7       Q     Take a moment to look at it and I'll ask

 8   you some questions after you've done that.

 9       A     (Perusing document.)

10       Q     All set?

11       A     Uh-hum.

12       Q     If we just focus on the bottom of the

13   page, under the first original message on the

14   bottom of the page --

15       A     Yup.

16       Q     -- it states "From:  Noriana Radwan,"

17   and it lists your aim email address?

18       A     Yes.

19       Q     Next it says "Sent Tuesday, January 13,

20   2015" --

21       A     Yes.

22       Q     -- "to Angie Cretors"?

23       A     Yes.

24       Q     Is this the person from NCAA Compliance

25   Office at UConn that you contacted?
```

Falzarano Court Reporters, LLC

```
1          A     I don't know what department she's in.

2          Q     Okay.  Then it says "Subject, Noriana

3    Radwan NOI release letter"?

4          A     Yes.

5          Q     You write, "Hi, Angie.  My name is

6    Noriana Radwan.  I'm a former player of the women's

7    soccer team at UConn.  This semester I am

8    transferring to Hofstra University.  I'm contacting

9    you to obtain a National Letter of Intent release

10   letter because it is necessary to make my transfer

11   final.  I don't know the details of this process,

12   but I was told to contact Compliance in order to

13   get the NOI release.  I have already gotten

14   Permission to Contact.  Hofstra should also be in

15   contact soon about obtaining the NCAA one-time

16   exemption as well.  Thank you, Noriana Radwan."

17               It states that, correct?

18         A     Yes.

19         Q     Based upon what's written in this email,

20   does it appear you were contacting Angie Cretors

21   because she was a person who worked at the NCAA

22   Compliance Office at UConn?

23         A     Yes.

24         Q     And it was for the purpose of obtaining

25   a National Letter of Intent Release?
```

UConn SJM Exhibit 48

```
 1          A      Yes.

 2          Q      The next part that I'd like to focus on

 3    is the top of the email.  This states "From Hargis,

 4    Kristen," so Kristen Hargis.

 5                 Okay.  To -- it lists your email address

 6    at aim.com?

 7          A      Yes.

 8          Q      "Subject, Re:  Noriana Radwan National

 9    Letter of Release letter."  You see that?

10          A      Yes, National Letter of Intent Release

11    letter.

12          Q      And it's dated January 13, 2015?

13          A      Yes.

14          Q      She writes, "Noriana, please follow the

15    instructions on the link provided to request your

16    release.  This has to be done through the National

17    Letter of Intent website.  From there we will be

18    notified of your request electronically.  Thanks,

19    Kristen."

20                 Then there is a link to the

21    nationalletter.org release page?

22          A      Yes.

23          Q      It states all that, correct?

24          A      Yes.

25          Q      And at the bottom it says that Kristen
```

UConn SJM Exhibit 48

1    Hargis is the Assistant Director of Compliance,

2    University of Connecticut?

3         A    Yes.

4         Q    Okay.  So you recall receiving this

5    email from Ms. Hargis with instructions on how to

6    obtain your National Letter of Intent Release?

7         A    Yes.

8         Q    You in fact contacted the National

9    Letter of Intent organization using this link to

10   obtain the National Letter of Intent Release?

11        A    Yes.

12        Q    And you were notified by the National

13   Letter of Intent organization when UConn released

14   you from your National Letter of Intent, correct?

15        A    I believe so.

16        Q    You would have received an email from

17   them so notifying you that UConn had agreed to

18   release you from the National Letter of Intent?

19        A    Yes.

20        Q    Okay.  And as I understand it, you have

21   an account with the National Letter of Intent

22   organization or Eligibility Center.  That's what

23   it's called.

24        A    I don't know my account information, but

25   I believe so, based on this, if I were to click a

Falzarano Court Reporters, LLC

1    you have access to?

2         A    I have not accessed that account

3    probably since then, freshman year, because there's

4    no need to with the letters, once you sign the

5    letters.

6         Q    Have you not accessed that because it's

7    only something that's relevant to you when you're

8    in high school or a freshman in college?

9         A    I believe that account and the NCAA

10   account is only relevant when I'm doing this

11   process, the process of transferring as a freshman.

12        Q    I'm also going to ask that you attempt

13   to access that account --

14        A    Okay.

15        Q    -- and take a screenshot of the

16   information that is captured in there.  Obviously

17   I'll have to talk to your attorney relating to

18   whether I can receive that.

19        A    Okay.

20        Q    If I understand, there's account

21   information in there giving a history of various

22   transactions from when you were subject to that

23   National Letter of Intent.

24        A    Okay.

25        Q    You've also canceled your enrollment at

1    UConn in January 2015?

2         A    Yes.

3         Q    And you did that so you would not be

4    charged for any fees or tuition for the spring 2015

5    semester?

6         A    Yes.

7         Q    Okay.  And you notified the UConn dean

8    of students that you were going to be transferring

9    to Hofstra --

10        A    Yes.

11        Q    -- on January 14, 2015.  Does that sound

12   right?

13        A    Yes.

14                   MS. McGOVERN:  Can I have this

15          marked, please.  We're up to 4.

16

17                   (Defendant's Exhibit 4:

18                    Marked for Identification.)

19

20   BY MS. McGOVERN:

21        Q    You can look at that.

22        A    (Perusing document.)

23        Q    So when you canceled your enrollment,

24   you did this online on the UConn website, correct?

25        A    Yes.

UConn SJM Exhibit 48

```
 1          Q     This document, Exhibit 4, states "UConn,

 2    University of Connecticut."  Then under it,

 3    "Voluntary separation, cancellations."

 4                It states that, correct?

 5          A     Yes.

 6          Q     Listed is "Cancellation for spring

 7    2015"?

 8          A     Yes.

 9          Q     The next line is "Processed"?

10          A     Yes.

11          Q     Then it states "Name, Noriana Radwan" --

12          A     Yes.

13          Q     -- "PeopleSoft," and then it looks like

14    next to that is your UConn student ID number?

15          A     Yes.

16          Q     Email address -- email, it's got again

17    your email address for aim.com?

18          A     Yes.

19          Q     And says "Primary reason for

20    transferring, I'm transferring to a different

21    university."

22          A     Yes.

23          Q     "Special reason," it says "Other."

24                Underneath that it states "Time line."

25    Do you see that?
```

UConn SJM Exhibit 48

```
 1          A      Yes.

 2          Q      It says "Submitted on 1/14/2015"?

 3          A      Yes.

 4          Q      That would have been the day you

 5    submitted this request for cancellation?

 6          A      Yes.

 7          Q      It says "Processed on 1/16/2015 by DEW

 8    13004."

 9          A      Yes.

10          Q      It states that, correct?

11          A      Yes.

12          Q      You received an email once this was

13    processed on that date, on January 16, 2015,

14    correct?

15          A      Yes.

16          Q      That would have been sent to your

17    aim.com email account, correct?

18          A      Yeah.

19          Q      So I have not received a copy of that

20    email from you.  I'm going to request that you

21    again research your email account --

22          A      Okay.

23          Q      -- and locate that email --

24          A      Okay.

25          Q      -- okay?
```

UConn SJM Exhibit 48

```
 1      Pittsburgh, and I'm hoping that I can join in the

 2      spring of 2015."

 3           A    Yes.

 4           Q    It says that, correct?

 5           A    Yes.

 6           Q    Okay.  And once again, if we just

 7      go   to the bottom -- go to the next page.  On

 8      page 15, you sign Noriana Radwan, with your

 9      cell phone account -- your cell phone telephone

10      number?

11           A    Yes.

12           Q    And then you also list contact

13      information for UConn women's coach, Len Tsantiris?

14           A    Yes.

15           Q    And also the assistant coach, Margaret

16      Rodriguez?

17           A    Yes.

18           Q    By December 23rd you had begun sending

19      emails to coaches at other Division I universities,

20      exploring the possibility of transferring to their

21      schools?

22           A    Yes.

23           Q    I'm done with that for now.

24                     MS. McGOVERN:  I believe this is

25            Exhibit 7.
```

```
 1        Q     How about the University of Pittsburgh?

 2        A     Same time.

 3        Q     And Hofstra?

 4        A     Same time as well, January.

 5              MS. McGOVERN:  I'd like to take a

 6         break for a few minutes.

 7

 8         (Recess taken:  11:19 to 11:31.)

 9

10              MS. McGOVERN:  Okay?

11    BY MS. McGOVERN:

12        Q     So we spoke earlier about a

13    Permission to Contact letter that you received

14    from UConn.

15        A     Yes.

16        Q     Do you remember?

17        A     Uh-hum.

18        Q     Okay.

19              MS. McGOVERN:  This is number 8.

20

21              (Defendant's Exhibit 8:

22               Marked for Identification.)

23

24              THE WITNESS:  (Perusing document.)

25              Okay.
```

UConn SJM Exhibit 48

1   BY MS. McGOVERN:

2       Q       Before I ask you some questions about

3   the document.

4               Again, the Permission to Contact, what's

5   your understanding of what that is?

6                       MR. KLEIN:  Objection to the form.

7           It calls for a legal conclusion.

8                       You can answer the question.

9                       THE WITNESS:  What I understand,

10          that it's just a formality that you need to

11          have in order to pursue further contact with

12          coaches that you're transferring and it

13          releases you to talk to other coaches.

14  BY MS. McGOVERN:

15      Q       Is it fair to say it allows other

16  coaches to talk with you about what opportunities

17  they have at their school for you to join --

18      A       Yes.

19      Q       -- the women's soccer team?

20      A       Yes.

21      Q       Looking at Exhibit 8, this is an email

22  from, it says Angie Cretors.

23      A       Yes.

24      Q       It's addressed to you, Noriana Radwan,

25  at your UConn email address?

```
 1            A      Yes.

 2            Q      And it is cc'd to Margaret Rodriguez?

 3            A      Yes.

 4            Q      Len Tsantiris?

 5            A      Yes.

 6            Q      And Ann Fiorvanti?

 7            A      Yes.

 8            Q      "Subject, Permission to Contact"?

 9            A      Yes.

10            Q      Dated Monday, December 22, 2014?

11            A      Yes.

12            Q      Indicating that there's an attachment?

13            A      Okay.

14            Q      After reviewing this document, do you

15     agree that this was the email with the attachment

16     that provided you with permission to contact other

17     Division I coaches?

18            A      Yes.

19            Q      No further questions on that one.

20                   Without this document, without this

21     Permission to Contact, you would not have been able

22     to explore scholarship opportunities to play

23     women's soccer at other colleges, correct?

24            A      Correct.

25            Q      What if any documents do you have
```

```
 1        Q      Okay.  So by January 7th, you had moved
 2   out from your dorm room at UConn?
 3        A      Yes.
 4        Q      Okay.  And moved everything out of your
 5   locker room at the Field House at UConn campus?
 6        A      Yes.
 7        Q      And you had received an offer from
 8   Hofstra for scholarship assistance to be on the
 9   women's soccer team?
10        A      Between those days?  I don't know if it
11   was before I moved out or after.
12        Q      Okay.  But by this email we know it was
13   at least sometime either on January 7th or before.
14        A      Yes.
15        Q      Okay.  This next series of questions are
16   going to be focused on Hofstra, your participation
17   on the women's soccer team at Hofstra University.
18        A      Uh-hum.
19        Q      Which athletic team practices are you
20   required to attend at Hofstra?
21        A      Rephrase that?
22        Q      Which athletic team practices were you
23   required to attend at Hofstra?
24        A      Women's soccer team, all of them.
25        Q      Which athletic games were you required
```

UConn SJM Exhibit 48

```
 1         A      Head coach, assistant coach, and the

 2   other assistant coach, who also served as a

 3   goalkeeping coach.

 4         Q      So the head coach is Len Tsantiris?

 5         A      Yes.

 6         Q      The first assistant coach is Margaret

 7   Rodriguez?

 8         A      Yes.

 9         Q      And the second assistant, slash, goal

10   coach, was Zac Shaw --

11         A      Yes.

12         Q      -- correct?

13                Which coaches oversaw the soccer games

14   that you participated in?

15         A      The head coach, assistant coach, and

16   other assistant coach.

17         Q      The UConn women's --

18         A      Women's soccer.  UConn women's soccer

19   team.

20         Q      Again, which coaches were responsible

21   for making decisions relating to the game during

22   the soccer games that you played?

23         A      The head coach and the two assistant

24   coaches of the UConn women's team.

25         Q      When you were a member of the UConn
```

UConn SJM Exhibit 48

```
 1    women's soccer team, you signed what was called a
 2    women's soccer contract for the 2014 season?
 3         A    Yes.
 4         Q    And this contract was effectively
 5    treated as team rules, correct?
 6         A    Yes.
 7                   MS. McGOVERN:  I think we're up
 8         to 9.
 9
10                   (Defendant's Exhibit 9:
11                    Marked for Identification.)
12
13    BY MS. McGOVERN:
14         Q    All set?
15         A    Yup.
16         Q    What's been marked as Exhibit 9, this is
17    entitled UConn Women's Soccer 2014 Contract.
18         A    Yes.
19         Q    Is this the contract that you testified
20    that you were subject to?
21         A    From what I remember.
22         Q    On the front page it lists various
23    obligations that team members have --
24         A    Yes.
25         Q    -- correct?
```

Falzarano Court Reporters, LLC

UConn SJM Exhibit 48

```
 1          A      Uh-hum.

 2          Q      On the second page, if you could turn to

 3     the second page, this indicates there's a signature

 4     page --

 5          A      Uh-hum, yes.

 6          Q      -- for the student athlete, right?

 7          A      Yes.

 8          Q      I'm sorry, it's a signature block.

 9          A      Yes.

10          Q      And also a signature block for the head

11     coach?

12          A      Yes.

13          Q      This one is blank, correct?

14          A      Yes.

15          Q      The second page generally states that

16     you understand what you have read and you realize

17     you're making a commitment to the team --

18          A      Yes.

19          Q      -- correct?

20          A      Uh-hum.

21          Q      Going back to the first page, do you

22     recall receiving this document?

23          A      Yes.

24          Q      Okay.  And this document was collected

25     from you after you signed it, correct?
```

UConn SJM Exhibit 48

```
 1          A     Yes.

 2          Q     You did not keep a copy of this

 3     document?

 4          A     We did not receive a copy.  It's not

 5     that I didn't keep it.  I never got one.

 6          Q     Did you ask to receive a copy of the

 7     document?

 8          A     No.

 9          Q     If you look to the last bullet point on

10     that page --

11          A     Yup.

12          Q     -- it says "I will be part of a culture

13     in which loyalty, leadership, honesty, integrity,

14     dignity, and discipline are valued."

15                It says that, correct?

16          A     Yes.

17          Q     If you go to page 2 --

18          A     Uh-hum.

19          Q     -- second to last paragraph --

20          A     Yup.

21          Q     -- it states "Should I fail to meet any

22     of the criteria described in this contract, in

23     addition to any further" -- "any future

24     requirements that may be made known to me, I accept

25     and understand that I may be sanctioned, suspended,
```

UConn SJM Exhibit 48

1    hockey team rules?

2         A    No.

3         Q    You weren't subject to the women's

4    swimming and diving rules?

5         A    No.

6         Q    You weren't subject to the women's

7    rowing team rules?

8         A    No.

9         Q    Okay.  So the only team rules that

10   applied to you were the women's soccer team rules?

11        A    Yes.

12        Q    Are you aware of the women's soccer

13   coaches, any of them, disciplining a UConn student

14   athlete who was not on the women's soccer team?

15        A    No.

16        Q    Okay.  While at UConn, were you ever

17   disciplined by any athletic coach who was not a

18   member of the women's soccer team coaching staff?

19        A    No.

20        Q    So on November 9, 2014, UConn women's

21   soccer team beat the University of South Florida

22   during the championship game, correct?

23        A    Yes.

24        Q    With this win, UConn won the conference

25   championship; isn't that right?

UConn SJM Exhibit 48

```
1            A     Yes.

2            Q     That was the first time that UConn had

3     won any conference championship in 10 years; isn't

4     that correct?

5            A     Yes.

6                       MS. McGOVERN:  We'll mark

7             Exhibit 10.

8

9                       (Defendant's Exhibit 10:

10                       Marked for Identification.)

11

12    BY MS. McGOVERN:

13           Q     Ms. Radwan, this is the complaint

14    that you filed against the University of

15    Connecticut and the three other defendants.  You

16    filed it in Federal Court on December 19, 2016,

17    correct?

18           A     Yes.

19           Q     Okay.  You filed this complaint on your

20    own, correct?

21           A     What do you mean, on my own?

22           Q     You drafted this complaint?  You were

23    not represented by counsel, correct, when this

24    complaint was filed?

25           A     My attorney, Greg, and another woman in
```

Falzarano Court Reporters, LLC

UConn SJM Exhibit 48

```
 1        Q      -- in these allegations.

 2        A      Yes.

 3        Q      Okay.  This was what was filed with the

 4   court in December 2016 --

 5        A      Yes.

 6        Q      -- correct?

 7        A      Uh-hum.

 8        Q      If you turn to paragraph 14.

 9               It states "On November 9, 2014,

10   defendant UConn women's soccer team played the

11   University of South Florida, USF, in Tampa,

12   Florida, for the AAC conference championship and

13   automatic NCAA Division I championship tournament

14   seeding, when, in excitement and celebration of

15   defeating USF by penalty kicks and overtime, having

16   become a part of her first championship team, the

17   plaintiff inadvertently, in celebration, showed

18   her middle finger to an ESPNU camera, which

19   broadcasted it live along with its Internet

20   streaming affiliate, Watch ESPN, creating an

21   unintended immediate social media and Internet

22   topic for comments, parentheses, in quotes, the

23   incident."

24        A      Yes.

25        Q      It states that, correct?
```

UConn SJM Exhibit 48

```
 1          A     Yes.

 2          Q     Okay.  Is this a true statement?

 3          A     Yes.

 4          Q     So your testimony is that you

 5     inadvertently showed your middle finger to the

 6     ESPNU camera?

 7          A     I didn't go to the camera and show it to

 8     the camera.  The camera caught me doing it.

 9          Q     You just stated that what was in

10     paragraph 14 --

11          A     Uh-hum.

12          Q     -- was a true statement.

13          A     Yes.

14          Q     We read that together.

15          A     Yes.

16          Q     It says, focusing on line 5, "The

17     plaintiff inadvertently, in celebration, showed her

18     middle finger to an ESPNU camera."

19                It says that, correct?

20          A     Yeah.

21          Q     And you testified that that's a true

22     statement --

23          A     Yes.

24          Q     -- correct?

25                So your testimony is that you
```

UConn SJM Exhibit 48

```
1     inadvertently showed your middle finger to the

2     ESPNU camera.

3          A     Yes.

4          Q     Do you agree that showing your middle

5     finger is an obscene gesture?

6          A     Define "obscene."

7          Q     You don't know what "obscene" means?

8          A     I don't -- I know what "obscene" means.

9     But you're saying -- can you repeat that?

10                    MS. McGOVERN:  Can you read back

11          that question, please.

12

13               (The last question was read by the court

14     reporter.)

15

16                    THE WITNESS:  I don't think it's

17          obscene.

18     BY MS. McGOVERN:

19          Q     Oh, okay.

20               Do you agree that showing your middle

21     finger is an inappropriate gesture?

22          A     Yes.

23          Q     Do you agree that showing your middle

24     finger means "fuck you"?

25          A     No.  I don't think it means FU to
```

UConn SJM Exhibit 48

```
 1        Q       -- when you provided this to the

 2   coaching staff, correct?

 3        A       Yes.

 4        Q       Okay.  And your description of your

 5   showing your middle finger --

 6        A       Uh-hum.

 7        Q       -- was that it was an obscene gesture --

 8        A       Yes.

 9        Q       -- correct?

10                And you wrote that it was inappropriate?

11        A       Yes.

12        Q       Coach Tsantiris, he suspended you

13   indefinitely from the team after you showed your

14   middle finger at the ESPNU camera, correct?

15        A       He suspended me for the rest of the NCAA

16   tournament, immediately.

17        Q       Okay.  And he -- Coach Tsantiris issued

18   a press release --

19        A       Yes.

20        Q       -- following this, your showing your

21   middle finger to the ESPNU camera?

22        A       Yes.

23        Q       And the press release was an apology --

24        A       Uh-hum.

25        Q       -- that you had used an inappropriate
```

UConn SJM Exhibit 48

```
 1                    (Defendant's Exhibit 14:

 2                     Marked for Identification.)

 3

 4    BY MS. McGOVERN:

 5         Q     If you could turn to page -- first, this

 6    Exhibit 14, on the bottom it has written "Radwan

 7    January 26, 2018, RFP responses."

 8         A     Uh-hum.

 9         Q     Then it has page numbers listed.

10         A     Yes.

11         Q     These were documents that you provided

12    to your attorney, and then he provided to me in

13    response to requests for production --

14         A     Okay.

15         Q     -- okay?

16               So if you turn to page 135.

17         A     Uh-hum.

18         Q     So it's 135, 136, 137.  Those three

19    pages go together.

20         A     Okay.

21         Q     Just flip through it.  I'll give you a

22    moment to look it over.

23         A     (Perusing document.)

24               You can go ahead.

25         Q     This is Hofstra -- this is a Hofstra
```

1     document, or produced by Hofstra, and it's entitled

2     Hofstra University Athletic Grant-In-Aid Agreement.

3          A     Uh-hum.

4          Q     It's dated January 21, 2015.

5          A     Yes.

6          Q     This is addressed to you.  On the third

7     page it's signed by the Dean of Admissions and

8     Financial Aid?

9          A     Yes.

10         Q     Director of Athletics, the soccer coach?

11         A     Uh-hum.

12         Q     How do you pronounce your soccer coach's

13    name?

14         A     Simon Riddiough, R-i-d-d-i-o-u-g-h.

15         Q     So this is a document that Hofstra sent

16    to you for the grant-in-aid it was offering to you

17    for spring semester 2014?

18         A     Yes.

19         Q     As you testified earlier, they offered

20    you 37 percent of a full athletic grant-in-aid

21    scholarship for the spring semester.

22         A     Yes.

23         Q     Every page on this is entitled Athletic

24    Grant-in-Aid.

25         A     Yes.

UConn SJM Exhibit 48

```
 1   alternatives --

 2        Q    Okay.

 3        A    -- since I could not come back to UConn.

 4        Q    Again, your coming back to UConn was

 5   that you were not going to be on the women's soccer

 6   team?

 7        A    Yes, or a student.

 8        Q    That's two different things.  Do you

 9   agree --

10        A    Yeah.

11        Q    -- being a student at UConn is different

12   from being a member of an athletic team?

13        A    Yes.

14        Q    Okay.  And having a scholarship is

15   different from -- having a scholarship terminated

16   is different than being told you cannot come back

17   to a school, isn't it?

18        A    Yes.

19        Q    You were not expelled from UConn,

20   correct?

21        A    Right.

22        Q    So if you had enough money to come back

23   to UConn, you would have been able to come back and

24   just take classes, correct?

25        A    Well, he told me that I shouldn't.
```

Falzarano Court Reporters, LLC

```
1        Q    Again, I'm not understanding how that

2   has any impact on your ability to come back to

3   UConn as a student.

4        A    Because I had all my friends within my

5   team and the whole athletic community, and I was a

6   part of that.  I couldn't just start over again as

7   not part of any sort of team or athlete, paying

8   full amount of money, which I didn't have.  And I

9   had a coach that told me not to come back.

10            And after he told me not to come back, I

11  wasn't in the right state of mind to say, I can

12  still come back, not be on the team and be okay

13  with it.

14       Q    So you could have come back to UConn and

15  continued to take classes at UConn?

16       A    I could have.

17       Q    Okay.  You chose not to because you

18  wanted to be part of the soccer team?

19       A    And I did not have the money.

20       Q    Okay.  So you being a student at UConn,

21  you would have had no interaction with Len

22  Tsantiris if you weren't on the soccer team,

23  correct?

24       A    Could be correct.  I mean, I would

25  have -- I could easily run into him at the
```

UConn SJM Exhibit 48

```
1        Q     Is there anything else that formed the
2   factual basis for the statement other than what you
3   just talked about?
4        A     Can you read which statement again?
5        Q     "After canceling the plaintiff's
6   scholarship, her aid was used to complete the
7   out-of-state full scholarship offer to        ."
8        A     No.
9        Q     In count one and two of your complaint,
10  the Title IX, an equal protection clause
11  complaint -- claims, rather -- what is your factual
12  basis for the claim that the defendants
13  discriminated against you because of your sex?
14       A     I believe that this would not have
15  happened on any other men's team.
16       Q     So my question to you, though, what is
17  the factual basis for your claim that the
18  defendants discriminated against you because of
19  your sex?
20       A     Because there are multiple cases that --
21  incidents that are worse, I would say, than what
22  happened with mine, have occurred on the men's
23  side, and no other actions been taken.
24       Q     What's the basis for your belief that
25  there's no action that's being taken against men
```

1    athletes at UConn?

2         A      There was no -- there was no press

3    release, there was no word that anybody was

4    suspended or pulled from a team.  I believe my

5    coach thought -- Coach Len felt that he could just

6    pull my scholarship, and I wouldn't have anything

7    to say about it.

8         Q      And so anything that -- besides the

9    allegations that are in your complaint regarding

10   different male athletes at UConn, are there any

11   other instances involving male athletes that you

12   believe support your claim that you were

13   discriminated against because of your sex?

14        A      Yes.  One of the members of the men's

15   soccer team was caught stealing from the Co-op at

16   UConn, stealing textbooks, and he was not suspended

17   or expelled from the team.

18        Q      Is that in your complaint?

19        A      I'm not sure.

20        Q      Is there anything else?

21        A      I believe one of the football players

22   was concealing a weapon in his car, did not receive

23   any sort of -- was not reprimanded nearly as

24   harshly as I was.

25        Q      Which football player?

UConn SJM Exhibit 48

1      A      I don't know the name of the football

2   player.  I don't remember.

3      Q      What year was that?

4      A      I think it was 2014 as well.

5      Q      What's the basis for your belief that

6   there was no consequence that the student received

7   for his actions?

8      A      Because it was not -- the student was

9   still allowed to play football and be at the

10  school.  I don't remember the name, though.

11     Q      Was there any other incident that

12  provides a factual basis for your claim that you

13  were discriminated against because of your sex?

14     A      It's stated in my claim also that four

15  members of the men's basketball team were suspended

16  from a game, a game or two, in Puerto Rico when

17  they were in the Puerto Rican Classic Tournament,

18  and no facts were released about why they were

19  suspended, and it was never talked about on the

20  media the way mine was talked about.  These players

21  were not released from the team indefinitely, or

22  suspended from the team indefinitely, like I was.

23     Q      Was there any other factual basis that

24  you have for your claim that you were discriminated

25  against because of your sex?

UConn SJM Exhibit 48

```
 1        A      Those are the three claims that --
 2   examples.
 3        Q      Let's turn to paragraph 63 of the
 4   complaint.  It states "Upon information and belief,
 5   male student athletes have engaged in similar acts
 6   of unsportsmanlike conduct without an effect on
 7   their scholarships, and have engaged in more
 8   inappropriate and sometimes illegal conduct without
 9   having their scholarships revoked."
10        A      Yes.
11        Q      It does say that, correct?
12        A      Yes.
13        Q      Can you clarify what you mean by
14   "engaged in similar acts of unsportsmanlike
15   conduct"?
16        A      Well, I can even give you an example.  I
17   think last year's March Madness Tournament, or two
18   years ago, 2015, when a basketball player was asked
19   in a press conference about another player, and he
20   said, on record, in front of everybody, you know,
21   F-N word, and it was just swept under the rug and
22   no one talked about it.
23        Q      I'm sorry.  What was it that the athlete
24   said?
25        A      He said F-u-c-k that N word.
```

UConn SJM Exhibit 48

```
 1          Q     Again, when was this?

 2          A     It was two years ago, two March Madness

 3    Tournaments ago.

 4          Q     So 2016?  I don't think they were at a

 5    tournament in 2017.

 6          A     Not UConn.

 7          Q     It wasn't UConn?

 8          A     No, this is not UConn.  This is just --

 9    yeah.

10          Q     So do you remember what team that was

11    from?

12          A     I want to say Wisconsin.

13          Q     Okay.  So as far as any male student

14    athletes at UConn, are there any that have engaged

15    in similar acts of unsportsmanlike conduct to

16    yourself?

17          A     What was the last part you said?  Sorry.

18          Q     You used the phrase in paragraph 63 that

19    "male student athletes have engaged in similar acts

20    of unsportsmanlike conduct" --

21          A     Uh-hum.

22          Q     -- "without an effect on their

23    scholarship."

24                So with regard to UConn male athletes,

25    can you clarify -- I guess, first, are there any
```

UConn SJM Exhibit 48

1    male UConn athletes that have been engaged in

2    similar acts of unsportsmanlike conduct to

3    yourself?

4        A    I cannot name a direct or specific

5    example other than the examples I gave you that

6    were similar to my incident.

7        Q    So, no, there are no male UConn student

8    athletes engaged that you're aware of whose

9    conduct -- who engaged in similar acts of

10   unsportsmanlike conduct to yours?

11       A    I'm not aware, but I believe -- I was

12   not made aware of it because it was not as big of a

13   deal, as blown up, as mine was.

14       Q    You're not aware of any male student

15   athlete at UConn who's engaged in similar acts of

16   unsportsmanlike conduct to yourself?

17       A    No.

18       Q    Okay.

19            MR. KLEIN:  When you use the phrase

20       "similar acts," you mean -- are you being

21       intentionally specific about that, as opposed

22       to using the phrase, "any unsportsmanlike" --

23   BY MS. McGOVERN:

24       Q    I'm using -- I'm coming back to the

25   phrase in paragraph 63.  Initially I started

Falzarano Court Reporters, LLC

```
 1    unsportsmanlike conduct.

 2         A     Uh-hum.

 3         Q     If you would turn to paragraphs 64 and

 4    65 of the complaint, Exhibit 10, just take a look

 5    at those paragraphs for a moment.

 6         A     Yeah.

 7         Q     Does that refresh your recollection

 8    about any similar acts of unsportsmanlike conduct

 9    at UConn and how they were handled?

10         A     Yeah.

11         Q     Tell me what you know about the -- that

12    incident in October 2015, the football player.

13         A     Well, I just know that he kind of did

14    something in the most similar way to what happened

15    to me, kicked a ball into the stands at people that

16    are in the stands, you know, spectators.  And he

17    got a penalty for it.  And it was just a dumb play

18    and he shouldn't -- he learned his lesson.  But he

19    was not suspended from the team or released from

20    any sort of scholarship and was not suspended from

21    any further games.  Or he was suspended from that

22    game, from that one play.

23              MR. KLEIN:  I just want to note for

24         the record the Exhibit 11, Exhibit Z, which

25         is an article about this, the date of the
```

UConn SJM Exhibit 48

```
 1                    STATE OF CONNECTICUT

 2         I, LYNNE STEIN, CSR #110, a Notary Public,

 3     duly commissioned and qualified in and for the

 4     State of Connecticut, do hereby certify that

 5     pursuant to Notice there came before me on May 2,

 6     2018, the following named person, to wit:  NORIANA

 7     RADWAN, who was by me duly sworn to testify to the

 8     truth and nothing but the truth; that she was

 9     thereupon carefully examined upon her oath and her

10     examination reduced to writing under my

11     supervision; that this deposition is a true record,

12     to the best of my ability, of the testimony given

13     by the witness.

14         I further certify that I am neither attorney

15     nor counsel for, nor related to, nor employed by

16     any of the parties to the action in which this

17     deposition is taken, and further, that I am not a

18     relative or employee of any attorney or counsel

19     employed by the parties hereto, or financially

20     interested in the action.

21         IN WITNESS WHEREOF, I have hereunto set my

22     hand this 16th day of May, 2018.

23

24     _____
                                    Lynne Stein
       My Commission Expires:  LYNNE STEIN, CSR #00110
25     January 31, 2019        Notary Public
```

Falzarano Court Reporters, LLC

UConn SJM Exhibit 48

| | |
|---|---|
| **From:** | Crim, Amy |
| **To:** | "nornor100@aim.com"; "NORIANA.RADWAN@UCONN.EDU" |
| **Cc:** | Fiorvanti, Ann |
| **Subject:** | Sp15 Housing Cancellation |
| **Date:** | Tuesday, January 13, 2015 2:10:22 PM |
| **Importance:** | High |

Noriana Radwan
2082747

Noriana,

Based on your email below your Spring 2015 housing application/assignment have been cancelled. At this time, you still show in the system as an enrolled student. Please be sure to cancel through the Dean of Students office. Until that is processed, it will show as a 50% cancellation fee. This cancellation forfeits all guarantees for future on-campus housing. We are advising all students who cancel and lose their housing guarantee to plan on living off-campus if they return to the Storrs campus in the future. Based on projected enrollment growth, we don't think we will be able to make many (if any) offers to the housing waiting list in the future.

Move-Out Reminders - By January 15, 2015
Please make arrangements to vacate your fall housing assignment by 5:00pm on Thursday January 15, 2015.
1.   Call The Front Desk at (860) 486-9000 to schedule an express check-out.
2.   Remove all belongings and return room to original condition.
3.   Return keys to The Front Desk staff.

Good luck,
Amy

Amy Joy Crim
Interim Director for Housing Services
626 Gilbert Road Ext. Unit 1022
Storrs, CT 06269-1022
(860)486-2926

Facebook: http://facebook.com/UConnResLife or search for "UConn Residential Life"
Twitter: @UConnResLife - http://twitter.com/UConnResLife

-----Original Message-----
From: Noriana Radwan [mailto:nornor100@aim.com]
Sent: Sunday, January 11, 2015 10:35 AM
To: ResLife - Living On Campus
Subject: Leaving room

To whom this may concern,

My name is Noriana Radwan and I am a former member of the women's soccer team. I spent the first semester living in Hale room 425 but I will be transferring this semester. I am emailing you to avoid any charges since I will no longer be living there. Thank you!!

Noriana Radwan

Sent from my iPhone



DEFENDANT'S
EXHIBIT NO. 2
FOR IDENTIFICATION
DATE: 5-2-18   RPTR:

UConn SJM Exhibit 48

**From:** Hargis, Kristen
**To:** nornor100@aim.com
**Subject:** RE: Noriana Radwan- NLI release letter
**Date:** Tuesday, January 13, 2015 12:50:55 PM

Noriana -

Please follow the instructions on the link provided to request your release. This has to be done through the National Letter of Intent website. From there, we will be notified of your request elecronically.

Thanks!

Kristen

http://www.nationalletter.org/releaseAndAppeals/index.html

Kristen C. Hargis
Assistant Director of Compliance
University of Connecticut | 2095 Hillside Road U-1173 | Storrs, CT 06269
Office: 860.486.2208 | Fax: 860.486.2245 | uconnhuskies.com

-----Original Message-----
From: Cretors, Angie
Sent: Tuesday, January 13, 2015 12:11 PM
To: Hargis, Kristen
Subject: FW: Noriana Radwan- NLI release letter

Can you send her contact letter and let her know about the NLI release.

-----Original Message-----
From: Noriana Radwan [mailto:nornor100@aim.com]
Sent: Tuesday, January 13, 2015 12:03 PM
To: Cretors, Angie
Subject: Noriana Radwan- NLI release letter

Hi Angie,

My name is Noriana Radwan. I am a former player of the women's soccer team at UConn. This semester, I am transferring to Hofstra University. I am contacting you to obtain the NLI release letter, because it is necessary to make my transfer final. I do not know the details of this process, but I was told to contact compliance in order to get the NLI release. I have already gotten a permission to contact. Hofstra should also be in contact soon about obtaining the NCAA one-time exemption as well. Thank you!

Noriana Radwan
nornor100@aim.com



UConn SJM Exhibit 48

**UCONN** | UNIVERSITY OF CONNECTICUT

Voluntary Separation    Cancellations    Reports ▾    Q Search

# Cancellation for Spring 2015

### PROCESSED

| | |
|---|---|
| **Name:** | Noriana Radwan |
| **PeopleSoft:** | 2083747 |
| **E-mail:** | norior100@aim.com |
| **Primary reason:** | I am transferring to a different university |
| **Special reason:** | Other |

### Timeline

- Submitted on 01/14/2015
- Processed on 01/16/2015 by dew13004



DEFENDANT'S
EXHIBIT NO. 4
FOR IDENTIFICATION
DATE: 5.2-18   RPTR:

UConn SJM Exhibit 48

| | |
|---|---|
| **From:** | Cretors, Angie |
| **To:** | NORIANA.RADWAN@UCONN.EDU |
| **Cc:** | Rodriguez (Tietjen), Margaret; Tsantiris, Leonidas; Fiorvanti, Ann |
| **Subject:** | Permission to Contact |
| **Date:** | Monday, December 22, 2014 2:25:00 PM |
| **Attachments:** | Radwan.pdf |
| | image001.png |

Hi Noriana –

Attached is your permission to contact institutions about the possibility of transferring. Just so you are aware, the American Athletic Conference does have a specific rule regarding transferring within the conference. The policy is below:

### INTRA-CONFERENCE TRANSFER POLICY
A student-athlete may transfer from one American institution to another American institution and participate in any sport provided that:

1. Prior to competing for or receiving athletically related financial aid from the second Conference institution, the student-athlete serves a year in residency at the second Conference institution [two full semesters or three full quarters (which shall be determined in accordance with NCAA rules associated with transfers)]. During such year of residency, the student-athlete is permitted to practice pursuant to NCAA practice eligibility rules. Further, a transfer student-athlete admitted after the 12th class day may not utilize that semester for the purpose of establishing residency.
2. The student-athlete shall be charged with the loss of one (1) season of eligibility (in all sports).
3. There are no exceptions or waivers to this policy.

Please note, that this policy does **not** apply if you transfer outside the American Athletic Conference.

Lastly, due to the fact that you signed an NLI, you will need to request a release via the NCAA Eligibility Center.

Please let me know if you have any questions.

Thanks-
Angie





UConn SJM Exhibit 48



# UCONN
## ATHLETICS

December 22, 2014

To whom it may concern:

A student-athlete at the University of Connecticut may have an interest in transferring to your institution. In accordance with NCAA Bylaw 13.1.1.3, the University of Connecticut is hereby granting permission to speak with **Noriana Radwan** in the sport of **Women's Soccer** to pursue potential transfer possibilities.

Should you need additional information, please feel free to contact me.


Sincerely,
Angie Cretors
Senior Associate Director of Athletics - Compliance
(860) 486-1211
Angie.cretors@uconn.edu



1

1          UNITED STATES DISTRICT COURT
2              DISTRICT OF CONNECTICUT
3   * * * * * * * * * * * * * * * * *
                                    *
4   NORIANA RADWAN,                 *
                                    *
5          Plaintiff               *
                                    *
6      VS.                          *
                                    * Civil Action No.
7   UNIVERSITY OF CONNECTICUT BOARD *
    OF TRUSTEES, WARDE MANUEL,      * 3:16-cv-02091 (VAB)
8   LEONARD TSANTIRIS, and MONA     *
    LUCAS, individually,            *
9                                   *
           Defendants              *
10                                  *
    * * * * * * * * * * * * * * * * *
11                                  Bridgeport, CT
                                    June 17, 2019
12                                  9:45 a.m.
                    - - -
13          DEPOSITION OF MONA LUCAS
                    - - -
14  APPEARANCES:
15      FOR THE PLAINTIFF:
16          LAW OFFICE OF JONATHAN J. KLEIN
            BY:  JONATHAN J. KLEIN, ESQUIRE
17               60 Lyon Terrace
                 Bridgeport, CT 06604
18               Phone:  (203) 330-1900
                 Fax:  (203) 330-1526
19               E-mail:  Jjkesq@hotmail.com
20                   -AND-
21          LAW OFFICES OF GREGORY J. TARONE
            BY:  GREGORY J. TARONE, ESQUIRE
22               5020 Route 9W, Suite 104
                 Newburgh, NY 12550
23               Phone:  (845) 527-5424
                 Fax:  (845) 563-0461
24               E-mail:  Greg@traoneesq.com
25                   - Cont'd -

4

1          (Whereupon, the Notice of Deposition

2   was marked Plaintiff's Exhibit 1 and the Objections to

3   Plaintiff's Exhibit A was marked Plaintiff's Exhibit 2

4   for Identification.)

5          THE COURT REPORTER:  Attorney

6   McGovern, will you be ordering a transcript?

7          MS. McGOVERN:  Yes.

8   Thereupon:

9          MONA LUCAS, residing at 11 Masons Brook Lane,

10  East Windsor, Connecticut, being first duly sworn, as

11  hereinafter certified, was examined and testified as

12  follows:

13  DIRECT EXAMINATION BY MR. KLEIN:

14      Q.     Good morning, Miss Lucas.  I'm Jonathan

15  Klein.  I'm the attorney for Noriana Radwan, the

16  plaintiff in this case, and we're here for your

17  deposition in the case of Noriana Radwan versus

18  University of Connecticut Board of Trustees, Ward

19  Manuel, Leonard Tsantiris, and you, individually.  Have

20  you ever had your deposition taken before?

21      A.     No.

22      Q.     So let me just give you a little bit of

23  the ground rules.  I'm sure your attorney has also.  Let

24  me just explain briefly.  This is a standard discovery

25  tool in civil litigation.  I ask the questions, you give

18

1       Q.      Do you understand what her duties were as

2   assistant athletic director for compliance service?

3       A.      I don't know the details.  She was one of

4   my points of contact regarding these processes.  I don't

5   know what else her role entails.

6                   (Whereupon, the Letter, Plaintiff's

7   Exhibit 4, was marked for Identification.)

8       Q.      You've been handed what's been marked

9   Plaintiff's Exhibit 4.  Can you tell us whether you've

10  seen this before?

11      A.      Yes.

12      Q.      And tell us what it is, please?

13      A.      This is the official notification of the

14  financial aid notification of the scholarship

15  cancellation and the notice of the offer to the student

16  athlete to request a hearing.

17      Q.      Now, this letter is dated December 22,

18  2014; correct?

19      A.      Yes.

20      Q.      And it's addressed to Noriana Radwan at

21  her home address?

22      A.      Yes.

23      Q.      And it's signed by you or --

24      A.      My representative.

25      Q.      There's a handwritten signature there, and

19

1   it looks like initials written in small letters next to

2   that.  Do you know whose initials those are?

3       A.      I believe those initials are Kimberly

4   Campbell.

5       Q.      Who is she?

6       A.      She is the or was the financial aid

7   officer in my office who had the staff level

8   responsibility for athletic aid processing, and she was

9   the person designated or granted the authority or

10  delegated the authority to sign off on letters if I was

11  out of the office or wouldn't be back at the office

12  within the amount of time the athletic compliance

13  department needed letters.

14      Q.      Okay.  Who drafted this letter?

15      A.      Athletics.  This is an athletics

16  compliance template, so the language came from them.

17      Q.      Did you review this letter before it was

18  signed by Kimberly on your behalf?

19      A.      No.

20      Q.      Where were you on December 22, 2014, if

21  you can recall?

22      A.      I can't recall, but just looking at the

23  date with it being close to the holiday season, I

24  suspect I was with family, but I don't know where I was.

25      Q.      Have you seen this template letter

20

1   notifying somebody of a reduction or cancellation of

2   their athletic grant-in-aid before?

3       A.      I think this was a familiar letter to me.

4   But what I don't recall is -- I think it was familiar.

5       Q.      So prior to December 22, 2014, in your

6   experience there as the director of student financial

7   aid services, had you had any involvement in the

8   administrative process of terminating an athletic grant?

9       A.      Yes, the administrative process.

10      Q.      When I say the administrative process, I

11  say that because you're not the decisionmaker; correct?

12      A.      You're absolutely right.  I'm not

13  involved -- or in the role that I was in, I'm not

14  involved at all in whose scholarship gets canceled or

15  renewed.  My involvement was really strictly on the

16  administrative end.  Once decisions were made by the

17  athletics department, my role would then be to sign off

18  on the notification letter to notify the student

19  athletes of the decision.

20      Q.      Although you apparently were not present

21  at UConn on December 22, 2014, did you know that this

22  letter was going to be sent out to Noriana Radwan?

23      A.      I don't believe so.  I don't recall, but I

24  don't think so.  I think this was my first indication.

25  I don't recall knowing prior to leaving for wherever I

23

1    seeing reference to it when I got back, that --

2         Q.      Do you remember when you would have

3    returned to your job at UConn in January of 2015?

4         A.      I think it would have been during the

5    first week, like -- so I can't say factually, but it

6    would make sense to me that it would be several days

7    after January 2nd, so I may have taken the week of

8    January 1st but certainly would have been back within a

9    week of the new year.

10        Q.      The letter informs Noriana Radwan that her

11   full athletics grant-in-aid will be canceled for the

12   remainder of the 2014/2015 academic year due to a

13   serious misconduct issue.  Did you know in December of

14   2014 what that quote, unquote "serious misconduct issue"

15   was?

16        A.      No, I didn't.

17        Q.      The conduct that led to this whole

18   thing -- as you sit here today, do you know what that

19   was?

20        A.      As I sit here today, I have an

21   understanding of what that was.

22        Q.      It was a middle finger gesture after -- in

23   the postgame celebration of the conference championship;

24   is that your understanding?

25        A.      Yes.

24

1        Q.      Did you ever see either a still photo or

2    video of that incident?

3        A.      I did not.

4        Q.      Did you ever -- in December of -- November

5    or December of 2014, did you ever discuss that incident

6    with anyone in the athletics department at UConn?

7        A.      Not at all.

8        Q.      How about in January of 2015, did you

9    discuss that incident with anyone in the athletics

10   department at UConn?

11       A.      No.

12       Q.      The second to the last sentence in Exhibit

13   4 says -- well, withdrawn.

14               The second paragraph of this letter says,

15   "If you feel that the cancellation of the aid is unfair

16   or unjustified, you can request a hearing as provided by

17   NCAA regulations.  A copy of UConn's established

18   policies and procedures for conducting the required

19   hearing, including the deadline by which the student

20   athlete must request such a hearing, are included with

21   this letter.  To make this request, contact my office in

22   writing within 14 business days of the receipt of this

23   letter."  Did I read that correctly?

24       A.      Yes.

25       Q.      Okay.  And, again, you're saying you had

25

1    nothing to do with the wording of this letter?

2         A.    That's correct.

3         Q.    When you returned from your holiday break

4    and saw this letter, did you question anything about the

5    wording of the letter or its accuracy?

6         A.    No.

7                    (Whereupon, the UConn Financial Aid

8    Hearing Procedure, Plaintiff's Exhibit 5, was marked

9    for Identification.)

10        Q.    You've been handed what's been marked

11   Plaintiff's Exhibit 5, and the heading on this two-page

12   document is "University of Connecticut Financial Aid

13   Hearing Procedure."  Do you know, is that the document

14   that's referenced in Exhibit 4 where it says a copy of

15   UConn's established policies and procedures for

16   conducting a required hearing would have been an

17   enclosure with this letter?  Is this that enclosure?

18        A.    Yes.

19        Q.    And this is -- would I be correct in

20   assuming this is something that's standard preprinted

21   and you just enclose it when you send out a notification

22   such as this?

23        A.    Correct.

24        Q.    Now, this references bylaw 15.3.2.3 in the

25   first line and that is an NCAA bylaw; correct?

26

1        A.        Correct.

2        Q.        And in the second paragraph it says,

3   "University of Connecticut has set the following

4   procedures relating to a hearing request."  And then

5   there's a -- there are four bullet points.  The second

6   bullet point says, "The student athlete will have 14

7   business days from the date on the notification letter

8   to submit a written request for a hearing to the

9   director of student aid financial services."  Did I read

10  that correctly?

11       A.        Yes.

12       Q.        Who prepared this document?

13       A.        This came from athletics compliance or the

14  athletics department, so -- yeah, so athletics.

15       Q.        Now, if you would look at -- I see you

16  have it there next to each other, Exhibits 4 and 5.  In

17  Exhibit 4, which is a notification letter which you say

18  came from the athletics department, it informs the

19  student, Miss Radwan that if she wanted to request a

20  hearing, she should contact your office in writing

21  within 14 business days of the receipt of this letter,

22  whereas this financial aid hearing procedure, Exhibit 5,

23  says that she'll have 14 business days from the date of

24  the notification of the letter to request a hearing in

25  writing.  Do you see the discrepancy there?

27

1      A.      I do.

2      Q.      Can you explain it?

3      A.      No, I can't explain.

4      Q.      Are you able to say which one is correct?

5      A.      I cannot.

6      Q.      Now, I believe I asked you this before,

7  but let me just ask again.  Do you know who made the

8  decision to terminate Noriana's grant-in-aid?

9      A.      I don't.

10     Q.      You just know it came from the athletics

11 department?

12     A.      Exactly.

13     Q.      Would it be fair to say, then, it was

14 either the athletic director, Warde Manuel, or the

15 women's soccer coach, Leonard Tsantiris?

16              MS. McGOVERN:  Objection to form.

17     A.      I don't know.

18     Q.      But it certainly wasn't you?

19     A.      No, it wasn't me.  That I'm certain of.

20     Q.      In December of 2014 who or what was

21 UConn's student disciplinary authority?

22     A.      I believe the student disciplinary

23 authority is managed through the office of community

24 standards.  That's all I know.

25     Q.      And who is the director of community

39

1    Do you know if Noriana Radwan was ever advised of that

2    aspect of this process?

3                    MS. McGOVERN:   Objection to form.

4        A.      I don't know.

5        Q.      Were you aware that there is an appeals

6    process that exists after the administrative hearing is

7    done?

8                    MS. McGOVERN:   Objection to form.

9        A.      I wasn't aware of that.

10                   (Whereupon, the E-mail, Plaintiff's

11   Exhibit 7, was marked for Identification.)

12       Q.      Showing you now what's been marked

13   Plaintiff's Exhibit 7.   This appears to be an e-mail

14   from Suzanne -- how do you pronounce that last name?

15       A.      Pare.

16       Q.      -- assistant to the director of student

17   financial aid services to Noriana Radwan dated January

18   5, 2015.   Subject, "Request for financial aid hearing."

19   You're not copied on this, but have you seen this e-mail

20   before?

21       A.      I have seen it.

22       Q.      Do you know if you saw it at or about the

23   time that it was sent to Miss Radwan?

24       A.      I don't know for certain.

25       Q.      Did you direct Miss Pare to send this

40

1    e-mail to Noriana?

2        A.      I don't recall for certain.  It makes

3    sense, but I can't say.

4        Q.      It indicates or it states, and again this

5    is on January 5th, that you were away from the office on

6    that date apparently.  That's Monday, January 5th.  Do

7    you know if she sent this on her own or she was in

8    contact with you while you were away?

9        A.      I don't believe she was in contact with me

10   while I was away.  That would not have been standard

11   protocol, if I was going to be back in a week or so.

12   But her -- based on her responsibilities, this doesn't

13   surprise me.  If she acted on her own, this wouldn't

14   surprise me.

15       Q.      Okay.  Do you keep a calendar or a diary

16   of any kind or did you at that time, that would, if you

17   were to consult that, you would know precisely when you

18   returned from your holiday break?

19       A.      Yes.

20       Q.      And that still exists?

21       A.      Yes.

22       Q.      I just ask if you would let Attorney

23   McGovern know -- if you would look at that after this

24   deposition, and let her know when you returned.

25       A.      Sure.

UConn SJM Exhibit 49

42

1          (Whereupon, the E-mail Chain,

2  Plaintiff's Exhibit 9, was marked for Identification.)

3      Q.      Showing you Exhibit 9, which is a

4  three-page document.  It's an e-mail string beginning on

5  January 5, 2015 which appears to contain the text of

6  what was in Exhibit 7 from Suzanne Pare to Noriana

7  Radwan, and she references in the next part of this

8  e-mail string dated February 6, 2015 from Noriana to

9  Suzanne Pare, she represents she sent an e-mail on

10  January 14th formally requesting a hearing.  Do you see

11  that?

12      A.      I do.

13      Q.      Does that refresh your recollection that

14  she sent that letter by e-mail and mail?

15      A.      Yes.

16      Q.      Now, how was -- withdrawn.

17          The letter notifying Noriana that her

18  grant was being terminated and telling her that she had

19  the right to request a hearing, that's Exhibit 4.  It

20  says, "To make this request, contact my office within 14

21  business days of receiving this letter."  Was there any

22  documents sent along with this letter that explained to

23  Noriana how she was to calculate 14 business days?

24      A.      No.

25      Q.      Do you know how she was supposed to be

45

1   academic calendar has nothing going on from December 15,

2   2014 to January 19, 2015, so that is the basis of my

3   question is isn't it possible that a student, such as

4   Noriana Radwan, looking at the academic calendar, might

5   conclude that there are no business days during that

6   period of time?

7               MS. McGOVERN:  Objection to form.

8       A.      So, well, certainly no academic business,

9   because it's the academic calendar, and you're

10  absolutely right, there's no academic business

11  scheduled, based on this or outlined, I should say.  I

12  can see what's shared on winter session, but I'm

13  assuming it's a comparable description of what happens

14  during winter session with this link.

15      Q.      Exhibit 4, the December 22, 2014

16  notification letter does not define what a business day

17  is; correct?

18      A.      Correct.

19              (Whereupon, the Letter, Plaintiff's

20  Exhibit 11, was marked for Identification.)

21      Q.      Looking at what's been marked as

22  Plaintiff's Exhibit 11, what is this?

23      A.      This is the formal notification from my

24  office to the student athlete to let her know that her

25  request for a hearing was denied.

46

1      Q.      Okay.  This is dated January 29, 2015;

2  correct?

3      A.      Yes.

4      Q.      Addressed to Noriana Radwan at her home in

5  Wappingers Falls, New York; right?

6      A.      Yes.

7      Q.      That's your signature on this letter?

8      A.      It is.

9      Q.      And did someone instruct you to send this

10  letter?

11      A.      I wouldn't say -- maybe I'll answer it

12  this way.  Part of my responsibility would have been to

13  notify the student, but do you mean using this actual

14  language?

15      Q.      Yes.

16      A.      No one instructed me to send this.  It was

17  ultimately my decision whether to send it.  I think the

18  only guidance sought was if my language was acceptable,

19  my proposed language.  No one instructed me to send it.

20      Q.      The guidance you're referring to would

21  have come from whom?

22      A.      Athletics compliance.  I believe it was

23  the assistant athletics, Julie Purcell.

24      Q.      She's CC'd on this letter.

25      A.      Oh, yes.  Okay.

47

1        Q.      Is this a templated letter that came from

2    the athletics department?

3        A.      No, this is a letter that I wrote.

4        Q.      So it's telling her she didn't submit her

5    request for a hearing within 14 business days of

6    December 22nd, so she's not going to get a hearing;

7    right?

8        A.      Correct.

9                (Whereupon, the E-mail, Plaintiff's

10   Exhibit 12, was marked for Identification.)

11       Q.      Showing you Exhibit 12, at the bottom of

12   this page is an e-mail from Noriana Radwan to -- it says

13   "To FAS Financial Aid, Dear Miss Lucas."  When it says

14   "To FAS Financial Aid," is that shorthand for your

15   e-mail address?

16       A.      It's the general e-mail address for the

17   department.

18       Q.      It's dated January 14, 2015 and says,

19   "Dear Miss Lucas, regarding the cancellation of my aid,

20   according to your letter of December 22nd, I want to

21   appeal.  Attached is my letter I'm mailing today.  I

22   look forward to hearing from you.  Thank you."  And do

23   you recall seeing this when it came in?

24       A.      Not when it came in, but I do recall

25   seeing it.

48

1      Q.      And then the top of this page, Exhibit 12,

2   is dated the next day, Thursday, January 15, 2015, from

3   Kathy Kammer, client services at UConn.  Is that someone

4   who worked in the student financial aid services

5   department?

6      A.      Yes.

7      Q.      And it says there, "Dear Noriana, Thanks

8   for submitting your paperwork through our e-mail

9   account.  I will forward this to our processing team for

10  posting to your file.  From there the paperwork will be

11  forwarded to our processing staff for review.  Please

12  allow 10 business days for the review process to take

13  place.  If we need to make any changes to your file, you

14  will be notified through your UConn e-mail account."

15  Now, in this response on January 15th from the student

16  financial aid services department, Noriana was not being

17  told that her request for a hearing was too late; was

18  she?

19     A.      No, not at all.

20             (Whereupon, the E-mail, Plaintiff's

21  Exhibit 13, was marked for Identification.)

22     Q.      This is Exhibit 13, which you have in

23  front of you now, is -- well, tell us what it is.

24     A.      It's the e-mail communication between

25  the -- someone from the financial aid office.  It looks

49

1   to be probably responding to the information that would

2   have been routed to her ultimately through -- that Kathy

3   Kammer refers to in her e-mail regarding "I'll forward

4   your information to the appropriate individuals."

5       Q.      Exhibit 12.

6       A.      Exhibit 12, yes.  So that's what it

7   looks -- so Kimberly is saying she received it and she's

8   reaching out to athletics to Julie asking will the

9   student be given a hearing.

10      Q.      Again, Kimberly Campbell worked in your

11  office?

12      A.      She did.

13      Q.      She's asking that question of Julie

14  Purcell on January 20, 2015 and then the next part or

15  this e-mail string above that is Julie Purcell

16  responding to you with a copy to Kimberly Campbell on

17  January 23rd; correct?

18      A.      Yes.

19      Q.      And in there she's telling you and

20  Kimberly that Noriana had "14 business days to appeal,"

21  quote, unquote and her letter was a day late.  Is that

22  essentially what it says?

23      A.      Yes.

24      Q.      And the -- Julie is saying our office,

25  meaning the athletics department, believes that she

50

1    should be notified that her request was denied because

2    her letter was late -- her request was late; correct?

3         A.     Yes.

4         Q.     Can you explain the -- your e-mail at the

5    top of this page?  What are you asking -- there's an

6    e-mail there from you to Kimberly Midolo.  Is that

7    Kimberly Campbell?

8         A.     It is.

9         Q.     What are you asking -- let me just read

10   it.  It says, "Kim, did you share a copy of the PO

11   request with me and Suzanne during the holiday season?

12   It looks like we are now out of compliance with the

13   appeal process.  What happened here?  Mona."  What were

14   you asking here?  What was going through your mind?

15        A.     What I was asking was that my

16   understanding was that if a student athlete requested a

17   hearing, that the hearing should be scheduled within 15

18   days, I think, of the request.  And I think this looks

19   to me as if I'm thinking wait a minute, it's January

20   23rd, have we responded.  I'm questioning like did we

21   drop the ball here, has anyone responded.  That's what

22   it looks like to me.

23        Q.     The word "appeal" is used in this e-mail

24   string.  Did you understand at the time, or did you not

25   understand at the time that there's a difference between

53

```
 1   BY MR. KLEIN:

 2       Q.      Miss Lucas, you have now in front of you

 3   what's been marked as Plaintiff's Exhibit 14, which is

 4   another e-mail string here.  The first part of it is

 5   dated February 12, 2015 from Suzanne Pare to Noriana

 6   Radwan saying, "I'm writing in response to your request

 7   for an appeal hearing.  Please refer to the attached

 8   letter that was sent via U.S. mail to you.  You may not

 9   have received a letter prior to responding to my e-mail

10   from January 5th."  And I don't have the attachment.

11   Apparently the attachment was the letter telling her

12   that she blew the timeframe.  Is that your

13   understanding?

14       A.      Yes.

15       Q.      And then Noriana responds to Suzanne Pare

16   at the top of this document from February 13, 2015, the

17   next day, saying, "I received your letter of January

18   29th" -- I should say it says, "Miss Pare and Miss

19   Lucas," although it appears that you were not copied on

20   this e-mail.  "Miss Pare and Miss Lucas, I received your

21   letter of January 29th denying my appeal just yesterday

22   at my home address.  I would like to know how you

23   calculated the" quote, unquote "business days from

24   December 22nd and whether this is the absolute end of my

25   chance of an appeal hearing.  That would not be fair."
```

57

1        Q.      Yes.

2        A.      No, absolutely not.  I would not have that

3   authority.

4        Q.      You, in your role of director of student

5   financial aid services, had no role to play in the

6   administrative hearing process or appeal process, other

7   than facilitating things administratively; correct?

8        A.      Yes.  And then advising -- yes,

9   administrative.

10       Q.      No decisionmaking authority?

11       A.      The decisionmaking authority of the

12  appeals committee was whether the committee voted as to

13  whether, based on the hearing, information presented at

14  the hearing was fair and reasonable or if we thought the

15  decision should be reversed or changed in any way.

16  That's the scope of the authority of the committee.

17       Q.      And in your experience these

18  administrative hearings were usually done by committee?

19              MS. McGOVERN:  Objection to form.

20       A.      Yes.

21       Q.      Let me show you -- I'm going to mark this

22  Exhibit 16, and this is one of the documents that was

23  produced this morning by Attorney McGovern on your

24  behalf.

25              (Whereupon, the E-mail, Plaintiff's

58

1    Exhibit 16, was marked for Identification.)

2        Q.      This is an e-mail string beginning January

3    20, 2015 from Kimberly Campbell to Julie Purcell saying

4    I've received this letter through imaging today.  I

5    think we've seen this before.  That's referring to the

6    letter from Noriana requesting a hearing, and Kimberly

7    is asking Julie can you review and let me know if she

8    will indeed be given a hearing.  Do you see that?

9        A.      I do.

10       Q.      And then Julie Purcell apparently, if you

11   look at the first page of Exhibit 16, apparently

12   forwarded that or responded to that to you and to CC to

13   Kimberly; correct?

14       A.      Yes.

15       Q.      And in that e-mail she expressed her

16   belief, as she says, "Our office, therefore, believes

17   Noriana should be notified that her request for an

18   appeal is denied because the opportunity to request a

19   hearing lapsed prior to her sending the appeal letter.

20   Do you see that?

21       A.      I do.

22       Q.      And then that denial letter, because of

23   the lateness of the request, was ensued from there;

24   correct?

25       A.      Correct.

74

1      Q.      During the time in which Noriana Radwan's

2  grant-in-aid was terminated and your office was

3  involved, the administrative process of offering her an

4  opportunity for an administrative hearing, did you have

5  any interaction with either Warde Manuel or Len

6  Tsantiris?

7              MS. McGOVERN:  Objection to form.

8      A.      No.

9      Q.      Did you have any contact with anyone at

10  the American Athletic Conference regarding Noriana's

11  conduct at the -- after the conference championship in

12  November 2014?

13     A.      No.

14     Q.      I have no further questions.

15              MS. McGOVERN:  I'm just going to ask

16  for a 10-minute break.

17              (Whereupon, a recess was taken from

18  12:17 p.m. until 12:28 p.m.)

19  CROSS-EXAMINATION MS. McGOVERN:

20     Q.      Miss Lucas, just turning your attention to

21  when a student athlete requests a hearing if the

22  determination of their financial aid is to be

23  discontinued, whether it's non-renewed or terminated,

24  can you explain what role you have in determining

25  whether a hearing will, in fact, be held?

UConn SJM Exhibit 49

75

1      A.      Sure.  The director of financial aid has

2  the ultimate authority to determine if a hearing will be

3  offered or not.

4      Q.      With regard to Miss Radwan's request for a

5  hearing in this case, what determination did you make

6  with regard to whether a hearing would be held?

7      A.      My decision was to deny the request for a

8  hearing.

9      Q.      And the basis for that decision was what?

10     A.      I relied on the information received from

11 compliance, that the appeal hearing request window had

12 expired one day prior to receiving the appeal.

13     Q.      But for -- just to be clear, it was your

14 decision that the hearing would not be held because it

15 was untimely requested?

16     A.      That's correct.

17     Q.      So during the -- just switching gears,

18 during the holiday season in 2014/'15, what staff, if

19 any, for the financial aid office would have been

20 working in the last week of December and first week of

21 January?

22     A.      During the holiday season, minimally we

23 were required -- the office was required to maintain at

24 least a skeleton crew.  So for -- let's say if we were

25 at 35 or 33 or 34 staff members, we probably would have

76

1    had at least 10 or 12 employees on each day of that --

2    the week between -- it's typically the week between

3    Christmas and New Year's.

4         Q.     Are those individuals accessible by phone?

5         A.     Yes.

6         Q.     During that time period are those

7    individuals accessible by e-mail?

8         A.     Yes.

9         Q.     So students can call or e-mail financial

10   aid staff during the last week of December or first week

11   of January 2014 to 2015?

12        A.     That's correct.

13        Q.     And I'm going to show you what's been

14   marked as Exhibit 7.  Attorney Klein asked you some

15   questions about this document earlier.  Do you recall

16   that?

17        A.     Yes.

18        Q.     And, again, can you identify who this

19   e-mail is from and who it's to and what the date of the

20   document is?

21        A.     Yes.  So the date is January 5th.  It's to

22   Miss Radwan from my then assistant, Suzanne Pare.  The

23   purpose was to let the student know that I was away from

24   the office and to ask if she planned to request a

25   hearing.

81

1                    C E R T I F I C A T E
2    UNITED STATES DISTRICT COURT
3    DISTRICT OF CONNECTICUT
4
5
6             I, DEBRA A. CHASSE, Court Reporter and
     Notary Public within and for the State of Connecticut,
7    duly commissioned and qualified, do hereby certify that
     pursuant to Notice, MONA LUCAS, the deponent herein, was
8    by me first duly sworn to testify the truth, the whole
     truth and nothing but the truth of her knowledge
9    touching and concerning the matters in controversy in
     this case; that she was thereupon carefully examined
10   upon her oath and her testimony reduced to writing by
     me; and that the deposition is a true record of the
11   testimony given by the witness.
12            I further certify that I am neither
     attorney or counsel for, nor related to or employed by
13   any of the parties to the action in which this
     deposition is taken, and further that I am not a
14   relative or employee of any attorney or counsel employed
     by the parties thereto or financially interested in the
15   action.
16            IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my notarial seal this /st day of
17   _____ July _____ , 2019.
18
19                              Debra A. Chasse, CSR
                                Notary Public
20                              State of Connecticut
21
     My Commission Expires:
22   June 30, 2021
     CSR No. 00055
23
24
25

Mona Lucas Depo. Ex. 7

| | |
|---|---|
| **From:** | Pare, Suzanne |
| **To:** | noriana.radwan@uconn.edu |
| **Subject:** | Request for a Financial Aid Hearing |
| **Date:** | Monday, January 05, 2015 9:39:40 AM |

Good morning Ms. Radwan,

I am writing on behalf of the Director of Financial Aid, Mona Lucas, to find out if you are going to request an appeal hearing regarding your financial aid. Dr. Lucas is away from the office and will not be able to respond to emails. If you contacted her last week, could you please forward your request to me so that our office can promptly act upon it? If you have chosen to not appeal, then please disregard this communication.

Best regards,
Suzanne

**Suzanne Pare**

Assistant to the Director
Student Financial Aid Services
University of Connecticut
233 Glenbrook Road - Unit 4116
Storrs, CT 06269-4116
(860) 486-2470 - p
(860) 486-5098- f
suzanne.pare@uconn.edu

UConn SJM Exhibit 49

**Lucas, Mona**

| | |
|---|---|
| **From:** | Lucas, Mona |
| **Sent:** | Monday, February 16, 2015 8:54 AM |
| **To:** | Purcell, Julie |
| **Subject:** | FW: Request for a Financial Aid Hearing |

**From:** Pare, Suzanne
**Sent:** Monday, February 16, 2015 8:23 AM
**To:** Lucas, Mona
**Cc:** Purcell, Julie
**Subject:** FW: Request for a Financial Aid Hearing

FYI

> **From:** Noriana Radwan [mailto:noriana.radwan@uconn.edu]
> **Sent:** Friday, February 13, 2015 5:09 PM
> **To:** Pare, Suzanne
> **Subject:** Re: Request for a Financial Aid Hearing
>
> Ms. Pare and Ms. Lucas,
>
> I received your letter of January 29th denying my appeal just yesterday at my home address. I would like to know how you calculated the "business days" from December 22nd and whether this is the absolute end of my chance of an appeal hearing. That would not be fair.
>
> Thank you.
>
> Yours sincerely,
> Noriana
>
> On Thu, Feb 12, 2015 at 2:02 PM, Pare, Suzanne <suzanne.pare@uconn.edu> wrote:
>
> Good afternoon Ms. Radwan,
>
> I am writing in response to your request for an appeal hearing. Please refer to the attached letter that was sent via US Mail to you. You may not have received the letter prior to responding to my email from January 5, 2015.
>
> Best regards,

Radwan v. UConn          Defendant's Response to RFP's 7/11/18          0001

UConn SJM Exhibit 49

**Suzanne Pare**

Assistant to the Director

Student Financial Aid Services

University of Connecticut

233 Glenbrook Road - Unit 4116

Storrs, CT 06269-4116

(860) 486-2470 - p

(860) 486-5098- f

suzanne.pare@uconn.edu

**From:** Noriana Radwan [mailto:noriana.radwan@uconn.edu]
**Sent:** Friday, February 06, 2015 7:43 PM
**To:** Pare, Suzanne
**Subject:** Re: Request for a Financial Aid Hearing

Hello Ms. Pare,

Yes, I definitely want to appeal. sent an email with letter attached to Ms. Lucas on January 14th "formally requesting a hearing." I even received an acknowledgement email from Ms. Krammer in Financial Aid the next day saying it was being processed. So, I have been waiting to hear from Ms. Lucas for a while with the date. According to the information about appealing that she sent to me with the scholarship cancellation letter, the hearing was supposed to have taken place within 15 business days, which I think was yesterday. Please let me know the hearing date well in advance so I can plan ahead. Thank you.

Sincerely yours,

Noriana

On Monday, January 5, 2015, Pare, Suzanne <suzanne.pare@uconn.edu> wrote:

Good morning Ms. Radwan,

I am writing on behalf of the Director of Financial Aid, Mona Lucas, to find out if you are going to request an appeal hearing regarding your financial aid. Dr. Lucas is away from the office and will not be able to respond to emails. If you contacted her last week, could you please forward your request to me so that our office can promptly act upon it? If you have chosen to not appeal, then please disregard this communication.

Best regards,

Suzanne

**Suzanne Pare**

Assistant to the Director

Student Financial Aid Services

University of Connecticut

233 Glenbrook Road - Unit 4116

Storrs, CT 06269-4116

(860) 486-2470 - p

(860) 486-5098- f

suzanne.pare@uconn.edu

UConn SJM Exhibit 49

Mona Lucas Depo. Ex. 11



Division of Enrollment Planning and Management
Student Financial Aid Services
*Financial Aid
*Scholarships
*Student Employment

January 29, 2015

Noriana Radwan
70 Holly Loop
Wappingers Falls, NY 12590

Dear Ms. Radwan:

This letter is sent in response to your request for a Financial Aid Committee Hearing to appeal the cancellation of your UConn Athletic Scholarship.

Your request has been denied because the request for a hearing was not submitted within 14 business days of the December 22, 2014 notification letter.

I wish you success in your future endeavors.

Regards,

Mona L. Lucas, M. Ed.
Director of Student Financial Aid Services

Cc:  Julie Purcell, Department of Athletics
233 GLENBROOK ROAD, UNIT 4116
STORRS, CT 06269-4116
PHONE 860.486.2819
FAX 860.486.6629
financialaid@uconn.edu
financialaid.uconn.edu

An Equal Opportunity Employer

UConn SJM Exhibit 49

| From: | Lucas, Mona |
|-------|-------------|
| To: | Midolo, Kimberly |
| Cc: | Beer, Dianne; Pare, Suzanne |
| Subject: | FW: Radwan, Noriana ID#2082747 |
| Date: | Friday, January 23, 2015 9:36:30 AM |
| Attachments: | 301YZ1H_01DPBX282001D53.tif |
| | 2014-2015 Athletic Grant-In-Aid Award Cancellation Letter.msg |

Kim,

Did you share a copy of appeal request with me and Suzanne during the holiday season? It looks like we are now out of compliance with the appeal process. What happened here?

Mona

**From:** Purcell, Julie
**Sent:** Friday, January 23, 2015 9:23 AM
**To:** Lucas, Mona
**Cc:** Campbell, Kimberly
**Subject:** RE: Radwan, Noriana ID#2082747

Good Morning,

Kim forwarded the attached appeal request from Noriana Radwan #2082747. Per our financial aid hearing procedures, which were provided to Noriana with her cancellation letter, she had 14 business days to appeal the cancellation. After a calculation of the days between the date of her notification letter and the date of her appeal letter, 15 business days had elapsed (excluding Christmas day and New Year's Day – both official University closings.) Our office therefore believes Noriana should be notified that her request for an appeal is denied because the opportunity to request a hearing lapsed prior to her sending the appeal letter.

Please let me know if you have any questions or would like to discuss this matter further.

Thank you (and happy Friday!) -

Julie

**From:** Campbell, Kimberly
**Sent:** Tuesday, January 20, 2015 3:47 PM
**To:** Purcell, Julie
**Subject:** Radwan, Noriana ID#2082747

Hi Julie,

I received this letter through imaging today...can you review, and let me know if she will indeed be given a hearing?

Thanks,

Kim



Mona Lucas Depo. Ex. 16

## Pare, Suzanne

| | |
|---|---|
| **From:** | Purcell, Julie |
| **Sent:** | Friday, January 23, 2015 9:47 AM |
| **To:** | Lucas, Mona |
| **Cc:** | Campbell, Kimberly; Beer, Dianne; Pare, Suzanne; Cretors, Angie; Fiorvanti, Ann |
| **Subject:** | RE: Radwan, Noriana ID#2082747 / LATE request for FA Appeal Committee Hearing |
| **Attachments:** | UConn - Financial Aid Hearing Procedures.pdf |

Hi Mona,

That is correct. Per the attached procedures, student-athletes have 14 business days from the date on the notification letter to submit a written request for a hearing. Our calculations confirmed Noriana did not submit the appeal letter until the opportunity to request a hearing lapsed- 15 business days after the notification letter.

Thank you,

Julie

_____

**From:** Lucas, Mona
**Sent:** Friday, January 23, 2015 9:39 AM
**To:** Purcell, Julie
**Cc:** Campbell, Kimberly; Beer, Dianne; Pare, Suzanne
**Subject:** RE: Radwan, Noriana ID#2082747 / LATE request for FA Appeal Committee Hearing

Hello Julie,
To make sure I understand this situation correctly, because the student notified the university of her interest in a hearing after the 15 day deadline, we are in a position to deny her request. Is this correct?

If so I will issue a denial letter as soon as time permits (today or on Monday).

**Mona L. Lucas, M.Ed.**
Director of Student Financial Aid Services
University of Connecticut
**UCONN**

_____

**From:** Purcell, Julie
**Sent:** Friday, January 23, 2015 9:23 AM
**To:** Lucas, Mona
**Cc:** Campbell, Kimberly
**Subject:** RE: Radwan, Noriana ID#2082747

Good Morning,

Kim forwarded the attached appeal request from Noriana Radwan #2082747. Per our financial aid hearing procedures, which were provided to Noriana with her cancellation letter, she had 14 business days to appeal the cancellation. After a calculation of the days between the date of her notification letter and the date of her appeal letter, 15 business days had elapsed (excluding Christmas day and New Year's Day – both official University closings.) Our office therefore believes Noriana should be notified that her request for an appeal is denied because the opportunity to request a hearing lapsed prior to her sending the appeal letter.

Please let me know if you have any questions or would like to discuss this matter further.

1

UConn SJM Exhibit 49

Mona Lucas Depo. Ex. 16

Thank you (and happy Friday!) -

Julie

**From:** Campbell, Kimberly
**Sent:** Tuesday, January 20, 2015 3:47 PM
**To:** Purcell, Julie
**Subject:** Radwan, Noriana ID#2082747

Hi Julie,

I received this letter through imaging today...can you review, and let me know if she will indeed be given a hearing?

Thanks,

Kim

2

UConn SJM Exhibit 49

```
                                             Page 1

 1

 2          UNITED STATES DISTRICT COURT

 3                    for the

 4             DISTRICT OF CONNECTICUT

 5  - - - - - - - - - - - - - - - - - - - -x

    NORIANA RADWAN,

 6

                          Plaintiff,

 7

            -against-

 8

    UNIVERSITY OF CONNECTICUT BOARD OF

 9  TRUSTEES, WARDE MANUEL, LEONARD TSANTIRIS

    and MONA LUCAS, individually and in their

10  official capacities,

11                     Defendants.

    - - - - - - - - - - - - - - - - - - - -x

12

                          101 Hofstra University

13                        Hempstead, New York

14

15                        July 16, 2018

                          1:19 p.m.

16

17

18      DEPOSITION of SIMON RIDDIOUGH, a

19  Nonparty Witness in the above-entitled

20  action, held at the above time and place,

21  taken before Christa D'Alessandro, a

22  Shorthand Reporter and Notary Public of

23  the State of New York, pursuant to the

24  Federal Rules of Civil Procedure, Subpoena

25  and stipulations between Counsel.
```

```
                                          Page 4

 1                      RIDDIOUGH
 2    S I M O N     R I D D I O U G H,
 3    a Nonparty Witness herein, having first
 4    been duly sworn by Christa D'Alessandro, a
 5    Notary Public of the State of New York,
 6    was examined and testified as follows:
 7    BY THE COURT REPORTER:
 8              THE COURT REPORTER:  Please
 9         state your name for the record.
10              THE WITNESS:  Simon Riddiough.
11              THE COURT REPORTER:  What is
12         your present business address?
13              THE WITNESS:  Room 253 PEB,
14         Hofstra University, Hempstead, New
15         York 11553.
16    EXAMINATION BY
17    MS. McGOVERN:
18         Q    Good afternoon, Mr. Riddiough.
19    We introduced ourselves before going on
20    the record.  My name is Rose McGovern.  I
21    represent the State of Connecticut,
22    University of Connecticut, and Warde
23    Manuel, Len Tsantiris, and Mona Lucas.
24    All were employees at the time of the acts
25    alleged in Ms. Radwan's lawsuit against
```

```
 1                    RIDDIOUGH
 2      A      Yeah, those are the usual
 3  conversations when talking about
 4  transferring.
 5      Q      Is there anything else that you
 6  asked him about with regard to Ms. Radwan?
 7      A      I don't believe so.
 8      Q      What did Mr. Tsantiris tell you
 9  in response to your question about her as
10  a player?
11      A      She wasn't fit to start the
12  season.  We liked her a lot prior to
13  coming to UConn.  She's a strong, powerful
14  player, great left foot, and she can play
15  attack and midfield or left wing, left
16  midfield.
17      Q      Anything else that Mr. Tsantiris
18  said about Ms. Radwan as far as how she is
19  as a player?
20      A      I don't believe so.
21      Q      What, if anything, did Mr.
22  Tsantiris tell you with regard to what Ms.
23  Radwan was like as a kid?
24      A      Everything was positive.
25      Q      Do you recall anything specific
```

```
 1                    RIDDIOUGH
 2   that he said to you with regard to Ms.
 3   Radwan as a kid?
 4        A      No.  It was -- he thinks that
 5   she made a mistake and she's remorseful,
 6   and maybe immature.
 7        Q      Can you just clarify what was
 8   meant by "he thinks that she made a
 9   mistake"?
10        A      The incident on ESPN.
11        Q      Showing her middle finger to the
12   ESPNU camera?
13        A      That's correct.
14        Q      I believe you also mentioned
15   about -- I'm not sure whether Mr.
16   Tsantiris asked this or whether you did --
17   whether Ms. Radwan would play when she
18   came to Hofstra?
19        A      Right.
20        Q      Who asked that question?
21        A      I probably asked Lenny that.
22        Q      What did he say in response?
23        A      He believed she would.  He felt
24   it was a good fit.
25        Q      Was there an occasion when you
```

```
                                          Page 72

 1                    RIDDIOUGH

 2            THE WITNESS:  Oh, I see.

 3      Q     As I stated, do you see where

 4   I'm starting?

 5      A     Yes.

 6      Q     "As I stated on your visit, we

 7   think very highly of you as a player.

 8   Your coaches at UConn spoke very highly

 9   about you as a person."

10            Do you see that?

11      A     Yes.

12      Q     Did I read that correctly?

13      A     Yes.

14            MS. MONE:  Objection.

15      Q     Can you describe what you meant

16   when you wrote here that, "Your coaches at

17   UConn also spoke very highly about you as

18   a person"?

19            MS. MONE:  Can you read that

20      question?

21            (The requested portion was

22      read.)

23      A     Is that to me?

24      Q     Yes.

25            MS. MONE:  I missed the
```

Page 73

```
 1                       RIDDIOUGH
 2      question.
 3      A       It's in relation to the previous
 4   conversation with Lenny and how he spoke
 5   highly of her as a person.  Thought she
 6   made one mistake, and she's a good kid,
 7   and, you know, he believes she learned
 8   from her lesson.
 9      Q       Is this a true and accurate copy
10   of the e-mail that you sent to Ms. Radwan?
11             MS. MONE:  Objection.
12      A       I believe so.
13      Q       Now, if you could turn to page
14   005 at the bottom where the number six
15   appears; do you see that?
16             MS. MONE:  Note for the record
17        that the page is cut off, page 005 of
18        the exhibit is cut off.
19             MS. McGOVERN:  Okay.
20      Q       I'm going to ask you questions
21   about the e-mail that has number six next
22   to it on page 005 that goes onto page 006.
23      A       Okay.
24      Q       Do you recognize this document?
25      A       It's an e-mail from me to
```

```
 1                    RIDDIOUGH

 2      A      Correct.

 3      Q      On page -- so Exhibit 3, page

 4   005, at the top of the document, the third

 5   full paragraph, I'm going to read that to

 6   you, if you could follow along.

 7             It states, "After much

 8   consideration and research, I am sure

 9   Hofstra University is the right fit for

10   me, both academically and athletically.

11   It would be an honor to play for you and

12   be part of the women's soccer program, and

13   I will not disappoint you.  I look forward

14   to immersing myself in Hofstra's spirit of

15   competition."

16             Did I read that correctly?

17      A      No.

18      Q      Where did I --

19      A      "It would be an honor to play

20   for you and be a part of the women's

21   soccer program."  You forgot the "A."  If

22   you want to be pedantic.

23      Q      That's fine.  I'll read it

24   again.

25             "After consideration and
```

```
 1                    RIDDIOUGH
 2   research, I am sure Hofstra University is
 3   the right fit for me, both academically
 4   and athletically."
 5            Did I read that correctly?
 6       A    Correct.
 7       Q    "It would be an honor to play
 8   for you and be a part of the women's
 9   soccer program, and I will not disappoint
10   you."
11       A    Correct.
12       Q    "I look forward to immersing
13   myself in Hofstra's spirit of
14   competition."
15            Did I read that correctly?
16       A    Correct.
17       Q    Then just below that paragraph,
18   this e-mail writes, in the second line of
19   that next paragraph, in the middle, "I
20   will also need to contact financial aid to
21   discuss grants/loans for costs not covered
22   by the athletic scholarship."
23            Did I read that correctly?
24       A    Correct.
25       Q    "Please let me know of the steps
```

```
                                    Page 79

 1                   RIDDIOUGH
 2   following my commitment."
 3              Did I read that correctly?
 4       A      Correct.
 5       Q      So having received this e-mail
 6   on January 7, 2015, what was your
 7   understanding with regard to Ms. Radwan's
 8   intention of transferring to Hofstra?
 9       A      It would have been that she's
10   coming to Hofstra.
11       Q      Is that a true and accurate copy
12   of this e-mail from Ms. Radwan to you?
13              MS. MONE:  Objection.
14       A      It looks like it.
15       Q      If you could turn to Exhibit 3,
16   004, the document next to the number 8.
17              MS. MONE:  Note that it's cut
18       off.  If you could put an eight on the
19       exhibit.
20              MS. McGOVERN:  I'm sorry.
21       Q      Do you recognize this document?
22       A      Yes.
23       Q      What is it?
24       A      It's an e-mail to Noriana.
25       Q      Who is it from?
```

```
                                    Page 87
 1                   RIDDIOUGH
 2   me to Noriana.
 3        Q      What is the date of this e-mail?
 4        A      Sunday January 18, 2015, 5:11
 5   p.m.
 6        Q      What is this e-mail regarding?
 7        A      Scholarship offer.
 8        Q      What is the scholarship offer?
 9        A      Thirty-five percent for spring
10   only, and then 70 percent thereafter.
11        Q      What is the 35 percent of, what
12   is the --
13        A      The offer we made was full
14   tuition and fees, which is approximately
15   70 percent, and 35 percent is the semester
16   portion, since she's only going to be here
17   for the second semester.
18        Q      So just so I understand
19   correctly, is the 70 percent of the total
20   cost of attendance -- so that was being
21   offered to Ms. Radwan?
22        A      Correct.
23        Q      And so for the spring semester,
24   she was being offered 35 percent --
25        A      Off --
```

Page 88

RIDDIOUGH

1

2      Q      -- of the total cost of

3  attendance for the spring semester?

4      A      Yes.

5      Q      Is this a true and accurate copy

6  of the e-mail?

7      A      It appears to be.

8      Q      Just above that again, Exhibit

9  3, page 008, next to what's been marked

10  14; do you see that?

11      A      Yes.

12      Q      Do you recognize this document?

13      A      It appears to be an e-mail from

14  Noriana to me.

15      Q      What is the date of this e-mail?

16      A      Sunday, January 18, 2015, 8:03

17  p.m.

18      Q      What is this regarding?

19      A      It's just a clarification of the

20  offer, basically.

21      Q      Who is seeking clarification?

22      A      Noriana.

23      Q      Is this a true and accurate copy

24  of the e-mail?

25            MS. MONE:   Objection.

```
                                          Page 96

 1                     RIDDIOUGH

 2  has already been produced -- this has

 3  already been discussed by us today in the

 4  Exhibit 3 e-mails?

 5       A      No.

 6       Q      "No," it has not?  I'm sorry.

 7              Is this e-mail a true and

 8  accurate copy?

 9              MS. MONE:  Exhibit 4, you're

10       talking about?

11              MS. McGOVERN:  Exhibit 4.

12       A      It appears to be, yes.

13       Q      Looking at Exhibit 5, do you

14  recognize this document?

15       A      This is a follow up e-mail.

16       Q      Pardon me?

17       A      It's a follow up e-mail to the

18  first document.

19       Q      So who is this from?

20       A      It's from me to Noriana.

21       Q      The date of the document?

22       A      January 5, Monday, 2015, 4:07

23  p.m.

24       Q      What is this document about?

25       A      It's about the visit and what we
```

```
 1                    RIDDIOUGH
 2   discussed in that visit.
 3       Q     Have we discussed this e-mail
 4   when we looked at the e-mails that were
 5   contained in Exhibit 3?
 6       A     No.
 7       Q     Is this a true and accurate copy
 8   of the e-mail?
 9       A     Yes.
10       Q     You brought this e-mail with you
11   today to the deposition; is that correct?
12       A     Yes.
13       Q     What did you do in determining
14   what e-mails should be brought here today,
15   aside from speaking -- the substance of
16   any conversation that you may have had
17   with your attorney?
18       A     I searched both e-mail accounts
19   I have, and these were the only two that
20   came up.
21       Q     These were the only two
22   documents that you discovered in relation
23   to Ms. Radwan --
24       A     Yes.
25       Q     -- inquiring about transferring
```

UConn SJM Exhibit 50

Page 112

1                    RIDDIOUGH

2                  CERTIFICATION

3

4        I, Christa D'Alessandro, a Notary

5   Public for and within the State of New

6   York, do hereby certify:

7            That SIMON RIDDIOUGH, the witness

8   whose testimony as herein set forth, was

9   duly sworn by me; and that the within

10  transcript is a true record of the

11  testimony given by said witness.

12           I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I am

15  in no way interested in the outcome of

16  this matter.

17           IN WITNESS WHEREOF, I have

18  hereunto set my hand this 5th day of

19  August, 2019.

20

21          *Christa D'Alessandro*

22              Christa D'Alessandro

23

24

25                    * * *

Noriana Radwan (nornor100@aim.com) To you (Bcc) + 1 more Details

Radwan (1).pdf (138 KB)

Dear Coach Riddiough,

My name is Noriana Radwan. I am a freshman at UCONN and I currently play for their Women's soccer team. Their program is not the best fit for me and I am looking to transfer as soon as possible. UCONN was a good school for my major of choice but I have since changed my major and I believe Hofstra would be a good place for me academically. I am now released and highly interested in joining your program and I am hoping that I can in the Spring of 2015. I am primarily an attacking center midfielder and I can also play outside forward. I believe I can be of value and make a positive impact to your team. I have been contacted by you prior to my commitment so I hope you remember me.

Prior to my college career, I played for Quickstrike FC in New York and I have also played for the ECNL team World Class. I have been a part of the ODP and Super-Y national pool. In high school I have been named All-Section and Poughkeepsie Journal All-Star for my region.

I would love to meet you and talk about the possibility of being a part of your team this spring. If there is anything I can do to help you decide whether I might be a good fit for your program please do not hesitate to ask. I will follow up with you soon by phone and if you have any further questions I look forward to answering them for you. Attached is my letter of release from UCONN.

Thank you very much for your time and I look forward to hearing back and contacting you via phone very soon. Happy Holidays!

Noriana Radwan
C: (845) 554-6818

UCONN Contact info:
Len Tsantiris-Head Coach:
C: (860) 208-8482
Leonidas.tsantiris@uconn.edu

Margaret Rodriguez-Assistant Coach:
C: (860) 617-5428
Margaret.rodriguez@uconn.edu



Noriana Radwan
nornor100@aim.com

Re: Hofstra U

Tue, Dec 30, 2014 2:33 pm

 (3a) →**Simon Riddiough** (Simon.Riddiough@hofstra.edu) To you Details
Sounds good. My cell is 516 606 1090. And we can chat sometime around 4 today.
Simon

Sent from my iPhone

 (3) → On Dec 30, 2014, at 11:36 AM, "Noriana Radwan" <nornor100@aim.com> wrote:

Hi Coach Simon, thank you very much for your email. I would love to talk to you for a few minutes. Can
are you available to call me anytime after 4 today? I'm participating in a charity tournament today but will
be available after 4.  My cell number is 845-554-6818.  Thank you coach.


Noriana Radwan
nornor100@aim.com


-----Original Message-----
 (2) From: Simon Riddiough <Simon.Riddiough@hofstra.edu>
To: nornor100 <nornor100@aim.com>
Sent: Tue, Dec 30, 2014 7:24 am
Subject: Hofstra U

Dear Noriana,

Me and my staff were huge fans of you in your youth days. However, we never
really got the chance to show you what Hofstra is about.

I am excited about receiving this email and would love to meet, and show you
campus. I understand time is of the essence with mid year transfers. At your
convenience reply with a few dates and times you can visit campus. I suggest
making room for 2 hours of your time.

I look forward to hearing from you.

Sincerely,

Simon

Sent from my iPhone


**Thank You**

(4) Wed, Dec 31, 2014 8:13 pm

**Noriana Radwan** (nornor100@aim.com) To you (Bcc) + 1 more Details
Hi Coach Simon,

I wanted to reach out to thank you and Coach Tobi for our meeting, the tour of the campus, and all the
information you gave me.  It was truly of a great value.  I like the environment and your soccer program.  I
sincerely believe that I can flourish, excel, and create a very positive impact on the team .   I'm fully
committed to bringing in 110% and I can't wait to show it on the pitch.

As discussed, at this point, affordability is definitely a factor for me in reaching a decision on my choice of
schools.  I look forward to hearing from you.

UConn SJM Exhibit 50

I wish you, your family, the Pride, and the entire Hofstra family a wonderful and safe new year!

Norian Radwan

**Fwd: Hofstra**
Mon, Jan 5, 2015 4:44 pm
**Simon Riddiough** (Simon.Riddiough@hofstra.edu)To:you Details

(5)

> Dear Noriana,
>
> It was great meeting with you and your Mom the other day. As I stated on your visit we think very highly of you as a player. Your coaches at Uconn also spoke very highly about you as a person.
>
> With all that said, we were very excited that you chose to give Hofstra a second chance in the recruiting trails.
>
> As mentioned in our meeting. We can offer Full Tuition and Fees for Spring 2015. We also can offer the same for 2015/2016 academic year.
>
> I appreciate your patience in allowing me the time to breakdown my scholarship budget. I sincerely hope this will be enough to entice you to choose Hofstra. I wish I could do more, but at this late time it is impossible. I also still feel Hofstra is your best option, although I am bias :)
>
> Yours in Soccer,
>
> Simon
>
> Sent from my iPhone

**Re: Hofstra :)**

Wed, Jan 7, 2015 7:37 pm

**Simon Riddiough** (Simon.Riddiough@hofstra.edu)To:you Details
Noriana,

(8) That is awesome news. Woo hoo :)

I will sit down with my compliance officer tomorrow and get the details of everything you and Hofstra need.

I will be in touch tomorrow :)

Simon

ent from my iPhone

1 Jan 7, 2015, at 7:18 PM, "Noriana Radwan" <nornor100@aim.com> wrote:

Hi Coach Simon,

I want to start off by thanking you so much for the opportunity that you have given me, and the vote of confidence. I was very pleased to have met you and Coach Tobi. My mother and I were impressed with the campus, the athletics facilities, your soccer program and you as coaches.

Your ambitions for the upcoming season are fantastic - I was swept up in the victory fever just walking grounds. You made me feel very comfortable and energized. I feel that under your leadership I will realize my fullest potential as a player. Needless to say, the trip was everything I expected it to be. It's no surprise that your school and program is so successful.

After much consideration and research, I am sure Hofstra University is the right fit for me, both academically and athletically. It would be an honor to play for you and be a part of the women's soccer program, and I will not disappoint you. I look forward to immersing myself in Hofstra's spirit of competition.



I will be applying to the school tonight or maximum tomorrow morning. I realize time is of the essence so please contact admission to be on the look-out for my application. I will also need to contact Financial Aid to discuss grants/loans for costs not covered by the athletic scholarship. Please let me know of the steps following my commitment.

Thank you again, Coach Simon, for giving me the chance to play for you. I am extremely excited. I look forward to seeing you again soon!

Sincerely,

Noriana Radwan
nornor100@aim.com

---

-----Original Message-----
From: Simon Riddiough <Simon.Riddiough@hofstra.edu>
To: nornor100 <nornor100@aim.com>
Sent: Wed, Jan 7, 2015 6:40 pm
Subject: Hofstra :)



Dear Noriana,

I understand you have a tough decision ahead. However, I wanted to explain you the positives about Hofstra.

1. Great academics.
2. We have been in 6 out of the last 10 conference finals.
3. We have been to 4 NCAAs in the last 10 years.
You will have a chance to compete for rings. As well as compete against s
f
ae best competition out there.
  It will be a new lease of life. I honestly feel after speaking with y
at
 coaching style suits your personality.
You will love all aspects of you career at Hofstra (soccer, academic
ial).
You know NYC is 30 mins away as well.

understand this is a huge decision. But after hearing your choices of
school,
I honestly feel Hofstra gives you the best of everything.

Obviously, there is some urgency to be had for your decision, but that's
purely
for application purposes. I hope to hear from you soon, and fingers crossed
it
will be a positive conversation.

Sincerely,

Simon

Sent from my iPhone

## RE: Noriana Radwan

Tue, Jan 13, 2015 12:08 pm

**Simon Riddiough** (Simon.Riddiough@hofstra.edu)To you Details
Noriana,



I will try and help out as well. The adviser is Michelle Spaterella. So expect an email today or tomorrow.

Thanks for the update,

Simon

**From:** Noriana Radwan [mailto:nornor100@aim.com]
**Sent:** Tuesday, January 13, 2015 12:08 PM
**To:** Simon Riddiough
**Subject:** Re: Noriana Radwan

Sounds good. I've been contacting compliance all day to get the NLI release. So far, no one has answered my calls, but I sent out an email just incase. I'm looking forward to hearing from the advisor soon!

Noriana Radwan
nornor100@aim.com

-----Original Message-----
From: Simon Riddiough <Simon.Riddiough@hofstra.edu>
To: Noriana Radwan <nornor100@aim.com>
Sent: Mon, Jan 12, 2015 3:28 pm
Subject: Re: Noriana Radwan

Noriana,

he basic release we have. This allows you to talk and visit and basically get recruited. The one you
sking for is a release from the NLI which is a commitment you made for a year. I'm sure Uconns
mpliance know what to do, and it will require Lenny to approve. Which I believe should not be an
sue.

Your transcript got sent over to our adviser this afternoon. I'm sure she will be reaching out to you tomorrow or Wednesday to get you registered and stuff.

Simon

Sent from my iPhone

b) On Jan 12, 2015, at 3:21 PM, "Noriana Radwan" <nornor100@aim.com> wrote:

Hi Coach,

Is this NLI release different from the NCAA one time exemption? That you said compliance is working on? Either way, I'll be sure to request it from uconn today.



Noriana

Sent from my iPhone

a) On Jan 12, 2015, at 11:06 AM, Simon Riddiough <Simon.Riddiough@hofstra.edu> wrote:

Noriana,

Please read the email below. It explains what you need to request from Uconn to make your transfer easy.

Getting closer :)

Simon

Sent from my iPhone

Begin forwarded message:

**From:** "Ariel I. Pesante" <Ariel.I.Pesante@hofstra.edu>
**Date:** January 12, 2015 at 10:41:22 AM EST
**To:** Simon Riddiough <Simon.Riddiough@hofstra.edu>, Tobias Bischof <Tobias.Bischof@hofstra.edu>, "Courtney C. Breen" <Courtney.C.Breen@hofstra.edu>
**Subject: Noriana Radwan**

Simon,

As a freshman student-athlete, not only does Noriana need a permission to contact letter, she also needs a complete NLI release. She needs to request the NLI release from UCONN. This is very important so let's have her complete this task sooner rather than later.

AP

--

### Ariel Pesante
Associate Director of Athletics/NCAA Education & Compliance Services
230 Hofstra University | Physical Education Center | Hempstead, NY 11549
**Office:** 516.463.6703 | **E-mail:** Ariel.Pesante@Hofstra.edu
**Website:** www.GoHofstra.com | **Social Media:** Twitter@HofstraPride

In its highest sense, leadership is integrity. This command by conscience asserts itself more by commitment and example than by directive."



<image002.jpg>

**Re: Scholarship Letter**
Sun, Jan 18, 2015 8:03 pm
Noriana Radwan (nornor100@aim.com)To:Simon.Riddiough Details

Hi Coach,

Thank you very much for your letter. I would just like to understand something please:

- Full year tuition and fees at Hofstra is 38,900
- Room is 8,000 and board is 4,460
- Thus the total cost per year of attending the school is 51,360
- 70% of 51,360 is approximately 36,000

Therefore the scholarship money of 36,000 does not cover the the tuition and fees of 38,900. What am I missing? I appreciate you explaining it to me for I just want to understand the total costs fully as you know I will have to borrow the difference.

Michelle also reached out to me so I am currently in contact with her about classes. As for housing, I believe there's an option of living in a suite in colonial square with a common room and without a common room, with a price difference of course. What are my options for room since I want to be placed with other athletes, preferably our team if it is available? I assume I will go where there is an opening....If there is someone I can talk to that handles this information let me know. Thanks for everything!

Noriana Radwan
nornor100@aim.com

-----Original Message-----
From: Simon Riddiough <Simon.Riddiough@hofstra.edu>
To: Noriana Radwan (nornor100@aim.com) <nornor100@aim.com>
Sent: Sun, Jan 18, 2015 5:11 pm
Subject: Scholarship Letter

Noriana,

Attached is the Scholarship letter.

Brief explanation.

35% of a Full Grant-in-aid is for the Spring only. This equates to a Full tuition and Fees scholarship, for the year.

Come the Fall you will then sign a new scholarship (AGIA). This will have 70% Full Grant-in-aid.

It says 35% because it's for only half a year, hope this makes sense. If you have any other questions fee free to call me.

Almost there J



**Re: Scholarship Letter**
Sun, Jan 18, 2015 8:11 pm
Simon Riddiough (Simon.Riddiough@hofstra.edu)To:you Details
Noriana,



Your maths is actually correct. I do not know what you are missing. I have never actually broken it down. I was told and believe that tuition and fees covers 70% of the costs. I will double check on Tuesday.

As for room. I would choose room without a lounge. That is where 90% of athletes live.

Before you sign and return the letter, I suggest that you wait until I get clarification. Make sense?

Getting closer :)

Simon
Sent from my iPhone

On Jan 18, 2015, at 8:03 PM, "Noriana Radwan" <nornor100@aim.com> wrote:
Hi Coach,

Thank you very much for your letter.  I would just like to understand something please:

*duplicate*
- Full year tuition and fees at Hofstra is 38,900
- Room is 8,000 and board is 4,460
- Thus the total cost per year of attending the school is 51,360
- 70% of 51,360 is approximately 36,000

Therefore the scholarship money of 36,000 does not cover the the tuition and fees of 38,900. What am I missing? I appreciate you explaining it to me for I just want to understand the total costs fully as you know I will have to borrow the difference.

Michelle also reached out to me so I am currently in contact with her about classes.  As for housing, I believe there's an option of living in a suite in colonial square with a common room and without a common room, with a price difference of course.  What are my options for room since I want to be placed with other athletes, preferably our team if it is available? I assume I will go where there is an opening....If there is someone I can talk to that handles this information let me know. Thanks for everything!
Noriana Radwan
nornor100@aim.com

---

## Re: Scholarship

Thu, Jan 22, 2015 1:00 pm

Noriana Radwan (nornor100@aim.com)To Simon.Riddiough Details

nal_scholarship_letter.PDF (1.0 MB)
ge_1_scholarship_letter.PDF (1.0 MB)

Coach,





It's all done. Thanks for making the changes to it! Can't wait!

Noriana Radwan
nornor100@aim.com

-----Original Message-----
From: Simon Riddiough <Simon.Riddiough@hofstra.edu>
To: Noriana Radwan (nornor100@aim.com) <nornor100@aim.com>
Sent: Wed, Jan 21, 2015 1:25 pm
Subject: Scholarship

Noriana,



Attached you will find the new scholarship letter.  Please make sure you initiail the first page and sign the second page and fax/scan it back.

Thanks,

Simon



DEFENDANT'S EXHIBIT

5

CAD 7/16/19

## Hofstra

From: Simon Riddiough (sime21@yahoo.com)

To: nornor100@aim.com

Date: Monday, January 5, 2015 04:07 PM EST

Dear Noriana,

It was great meeting with you and your Mom the other day. As I stated on your visit we think very highly of you as a player. Your coaches at Uconn also spoke very highly about you as a person.

With all that said, we were very excited that you chose to give Hofstra a second chance in the recruiting trails.

As mentioned in our meeting. We can offer Full Tuition and Fees for Spring 2015. We also can offer the same for 2015/2016 academic year.

I appreciate your patience in allowing me the time to breakdown my scholarship budget. I sincerely hope this will be enough to entice you to choose Hofstra. I wish I could do more, but at this late time it is impossible. I also still feel Hofstra is your best option, although I am bias :)

Yours in Soccer,

Simon

Sent from my iPhone

1

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3   * * * * * * * * * * * * * * * *  *
                                      *
 4   NORIANA RADWAN,                  *
                                      *
 5           Plaintiff               *
                                      *
 6       VS.                          *
                                      * Civil Action No.
 7   UNIVERSITY OF CONNECTICUT BOARD  *
     OF TRUSTEES, WARDE MANUEL,       * 3:16-cv-02091 (VAB)
 8   LEONARD TSANTIRIS, and MONA      *
     LUCAS, individually,             *
 9                                    *
             Defendants               *
10                                    *
     * * * * * * * * * * * * * * *  *
11                                     Hartford, CT
                                       July 11, 2019
12                                     2:09 p.m.
                     - - -
13           DEPOSITION OF CATHERINE COCKS
                     - - -
14   APPEARANCES:
15       FOR THE PLAINTIFF:
16           LAW OFFICE OF JONATHAN J. KLEIN
             BY:  JONATHAN J. KLEIN, ESQUIRE
17                60 Lyon Terrace
                  Bridgeport, CT 06604
18                Phone:  (203) 330-1900
                  Fax:  (203) 330-1526
19                E-mail:  Jjkesq@hotmail.com
20                   -AND-
21           LAW OFFICES OF GREGORY J. TARONE
             BY:  GREGORY J. TARONE, ESQUIRE
22                5020 Route 9W, Suite 104
                  Newburgh, NY 12550
23                Phone:  (845) 527-5424
                  Fax:  (845) 563-0461
24                E-mail:  Greg@traoneesq.com
25                   -CONT'D -
```

4

1                    (Whereupon, the Notice of Deposition

2    was marked Plaintiff's Exhibit 1 and the Subpoena was

3    marked Plaintiff's Exhibit 2 for Identification.)

4                    THE COURT REPORTER:  Attorney

5    McGovern, will you be ordering a transcript?

6                    MS. McGOVERN:  Yes, I will.

7                    MR. KLEIN:  Usual stips, and read

8    and sign?

9                    MS. McGOVERN:  Read and sign.

10   Thereupon:

11        CATHERINE COCKS, residing at 105 Maple

12   Avenue, Unit 1, Vernon, Connecticut, being first duly

13   sworn, as hereinafter certified, was examined and

14   testified as follows:

15   DIRECT EXAMINATION BY MR. KLEIN:

16        Q.    Good afternoon, Miss Cocks.  I'm the

17   attorney representing Noriana Radwan in this lawsuit

18   that she has pending against the University of

19   Connecticut, Warde Manuel, Len Tsantiris, and Mona

20   Lucas.  Let me do a little background information.

21             The purpose of the deposition is a routine

22   discovery mechanism in civil lawsuits.  I ask the

23   questions, you give the answers.  If you don't

24   understand a question that I've asked you, please tell

25   me and I'll be happy to try to rephrase it so that you

9

1    director of residence education, which oversaw the RA

2    program in the student conduct matters in residential

3    life.  From January of 2005 until December of 2018, I

4    was the director of community standards.

5        Q.    And in December of 2018 did you retire?

6        A.    No.

7        Q.    Okay.  What were the circumstances under

8    which you left UConn?

9        A.    I was forced to resign.

10       Q.    Okay.

11       A.    And I'm now a hiring consultant.

12       Q.    Tell me about the circumstances under

13   which you were forced to resign.

14       A.    Sure.  I was told by the institution that

15   I was curt and abrupt and that there were concerns from

16   my staff, and I was told on December 28th that I could

17   either resign or be terminated.

18       Q.    After 14 years?

19       A.    Actually, after 20 years.

20       Q.    Does the fact that you left UConn under

21   those circumstances, is that going to color your

22   deposition testimony here in any way?

23       A.    No.  My personal integrity is more

24   important than my feelings towards the University of

25   Connecticut.

11

1        A.      Yes.

2        Q.      Going back for a moment to your

3   resignation from UConn, who was it who gave you the

4   choice to resign or be terminated?

5        A.      It was in a meeting with Christopher

6   Delello.  I'm not sure what his title is.  I believe

7   he's the director of human resources, or something like

8   that.  Elly Daugherty, associate vice president of

9   student affairs, and Michael Gilbert, the vice president

10  of student affairs.

11       Q.      Would I be correct in assuming that that

12  situation had absolutely nothing to do with this case?

13       A.      That is correct.

14       Q.      As far as this case is concerned, when did

15  you first become aware of the existence of this lawsuit?

16       A.      I became aware of the existence of this

17  lawsuit shortly after it was filed and it was in the

18  news.  I had read about it in, I believe, The Hartford

19  Courant.

20       Q.      Did anyone within UConn discuss it with

21  you when -- around the time that it was commenced?

22       A.      I don't remember.  There was an FOI

23  request at some point.

24       Q.      And that came across your desk?

25       A.      Yes.

12

1      Q.      So you were involved with gathering

2  documents to respond to that request?

3      A.      I was -- a request was made of me by Paul

4  McCarthy, who was managing those at that time, and he

5  produced the Excel sheet, which I believe you have a

6  copy of.

7      Q.      Is that the Excel sheet that lists student

8  athletes who faced disciplinary actions of various

9  kinds?

10      A.      Yes, it does, for actions related to the

11  student code.

12      Q.      Did you create that document?

13      A.      That is a document that's produced --

14  sorry.  Excuse me.  That actual document, I believe I

15  printed that out.

16      Q.      So it's not a document that was created --

17  withdrawn.

18              Was that document created for the purpose

19  of responding to the Freedom of Information Act request,

20  or was it something that was in the record of UConn?

21      A.      It's something in the records of UConn.

22  We have a database system that there is an automatic

23  report that holds any student conduct matter that falls

24  under the student code that it automatically generates

25  that, so what I would have done is generated that

14

1     Q.      And it does not appear that you were CC'd

2 on this letter; is that correct?

3     A.      That is correct.

4     Q.      Take a moment to read through it.  It's

5 only two paragraphs long.

6     A.      (Witness complies.)

7     Q.      Have you ever been involved with cases in

8 which a student athlete's grant-in-aid was canceled?

9     A.      I'm going to ask a little bit of a

10 question.  Can I do that?

11     Q.      Sure.

12     A.      Are you asking if I had been part of the

13 process in terms of the grant-in-aid, or are you asking

14 me if I ever managed a student conduct code case that

15 may have resulted in?

16     Q.      Actually, both.

17     A.      The first question, have I ever been part

18 of this process in terms of athletics, no.  That's not

19 part of my role.

20          The second part is I don't know.  I have

21 managed students who are athletes who may have violated

22 the student code but have not been -- but what those

23 consequences were out of athletics is not something that

24 I was part of.  So I don't know if that helps.

25     Q.      When you say managed student athletes, in

15

1    that context what do you mean by managed?

2        A.    If a student potentially violates the

3    student code, that would typically go through my office.

4    If it was a resident hall case, it would go to

5    residential life.  It all ultimately falls under the

6    umbrella of community standards.

7            Again, if a student violates one of the

8    provisions of the code, or allegedly violates one of the

9    provisions of the code, we would address that.  We would

10   manage that from the time that we received the referral

11   to the resolution of that.

12           Now, whether or not the student athlete or

13   someone else, as an example, a resident assistant,

14   whatever may happen because of their role was not

15   something that would occur from my office.

16       Q.    When you talk about, again, managing the

17   process, when an allegation would come to your attention

18   of some sort of student misconduct or violation of the

19   student code, can you explain, what are the steps along

20   the way of what the community standards office does when

21   they receive that kind of information?

22       A.    Sure.  We receive information that

23   someone's alleging that, again, a provision of student

24   code was violated.  If it's a resident hall situation

25   that is accurate would result -- that could result in a

21

1          Do I understand from your answer correctly

2     that during your tenure as the director of community

3     standards, the athletics department never referred an

4     unsportsmanlike conduct or athletics related misconduct

5     incident to your office for this disciplinary process?

6          A.     Correct.   The code is about students.

7     There are pieces -- there are students that may have

8     multiple roles at an institution.   This is purely about

9     students, so we -- that would not have been an

10    expectation of mine, that I would receive those.

11         Q.     Student athletes are students; right?

12         A.     Not for a misconduct that happened on a

13    field.   I'll give you sort of an example.   Outside of

14    that, many of our students have jobs.   So if they work

15    in the dining hall and the dining hall has policies and

16    procedures in place that you can't -- you can't be late

17    to work or that it's -- they consider it misconduct if

18    they had two apples instead of one apple.   That would

19    not fall under the student code because that's a

20    provision that has to do with their role as a student

21    employee.

22         If that student employee steals an apple,

23    then it's going to fall under the student code because

24    no student can steal a piece of fruit.   So if a student

25    athlete were to behave in that way that that behavior

22

1   was prohibited by all students, then it would fall under

2   the student code.

3        Q.        Describe for me, please, the scope of your

4   duties as the director of community standards at UConn.

5        A.        I was responsible for managing the student

6   conduct process as related to the community life student

7   code for the institution, the main campus of three

8   campuses; the law school, its graduate programs.  I did

9   not have responsibility for the medical school.  That

10  included addressing alleged violations of the student

11  code, working with students on behavior issues, whether

12  or not they -- sometimes they were violations of the

13  student code.  Sometimes if you had a student who was

14  just struggling, we might work with them.

15              I was a chair of the student threat

16  assessment team.  I was responsible for the sanctioning

17  that came under the student conduct process.  So, again,

18  when a student did violate the student code, what our

19  response was in any programs or initiatives that would

20  fall under that.  I was responsible for updating the

21  policies around the student code.  I had

22  responsibilities under Clery -- under the Clery Act in

23  terms of providing the statistical data.  I had

24  responsibilities under Title 9.  My office managed the

25  investigation of sexual misconduct cases when the

23

1    respondent was a student.  And I'm trying to think what

2    else I had to do at the time.  But pretty much my role

3    was to manage behavioral for students when it comes

4    under the student code.  So ultimately my job started

5    with the responsibility of community life student code,

6    and if it fell under there, all those other things came

7    up.

8         Q.      Would it be fair to say you were the

9    university's regular student disciplinary authority?

10        A.      Yes.

11        Q.      You mentioned Title 9, and I think if I

12   understood you correctly, you mentioned it in the

13   context of sexual misconduct.

14        A.      Mm-hmm.

15        Q.      Did you ever deal with any Title 9

16   questions or issues as it relates to treatment by the

17   university of female student athletes, as compared with

18   male student athletes?

19        A.      No.

20        Q.      Are you familiar with the NCAA Division 1

21   manual?

22        A.      Yes.

23        Q.      In what context are you familiar with it?

24        A.      Many years ago when Pat Babcock worked in

25   athletics, she would send me a copy of the manual as

42

```
 1                    C E R T I F I C A T E
 2    UNITED STATES DISTRICT COURT
 3    DISTRICT OF CONNECTICUT
 4
 5
 6              I, DEBRA A. CHASSE, Court Reporter and
      Notary Public within and for the State of Connecticut,
 7    duly commissioned and qualified, do hereby certify that
      pursuant to Notice, CATHERINE COCKS, the deponent
 8    herein, was by me first duly sworn to testify the truth,
      the whole truth and nothing but the truth of her
 9    knowledge touching and concerning the matters in
      controversy in this case; that she was thereupon
10    carefully examined upon her oath and her testimony
      reduced to writing by me; and that the deposition is a
11    true record of the testimony given by the witness.
12              I further certify that I am neither
      attorney or counsel for, nor related to or employed by
13    any of the parties to the action in which this
      deposition is taken, and further that I am not a
14    relative or employee of any attorney or counsel employed
      by the parties thereto or financially interested in the
15    action.
16              IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my notarial seal this 24th day of
17    _____JJlY_____, 2019.
18
19                                    Debra A. Chasse, CSR
                                      Notary Public
20                                    State of Connecticut
21
      My Commission Expires:
22    June 30, 2021
      CSR No. 00055
23
24
25
```

UConn SJM Exhibit 51

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
NORIANA RADWAN,                    :
                                   :          Case No: 3:16-CV-02901
                    Plaintiff      :
                                   :
        against                    :          CERTIFICATION OF BUSINESS
                                   :          RECORDS AFFIDAVIT
UNIVERSITY OF CONNECTICUT BOARD    :
OF TRUSTEES ET AL.                 :
                    Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STATE OF NEW YORK    )
COUNTY OF NASSAU     )

        JESSICA EADS, being duly sworn, deposes and says:

1.      I am employed by Hofstra University as the Vice President for Enrollment Management

and Dean of Admission, and, as such, am qualified to make the certification set forth hereinafter.

2.      To the best of my knowledge, after reasonable inquiry, I certify that copies of the

documents attached to this certification are true and accurate copies of the original documents.

3.      The records or copies produced were made by the personnel or staff of the University, or

persons acting under their control, in the course of regularly conducted activity for the

University, at the time of the act, transaction, occurrence or event recorded therein, or within a

reasonable time thereafter, and it was the regular practice of that activity to make such records.

_____
                                        Jessica Eads

Sworn to and subscribed
on this _9_ day of _July_ 2019

_____
Notary Public

                    MARIE DIAMOND
            Notary Public, State of New York
                    No. 4892879
HU Doc # 13217      Qualified In Nassau County
            Commission Expires _5-4-23_

# HOFSTRA UNIVERSITY  - TRANSFER .EDU APPLICATION

## About You

| | |
|---|---|
| First Name | Noriana |
| Middle Name | |
| Last Name/Surname | Radwan |

| | |
|---|---|
| Gender | [] Male   [X] Female |
| Date of Birth | ▓▓▓▓▓▓▓▓ |
| Social Security Number | ▓▓▓▓▓▓▓ |

| | |
|---|---|
| Home Phone | (845)938-5384 |
| Cell Phone | (845)554-6818 |

[X]  I give permission to Hofstra University to send me important updates via text messaging. (Standard messaging charges apply.)

| | |
|---|---|
| Permanent Address 1 | 70 Holly Loop |
| City | Wappinger Falls |
| State/Province (if applicable) | New York |
| ZIP/Postal Code (required if used) | 12590 |
| Country | United States |

| | |
|---|---|
| Email Address | nornor100@aim.com |

## Type of Applicant

[X]  Transfer First-Year (Student who is attending or has attended a college/university with fewer than 24 credits earned at the time of application.)
[]   Transfer (Student who is attending or has attended a college/university with 24 or more credits earned at the time of application.)
Are you transferring from a two-year or four-year college/university?
[]   Two-year
[X]  Four-year
[]   Re-admit (previously attended Hofstra and received grades)

| | | |
|---|---|---|
| Have you applied to Hofstra before? | [] Yes | [X] No |
| Do you or will you have an associate's degree prior to enrolling at Hofstra? | [] Yes | [X] No |
| Are you applying for admission to a second bachelor's degree program? | [] Yes | [X] No |

If you are not currently in attendance at a college/university, describe your activities since your last school attendance.

## Enrollment Plans

Semester of Entry
[X]  Spring 2015 - Classes start January 2015
[]   Fall 2015 - Classes start September 2015

| | | |
|---|---|---|
| Do you plan to attend full-time or part-time? | [X] Full-time | [] Part-time |

## Citizenship

UConn SJM Exhibit 52

001

[X]  United States Citizen
[]   Non-Resident Alien
[]   Permanent U.S. Resident/Green Card Holder
[]   Other

**Is English your native language?**                                      [X]  Yes          []   No

## Optional Information

Are you of Hispanic or Latino descent? (A []  Yes            [X]  No
person of Cuban, Mexican, Puerto Rican,
South or Central American or other
Spanish culture or origin, regardless of
race.)
[]   American Indian or Alaska Native
[]   Asian
[]   Black or African American
[]   Native Hawaiian or Other Pacific Islander
[X]  White

| | |
|---|---|
| Religious Preference | Islam |
| Please indicate your U.S. military service status (if applicable). | |
| Service Start Date | / |
| Service End Date | / |

## High School

| | |
|---|---|
| Name | Beacon High School(Ceeb :330360) |
| Address | 101 Matteawan Rd |
| City | Beacon |
| State/Province | NY |
| ZIP/Postal Code | 12508-1571 |
| Country | US |
| Month and year of graduation from secondary school/high school: | 06/2014 |

[]   Please check here if you would like to provide GED information.

## GPA & Class Rank

| | |
|---|---|
| Cumulative GPA | 3.74 |
| Is this GPA weighted? | []   Yes          [X]  No |
| GPA Scale | 4.0 |
| Class Rank | 32 |
| Graduating Class Size | 287 |

## Test Scores (Optional)

**Submitting standardized test scores to Hofstra is optional.** If you choose to submit scores from the SAT or the ACT, official test scores must be sent directly from the testing service.

Please select one of the options below:

[X]  I would like my SAT/ACT scores to be considered as part of my application.
[]   I do not want my SAT/ACT scores to be considered as part of my application.

Please indicate if you have taken, or plan to take, any of the following tests:

[X]  SAT

Please share the dates you have taken, or will take, the SAT.

SAT Test #1-Date                01/2013

SAT Test #2-Date                05/2013

SAT Test #3-Date                /

Please share the highest individual SAT scores you have earned so far, even if those scores are from different test dates.

SAT Math Score                  590
SAT Critical Reading Score      590
SAT Writing Score               540

[]   ACT

Please share the dates you have taken, or will take, the ACT.

ACT Test #1-Date                /

ACT Test #2-Date                /

ACT Test #3-Date                /

Please share the highest individual ACT scores you have earned so far, even if those scores are from different test dates.

ACT Composite Score
ACT Reading Score
ACT Science Score
ACT English Score
ACT Math Score
ACT Writing Score

[]   AP (Advanced Placement)

AP Test #1-Subject
AP Test #1-Date                 /
AP Test #1-Score

[]   IB (International Baccalaureate)

UCo  n SJM Ex

003

| | |
|---|---|
| IB Test #1-Subject | |
| IB Test #1-Date | / |
| IB Test #1-Score | |

Have you taken, or do you plan to take, a CLEP exam?   [] Yes      [X] No

| | |
|---|---|
| CLEP Test #1-Subject | |
| CLEP Test #1-Date | / |

## College/University

| | |
|---|---|
| Name | Univ Connecticut(Ceeb :003915) |
| Address | |
| City | Storrs |
| State/Province | CT |
| ZIP/Postal Code | |
| Country | US |
| Date Attended (from) | 08/2014 |
| Date Attended (to) | 12/2014 |
| Credits Earned | 14 |

## Parent 1

| | |
|---|---|
| First Name | Amani |
| Last Name/Surname | Hassan |
| Parent 1 Relationship | Mother |
| Is Parent 1 still living? | [X] Yes      [] No |

Is Parent 1's address different from yours?      [] Yes      [X] No

| | |
|---|---|
| Occupation | Accountant |
| Employer | IBM |
| Work Phone Number | (845)433-4844 |
| Email Address | annhass22@gmail.com |
| Highest Degree Obtained | Bachelor's |

| | |
|---|---|
| Name | Cuny Baruch College(Ceeb :002034) |
| Address | |
| City | New York |
| State/Province | NY |
| ZIP/Postal Code | |
| Country | US |

## Parent 2

| | |
|---|---|
| First Name | Khaled |
| Last Name/Surname | Radwan |
| Parent 2 Relationship | Father |
| Is Parent 2 still living? | [X] Yes      [] No |

UCo n SJM Ex

004

Is Parent 2's address **different** from yours?                    [] Yes            [X] No

| | |
|---|---|
| Occupation | Construction Manager |
| Employer | FCS Modular |
| Work Phone Number | (845)489-0099 |
| Email Address | coachrod111@yahoo.com |
| Highest Degree Obtained | Some College |

| | |
|---|---|
| Name | |
| Address | |
| City | |
| State/Province | |
| ZIP/Postal Code | |
| Country | |

## Legal Guardian (if applicable)

| | |
|---|---|
| First Name | |
| Last Name | |
| Email Address | |

## Your Family

With whom do you make your permanent home?
[X]  Both Parents
[]  Father
[]  Mother
[]  Legal Guardian
[]  Self
[]  Ward of the State/Court
[]  Other

| | |
|---|---|
| To whom should we send communications? | Mother |
| Parents' Marital Status (relative to each other) | Married |

## Your Family & Hofstra

Are any immediate family members graduates of, or students at, Hofstra?        [] Yes        [X] No

Are you a Hofstra University employee or the legal dependent of a Hofstra University employee?        [] Yes        [X] No

## Academic Interests

Please indicate your area of academic interest or intended major. A selection is not binding.

| | |
|---|---|
| Academic Interest or Intended Major | Health Science |

UCo  n SJM Ex

## Academic Programs

Please indicate if you are interested in any of the following options:

**Special Enrollment Options**

[] Hofstra University Honors College (HUHC)

**Hofstra University Honors College (HUHC),** serves transfer students who perform at the highest academic levels in any undergraduate program or major. The HUHC curriculum is designed to provide a wide-ranging and multidisciplinary intellectual experience while fostering a sense of community and identity among the cohort of students who share the HUHC experience. Transfer students who have earned a 3.5 GPA or higher with 24 or more credits earned are invited into HUHC upon admission. Students who have earned honors credits at a previous institution may apply them toward completion of the Honors College Recognition designation.

**Pre-Advisement Options**

The Center for University Advisement provides pre-professional advisement for students contemplating graduate studies in either law or health-related professions such as:

[] Pre-Chiropractic
[] Pre-Dental
[] Pre-Law
[] Pre-Medical
[] Pre-Optometry
[] Pre-Osteopathy
[X] Pre-Physical Therapy
[] Pre-Physician Assistant
[] Pre-Podiatry
[] Pre-Veterinary

## School and Community Activities

List school and community extracurricular activities that have been important to you.

| | |
|---|---|
| Activity | Women's soccer |
| Offices Held/Honors Earned | University of Connecticut Women's soccer team |
| Hours per Week | 10 |

| | |
|---|---|
| Activity 2 | Student Council |
| Offices Held/Honors Earned | Secretary |
| Hours per Week | 2 |

| | |
|---|---|
| Activity 3 | National Honor Society |
| Hours per Week | 2 |

## Academic Honors and Awards

List any academic honors and awards you have received (e.g., National Merit Scholarship, National Honor Society, etc.).

| | |
|---|---|
| Academic Honor/Award | High Honor Roll |

Academic Honor/Award 2        National Honor Society

## Employment Experience

Beginning with the most recent, list work experiences including internships.

| | |
|---|---|
| Position | Server |
| Employer | Lucky's Restaurant |
| Date (from) | 10/2013 |
| Date (to) | 03/2014 |
| Hours per Week | 15 |

| | |
|---|---|
| Position 2 | Operations Employee |
| Employer | Splashdown Beach Waterpark |
| Date (from) | 05/2013 |
| Date (to) | 09/2013 |
| Hours per Week | 30 |

| | |
|---|---|
| Position 3 | Janitor |
| Employer | Splashdown Beach Waterpark |
| Date (from) | 05/2012 |
| Date (to) | 09/2012 |
| Hours per Week | 25 |

## Interests

Hofstra University has over 200 clubs and organizations. Please check any of the following activities and interests in which you may wish to participate at Hofstra:

**Clubs/Organizations/Sports**

**Special Interests**

[X] NCAA Division I Athletics

## Other Colleges/Universities

To what other colleges/universities are you applying?

Name

Address

UCo n SJM Ex

City _____

State/Province _____

ZIP/Postal Code _____

Country _____

## Personal

Are you planning to apply for financial assistance?                    [X] Yes          [] No

Do you plan to live on campus?                    [X] Yes          [] No          [] Haven't Decided

Why are you currently applying to Hofstra?

I am highly interested in their academic programs and all Hofstra has to offer.  I plan on earning a degree in Health Sciences and ultimately earning my doctorate degree in Physical Therapy during my graduate years.  I am also planning on becoming a member of the women's soccer team.

Have you ever been adjudicated guilty or convicted of a misdemeanor, felony or other crime? (Note that you    [] Yes          [X] No
are not required to answer "yes" to this question, or provide an explanation, if the criminal adjudication or
conviction has been expunged, sealed, annulled, pardoned, destroyed, erased, impounded or otherwise
ordered by a court to be kept confidential.)

Please explain.

Have you ever been found responsible for a disciplinary violation at any educational institution you have    [] Yes          [X] No
attended from 9th grade (or the international equivalent) forward, whether related to academic misconduct or
behavioral misconduct, that resulted in your probation, suspension, removal, dismissal or expulsion from the
institution?

Please explain.

## You're Almost Done!

**After you hit the Submit Application button below, you will be able to ...**

- Print this packet and save it for your records.
- Ask the appropriate school officials to submit your official transcripts.
- Make sure Hofstra receives your test scores, if you chose to submit them.

## Pay Your $60 Application Fee

In order to submit your application, you must first pay the nonrefundable $60 application fee. Please use the PayPal link below to submit your application fee payment.

Paying your application fee will NOT automatically submit your application.

When you click "Pay Online Now" below, you will be taken to the PayPal website and away from this application. **You must return to your application after your payment is made and click "Submit Application," or your application will not be processed.**

How would you like to pay your application fee?

[X]   I will pay the fee online.

[]   I have a fee waiver.

Your fee must be paid now in order to
submit your application.                    996696272

## Your Fee has been received. Thank you.

## Submit Application

UCo n SJM Ex

008

[X] Checking here indicates that the information in my application is complete, factually correct and honestly presented. I grant the appropriate school official permission to release my transcripts to Hofstra University.

## Signature

| | |
|---|---|
| Student Name | Noriana Radwan |
| Date Completed | 2015-01-08 10:17:28.803 |

UCo n SJM Ex

009

personal_statement_pdf

I breathe in the familiar scent of the field.   I gaze at the perfect rectangle, with two large goals sitting on opposite ends of each other.  Without flowers and any other wildlife, it is beautiful in its own way.   I don't think there is anywhere in the world where I could feel more content than on a soccer field. Soccer has always been the one constant in my life.  While people grow older, and things change, soccer manages to stay the same.  Even after all these years, I still feel the familiar rush of adrenaline and excitement before a game.  No matter what problem I have, soccer is my refuge and my escape.  In school, we are always taught to act and behave a certain way.  We are focused on becoming the person society expects us to be.  At home, we are tamed and respectful.  When I play soccer, however, I am finally able to be myself.  I feel freedom surround me.

The soccer field is my "home away from home." There is nowhere I would rather be when I need a release.  An empty field is incredibly peaceful and quiet.  Without the fans cheering from the sidelines, the other 21 players all shouting commands and a referee blowing his shrill whistle, the soccer field takes on this tranquil silence.  I am comfortable sitting in the middle of field, basking in its glory.

I suppose the reason I love being there so much is also because of the memories that were made on a soccer field.  On a soccer field is also where I have scored goals and won championships.  I remember taking a free kick from the middle of the field and sending the ball sailing effortlessly into the goal.   On a soccer field is where I met my best friend, Nicole.  I remember when we met, both of us nervous little ten year-olds at travel soccer tryouts.  As we had countless games and practices together, our relationship bonded into something like sisterhood. There, I learned to treat my teammates as family.  I learned to be cooperative and patient.  It was the best place for me to learn to take a leadership role as I slowly worked my way up as a captain of my team.

Though overwhelmingly positive, some of my soccer experiences were frightening.  My sophomore year I tore my ACL while playing a game.  After recovery, I feared stepping back on the field, plagued with the painful memories that almost destroyed my soccer career.  I thought I had faced failure.  It took time before I was able to step back on the field and finally be in my element again.  It is because of these memories that I am actually able to call the soccer field my home.  Through the triumphs and hardship, I learned to love and appreciate every moment I spent on the field.

I take in the beauty of the field as I stare into the distance.  I smell the freshly-cut grass and relish the feeling of having the sun on my back.  I grab a ball and sprint off towards the goal.  I am home.

UCo n SJM Ex

# DUTCHESS
## COMMUNITY COLLEGE

202169257

**Issued To:**

Hofstra University
100 Hofstra University
Hempstead, NY 11549-1000

**ID:** A00231775

Noriana Radwan

70 Holly Loop
Wappingers Falls, NY 12590-7508

Date of Birth: ▮▮▮▮

Level: Credit

Date Issued: 08-JAN-2015    1        Page:

Course Level: Credit

Current Program
Undeclared:
    Program : Undeclared/Undecided

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS R |
|------|-----|--------------|------|-----|-------|

**INSTITUTION CREDIT:**

**Fall 2012**
MAT 118  ELEMENTARY STATISTICS  3.00 A  12.00
      Ehrs:  3.00  GPA-Hrs: 3.00  QPts: 12.00  GPA:  4.00

**Fall 2013**
ENG 101  COMPOSITION 2  3.00 A  12.00
GOV 121  AMERICAN NATIONAL EXPERIENCE  3.00 B+  9.99
PSY 112  PSYCHOLOGICAL PRINCIPLES  3.00 B+  9.99
      Ehrs:  9.00  GPA-Hrs: 9.00  QPts: 31.98  GPA:  3.55

**Spring 2014**
ECO 105  ECONOMIC ISSUES  3.00 B  9.00
ENG 102  COMPOSITION II  3.00 A  11.01
PSY 112  PSYCHOLOGICAL PRINCIPLES II  3.00 B  9.00
      Ehrs:  9.00  GPA-Hrs: 9.00  QPts: 29.01  GPA:  3.22



********** TRANSCRIPT TOTALS **********
|  | Earned Hrs | GPA Hrs | Points | GPA |
|--|-----------|---------|--------|-----|
| TOTAL INSTITUTION | 21.00 | 21.00 | 72.99 | 3.48 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 21.00 | 21.00 | 72.99 | 3.48 |

********** END OF TRANSCRIPT **********



**OFFICIAL TRANSCRIPT**
Valid with multicolor seal.

OFFICIAL TRANSCRIPT FOR YOUR EXCLUSIVE USE
Not to be given to the student or
a third party under any circumstances.

ASSOCIATE REGISTRAR

A RAISED SEAL IS NOT REQUIRED.



## LEGEND

### HONORS COURSES

(Honor) in the course title identifies an honors level course.

### COLLEGE-WIDE HONORS

Honors are calculated on the basis of semester grade point average. Only college-level credits count in qualifying a student for honors. A part-time student becomes eligible for honors upon completion of 12 credits and remains eligible every semester thereafter.

| | |
|---|---|
| **Academic Citation** | 3.00 - 3.19 |
| **Dean's List** | 3.20 - 3.74 |
| **President's List** | 3.75 - 4.00 (first reflects in Fall 1995) |

### GRADE COLUMN

The following grading system is used at Dutchess Community College effective Fall 1999. Before Fall 1999 the College did not utilize the +/- system.

| Grade | Quality | Grade Points | Numerical Equivalent |
|---|---|---|---|
| A | Excellent | 4.00 | 93-100 |
| A- | | 3.67 | 90-92 |
| B+ | | 3.33 | 87-89 |
| B | Good/Above Average | 3.00 | 83-86 |
| B- | | 2.67 | 80-82 |
| C+ | | 2.33 | 77-79 |
| C | Satisfactory/Average | 2.00 | 70-76 |
| D | Acceptable but below graduation standards. If received in a prerequisite course, the student may not qualify for the next course in sequence. | 1.00 | 60-69 |
| F | Failing | 0.00 | 0-59 |
| I | Incomplete: a temporary grade given in cases where students have not completed course requirements due to reasons beyond their control. | | |
| J | Proficiency | | |
| P | Passing | | |
| U | Audit (No credit) | | |
| W | Withdrew without academic penalty | | |
| WA | Administrative Withdrawal | | |
| T | Transfer credit (a curriculum change may invalidate transfer credit; transfer credit does not compute into grade point average. | | |
| # | This indicator is used to designate a grade in a developmental course. Any grade followed by a # is not calculated into the student's grade point average. | | |

**REPEAT COLUMN (R)**   E indicates a course is excluded from the GPA. I indicates the repeated course is included in the GPA.

**POINTS (PTS)** Quality points the student earned, for example, a three credit course in which a student earned a grade of C generates 6 points.

**TERM TOTAL**   Reports totals for the semester indicated

**INSTITUTION TOTAL**   Reports accumulated totals for all semesters completed at DCC

**ATTEMPTED HRS. POINTS** divided by **GPA HOURS** is the student's cumulative grade point average under the **GRADE** column.

**Dutchess Community College** grants the following: Associate in Arts (A.A.), Associate in Science (A.S.), Associate in Applied Science (A.A.S.), Certificate

**PROGRAM**   The current curriculum. Former curricula do not reflect on this transcript. Records of past curricula are maintained in the Registrar's Office.

**ACADEMIC FORGIVENESS**   XD, XF, XW indicates Coursework discounted from GPA due to Application of a Fresh Start

**ACADEMIC STATUS**   Unless indicated otherwise a student is in good standing.

### NOTES

The transcript is dynamically computed. Repetitions of courses will cause previous semester TOTALS to be recomputed. After graduation, the transcript is recomputed if the student continues to enroll.

Any errors on this transcript should be called immediately to the attention of the Registrar at (845) 431-8020. After 4 weeks this document will be considered correct.

A credit hour is defined as one "hour" of instruction for 15 weeks or the equivalent.

The Key was revised September 2010.

**270 Series Courses:**

Independent study coursework. Copies of independent study contracts are available upon request from the Office of the Registrar.

**700 Series Courses:** Overseas courses.

**800 Series Courses:** Television courses or internships.

**900 Series Courses:** Experimental courses.

RELEASE OF TRANSCRIPT TO THIRD PARTIES IS PROHIBITED UNDER THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974.

DUTCHESS COMMUNITY COLLEGE DOES NOT DISCRIMINATE ON THE BASIS OF RACE, COLOR, SEX, RELIGION, AGE, NATIONAL ORIGIN, DISABILITY, OR SEXUAL ORIENTATION IN ITS EDUCATIONAL PROGRAMS AND ACTIVITIES, INCLUDING EMPLOYMENT, OR IN ADMISSION TO SUCH PROGRAMS AND ACTIVITIES.

*A MINIMUM GRADE POINT AVERAGE OF 2.0 IS REQUIRED FOR GRADUATION.*

*A MAXIMUM OF FORTY ADVANCED STANDING CREDITS MAY BE APPLIED PER DEGREE.*

*A MAXIMUM OF TWENTY ADVANCED STANDING CREDITS MAY BE APPLIED PER CERTIFICATE.*

Dutchess Community College
53 Pendell Road
Poughkeepsie, NY 12601  (845) 431-8099

# DUTCHESS
## COMMUNITY COLLEGE

Issued: 06-JAN-2015

SUNY GENERAL EDUCATION
TRANSCRIPT ADDENDUM

RECORD OF:

Norissa Radwan

SSN:

Student No:

ISSUED TO:

Hofstra University
100 Hofstra University
Hempstead NY 11549-1000

This transcript Addendum reflects SUNY General Education Requirements that have been met. This addendum is official only if accompanied by an official transcript in a SEALED envelope or if it contains the Registrar's signature and/or College Seal and is received in a sealed envelope. Thirty General Education credits or their equivalent are required for completion of a SUNY baccalaureate degree.

Categories one and ten are required, and a minimum of five of the eight remaining categories numbered two through nine.

| MET | | CATEGORY | | TERM | GRADE | CREDITS |
|-----|---|----------|---|------|-------|---------|
| YES | 1. | Mathematics (Required) | | | | |
| | | *MAT 118 | ELEMENTARY STATISTICS | Fall 2012 | A | 3.00 |
| YES | 10. | Basic Communication (Required) | | | | |
| | | *ENG 101 | COMPOSITION I | Fall 2013 | A | 3.00 |
| NO | 2. | Natural Sciences | | | | |
| | | | | | | |
| YES | 3. | Social Sciences | | | | |
| | | *ECO 105 | ECONOMIC ISSUES | Spring 2014 | B | 3.00 |
| | | PSY 111 | PSYCHOLOGICAL PRINCIPLES I | Fall 2013 | B+ | 3.00 |
| | | PSY 112 | PSYCHOLOGICAL PRINCIPLES II | Spring 2014 | B | 3.00 |
| YES | 4. | American History | | | | |
| | | *GOV 121 | AMERICAN NATIONAL EXPERIENCE | Fall 2013 | B- | 3.00 |
| NO | 5. | Western Civilization | | | | |
| | | | | | | |
| NO | 6. | Other World Civilizations | | | | |
| | | | | | | |
| YES | 7. | Humanities | | | | |
| | | *ENG 102 | COMPOSITION II | Spring 2014 | A- | 3.00 |
| NO | 8. | The Arts | | | | |
| | | | | | | |
| NO | 9. | Foreign Language | | | | |



RECEIVED

JAN 12 2015

UNDERGRADUATE ADMISSIONS



OFFICIAL
TRANSCRIPT
Valid with
multicolor seal

OFFICIAL TRANSCRIPT FOR YOUR EXCLUSIVE USE
Not to be given to the student or
a third party under any circumstances.



ASSOCIATE REGISTRAR



A RAISED SEAL IS NOT REQUIRED.

UConn SJM Exhibit 52

013

## LEGEND

### HONORS COURSES

**(Honor)** in the course title identifies an honors level course.

### COLLEGE-WIDE HONORS

Honors are calculated on the basis of semester grade point average. Only college-level credits count in qualifying a student for honors. A part-time student becomes eligible for honors upon completion of 12 credits and remains eligible every semester thereafter.

| | |
|---|---|
| **Academic Citation** | 3.00 - 3.19 |
| **Dean's List** | 3.20 - 3.74 |
| **President's List** | 3.75 - 4.00 (first reflects in Fall 1995) |

### GRADE COLUMN

The following grading system is used at Dutchess Community College effective Fall 1999. Before Fall 1999 the College did not utilize the +/- system.

| Grade | Quality | Grade Points | Numerical Equivalent |
|---|---|---|---|
| A | Excellent | 4.00 | 93-100 |
| A- | | 3.67 | 90-92 |
| B+ | | 3.33 | 87-89 |
| B | Good/Above Average | 3.00 | 83-86 |
| B- | | 2.67 | 80-82 |
| C+ | | 2.33 | 77-79 |
| C | Satisfactory/Average | 2.00 | 76-76 |
| D | Acceptable but below graduation standards. If received in a prerequisite course, the student may not qualify for the next course in sequence. | 1.00 | 60-69 |
| F | Failing | 0.00 | 0-59 |
| I | Incomplete: a temporary grade given in cases where students have not completed course requirements due to reasons beyond their control. | | |
| J | Proficiency | | |
| P | Passing | | |
| U | Audit (No credit) | | |
| W | Withdrew without academic penalty | | |
| WA | Administrative Withdrawal | | |
| T | Transfer credit (a curriculum change may invalidate transfer credit); transfer credit does not compute into grade point average. | | |
| # | This indicator is used to designate a grade in a developmental course. Any grade followed by a # is not calculated into the student's grade point average. | | |

**REPEAT COLUMN (R)** R Indicates a course is excluded from the GPA. I Indicates the repeated course is included in the GPA.

**POINTS (PTS)** Quality points the student earned, for example, a three credit course in which a student earned a grade of C generates 6 points.

**TERM TOTAL** Reports totals for the semester indicated.

**INSTITUTION TOTAL** Reports accumulated totals for all semesters completed at DCC

**ATTEMPTED HRS. POINTS** divided by GPA HOURS is the student's cumulative grade point average under the **GRADE** column.

**Dutchess Community College** grants the following: Associate in Arts (A.A.), Associate in Science (A.S.), Associate in Applied Science (A.A.S.), Certificate

**PROGRAM** The current curriculum. Former curricula do not reflect on this transcript. Records of past curricula are maintained in the Registrar's Office.

**ACADEMIC FORGIVENESS** XD, XF, XW indicates Coursework discounted from GPA due to Application of a Fresh Start

**ACADEMIC STATUS** Unless indicated otherwise a student is in good standing.

### NOTES

The transcript is dynamically computed. Repetitions of courses will cause previous semester TOTALS to be recomputed. After graduation, the transcript is recomputed if the student continues to enroll.

Any errors on this transcript should be called immediately to the attention of the Registrar at (845) 431-8020. After 4 weeks this document will be considered correct.

A credit hour is defined as one "hour" of instruction for 15 weeks or the equivalent.

The Key was revised September 2010.

**270 Series Courses:**

Independent study coursework. Copies of independent study contracts are available upon request from the Office of the Registrar.

**700 Series Courses:** Overseas courses.

**800 Series Courses:** Television courses or internships.

**900 Series Courses:** Experimental courses.

RELEASE OF TRANSCRIPT TO THIRD PARTIES IS PROHIBITED UNDER THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974.

DUTCHESS COMMUNITY COLLEGE DOES NOT DISCRIMINATE ON THE BASIS OF RACE, COLOR, SEX, RELIGION, AGE, NATIONAL ORIGIN, DISABILITY, OR SEXUAL ORIENTATION IN ITS EDUCATIONAL PROGRAMS AND ACTIVITIES, INCLUDING EMPLOYMENT, OR IN ADMISSION TO SUCH PROGRAMS AND ACTIVITIES.

*A MINIMUM GRADE POINT AVERAGE OF 2.0 IS REQUIRED FOR GRADUATION.*

*A* ~~*THE*~~ *CED STANDING CREDITS MAY PE. DE.*

*A MAXIMUM OF TWENTY ADVANCED STANDING CREDITS MAY BE APPLIED PER CERTIFICATE.*

Dutchess Community College
53 Pendell Road
Poughkeepsie, NY 12601 (845) 431-8099

UConn SJM Exhibit 52

014



STATE OF CONNECTICUT
Board of Governors for Higher Education

# UNIVERSITY OF CONNECTICUT

STORRS, CONNECTICUT, 06269-4077

1/7/2015
Page 1 of 1

Lauren DiGrazia
University Registrar

AN OFFICIAL SIGNATURE IS WHITE WITH
A BLUE BACKGROUND.

Name : Mariana Madran
Student ID : 2082747

702169 2-77

Send To: Hofstra University
100 Hofstra University
Hempstead, NY 11549

RECEIVED

JAN 1 2 2015

UNDERGRADUATE ADMISSION

Beginning of Undergraduate Record
Fall 2014

| Course | Description | Units | Grade |
|---|---|---|---|

Transfer Credit from Dutchess Cmty College
Applied Toward ACES Program
Course Trans GPA: 0.000  Transfer Totals:     21.0

Fall 2014  (2014-08-25 to 2014-12-14)

| Course | Description | Units | Grade |
|---|---|---|---|
| Program : | ACES | | |
| Plan : | Pre-Kinesiology Major | | |
| BIOL 1107 | Principles of Biology I | 4.0 | D |
| GSCI 1070 | Global Change&Natural Disaster | 3.0 | A |
| MATH 1060Q | Precalculus | 3.0 | C |
| SOCI 1701 | Society in Global Perspective | 3.0 | B |
| UNIV 1800 | FYE University Learning Skills | 1.0 | A |

Course Topic(s): University Learning Skills
TERM GPA :   2.479    TERM TOTALS :   14.0

CUM GPA :   2.479    CUM TOTALS :   35.0

Undergraduate Career Totals
CUM GPA :   2.479    CUM TOTALS :   35.0
- - - - - End of Transcript - - - - -

# UNIVERSITY OF CONNECTICUT
## Key to Official Transcript

The University of Connecticut is accredited by the New England Association of Schools and Colleges. The academic calendar is based on a fourteen-week semester. One credit represents 50 minutes of lecture/discussion; 2-3 hour laboratories = 1 credit; 4 hour advanced or design labs may earn 3 credits.

### Course Numbering System (effective Summer 2008)

| | |
|---|---|
| 0000-0999 | For the Ratcliffe Hicks School of Agriculture (formerly 0-99) |
| 1000-1999 | Primarily freshmen and sophomore level (formerly 100-199) |
| 2000-2999 | Primarily sophomore level (formerly 100-199) |
| 3000-3999 | Primarily juniors and senior level (formerly 200-299) |
| 4000-4999 | Primarily senior level (formerly 200-299) |
| 5000 & above | Graduate and professional level (formerly 300 & above) |

| Undergraduate | Grades | Grade Points | Graduate |
|---|---|---|---|
| Not assigned | A+ | 4.3 | Distinction |
| Excellent | A | 4.0 | " |
| Excellent | A- | 3.7 | " |
| Very good | B+ | 3.3 | Good Quality |
| to | B | 3.0 | " |
| Good | B- | 2.7 | " |
| Average | C+ | 2.3 | Below |
| to | C | 2.0 | expected |
| Fair | C- | 1.7 | standard |
| Poor to | D+ | 1.3 | Unsatisfactory |
| merely | D | 1.0 | quality |
| passing | D- | 0.7 | " |
| Failure | F | 0.0 | Failure |

### Non-calculable Grades

| | |
|---|---|
| P@ | Successful completion of course on Pass/Fail |
| F@ | Failure in Pass/Fail course |
| S | Successful completion of Satisfactory/Unsatisfactory course |
| U | Failure in Satisfactory/Unsatisfactory course |
| AU | Audit (no credit) |
| W | Withdrawal from course after second week of semester |
| WAU | Course was changed from credit to audit after the 2nd week of term |
| R | Verifies required registration in selected non-credit courses |

Blank Grade not submitted by printing date of transcript.

### Administrative Marks

| | |
|---|---|
| I | Incomplete |
| X | Absent from final examination |
| N | Limited or no attendance in course; also, prior to Fall 1977 verifies required registration in graduate Special Readings 398/498, Thesis/Dissertation Prep 399/499, Clinical Internship 495 |

Note: An administrative mark and an earned grade printed together (e.g. "IC," "NF," "IS") constitute a Final grade, not a temporary one. The "I" or "X" mark standing alone indicates that a course has not been completed. Undergraduates who do not resolve an administrative mark by a prescribed deadline receive an administrative failure, e.g. "IF," "XF," "IU," "NF."

**Institutional Recording Policies:** All courses attempted are recorded, except courses dropped in the first two weeks of the term and all courses in which the student was enrolled at the time of voluntary withdrawal from the University. Repeated courses (undergraduates): The University adopted a grade forgiveness policy effective summer 2002. Prior to that term the GPA reflected the grade earned in each course. Transfer Credit: GPAs of students with transferred credit are computed only on work taken at the University of Connecticut.

**Early College Experience Program:** College credits earned by superior students in secondary school with University consent and guidance. See "Advanced standing for superior high school students" and course descriptions in general catalog.

**Undergraduate Academic Honors:**

**Dean's List:** Indicated by semester for undergraduates who (1) earned a minimum of 12 calculable credits, (2) received no grade below C (effective Fall 1984 includes courses on Pass/Fail), (3) had a minimum term GPA of 3.0 and (4) were in the upper quartile of their college or school.

**Dean's List (Part-time):** following Spring semesters, beginning Spring 2009, indicated undergraduates who were registered for a total of 12 calculable credits during the previous 12 months as part-time students and who met the dean's list criteria stated above.

NOTE: Undergraduate Dean's List notations are withheld pending resolution of administrative marks.

**Cum Laude Designation at Graduation:** based on the following criteria -

**Cum Laude:** minimum of 54 calculable credits, a 3.0 cumulative GPA and 75th percentile college class rank.

**Magna cum laude:** minimum 54 calculable credits, a 3.4 cumulative GPA and 85th percentile college class rank.

**Summa cum laude:** minimum 54 calculable credits, a 3.7 cumulative GPA and 95th percentile college class rank.

**Honors Program:** designates enrollment in a nationally competitive academic program, that is more demanding than the general University curriculum.

**Honors Scholar:** posted with degree conferral indicates completion of all Honors Scholar Program requirements, which include superior performance in accelerated departmental courses and completion of a senior thesis demonstrating exceptional creativity and analytic rigor.

**University Scholar:** posted with degree conferral indicates completion of a University Scholar Program, the most prestigious and demanding undergraduate program at the University, in which the student designates a creative plan of study under the supervision of a faculty committee.

THIS KEY REFLECTS GRADING SYSTEMS IN CURRENT USE.
TRANSCRIPT IS VALIDATED BY UNIVERSITY REGISTRAR'S FACSIMILE SIGNATURE IN UPPER LEFT CORNER.

TO TEST FOR AUTHENTICITY: Translucent two-dimensional overall chainlink design authentic watermark MUST be viewable from both sides when held in front of a light source (absence indicates a counterfeit transcript). The face of this document is printed with the name of the institution appearing in reversed printed white type.

UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT • UNIVERSITY OF CONNECTICUT

ADDITIONAL TESTS: When photocopied, a latent statement containing the institutional name and the words COPY COPY COPY appear over the face of the entire document. Various colored stains will appear if this document is exposed directly to chemicals (including bleach) from the five families of chemicals used for alteration (appearance of stains indicates a possibly altered transcript). A black and white or color copy of this document is not an original and should not be accepted as an official institutional document. Fluorescent security fibers are viewable when exposed to a U-V blacklight (absence indicates a counterfeit transcript). This document cannot be released to a third party without the written consent of the student. This is in accordance with the Family Educational Rights and Privacy Act of 1974. If you have any questions about this document, please contact our office at (860) 486-3331. ALTERATION OF THIS DOCUMENT MAY BE A CRIMINAL OFFENSE!

UConn SJM Ex



STATE OF CONNECTICUT
Board of Governors for Higher Education
**UNIVERSITY OF CONNECTICUT**
STORRS, CONNECTICUT 06269-4077

12/31/2014
Page 1 of 2

Lauren DiGrazia
University Registrar

AN OFFICIAL SIGNATURE IS WHITE WITH
A BLUE BACKGROUND

Name      Bonisha Fadyan
Student ID:   2082147

RECEIVED
JAN 0 6 2015
UNDERGRADUATE ADMISSION

Send To:   Hofstra University
           100 Hofstra University
           Hempstead, NY 11549

OFFICIAL

---- Beginning of Undergraduate Record ----
Fall 2014

| Course | Description | Units | Grade |
|--------|-------------|-------|-------|

Transfer Credit From Dutchess Cmty College
Applied Toward ACES Program
   Course Trans GPA:  0.000   Transfer Totals:     21.0

Fall 2014 (2014-08-25 to 2014-12-14)

| Course | Description | Units | Grade |
|--------|-------------|-------|-------|
| Program : | ACES | | |
| Plan : | Pre-Kinesiology Major | | |
| BIOL 1107 | Principles of Biology I | 4.0 | D |
| GSCI 1070 | Global Change:Natural Disaster | 3.0 | A |
| MATH 1060Q | Precalculus | 3.0 | C |
| SOCI 1701 | Society in Global Perspective | 3.0 | B |
| UNIV 1800 | FYE University Learning Skills | 1.0 | A |

   Course Topic(s): University Learning Skills
TERM GPA :    2.679      TERM TOTALS :    14.0

CUM GPA :    2.679      CUM TOTALS :    35.0

**Undergraduate Career Totals**
CUM GPA :    2.679      CUM TOTALS :    35.0
---- End of Transcript ----

017

Radwan, Noriana

# UNIVERSITY OF CONNECTICUT
## Key to Official Transcript

The University of Connecticut is accredited by the New England Association of Schools and Colleges. The academic calendar is based on a fourteen-week semester. One credit represents 50 minutes of lecture/discussion; 2-3 hour laboratories = 1 credit; 4 hour advanced or design labs may earn 3 credits.

### Course Numbering System (effective Summer 2008)
| | |
|---|---|
| 0000-0999 | For the Ratcliffe Hicks School of Agriculture (formerly 0-99) |
| 1000-1999 | Primarily freshmen and sophomore level (formerly 100-199) |
| 2000-2999 | Primarily sophomore level (formerly 100-199) |
| 3000-3999 | Primarily juniors and senior level (formerly 200-299) |
| 4000-4999 | Primarily senior level (formerly 200-299) |
| 5000 & above | Graduate and professional level (formerly 300 & above) |

| Undergraduate | Grades | Grade Points | Graduate |
|---|---|---|---|
| Not assigned | A+ | 4.3 | Distinction |
| Excellent | A | 4.0 | " |
| Excellent | A- | 3.7 | " |
| Very good | B+ | 3.3 | Good Quality |
| to | B | 3.0 | " |
| Good | B- | 2.7 | " |
| Average | C+ | 2.3 | Below |
| to | C | 2.0 | expected |
| Fair | C- | 1.7 | standard |
| Poor to | D+ | 1.3 | Unsatisfactory |
| merely | D | 1.0 | quality |
| passing | D- | 0.7 | " |
| Failure | F | 0.0 | Failure |

### Non-calculable Grades
| | |
|---|---|
| P@ | Successful completion of course on Pass/Fail |
| F@ | Failure in Pass/Fail course |
| S | Successful completion of Satisfactory/Unsatisfactory course |
| U | Failure in Satisfactory/Unsatisfactory course |
| AU | Audit (no credit) |
| W | Withdrawal from course after second week of semester |
| WAU | Course was changed from credit to audit after the 2nd week of term |
| R | Verifies required registration in selected non-credit courses |

Blank Grade not submitted by printing date of transcript.

### Administrative Marks
| | |
|---|---|
| I | Incomplete |
| X | Absent from final examination |
| N | Limited or no attendance in course; also, prior to Fall 1977 verifies required registration in graduate Special Readings 398/498, Thesis/Dissertation Prep 399/499, Clinical Internship 495 |

Note: An administrative mark and an earned grade printed together (e.g. "IC," "NF," "IS") constitute a final grade, not a temporary one. The "I" or "X" mark standing alone indicates that a course has not been completed. Undergraduates who do not resolve an administrative mark by a prescribed deadline receive an administrative failure, e.g. "IF," "XF," "IU," "NF."

**Institutional Recording Policies:** All courses attempted are recorded, except courses dropped in the first two weeks of the term and all courses in which the student was enrolled at the time of voluntary withdrawal from the University. Repeated courses (undergraduates): The University adopted a grade forgiveness policy effective summer 2002. Prior to that term the GPA reflected the grade earned in each course. Transfer Credit: GPAs of students with transferred credit are computed only on work taken at the University of Connecticut.

**Early College Experience Program:** College credits earned by superior students in approved secondary school with University consent and guidance. See "Advanced standing for superior high school students" and course descriptions in general catalog.

### Undergraduate Academic Honors:
**Dean's List:** Indicated by semester for undergraduates who (1) earned a minimum of 12 calculable credits, (2) received no grade below C (effective Fall 1984 includes courses on Pass/Fail), (3) had a minimum term GPA of 3.0 and (4) were in the upper quartile of their college or school.

**Dean's List (Part-time):** following Spring semesters, beginning Spring 2009, indicated undergraduates who were registered for a total of 12 calculable credits over the previous 12 months as part-time students and who met the dean's list criteria stated above.

NOTE: Undergraduate Dean's List notations are withheld pending resolution of administrative marks.

**Cum Laude Designation at Graduation:** based on the following criteria –
Cum Laude: minimum of 54 calculable credits, a 3.0 cumulative GPA and 75th percentile college class rank.
Magna cum laude: minimum 54 calculable credits, a 3.4 cumulative GPA and 85th percentile college class rank.
Summa cum laude: minimum 54 calculable credits, a 3.7 cumulative GPA and 95th percentile college class rank.

**Honors Program:** designates enrollment in a nationally competitive academic program, that is more demanding than the general University curriculum.

**Honors Scholar:** posted with degree conferral indicates completion of all Honors Scholar Program requirements, which include superior performance in accelerated departmental courses and completion of a senior thesis demonstrating exceptional creativity and analytic rigor.

**University Scholar:** posted with degree conferral indicates completion of a University Scholar Program, the most prestigious and demanding undergraduate program at the University, in which the student designates a creative plan of study under the supervision of a faculty committee.

RECEIVED

JAN 06 2015

UNDERGRADUATE ADMISSION

THIS KEY REFLECTS GRADING SYSTEMS IN CURRENT USE.
TRANSCRIPT IS VALIDATED BY UNIVERSITY REGISTRAR'S FACSIMILE SIGNATURE IN UPPER LEFT CORNER.

**TO TEST FOR AUTHENTICITY:** Translucent two-dimensional overall chainlink design authentic watermark MUST be viewable from both sides when held in front of a light source (absence indicates a counterfeit transcript). The face of this document is printed with the name of the institution appearing in reversed printed white type.

UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT ● UNIVERSITY OF CONNECTICUT

**ADDITIONAL TESTS:** When photocopied, a latent security statement containing the institutional name and the words COPY COPY COPY appear over the face of the entire document. Various colored stains will appear if this document is exposed directly to chemicals (including bleach) from the five families of chemicals used for alteration (appearance of stains indicates a possibly altered transcript). A black and white or color copy of this document is not an original and should not be accepted as an official institutional document. Fluorescent security fibers are viewable when exposed to a U-V blacklight (absence indicates a counterfeit transcript). This document cannot be released to a third party without the written consent of the student. This is in accordance with the Family Educational Rights and Privacy Act of 1974. If you have any questions about this document, please contact our office at (860) 486-3331. ALTERATION OF THIS DOCUMENT MAY BE A CRIMINAL OFFENSE!

UCo n SJM Ex

01/08/2015  13:55    8452310471                                                    PAGE  02/02

## Secondary School Record-Official Transcript

| Transcript of: | Cumulative GPA: 89.6429 | Beacon High School |
|---|---|---|
| 70 Holly Loop Wappingers Falls, NY 12590 | Academic GPA: 94.4307 Current Class Rank: 34 out of 250 | 101 Matteawan Road Beacon, NY 12508 (845) 838 - 6900 |
| Date of Birth: | Total Credits:   28 | |
| Regents Diploma with Advanced Designation | Date of Graduation June 28, 2014 | |

Academic GPA and Rank in class are weighted. Rank is determined by adding 5% to the final average in Regents courses, 7% to the final average in Honors Courses and 10% to the final average in college-level courses: Advanced Placement (AP), Dutchess Community College

| SAT | Date | Critical Reading | Math | Writing |
|---|---|---|---|---|
| | BEST | 590 | 590 | 560 |
| | 1/26/2013 | 590 | 580 | 520 |
| | 5/4/2013 | 540 | 590 | 560 |

| Year/School | Grade | Course | Grade | | Credits |
|---|---|---|---|---|---|
| 13-14  Beacon High School | 12 | DCC ENGLISH 101 | 93 | | 0.50 |
| | 12 | DCC ENGLISH 102 | 91 | | 0.50 |
| | 12 | DCC PSYCHOLOGY 111 | 88 | | 0.50 |
| | 12 | DCC PSYCHOLOGY 112 | 85 | | 0.50 |
| | 12 | DCC GOVERNMENT | 89 | | 0.50 |
| | 12 | DCC ECONOMICS | 85 | | 0.50 |
| | 12 | AP CALCULUS AB | 89 | | 1.00 |
| | 12 | MARINE BIOLOGY | 98 | | 0.50 |
| | 12 | HUMAN ANATOMY | 89 | | 0.50 |
| | 12 | PHYSICAL ED 11/12 | 93 | | 0.50 |
| 12-13  Beacon High School | 11 | ENGLISH 12 | 89 | | 1.00 |
| | 11 | AP UNITED STATES HISTORY | 94 | 91 | 1.00 |
| | 11 | PRE-CALCULUS H | 92 | | 1.00 |
| | 11 | DCC STATISTICS | 94 | | 1.00 |
| | 11 | PHYSICAL SETTING/PHYSICS | 85 | 76 | 1.00 |
| | 11 | PHYSICAL SETTING/PHYSICS LAB | P | | 0.00 |
| | 11 | SPANISH IVH | 88 | | 1.00 |
| | 11 | PHYSICAL ED 11/12 | 91 | | 0.50 |
| 11-12  Beacon High School | 10 | ENGLISH 11H | 89 | 87 | 1.00 |
| | 10 | GLOBAL STUDIES II H | 89 | 95 | 1.00 |
| | 10 | ALGEBRA 2/TRIGONOMETRY R | 86 | 81 | 1.00 |
| | 10 | PHYSICAL SETTING/CHEMISTRY | 83 | 72 | 1.00 |
| | 10 | PHYSICAL SETTING/CHEMISTRY LAB | | | 0.00 |
| | 10 | SPANISH III REGENTS | 90 | | 1.00 |
| | 10 | CERAMICS I | 93 | | 0.50 |
| | 10 | HEALTH | 91 | | 0.50 |
| | 10 | PHYSICAL ED 9/10 | 92 | | 0.50 |
| 10-11  Beacon High School | 9 | ENGLISH 10H | 90 | | 1.00 |
| | 9 | GLOBAL STUDIES I REGENTS | 91 | | 1.00 |
| | 9 | INTEGRATED GEOMETRY | 87 | 84 | 1.00 |
| | 9 | LIVING ENVIRONMENT REGENTS | 88 | 90 | 1.00 |
| | 9 | LIVING ENVIRONMENT LAB | | | 0.00 |
| | 9 | FORENSIC SCIENCE | 94 | | 0.50 |
| | 9 | SPANISH II REGENTS | 94 | | 1.00 |
| | 9 | DIGITAL STUDIO ART | 90 | | 0.50 |
| | 9 | PHYSICAL ED 9/10 | 92 | | 0.50 |
| 09-10  Rombout Middle School | 8 | ENGLISH 9 REGENTS | 89 | | 1.00 |
| | 8 | INTEGRATED ALGEBRA | 84 | 86 | 1.00 |
| | 8 | SPANISH I REGENTS | 89 | 84 | 1.00 |

Date: July 15, 2014       Signature: _William Sindan_       Title: _student-Data_

UCon SJM Ex

019

## Secondary School Record-Official Transcript

| Transcript of:<br>**Ridwan Nariane**<br><br>70 Holly Loop<br>Wappingers Falls, NY 12590 | Cumulative GPA:<br>89.6429<br>Academic GPA:<br>94.4307<br>Current Class Rank:<br>34 out of 250 | **Beacon High School**<br>101 Matteawan Road<br>Beacon, NY 12508<br>(845) 838 - 6900 |
|---|---|---|
| Date of Birth: | Total Credits:   28 | |
| **Regents Diploma with Advanced Designation** | Date of Graduation<br>June 28, 2014 | |

### Standardized Testing

| Academic GPA and Rank in class are weighted. Rank is determined by adding 5% to the final average in Regents courses, 7% to the final average in Honors Courses and 10% to the final average in college-level courses: Advanced Placement (AP), Dutchess Community College | SAT | Date<br>BEST<br>1/26/2013<br>5/4/2013 | Critical Reading<br>590<br>590<br>540 | Math<br>590<br>580<br>590 | Writing<br>560<br>520<br>560 | **RECEIVED**<br><br>JAN 14 2015 |
|---|---|---|---|---|---|---|

| Year   School | Grade | Course | Summer Grade | Final Grade | Regents Exam<br>Com. Core | | | | Credit Earned |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Jan | June | June | Aug | |
| **13-14  Beacon High School** | 12 | DCC ENGLISH 101 | | 93 | | | | | 0.50 |
| | 12 | DCC ENGLISH 102 | | 91 | | | | | 0.50 |
| | 12 | DCC PSYCHOLOGY 111 | | 88 | | | | | 0.50 |
| | 12 | DCC PSYCHOLOGY 112 | | 85 | | | | | 0.50 |
| | 12 | DCC GOVERNMENT | | 89 | | | | | 0.50 |
| | 12 | DCC ECONOMICS | | 85 | | | | | 0.50 |
| | 12 | AP CALCULUS AB | | 89 | | | | | 1.00 |
| | 12 | MARINE BIOLOGY | | 98 | | | | | 0.50 |
| | 12 | HUMAN ANATOMY | | 89 | | | | | 0.50 |
| | 12 | PHYSICAL ED 11/12 | | 93 | | | | | 0.50 |
| **12-13  Beacon High School** | 11 | ENGLISH 12 | | 89 | | | | | 1.00 |
| | 11 | AP UNITED STATES HISTORY | | 94 | 91 | | | | 1.00 |
| | 11 | PRE-CALCULUS H | | 92 | | | | | 1.00 |
| | 11 | DCC STATISTICS | | 94 | | | | | 1.00 |
| | 11 | PHYSICAL SETTING/PHYSICS | | 88 | 76 | | | | 1.00 |
| | 11 | PHYSICAL SETTING/PHYSICS LAB | | P | | | | | 0.00 |
| | 11 | SPANISH IVH | | 88 | | | | | 1.00 |
| | 11 | PHYSICAL ED 11/12 | | 91 | | | | | 0.50 |
| **11-12  Beacon High School** | 10 | ENGLISH 11H | | 89 | 97 | | | | 1.00 |
| | 10 | GLOBAL STUDIES II H | | 89 | 95 | | | | 1.00 |
| | 10 | ALGEBRA 2/TRIGONOMETRY R | | 86 | 81 | | | | 1.00 |
| | 10 | PHYSICAL SETTING/CHEMISTRY | | 83 | 72 | | | | 1.00 |
| | 10 | PHYSICAL SETTING/CHEMISTRY LAB | | | | | | | 0.00 |
| | 10 | SPANISH III REGENTS | | 90 | | | | | 1.00 |
| | 10 | CERAMICS I | | 93 | | | | | 0.50 |
| | 10 | HEALTH | | 91 | | | | | 0.50 |
| | 10 | PHYSICAL ED 9/10 | | 92 | | | | | 0.50 |
| **10-11  Beacon High School** | 9 | ENGLISH 10H | | 90 | | | | | 1.00 |
| | 9 | GLOBAL STUDIES I REGENTS | | 91 | | | | | 1.00 |
| | 9 | INTEGRATED GEOMETRY | | 87 | 84 | | | | 1.00 |
| | 9 | LIVING ENVIRONMENT REGENTS | | 88 | 90 | | | | 1.00 |
| | 9 | LIVING ENVIRONMENT  LAB | | | | | | | 0.00 |
| | 9 | FORENSIC SCIENCE | | 94 | | | | | 0.50 |
| | 9 | SPANISH II REGENTS | | 94 | | | | | 1.00 |
| | 9 | DIGITAL STUDIO ART | | 90 | | | | | 0.50 |
| | 9 | PHYSICAL ED 9/10 | | 92 | | | | | 0.50 |
| **09-10  Rombout Middle School** | 8 | ENGLISH 9 REGENTS | | 89 | | | | | 1.00 |
| | 8 | INTEGRATED ALGEBRA | | 84 | 86 | | | | 1.00 |
| | 8 | SPANISH I REGENTS | | 89 | 84 | | | | 1.00 |

Date: July 15, 2014     Signature: *William Birdbaum*     Title: Student Data

UCo n SJM Ex

020



# HOFSTRA
### UNIVERSITY.

## Athletic Grant-in-Aid Agreement

Issue Date: January 21, 2015

702169277

Dear Noriana Radwan,

The Office of Financial Aid at Hofstra University is pleased to inform you that the Department of Athletics has recommended you to receive an Athletic Grant-In-Aid during the 2014-2015 Award Year.

The recommended Athletic Grant-In-Aid is as follows:

Award Amount: **37% of a full grant-in-aid.**

Sport: Women's Soccer

Term of Award (Check All That Apply):   Fall ____ Spring **X** ____
                                         Intersession _____ Summer _____

Special terms:

At the beginning of this award period, the student athlete will have **3** year(s) of athletic eligibility remaining.

This award is made in accordance with, and subject to, the rules and regulations of Hofstra University, the Colonial Athletic Association, and the National Collegiate Athletic Association (NCAA).

A summary of terms governing this award may be found on page three (3) of this letter. Please note the following:

- Per the Hofstra University Undergraduate Bulletin, Athletic or "Activity" grants may be renewed if the recipient achieves and maintains a 2.0 cumulative grade point average and successfully completes 24 credit hours each academic year at Hofstra University with a minimum of 18 credit hours for a letter grade other than P.
- Hofstra University pays for a maximum of 17 hours per semester.
- Per the NCAA, if the value of the Athletic-Grant-In-Aid exceeds the necessary expenses related to attendance, Hofstra University reserves the right to adjust any Athletic Grant-In-Aid. Necessary expenses are limited to tuition, fees, room, board and books.
- Student-athletes are required to complete a FAFSA (Free Application for Federal Student Aid) form as well as a New York State TAP Grant application (for NY residents only).
- Any room or board changes must be approved by athletics compliance prior to submission to Residential Programs. Failure to do so may result in termination of this athletics aid agreement. The option to terminate will be determined by the head coach, athletics compliance and the director of athletics or designee.

_____ Student initial
_____ Parent/Guardian initial

TF = 19450
    - 250 TAP
    19200

Full = 53260

37% = 19706.20

RB = 506.20



POSTED
1/23/15
8n

021

  
Any Hofstra student-athlete receiving athletic aid may not be awarded other institutional aid per NCAA Bylaw 15.02.4.1 without prior approval from the Head Coach, and ultimately the Office of Financial Aid. Other institutional aid is defined as all funds administered by Hofstra University, which include, but are not limited to the following: scholarships, grants, tuition waivers or employee dependent tuition benefits. Any other aid received from an outside source where athletic participation may be a major criterion is also subject to approval.

If you have been offered an academic based merit award as an incoming freshman you must meet the criteria outlined in NCAA Bylaw 15.5.3.2.1.1 and stated below in order to receive the award. A cumulative 3.0 GPA at the end of each academic year is required for any merit award to be renewable.

NCAA Bylaw 15.5.3.2.1.1 criteria:
- A minimum of 3.5 core course GPA (based on a 4.0 scale), or
- A minimum SAT score of 1200, or
- A minimum ACT sum score of 105, or
- Be ranked in the top 10% of the high school graduating class

Your signed acceptance of this letter indicates that you have read, understand, and agree to abide by the provisions of this agreement and the attached athletic grant-in-aid conditions

Sincerely,

Jessica Eads
Vice President for Enrollment Management,
Dean of Admission and Financial Aid

Jeff Hathaway
Director of Athletics

Head Coach

SIMON RIDDIOUGH
Please print name

Signature

Accepted:

Signature of Prospect/Student Athlete                SS/700#                Date   1/22/15

Signature of Parent/Guardian                                               Date   1/22/15

This form must be properly signed and returned within two weeks of the issue date in order for your Athletic Grant-In-Aid Award to be finalized.
Please sign and return ONE copy directly to:

Ariel Pesente
Associate Director of Athletics for Compliance
Hofstra Department of Athletics
240 Physical Education Building
230 Hofstra University
Hempstead, NY 11549-2300

UCo n SJM Ex

022



# HOFSTRA UNIVERSITY.



## Athletic Grant-in-Aid Agreement

June 12, 2015

Dear Noriana Radwan:

ID#: 702169277

The Office of Financial Aid at Hofstra University is pleased to inform you that the Department of Athletics has recommended you to receive an Athletic Grant-In-Aid during the 2015-2016 Award Year.

The recommended Athletic Grant-In-Aid is as follows:

Award Amount: <u>75% of a full grant in aid</u>

Sport: <u>Women's Soccer</u>

Term of Award (Check All That Apply):          Fall__ X__  Spring__ X__

Intersession _____ Summer _____

Special terms:

---

At the beginning of this award period, the student athlete will have __3__ year(s) of athletic eligibility remaining.

This award is made in accordance with, and subject to, the rules and regulations of Hofstra University, the Colonial Athletic Association, and the National Collegiate Athletic Association (NCAA).

A summary of terms governing this award may be found on page three (3) of this letter. Please note the following:

- Per the Hofstra University Undergraduate Bulletin, Athletic or "Activity" grants may be renewed if the recipient achieves and maintains a 2.0 cumulative grade point average and successfully completes 24 credit hours each academic year at Hofstra University with a minimum of 18 credit hours for a letter grade other than P.
- Hofstra University pays for a maximum of 17 hours per semester.
- Per the NCAA, if the value of the Athletic Grant-In-Aid exceeds the necessary expenses related to attendance, Hofstra University reserves the right to adjust any Athletic Grant-In-Aid. Necessary expenses are limited to tuition, fees, room, board and books.
- Student-athletes are required to complete a FAFSA (Free Application for Federal Student Aid) form as well as a New York State TAP Grant application (for NY residents only).
- Any room or board changes must be approved by athletics compliance prior to submission to Residential Programs. Failure to do so may result in termination of this athletics aid agreement. The option to terminate will be determined by the head coach, athletics compliance and the director of athletics or designee.

TF= 40510 (spec=50)   RB= 10,000+3980 = 13980
                      BK= 800

Full = 55290 x 75% = 41,467.50
    TF = 40510
    RB = 957.50

| | |
|---|---|
| NR | Student initial |
| [initials] | Parent/Guardian initial |

POSTED 7/2/15 BW

UCo  n SJM Ex

Any Hofstra student-athlete receiving athletic aid may not be awarded other institutional aid per NCAA Bylaw 15.02.4.1 without prior approval from the Head Coach, and ultimately the Office of Financial Aid. Other institutional aid is defined as all funds administered by Hofstra University, which include, but are not limited to the following: scholarships, grants, tuition waivers or employee dependent tuition benefits. Any other aid received from an outside source where athletic participation may be a major criterion is also subject to approval.

If you have been offered an academic based merit award as an incoming freshman you must meet the criteria outlined in NCAA Bylaw 15.5.3.2.1.1 and stated below in order to receive the award. A cumulative 3.0 GPA at the end of each academic year is required for any merit award to be renewable.

NCAA Bylaw 15.5.3.2.1.1 criteria:
- A minimum of 3.5 core course GPA (based on a 4.0 scale), or
- A minimum SAT score of 1200, or
- A minimum ACT sum score of 105, or
- Be ranked in the top 10% of the high school graduating class

Your signed acceptance of this letter indicates that you have read, understand, and agree to abide by the provisions of this agreement and the attached athletic grant-in-aid conditions

Sincerely,

Jessica Eads
Vice President for Enrollment Management,
Dean of Admission and Financial Aid

Jeff Hathaway
Director of Athletics

Head Coach

SIMON RIDDIOUGH
Please print name

Signature

Accepted:

Signature of Prospect/Student Athlete

/ 702169277
SS/700#

6/28/15
Date

Signature of Parent/Guardian

6/28/15
Date

This form must be properly signed and returned within two weeks of the issue date in order for your Athletic Grant-In-Aid Award to be finalized.
Please sign and return ONE copy directly to:

Sandra Mervius
Director of Financial Aid
202 Memorial Hall
126 Hofstra University
Hempstead, NY 11549

## Athletic Grant-In-Aid Conditions

All recipients of Athletic Grant-In-Aid awards shall meet the requirements for admission to Hofstra University as well as the initial and continuing academic eligibility standards set forth by the National Collegiate Athletic Association (NCAA). All Athletic Grant-In-Aid monies are awarded by the University's Office of Financial Aid upon the recommendation of the Director of Athletics. This Athletic Grant-In-Aid offer is valid only for the indicated academic year.

### Renewal of the Athletic Grant-In-Aid will depend on the recipient:

1. Meeting Hofstra University standards of satisfactory academic progress;
2. Meeting all conditions and athletic eligibility requirements as specified by the NCAA Division I policy manual;
3. Meeting all conditions and requirements set forth by the Director of Athletics and the Head Coach of the sport for which the grant was awarded;
4. Participating in the sport(s) throughout the season(s). Participation is understood to include trying out for the team, attending all practices and scheduled events, training sessions, fundraising promotions, and post-season competition. Failure to participate without the approval of the coach or Director of Athletics could result in the non-renewal/cancellation of the recipient's aid;
5. Understanding that Athletic Grants-In-Aid are awarded for a maximum of one (1) academic year, with renewal contingent upon the student-athlete conforming to the eligibility rules and regulations for athletic participation as determined by Hofstra University, its applicable athletic conference affiliation, and the NCAA. Individual team training guidelines for intercollegiate student-athletes are also considered rules of the University;
6. Recognizing that a fifth year of Athletic Grant-In-Aid may be provided to a student-athlete who qualified for, and was officially granted, a Medical Hardship Waiver (i.e. "medical redshirt") through the Department of Athletics and the appropriate athletic conference office;
7. Acknowledging that a fifth year of Athletic Grant-In-Aid may not be provided to a student-athlete for the purpose of a "non-participation redshirt";
8. Completing and filing the appropriate financial aid forms each year (FAFSA, Pell, Stafford, etc.) with Hofstra University Office of Financial Aid;
9. Returning all uniforms and equipment issued at the conclusion of the season. Failure to do so may result in the non-renewal/cancellation of the recipient's Athletic Grant-In-Aid.

### This Athletic grant may be revoked, cancelled, and/or non-renewed for any of the following reasons:

1. Failure to sign and return this Athletic Grant-In-Aid Agreement;
2. Academic dismissal from the University;
3. Violation of athletic department and team rules;
4. Violation of the NCAA and/or Hofstra University drug testing program(s);
5. Failure to attend mandatory study hall;
6. Failure to comply with NCAA regulations and/or committing a violation of NCAA regulations;
7. Failure to meet University academic standards;
8. Voluntary withdrawal from the University;
9. Signing a professional sports contract for this sport;
10. Agreeing to be represented by an agent;
11. Receiving other aid that exceeds individual financial aid limits.

Additionally, per the NCAA Bylaw for the Permitted Reduction or Cancellation of Aid, the Athletic Grant-In-Aid may be reduced or cancelled during the period of the award if the recipient:

1. Renders himself or herself ineligible for intercollegiate competition; or
2. Fraudulently misrepresents any information on an application, letter of intent or financial aid agreement; or
3. Engages in serious misconduct warranting substantial disciplinary penalty; or
4. Voluntarily withdraws, quits, or resigns from a sport/team at any time for personal reasons.

If a student-athlete voluntarily withdraws from participation in a sport, their Athletic Grant-In-Aid may be prorated and adjusted as of the date of withdrawal. Any reduction or cancellation of athletic aid will be provided in writing to the student-athlete by the Office of Financial Aid.

Per the NCAA Bylaw regarding the Non Permitted Reduction or Cancellation of Athletics Aid, aid cannot be reduced or canceled during the period of its award on the basis of athletics ability, performance, or contribution to a team's success; because of an injury or illness that prevents a student-athlete from participating in athletics, or for any other athletics reason.

Athletic equipment will not be issued to a student-athlete until this agreement is signed and returned to the Hofstra University Office of Financial Aid.



# HOFSTRA
UNIVERSITY.

## Athletic Grant-in-Aid Agreement

**June 10, 2016**

Dear Noriana Radwan:                                        **ID#: 702169277**

The Office of Financial Aid at Hofstra University is pleased to inform you that the Department of Athletics has recommended you to receive an Athletic Grant-In-Aid during the 2016-2017 Award Year.

The recommended Athletic Grant-In-Aid is as follows:

Award Amount: **72% Of a Full Grant In Aid**

Sport: **Women's Soccer**

Term of Award (Check All That Apply):        Fall **X**  Spring **X**

                                            Intersession _____ Summer _____

*Handwritten notes:*
$TF = 42,210$
$RB = 15,550$
POSTED SWH 7/19/16
$BK = 800$
$58,560 \times 72\% = 42,163.20$
Posted $TF = 42,165.20$

Special terms:
_____

At the beginning of this award period, the student athlete will have **2** year(s) of athletic eligibility remaining.

This award is made in accordance with, and subject to, the rules and regulations of Hofstra University, the Colonial Athletic Association, and the National Collegiate Athletic Association (NCAA).

A summary of terms governing this award may be found on page three (3) of this letter. Please note the following:

- A Full Grant-in-Aid covers the amount of a student's tuition, fees, room, board and required course related books as per NCAA Bylaw 20.02.7.
- Your award amount is the percentage of a Full Grant-in-Aid indicated above. The dollar amount of your award will first be applied to your tuition balance. Any remaining funds will then be applied to fees, room, board, and required course-related books.
- Awards may not be applied to off-campus room and board; award amounts may only be used for on-campus residence hall rooms and meal plans.
- Per the Hofstra University Undergraduate Bulletin, Athletic or "Activity" grants may be renewed if the recipient achieves and maintains a 2.0 cumulative grade point average and successfully completes 24 credit hours each academic year at Hofstra University with a minimum of 18 credit hours for a letter grade other than P.
- Hofstra University pays for a maximum of 17 hours per semester.
- Per the NCAA, if the value of the Athletic Grant-In-Aid exceeds the necessary expenses related to attendance, Hofstra University reserves the right to adjust any Athletic Grant-In-Aid. Necessary expenses are limited to tuition, fees, room, board and books.
- Student-athletes are required to complete a FAFSA (Free Application for Federal Student Aid) form as well as a New York State TAP Grant application (for NY residents only).
- Any room or board changes must be approved by athletics compliance prior to submission to Residential Programs. Failure to do so may result in termination of this athletics aid agreement. The option to terminate will be determined by the head coach, athletics compliance and the director of athletics or designee.

Student initial
Parent/Guardian initial

UCo n SJM Ex

026

**Any Hofstra student-athlete receiving athletic aid may not be awarded other institutional aid per NCAA Bylaw 15.5.3.2 without prior approval from the Head Coach, and ultimately the Office of Financial Aid.** Other institutional aid is defined as all funds administered by Hofstra University, which include, but are not limited to the following: scholarships, grants, tuition waivers or employee dependent tuition benefits. Any other aid received from an outside source where athletic participation may be a major criterion is also subject to approval.

If you have been offered an academic based merit award as an incoming freshman you must meet the criteria outlined in NCAA Bylaw 15.5.3.2.4.1 and stated below in order to receive the award. A cumulative 3.0 GPA at the end of each academic year is required for any merit award to be renewable.

**NCAA Bylaw 15.5.3.2.4.1 criteria:**
- A minimum of 3.5 GPA (based on a 4.0 scale), or
- A minimum SAT score of 1200, or
- A minimum ACT sum score of 105, or
- Be ranked in the top 10% of the high school graduating class

Your signed acceptance of this letter indicates that you have read, understand, and agree to abide by the provisions of this agreement and the attached athletic grant-in-aid conditions

Sincerely,

Jessica Eads
Vice President for Enrollment Management,
Dean of Admission and Financial Aid

Jeff Hathaway
Director of Athletics

Head Coach

SIMON RIDDIOUGH
Please print name

Signature

Accepted:

Signature of Prospect/Student Athlete

/ 702169277
SS/700#

7/13/16
Date

Signature of Parent/Guardian

7/13/2016
Date

This form must be properly signed and returned within two weeks of the issue date in order for your Athletic Grant-In-Aid Award to be finalized.
Please sign and return **ONE** copy directly to:

Sandra Mervius
Director of Financial Aid
202 Memorial Hall
126 Hofstra University
Hempstead, NY 11549

### Athletic Grant-In-Aid Conditions

All recipients of Athletic Grant-In-Aid awards shall meet the requirements for admission to Hofstra University as well as the initial and continuing academic eligibility standards set forth by the National Collegiate Athletic Association (NCAA). All Athletic Grant-In-Aid monies are awarded by the University's Office of Financial Aid upon the recommendation of the Director of Athletics. This Athletic Grant-In-Aid offer is valid only for the indicated academic year.

**Renewal of the Athletic Grant-In-Aid will depend on the recipient:**

1. Meeting Hofstra University standards of satisfactory academic progress;
2. Meeting all conditions and athletic eligibility requirements as specified by the NCAA Division I policy manual;
3. Meeting all conditions and requirements set forth by the Director of Athletics and the Head Coach of the sport for which the grant was awarded;
4. Participating in the sport(s) throughout the season(s). Participation is understood to include trying out for the team, attending all practices and scheduled events, training sessions, fundraising promotions, and post-season competition. Failure to participate without the approval of the coach or Director of Athletics could result in the non-renewal/cancellation of the recipient's aid;
5. Understanding that Athletic Grants-In-Aid are awarded for a maximum of one (1) academic year, with renewal contingent upon the student-athlete conforming to the eligibility rules and regulations for athletic participation as determined by Hofstra University, its applicable athletic conference affiliation, and the NCAA. Individual team training guidelines for intercollegiate student-athletes are also considered rules of the University;
6. Recognizing that a fifth year of Athletic Grant-In-Aid may be provided to a student-athlete who qualified for, and was officially granted, a Medical Hardship Waiver (i.e. "medical redshirt") through the Department of Athletics and the appropriate athletic conference office;
7. Acknowledging that a fifth year of Athletic Grant-In-Aid may not be provided to a student-athlete for the purpose of a "non-participation redshirt";
8. Completing and filing the appropriate financial aid forms each year (FAFSA, Pell, Stafford, etc.) with Hofstra University Office of Financial Aid;
9. Returning all uniforms and equipment issued at the conclusion of the season. Failure to do so may result in the non-renewal/cancellation of the recipient's Athletic Grant-In-Aid.

**This Athletic grant may be revoked, cancelled, and/or non-renewed for any of the following reasons:**

1. Failure to sign and return this Athletic Grant-In-Aid Agreement;
2. Academic dismissal from the University;
3. Violation of athletic department and team rules;
4. Violation of the NCAA and/or Hofstra University drug testing program(s);
5. Failure to attend mandatory study hall;
6. Failure to comply with NCAA regulations and/or committing a violation of NCAA regulations;
7. Failure to meet University academic standards;
8. Voluntary withdrawal from the University;
9. Signing a professional sports contract for this sport;
10. Agreeing to be represented by an agent;
11. Receiving other aid that exceeds individual financial aid limits.

**Additionally, per the NCAA Bylaw for the Permitted Reduction or Cancellation of Aid,** the Athletic Grant-In-Aid may be reduced or cancelled during the period of the award if the recipient:

1. Renders himself or herself ineligible for intercollegiate competition; or
2. Fraudulently misrepresents any information on an application, letter of intent or financial aid agreement; or
3. Engages in serious misconduct warranting substantial disciplinary penalty; or
4. Voluntarily withdraws, quits, or resigns from a sport/team at any time for personal reasons.

If a student-athlete voluntarily withdraws from participation in a sport, their Athletic Grant-In-Aid may be prorated and adjusted as of the date of withdrawal. Any reduction or cancellation of athletic aid will be provided in writing to the student-athlete by the Office of Financial Aid.

**Per the NCAA Bylaw regarding the Non Permitted Reduction or Cancellation of Athletics Aid,** aid cannot be reduced or canceled during the period of its award on the basis of athletics ability, performance, or contribution to a team's success; because of an injury or illness that prevents a student-athlete from participating in athletics, or for any other athletics reason.

This award, or a portion of this award, may be taxable. Please refer to the Payments to Students and their Taxability policy, located at http://www.hofstra.edu/taxablepayments, for more information. Students are responsible for consulting their own tax advisors regarding any tax obligations that may arise in connection with this award.

**Athletic equipment will not be issued to a student-athlete until this agreement is signed and returned to the Hofstra University Office of Financial Aid.**



## HOFSTRA
UNIVERSITY.

### Athletic Grant-in-Aid Agreement

June 20, 2017

ID#:702169277

Dear : Norhan Radwan

The Office of Financial Aid at Hofstra University is pleased to inform you that the Department of Athletics has recommended you to receive an Athletic Grant-In-Aid during the 2017-2018 Award Year.

The recommended Athletic Grant-In-Aid is as follows:

Award Amount: 73% of a Full Grant-In-Aid

Sport: Women's Soccer

Term of Award (Check All That Apply):      Fall __X__  Spring _X__

Intersession _____ Summer _____

Special terms:

At the beginning of this award period, the student athlete will have __2__ year(s) of athletic eligibility remaining.

This award is made in accordance with, and subject to, the rules and regulations of Hofstra University, the Colonial Athletic Association, and the National Collegiate Athletic Association (NCAA).

A summary of terms governing this award may be found on page three (3) of this letter.  Please note the following:

- A Full Grant-in-Aid covers the amount of a student's tuition, fees, room, board and required course related books as per NCAA Bylaw 20.02.7.
- Your award amount is the percentage of a Full Grant-in-Aid indicated above.  The dollar amount of your award will first be applied to your tuition balance.  Any remaining funds will then be applied to fees, room, board, and required course-related books.
- Awards may not be applied to off-campus room and board; award amounts may only be used for on-campus residence hall rooms and meal plans.
- Per the Hofstra University Undergraduate Bulletin, Athletic or "Activity" grants may be renewed if the recipient achieves and maintains a 2.0 cumulative grade point average and successfully completes 24 credit hours each academic year at Hofstra University with a minimum of 18 credit hours for a letter grade other than P.
- Hofstra University pays for a maximum of 17 hours per semester.
- Per the NCAA, if the value of the Athletic Grant-In-Aid exceeds the necessary expenses related to attendance, Hofstra University reserves the right to adjust any Athletic Grant-In-Aid.  Necessary expenses are limited to tuition, fees, room, board and books.
- Student-athletes are required to complete a FAFSA (Free Application for Federal Student Aid) form as well as a New York State TAP Grant application (For NY residents only).
- Any room or board changes must be approved by athletics compliance prior to submission to Residential Programs. Failure to do so may result in termination of this athletics aid agreement. The option to terminate will be determined by the head coach, athletics compliance and the director of athletics or designee.

Student initial

Parent/Guardian initial

Any Hofstra student-athlete receiving athletic aid may not be awarded other institutional aid per NCAA Bylaw 15.02.4.1 without prior approval from the Head Coach, and ultimately the Office of Financial Aid. Other institutional aid is defined as all funds administered by Hofstra University, which include, but are not limited to the following: scholarships, grants, tuition waivers or employee dependent tuition benefits.

If you have been offered an academic based merit award as an incoming freshman you must meet the criteria outlined in NCAA Bylaw 15.5.3.2.1.1 and stated below in order to receive the award. A cumulative 3.0 GPA at the end of each academic year is required for any merit award to be renewable.

NCAA Bylaw 15.5.3.2.1.1 criteria:
- A minimum of 3.5 core course GPA (based on a 4.0 scale), or
- A minimum SAT score of 1200 (Old SAT), 1270 (New SAT), or
- A minimum ACT sum score of 105, or
- Be ranked in the top 10% of the high school graduating class

Your signed acceptance of this letter indicates that you have read, understand, and agree to abide by the provisions of this agreement and the attached athletic grant-in-aid conditions

Sincerely,

Jessica Eads
Vice President for Enrollment Management,
Dean of Admission and Financial Aid

Jeff Hathaway
Director of Athletics

Head Coach

SIMON RIDDIOUGH
Please print name

Signature

Accepted:

Signature of Prospect/Student Athlete

/702169277
SS/700#

7/23/17
Date

Signature of Parent/Guardian

7/23/17
Date

This form must be properly signed and returned within two weeks of the issue date in order for your Athletic Grant-In-Aid Award to be finalized.
Please sign and return ONE copy directly to:

Sandra Mervius
Director of Financial Aid
202 Memorial Hall
126 Hofstra University
Hempstead, NY 11549