# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NORIANA RADWAN,<br>　　　　*Plaintiff*,<br><br>　　　　v.<br><br>UNIVERSITY OF CONNECTICUT BOARD<br>OF TRUSTEES, WARDE MANUEL,<br>LEONARD TSANTIRIS, and MONA<br>LUCAS, individually,<br>　　　　*Defendants*. | No. 3:16-cv-2091 (VAB) |

## RULING AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case arises out of events following a soccer game on November 9, 2014, where Noriana Radwan ("Plaintiff"), then a member of the University of Connecticut ("UConn") women's soccer team, made a hand gesture which was broadcast live on ESPNU, resulting in her dismissal from the UConn women's soccer team and the cancellation of her athletic scholarship.

Ms. Radwan has sued the UConn Board of Trustees, Leonidas Tsantiris ("Coach Tsantiris"), Head Coach of the UConn women's soccer team; Warde Manuel, UConn Athletic Director ("Athletic Director Manuel"); and Mona Lucas, UConn Director of Student Financial Aid Services. Compl., ECF No. 1 (Dec. 19, 2016).

She claims that UConn violated her rights under Title IX of the Education Amendments Act of 1972 ("Title IX"), and that Coach Tsantiris, Athletic Director Manuel, and Financial Aid Director Lucas (collectively, "Individual Defendants") violated her rights to equal protection and procedural due process under the Fourteenth Amendment and her rights under the First Amendment. Ms. Radwan also brings claims of breach of contract and negligent infliction of emotional distress under state law against the Individual Defendants.

Ms. Radwan and the Defendants have now filed cross-motions for summary judgment. Mot. for Summ. J., ECF No. 90 (Nov. 1, 2019) ("Defs.' Mot."); Cross Mot. for Summ. J., ECF No. 102 (Dec. 23, 2019) ("Pl.'s Mot."). Defendants move for summary judgment as to the Complaint in its entirety: Counts I–VI. Defs.' Mot. Plaintiff has moved for summary judgment only on her constitutional claims: Counts II, III, and IV. Pl.'s Mot.

For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED**, and Plaintiff's motion for partial summary judgment is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

<u>Parties</u>

Noriana Radwan was a full time student and a member of the UConn women's soccer team at the start of the 2014-2015 academic year. Defs.' Local Rule 56(a)(1) Statement of Undisputed Facts ¶ 19, ECF No. 91-1 (Nov. 1, 2019) ("Defs.' SOMF").

UConn is an institution of higher education and a state entity, part of the system of public higher education established by the Connecticut state legislature. *Id.* ¶ 1. The UConn Board of Trustees and its duties are established by statute. *Id.* ¶ 2 (citing Conn. Gen. Stat. §§ 10-103, 10-104). In 2014 and at all relevant times, UConn was a non-autonomous member of the National Collegiate Athletic Association's ("NCAA") Division I, subject to the NCAA bylaws for Division I non-autonomous members. *Id.* ¶ 3. UConn was also a member of the American Athletic Conference ("AAC") in 2014 and at all relevant times, subject to the AAC bylaws, rules, policies, and code of sportsmanship. *Id.* ¶ 4.

Warde Manuel served as Athletic Director for UConn from March 2012 until March 2016. Defs.' SOMF ¶ 6.

Leonard Tsantiris served as the women's head soccer coach at UConn from March 1981 until he retired in December 2017. *Id.* ¶ 7. The UConn women's soccer team competed in the AAC. *Id.* ¶ 5.

Coach Tsantiris ultimately reported to Athletic Director Manuel. *Id.* ¶ 12. On a day-to-day basis, Coach Tstantiris reported to Neal Eskin, the Senior Associate Director of Athletics and assigned Sport Administrator to women's soccer. *Id.* Mr. Eskin is not a party to this lawsuit.

Mona Lucas served as the UConn Director of Student Financial Aid Services in 2014 and at all relevant times. Defs.' SOMF ¶ 9.

<u>UConn Agreements and Codes of Conduct</u>

On February 2, 2014, UConn awarded Ms. Radwan a full out-of-state athletic scholarship to UConn for the 2014-2015 academic year, including tuition, fees, room, board, and books. Compl. Ex. A, ECF No. 1-1 at 4 ("Lucas Award Letter").

Ms. Lucas notified Ms. Radwan of her award by letter, which stated that the award was conditional upon, among other things, "adherence to NCAA, Conference, Division of Athletics and University rules, scholarship standards required by the University, and contribution to student life through participation in Women's Soccer." *Id.*

Under Bylaw 15.3.4.2(c) of the 2013–2014 NCAA Division I Manual, "Institutional financial aid based in any degree on athletics ability may be reduced or canceled during the period of the award if the recipient: . . . (c) Engages in serious misconduct warranting substantial disciplinary penalty." Pl.'s Local Rule 56(a)1 Statement of Facts ¶ 30, ECF No. 102-2 (Dec. 23, 2019) ("Pl.'s SOMF"); Compl. Ex. O, ECF No. 1-1 at 83–84 ("NCAA Division I Bylaw 15.3.4"). There is no definition of "serious misconduct" in the NCAA bylaws. Pl.'s SOMF ¶ 50;

Defs.' Local Rule 56(a)(2) Statement of Facts ¶ 50, ECF No. 106-1 (Feb. 7, 2020) ("Defs.' Opp'n SOMF").

On February 10, 2014, Ms. Radwan signed an NCAA National Letter of Intent indicating intent to enroll and play women's soccer at UConn. Defs.' Ex. 14, ECF No. 91-2 at 71 ("NLI").

On February 11, 2014, Ms. Radwan signed an Athletics Financial Aid Agreement. Compl. Ex. C, ECF No. 1-1 at 11 ("Ath. Fin. Aid Agreement"). Under the agreement, her financial aid "may be immediately reduced or canceled during the term of this award if" she "engage[s] in serious misconduct that brings substantial disciplinary penalty." *Id.*

All UConn student-athletes, including Ms. Radwan, were required to comply with the certification process specified in NCAA bylaws 12.7 and 14.4 in order to be eligible to participate in intercollegiate athletics. Defs.' SOMF ¶ 20.

On August 4, 2014, Ms. Radwan completed this certification process. *Id.* ¶ 21. As part of the process, she electronically signed a verification form indicating that she had read and agreed to the Student-Athlete Handbook and the UConn Student Code. Defs.' Ex. 16, ECF No. 91-2 at 74 ("UConn Verification of Documents Received"). The form included the statement: "I understand that violations of this [UConn] Student Code may render my participation and financial aid package null and void." *Id.*

The UConn Director of the Office of Community Standards has responsibility for coordinating the UConn student conduct system, including making final determinations as to what constitutes a potential violation of the Student Code. Defs.' SOMF ¶¶ 117–18. Cathy Cocks served as the Director of the Office of Community Standards from January 2005 through December 2018. *Id.* ¶ 115.

4

Under this office's procedure for a disciplinary hearing, a student would be sent a hearing notification letter explaining the alleged behavior and the alleged violation, and asked to confirm attendance at the hearing by a specific date, and notifying the student that they could have a support person present. Pl.'s SOMF ¶ 44.

The student also would be provided with a copy of the hearing agenda and copies of any documents that would be considered by the hearing officer. *Id.* If the student did not respond by the deadline, a disciplinary hearing would be conducted anyway. *Id.* ¶ 45. If a student-athlete behaved in a way that was prohibited by all students, then this behavior would fall within the scope of the Student Code. *Id.* ¶ 28; Defs.' Opp'n SOMF ¶ 28.

Student-athletes at UConn, however, were subject to "additional obligations" beyond those in the Student Code, "because student-athletes enjoy privileges that other students do not and they are responsible for requirements that do not apply to other students, i.e., athletic eligibility requirements, media relations," etc. Defs.' SOMF ¶ 19.

The 2013-2014 Student-Athlete Handbook specified in its code of conduct that the "University will not tolerate" unsportsmanlike behavior, including "[u]sing obscene or inappropriate language or gestures to officials, opponents, team members or spectators;" and "[v]iolating generally recognized intercollegiate athletic standards or the value and standards associated with the University as determined by your Head Coach and approved by the Athletic Director." Pl.'s Ex. G, ECF No. 101-9 ("UConn Student-Athlete Handbook").

Coach Tsantiris also developed written team rules for the women's soccer team for the 2014 season, titled "UConn Women's Soccer Contract." Defs.' SOMF ¶ 24. He had done so "because the previous few seasons had not been successful and [he] attributed part of the team's lack of success to the player[]s['] and team's lack of discipline." Defs.' SOMF ¶¶ 24–25;

Tsantiris Aff. ¶¶ 14–15, Defs.' Ex. 42, ECF No. 61-2 at 141–51. Coach Tsantiris developed the

rules with his assistant coaches, Margaret Rodriguez and Zachary Shaw, and had them approved

by Sport Administrator Eskin. Defs.' SOMF ¶¶ 13, 24. The Women's Soccer Contract required,

among other things, that the athletes "comply with all University, Athletic Department and

Women's Soccer program rules concerning conduct and behavior." Defs.' Ex. 43, ECF No. 91-2

at 152 ("Women's Soccer Contract").

Around August 4, 2014, Ms. Radwan signed the Women's Soccer Contract. Defs.'

SOMF ¶ 28.

### The Incident on November 9, 2014

On November 9, 2014, the UConn women's soccer team won an American Athletic

Conference ("AAC") tournament championship game against the University of South Florida,

Def.'s SOMF ¶ 29, a game broadcast live on television by ESPNU, *id.* ¶ 30.

The team celebrated on the field immediately following the game. During the celebration,

Ms. Radwan "showed her middle finger to an ESPNU camera and created an immediate social

media and internet topic." *Id.*; *see also* Pl.'s SOMF ¶ 1. The ESPNU camera operator who

captured the image could not say that the gesture was directed at the opposing team, and he did

not see any players from the opposing team while he was videoing. Pl.'s SOMF ¶¶ 2, 6.

Sport Administrator Eskin was present at the game and received a message on his phone

from the Associate Director of Athletics for Communications with a screen shot of Ms.

Radwan's gesture to camera. *Id.* ¶ 33. He immediately showed the image to Coach Tsantiris. *Id.*

Athletic Director Manuel had been attending a UConn basketball game while the

women's soccer team was celebrating, and he was shown a screen shot of Ms. Radwan's gesture

shortly after it occurred, and he directed UConn Athletic Department staff to contact the

6

women's soccer coaches about the incident immediately to make sure the behavior was not repeated by Ms. Radwan or anyone else. *Id.* ¶ 31. In his view, Ms. Radwan's behavior publicly embarrassed her, the team, and UConn, as it was unsportsmanlike and disrespectful. *Id.* ¶ 32.

Not long after the game, Coach Tsantiris confronted Ms. Radwan about the gesture and suspended her from all team activities including participating in the NCAA tournament. *Id.* ¶ 35. The UConn Athletic Department helped decide the discipline she would receive. *Id.* ¶ 36.

On the same day, the UConn Athletic department issued a press release from Coach Tsantiris, with assistance from Sport Administrator Eskin and other UConn Athletic Department Staff, apologizing for Ms. Radwan's gesture. *Id.* ¶ 37. The press release stated, in part: "In particular, we apologize to the American Athletic Conference, our opponent and host school USF and to the members of the television audience. . . . The student-athlete has been indefinitely suspended from all team activities, including participation in UConn's upcoming NCAA tournament games." Compl. Ex. D, ECF No. 1-1 at 14 ("UConn Women's Soccer Apology"). It also stated that the "gesture showed poor judgment and sportsmanship and does not represent what we want our program and University to stand for." *Id.*

Mr. Manuel did not receive a complaint about Ms. Radwan's gesture from the opposing coach, opposing players, or opposing university. Pl.'s SOMF ¶ 9.

Around 1:30 a.m. on November 10, 2014, the night of the AAC championship game, Ms. Radwan sent an e-mail to Assistant Coach Rodriguez and apologized for her behavior. Defs.' Ex. 24, ECF No. 91-2 at 97 ("Radwan Nov. 10, 2014 Apology E-mail"). Her e-mail stated, in part:

> I understand that this apology in no way excuses my actions. However, I wanted to say that I am truly sorry for the way I acted after the game. It was an impulsive move and my senses did not kick in until it happened. I was in the heat of the moment, and I don't know why that was my first move. Unfortunately, by the time I realized it was a huge mistake, it was too late. It was never my

> intention to bring about so much attention to me or the school. . . . I extended my apology out to the team, and I will continue to extend it to [C]oach and Zac, as well as the administrative team who was there. I have made a terrible mistake, but I hope you can accept my sincere apology.

*Id.* Ms. Radwan sent another e-mail to Asst. Coach Rodriguez on November 10, stating that she had stopped by the office to talk to any coaching staff who might be in. Defs.' Ex. 25, ECF No. 91-2 at 98 ("Radwan Nov. 10, 2014 Follow Up E-mail"). She also had set up an appointment with Athletic Director Manuel the following day to apologize and asked Assistant Coach Rodriguez for the best way to get in touch with Coach Tsantiris to speak with him. *Id.*

On November 10, 2014, the Associated Press reported that UConn had suspended Ms. Radwan for "ma[king] an obscene gesture to a television camera" after the AAC championship game, and that Coach Tsantiris had issued a statement apologizing to the conference, University of South Florida, and those who watched the game on television. Compl. Ex. E, ECF No. 1-1 at 16 (*UConn suspends Noriana Radwan*, ASSOCIATED PRESS (Nov. 10, 2014)).

On November 10, 2014, Ellen Ferris, Associate Commissioner for Governance and Compliance for the AAC ("Associate Commissioner Ferris"), spoke with Deborah Corum, Senior Associate Director of Athletics at UConn, regarding Ms. Radwan's gesture at the game. Defs.' SOMF ¶ 39. Associate Commissioner Ferris stated by e-mail that the AAC had a video of Ms. Radwan's gesture at the game and that they believed the action was a potential violation of the AAC Code of Conduct. Defs.' Ex. 5, ECF No. 91-2 at 30 ("AAC E-mails Nov. 10, 2014"). She requested any further information the institution had about the incident as well as any corrective measures that had been or would be taken. *Id.* Ms. Corum forwarded this request to Sport Administrator Eskin, who responded with a narrative of the incident. *Id.*

In an e-mail sent that day, Susan Herbst, the President of UConn, asked Mr. Manuel about the penalty being imposed by AAC. Pl.'s SOMF ¶ 12. Mr. Manuel responded: "Letter of reprimand. I would believe that would be all they would do. Anything else would be excessive. She's already been suspended by [Coach Tsantiris]." *Id.*

Ms. Corum sent a letter by overnight mail that day to Associate Commissioner Ferris in response to Ms. Ferris's request, stating that Coach Tsantiris had immediately suspended Ms. Radwan indefinitely from all team activities and that he would be meeting with Ms. Radwan "to discuss her future with the team." Defs.' SOMF ¶ 40; Defs.' Ex. 6, ECF No. 91-2 at 33 ("UConn Letter to AAC"). The letter attached Coach Tsantiris's press release and the e-mail narrative from Sport Administrator Eskin. UConn Letter to AAC. The letter copied Athletic Director Manuel, Coach Tsantiris, Sport Administrator Eskin, and Ms. Radwan. *Id.*

On November 11, 2014, Associate Commissioner Ferris sent an e-mail to Ms. Corum with the AAC Commissioner's Report "regarding the sportsmanship matter involving women's soccer student-athlete Noriana Radwan." Defs.' SOMF ¶ 41; Defs.' Ex. 7, ECF No. 91-2 at 35 ("AAC Comm'r Report"). The report found that, "[a]lthough [Ms. Radwan] indicated to the coach that she 'was caught in the heat of the moment,'" her gesture to the ESPNU camera was "a clear violation of the Conference Code of Conduct." AAC Comm'r Report. The AAC also stated that it agreed with UConn's conclusions and accepted its actions to address Ms. Radwan's behavior. *Id.* Further, the letter attached a letter of reprimand to Ms. Radwan, "as is typical in cases where an individual makes an obscene gesture." *Id.*

Upon receiving the Commissioner's Report, Athletic Director Manuel and Ms. Corum met with Ms. Radwan and informed her that she had received a letter of reprimand from the AAC. Defs.' SOMF ¶ 43. Ms. Corum responded to Associate Commissioner Ferris's e-mail later

that day, copying Sport Administrator Eskin, Mr. Manuel, and Coach Tsantiris, and stating that

UConn accepted the letter of reprimand to Ms. Radwan. Defs.'s Ex. 8, ECF No. 91-2 at 39

("UConn E-mail re: AAC Reprimand"). Ms. Corum stated in the e-mail to Ms. Ferris:

> Warde and I met with Noriana an hour ago and as part of the
> conversation, he informed her that she had received a letter of
> reprimand from the Commissioner for violating the Conference
> Code of Conduct. He also notified her that should she breach this
> policy in the future, that this reprimand could be used to indicate
> that she [should] receive more substantial penalties. Warde shared a
> quote with her that sums up the lesson for her: "The proactive
> approach to a mistake is to acknowledge it instantly, correct and
> learn from it." (Stephen Covey). We believe that Noriana has
> learned from this experience as she is being proactive in
> acknowledging her mistake and is trying to correct the harm that was
> done. She is remorseful and took it upon herself to approach Warde
> to express her apologies. She has learned a valuable the lesson the
> hard way but we hope that now we can all put this behind us and
> move on to winning a national championship in women's soccer.

*Id.*; Pl.'s SOMF ¶ 12. Mr. Eskin sent an e-mail to Mr. Manuel and Ms. Corum, stating: "Thanks

Deb and Warde—for meeting with Noriana. She was quite remorseful when I spoke to her

yesterday—and I commended her for taking the initiative to meet. The Covey quote is certainly

appropriate for this situation." Defs.' Ex. 8, ECF No. 91-2 at 39 ("Eskin E-mail Nov. 11, 2014").

On November 11, 2014, Mr. Manuel met with Ms. Radwan at her request. Pl.'s SOMF ¶

15. She was apologetic and remorseful. *Id.* Mr. Manuel listened to her and emphasized the

importance of sportsmanship, and how to represent herself, the team, and UConn. *Id.* He also

sent an e-mail to President Herbst that day, stating: "Case closed with the reprimand." *Id.* ¶ 14.

Up until that time, no report had been made to the UConn Office of Community

Standards about the November 9, 2014 incident. Defs.' SOMF ¶ 120.

10

With the exception of Ms. Radwan, the AAC did not reprimand any other UConn student-athlete from 2013 to October 2019. Defs.' SOMF ¶ 44; Eskin Aff. ¶ 22, Defs.' Ex. 4, ECF No. 91-2 at 23–29.

<u>November 2014–February 2015</u>

The UConn women's soccer team played NCAA tournament games on November 15 and November 22, 2014. Defs.' SOMF ¶¶ 45–46.

On November 20, 2014, Ms. Radwan sent an e-mail to Assistant Coach Rodriguez to wish her, the other coaches, and the women's soccer team luck at the upcoming game. Defs.' Ex. 26, ECF No. 91-2 at 99 ("Nov. 20 E-mails re: Apology Letter"). She also told Assistant Coach Rodriguez that she had left a letter on her desk and on Coach Tsantiris's desk. *Id.*

Assistant Coach Rodriguez replied the same day, stating that she had not gone into the office that morning but would "get the letter when we return." *Id.* She also said: "I know this is a hard time for you and I'm thinking of you. . . . Thanks for keeping in touch and I will touch base when we get back." *Id.*

At some point before the Thanksgiving break, from November 23 through 29, 2014, *id.* ¶ 47, Assistant Coach Shaw met with Ms. Radwan and discussed the incident, Defs.' SOMF ¶ 51. He told Ms. Radwan that her behavior was serious and that it could impact her scholarship. *Id.*

On November 27, 2014, Ms. Radwan sent an e-mail to Coaches Tsantiris, Rodriguez, and Shaw, wishing them a happy Thanksgiving. Defs.' Ex. 28, ECF No. 91-2 at 102 ("Thanksgiving 2014 E-mails"). Assistant Coach Rodriguez responded, wishing Ms. Radwan happy Thanksgiving in return. *Id.* Assistant Coach Rodriguez also said that she had not been back to the office since Ms. Radwan's last e-mail so still had not received Ms. Radwan's lettder. *Id.*; *see also* Defs.' Ex. 27, ECF No. 91-2 at 100–01 ("Radwan Apology Letter").

On December 2, 2014, Assistant Coach Rodriguez forwarded an email from Megan Hastillo, UConn Assistant Director of Equipment, to all members of the women's soccer team, including Ms. Radwan, requesting that all team members provide their shoe request to Ms. Hastillo for the next year. Defs.' SOMF ¶ 52; Defs.' Ex. 29, ECF No. 91-2 at 103 ("Shoe Request E-mail"). Ms. Radwan sent an e-mail to Ms. Hastillo with her shoe request the next day. Compl. Ex. J, ECF No. 101 at 72 ("Radwan Shoe Request").

In the beginning of December 2014, Ms. Radwan met with Coach Tsantiris for an end of season meeting that he held with every member of the women's soccer team at the end of the season. Defs.' Mem. ¶ 54. At this meeting, Coach Tsantiris told Ms. Radwan that she needed to work on her fitness and schoolwork for the upcoming year. *Id.* ¶ 55. He also told her that he would make a decision at the end of the semester about her future on the team. *Id.*

Ms. Radwan apologized to Coach Tsantiris for her behavior at the end of the AAC championship game. *Id.* Coach Tsantiris did not tell her at this meeting that he was considering recommending to his superiors that her scholarship be cancelled and that she should be taken off the team. *Id.* ¶ 56. He realized that this information could be devastating to her, and he did not want to distract her from her final exams. *Id.*

Assistant Coach Rodriguez met with Ms. Radwan after her end of season meeting with Coach Tsantiris. *Id.* ¶ 57. She told Ms. Radwan that she did not know about her future on the team, but that Coach Tsantiris was very upset about her behavior on November 9, 2014. *Id.* Following the November 9 incident, Coach Tsantiris had encountered other coaches teasing him about Ms. Radwan's behavior on November 9. Pl.'s SOMF ¶ 24; Defs.' Opp'n SOMF ¶ 24.

The process for cancelling a student-athlete's grant-in-aid for disciplinary reasons begins with the student-athlete's coach (here, Coach Tsantiris) making a recommendation to the Sport

Administrator (here, Sport Administrator Eskin), who would make a recommendation to the Athletic Director (here, Mr. Manuel). Defs.' SOMF ¶ 53. "The grant-in-aid would only be cancelled if AD Manuel agreed with the rationale provided by the coach and/or the Sport administrator." *Id.* The same procedure applied to the decision to remove a student-athlete from a team. *Id.* ¶ 54. There is no procedure in the UConn Student-Athlete Handbook, however, governing the termination of a grant-in-aid in midyear. Pl.'s SOMF ¶ 23.

In December 2014, Coach Tsantiris, Sport Administrator Eskin, and Mr. Manuel met to discuss cancelling Ms. Radwan's athletic grant-in-aid. Defs.' SOMF ¶ 66. Ultimately, Mr. Manuel made the final decision that Ms. Radwan's grant-in-aid could be cancelled for the spring semester. *Id.* ¶ 67. Assistant Coaches Rodriguez and Shaw agreed with the decision to cancel Ms. Radwan's scholarship. *Id.* ¶ 68.

On December 21, 2014, Coach Tsantiris called Ms. Radwan to tell her that her scholarship had been cancelled for the spring 2015 semester. *See* Defs.' SOMF ¶ 69.

After receiving the call from Coach Tsantiris, Ms. Radwan sent an e-mail to Mr. Manuel about the decision to take away her scholarship and asking for his help. Defs.' Ex. 9, ECF No. 91-2 at 43 ("Radwan E-mail to AD Manuel, Dec. 21, 2014"). She stated:

> The last time I spoke to Coach [Tsantiris] was during the year-end evaluation less than two weeks ago, in which we talked about the spring season and his expectations of me and how I should be performing in the Spring to maximize my impact on the team. I walked away after that meeting excited and looking forward to a brighter future with the team."

*Id.* She also stated that her "family d[id] not have any money to support [her] going anywhere else, and [she] need[ed] to keep [her] one year scholarship that was guaranteed to [her] for the rest of the spring." *Id.*

Later that evening, Ms. Radwan sent an e-mail to Coach Tsantiris, and copied Assistant Coach Rodriguez and Mr. Manuel, requesting that he reconsider his decision to remove her from the team and take away her athletic grant-in-aid. Defs.' SOMF ¶ 72. The e-mail stated, in part:

> When you evaluated me two weeks ago, you discussed your expectations of my performance in the spring season. You stated, "I want you to come back and play hard and make an impact on the team." You have not expressed to me that I was [in] jeopardy of losing my spot on the team and my scholarship before the end of May. . . .
>
> Now, with no other communication, I'm shocked to have received your phone [call] with no further justification just dismissing me from the team and taking away my scholarship. Further, you've advised me "to not attend UConn" in the spring, but if I must go to school, to "take classes at a community college"? This doesn't sound appropriate to me.

Defs.' Ex. 30, ECF No. 91-2 at 105 ("Radwan E-mail Dec. 21, 2014"). Her e-mail also expressed her hope to retain her scholarship for Spring 2015. *Id.*

On December 22, 2014, Assistant Coach Rodriguez responded to Ms. Radwan's e-mail, copying Assistant Coach Shaw and Coach Tsantiris. Defs.' SOMF ¶ 73. Ms. Rodriguez told Ms. Radwan that the "decision [wa]s final" and that the Athletic Department and coaching staff "[we]re moving forward with cancelling [he]r aid for the spring semester based on misconduct." *Id.* ¶ 74; Defs.' Ex. 31, ECF No. 91-2 at 106 ("Rodriguez E-mail Dec. 22, 2014"). She stated:

> We understand that canceling your aid is serious[,] but your obscene gesture at the championship game was serious as well and was an embarrassment to the University and [the] UConn women's soccer program. You were informed immediately after the incident that you will be suspended indefinitely and were told by [Coach Shaw] . . . that this incident could impact your scholarship.
>
> . . . . If you wish to stay at UConn this spring and continue to take the classes that you are registered for th[e]n you are more than welcome to do so, but we will not be able to help you financially. Coach [Tsantiris] brought up the option of taking classes back home in order to offer you an alternative. He thought this could be a less

14

expensive [option] for you. If you wish to transfer, as you mentioned in your email, then we will do what we can to help you find a program.

Rodriguez E-mail Dec. 22, 2014; *see also* Defs.' SOMF ¶¶ 75–77 (quoting excerpts).

Ms. Radwan understood that UConn's cancellation of her grant-in-aid did not mean that UConn expelled her or prohibited her from returning to UConn as a student in the spring 2015. Defs.' SOMF ¶ 85.

The custom and practice of UConn Athletics Compliance and Financial Aid for cancelling a student's athletic grant-in-aid was for Athletics Compliance to prepare a cancellation letter for the Financial Aid Director, Ms. Lucas, to sign. Defs.' SOMF ¶ 78. Ms. Lucas, or an authorized representative on her behalf, then would sign the letter, and then Financial Aid would provide the letter to Athletics Compliance to send to the student-athlete. *Id.*

On December 22, 2014, Ann Fiorvanti, Assistant Athletic Director for Compliance, sent Ms. Radwan a letter by e-mail from Financial Aid informing Ms. Radwan that her grant-in aid was being cancelled for the spring 2015 semester. *Id.* ¶ 80. Kimberly Campbell, an authorized representative of Ms. Lucas, signed the letter on Ms. Lucas's behalf. *Id.*; Pl.'s SOMF ¶ 27.

The letter stated that Ms. Radwan's scholarship had been terminated because of "serious misconduct" and that if Ms. Radwan considered the cancellation of the aid to be unfair or unjustified, she could request a hearing by contacting Ms. Lucas's office within fourteen business days of receiving the letter. Defs.' SOMF ¶¶ 81–82; Defs.' Ex. 17, ECF No. 91-2 at 75 ("Award Cancellation Letter"). The letter also attached the UConn Financial Aid Hearing Procedure, bylaw 15.3.2.3., which listed a slightly different time period to request an appeal. The Bylaws stated that a request had to be filed fourteen business days from the date on the letter. Defs.' SOMF ¶ 82; Award Cancellation Letter.

Ms. Lucas had not been in the office when Ms. Campbell signed the Award Cancellation Letter on her behalf. Defs.' SOMF ¶ 79. She also had no personal involvement with the decision to cancel Ms. Radwan's scholarship and no knowledge of Ms. Radwan's behavior on November 9, 2014. *Id.* ¶ 79.

On the same day, Angie Cretors, UConn Senior Associate Director of Athletics Compliance ("Assoc. Director of Athletics Compliance Cretors"), provided Ms. Radwan with a letter permitting her to contact other institutions about the possibility of transferring and playing soccer with another institution within the AAC. Defs.' SOMF ¶ 93; Defs.' Ex. 32, ECF No. 91-2 at 107 ("E-mail Permission to Contact").

Ms. Radwan also began exchanging text messages with Assistant Coach Rodriguez on December 22, 2014, regarding Ms. Radwan's efforts to transfer from UConn to a new school where she could join the soccer program in the spring of 2015, and Assistant Coach Rodriguez's efforts to help her. Defs.' SOMF ¶ 94; Defs.' Ex. 32, ECF No. 91-2 at 107 ("Text Messages"). These text messages continued through January 13, 2015. *Id.*

On December 23, 2014, Ms. Radwan sent an e-mail to Sport Administrator Eskin thanking him for "all [his] effort in getting [C]oach[ Tsantiris]'s decision reconsidered." Defs.' Ex. 10, ECF No. 91-2 at 44 ("Radwan E-mail to Eskin Dec. 23, 2014"). She said she "[l]ove[d] all of [UConn's] facilities and everything it ha[d] to offer," that she "could not picture [her]self anywhere else," and that the decision to cancel her scholarship "ha[d] destroyed [her] life." *Id.* She again expressed her regret for the November 9, 2014 incident, and stated that now she "d[id] not know where to go and what to do" and that she now "ha[d] less than a month to figure it out." *Id.* She stated that "the psychological and emotional agony [wa]s overwhelming[.]" *Id.*

On the same day, Ms. Radwan began contacting other NCAA Division I soccer coaches, seeking to transfer from UConn to play soccer at one of these schools. Defs.' SOMF ¶ 86.

On December 28, 2014, Ms. Radwan sent an e-mail to Coach Tsantiris requesting that he send a soccer highlight video she had created to coaches at other schools she had contacted. Defs.' Ex. 45, ECF No. 91-2 at 155 ("Radwan E-mail to Tsantiris Dec. 28, 2014").

At the end of December 2014, Coach Tsantiris spoke to Coach Riddiough, the Hofstra University women's soccer head coach, about Ms. Radwan. Defs.' SOMF ¶ 90. Coach Riddiough already knew about Ms. Radwan because he had attempted to recruit her while she was high school. *Id.* Coach Tsantiris reiterated that Ms. Radwan was an excellent player and that she would be a good addition to his program. *Id.*; Tsantiris Aff. ¶ 50.

By January 5, 2015, Ms. Radwan had removed all of her personal belongings from her UConn dorm room and the locker room at the UConn field house. Defs.' SOMF ¶ 91.

On January 5, 2015, Suzanne Pare, Assistant to the Director of Student Financial Aid Services at UConn, sent an e-mail to Ms. Radwan on behalf of Financial Aid Director Lucas. Lucas Dep. Ex. 7, ECF No. 91-2 at 292 ("Pare Fin. Aid E-mail Jan. 5, 2015"). Ms. Pare wrote "to find out if [Ms. Radwan was] going to request an appeal hearing regarding [her] financial aid" and asking that Ms. Radwan forward any request she might have sent to Ms. Lucas the previous week, since Ms. Lucas had been away from the office. *Id.*

Later that day, Coach Riddiough sent an e-mail to Ms. Radwan and offered her a place on the women's soccer team at Hofstra. Riddiough Dep. Ex. 5, ECF No. 91-2 at 323 ("Hofstra Offer E-mail"). He stated, in part:

> It was great meeting with you and your Mom the other day. As I stated on your visit we think very highly of you as a player. Your coaches at U[C]onn also spoke very highly about you as a person. With all that said, we were very excited that you chose to give

17

> Hofstra a second chance in the recruiting trails. As mentioned in our
> meeting[, w]e can offer Full Tuition and Fees for Spring 2015. We
> also can offer the same for [the] 2015/2016 academic year.

*Id.*

Around January 7, 2015, Ms. Radwan accepted Coach Riddiough's offer for an athletic grant-in-aid to transfer to Hofstra and to join the women's soccer team. Defs.' SOMF ¶ 92.

On January 8, 2015, Alyssa Morales, Assistant Director of Athletics/Compliance at Hofstra, sent a transfer eligibility questionnaire regarding Ms. Radwan. *Id.* ¶ 96; Defs.' Ex. 20, ECF No. 91-2 at 85 ("Hofstra Transfer Eligibility Questionnaire"). The questionnaire provided information about Ms. Radwan's academic and athletic eligibility and granted her use of the one-time transfer exception under NCAA rules for immediate eligibility at her next institution. Defs.' SOMF ¶ 97; Hofstra Transfer Eligibility Questionnaire.

On January 9, 2015, Ms. Radwan confirmed by text message to Assistant Coach Rodriguez that she was transferring to Hofstra. Defs.' SOMF ¶ 95; Text Messages.

On January 11, 2015, Ms. Radwan sent an e-mail to UConn residential life explaining her transfer from UConn and to avoid being charged for housing. Defs.' SOMF ¶ 98; Defs.' Ex. 40, ECF No. 91-2 at 137 ("Housing Cancellation E-mails"). Amy Crim, UConn Residential Life Interim Director for Housing Services, replied to Ms. Radwan's e-mail on January 13, 2015, advising her that her housing assignment had been cancelled. Defs.' SOMF ¶ 98; Housing Cancellation E-mails.

On January 13, 2015, Ms. Radwan submitted a request to be released from her NLI letter, triggering an automated e-mail from NLI to Mr. and Ms. Cretors. Defs.' SOMF ¶ 100; Defs.' Ex. 19, ECF No. 91-2 at 82 ("NLI Release E-mails"). Asst. Coach Rodriguez confirmed that Ms. Radwan had been released from her NLI. NLI Release E-mails.

On January 14, 2015, Ms. Radwan sent a letter to Ms. Lucas "formally requesting a hearing" on the decision to cancel her grant-in-aid scholarship. Compl. Ex. Q, ECF No. 101 at 90 ("Radwan Appeal"). The letter stated:

> In response to your December 22, 2014 letter notifying me that my grant-in-aid scholarship was cancelled, I am formally requesting a hearing. I am sending this by regular U.S. mail today, too, because it seems it may be the last day to 'file' the appeal[,] and I am not sure if that meant attaching the letter to the email was sufficient.

*Id.*

On the same day, Ms. Radwan cancelled her enrollment at UConn for the spring of 2015 by submitting an online request to the UConn Dean of Students about transferring to another university. Defs.' SOMF ¶ 101; Defs.' Ex. 38, ECF No. 91-2 at 133 ("Online Cancellation Screenshot"). The Dean of Students processed Ms. Radwan's enrollment cancellation request on January 16, 2015. Defs.' SOMF ¶ 102; Armstrong Aff. ¶ 3, Defs.' Ex. 37, ECF No. 91-2 at 131.

On January 21, 2015, Ms. Radwan received an athletic grant-in-aid offer from Hofstra. Defs.' SOMF ¶ 103; Compl. Ex. W, ECF No. 1-1 at 122 ("Hofstra Grant-in-Aid Agreement"). She received 37% of full aid for spring 2015, 75% of full aid for 2015–2016, and 72% of full aid for 2017–2018. Defs.' SOMF ¶ 104; Hofstra Grant-in-Aid Agreement.

On January 23, 2015, Ms. Lucas became aware of Ms. Radwan's request for a hearing to appeal her UConn grant-in-aid cancellation. Defs.' SOMF ¶ 109. Ms. Lucas forwarded an e-mail containing Ms. Radwan's appeal request to other financial aid staff, asking: "Did you share a copy of appeal request with me and Suzanne [Pare] during the holiday season? It looks like we are now out of compliance with the appeal process. What happened here?" Lucas Dep. Ex. 13, Defs.' Ex. 49, ECF No. 297 ("Lucas Internal Appeal Inquiry"). Financial Aid staff, including

Ms. Lucas, consulted with Athletics Compliance staff about whether a hearing would be required. Defs.' SOMF ¶ 109. The Athletics Compliance staff issued the following reply:

> After a calculation of the days between the date of her notification letter and the date of her appeal letter, 15 business days had elapsed (excluding Christmas day and New Year's Day—both official University closings.) Our office therefore believes Noriana should be notified that her request for an appeal is denied because the opportunity to request a hearing lapsed prior to her sending the appeal letter.

Lucas Ex. 16, Defs.' Ex. 49, ECF No. 91-2 at 298 ("E-mails re: Appeal Request"). Ms. Lucas and the Financial Aid Office then denied Ms. Radwan's hearing request without involvement from Coach Tsantiris or Manuel, the Athletic Director. Defs.' SOMF ¶ 111; Pl.'s Opp'n SOMF ¶ 111 (admitting).

Mr. Manual, however, claims to be the ultimate decision-maker at UConn with respect to terminating the grant-in-aid of a student-athlete, and he believed that Ms. Radwan's right to a hearing was an appeal of his decision to terminate a student-athlete's grant-in-aid. Pl.'s SOMF ¶ 17; Defs.' Opp'n SOMF ¶ 17 (admitting).

The weekend of January 24–25, 2015, Ms. Radwan moved into Hofstra dorms. Defs.' SOMF ¶ 105. She began classes that week. *Id.*

On January 29, 2015, Ms. Lucas notified Ms. Radwan that her appeal "request ha[d] been denied because the request for a hearing was not submitted within 14 business days of the December 22, 2014 notification letter." Defs.' SOMF ¶ 110; Lucas Dep. Ex. 11, Defs.' Ex. 49, ECF No. 91-2 at 296 ("Appeal Denial Letter").

On February 6, 2015, Ms. Radwan responded to Ms. Pare's January 5, 2015 e-mail, stating: "I definitely want to appeal." Defs.' SOMF ¶ 112; Lucas Dep. Ex. 9, Defs.' Ex. 49, ECF No. 91-2 at 293–94 ("Radwan Appeal E-mails"). She had requested a hearing on January 14,

2015, and "ha[d] been waiting to hear from Ms. Lucas for a while with the date [for the hearing]." Radwan Appeal E-mails.

On February 12, 2015, Ms. Pare sent Ms. Radwan a copy of the letter that Ms. Lucas sent on January 29, 2015, the one denying Ms. Radwan's request for an appeal. *Id.* Ms. Radwan responded the next day and wanted "to know how you calculated the 'business days' from December 22nd and whether this is the absolute end of my chance of an appeal hearing." *Id.* Ms. Pare forwarded this e-mail to Ms. Lucas. *Id.*

The UConn Office of Community Standards did not play a role in terminating Ms. Radwan's grant-in-aid. Pl.'s SOMF ¶¶ 35–36; Defs.' Opp'n SOMF ¶¶ 35–36. Ms. Cocks, the Director of the UConn Office of Community Standards, does not recall ever having a disciplinary matter referred to the Office of Community Standards based on someone making an obscene gesture. Pl.'s SOMF ¶ 42.

<u>Incidents Involving Other UConn Student-Athletes</u>

Around November 22, 2014, four UConn men's basketball players missed curfew during a tournament in Puerto Rico. Defs.' SOMF ¶ 145. They were sent home early and missed the rest of the tournament. Pl.'s SOMF ¶ 47. Two of these students had full athletic scholarships. Defs.' SOMF ¶ 146. The UConn Office of Community Standards did not receive a report of this incident, and the UConn men's head basketball coach did not recommend that their scholarships be cancelled or reduced. *Id.* ¶¶ 147–49.

Months later, on April 15, 2015, a member of the UConn men's soccer team who did not have an athletic scholarship was arrested for theft. Defs.' SOMF ¶¶ 137–38. The UConn Office of Community Standards received a report of the incident and held an administrative conference

with the student. *Id.* ¶¶ 139, 141. The Office of Community Standards issued a University

Warning and required him to participate in a "Living Your Values Workshop." *Id.* ¶ 141.

      The head coach of the men's soccer team stated about the incident: "I felt that [the

student] was a good kid and that the incident was not at all typical for him, so I decided that there

was no further consequence or punishment that I should recommend that the athletic department

issue to [the student] for his behavior." Reid Aff. ¶ 6, Defs.' Ex. 36, ECF No. 91-2 at 129.

      Nearly a year later, on October 2, 2015, a senior UConn football player on a full athletics

scholarship kicked a ball into the crowd. Defs.' SOMF ¶¶ 130–33. A game official assessed a

fifteen-yard penalty against UConn for the player's "unsportsmanlike conduct during the game."

*Id.* ¶ 133. The UConn Office of Community Standards did not receive a report of the incident,

the AAC did not reprimand the student, and the football coach did not recommend that his grant-

in-aid be cancelled. *Id.* ¶¶ 134–35.

      On March 21, 2016, David Benedict replaced Mr. Manuel as the UConn Athletic

Director. *Id.* ¶ 150.

      Around September 17, 2016, a member of the UConn football team on a full athletic

scholarship became involved in a physical altercation at an off-campus party. *Id.* ¶¶ 159–60. The

UConn Office of Community Standards received a report of his behavior, investigated the

allegations, held an administrative hearing, and determined that the student had violated various

provisions of The Student Code. The UConn Office of Community Standards imposed a sanction

of University probation and required completion of an educational project. *Id.* ¶ 163. Neither the

UConn men's football coach nor the Sport Administrator for football recommended that his

scholarship should be cancelled. *Id.* ¶ 164.

Nearly two years after Ms. Radwan's incident, on October 19, 2016, another member of

the UConn football team on a full athletic scholarship was arrested. *Id.* ¶¶ 154–55. The UConn

Office of Community Standards reviewed the matter and, after an administrative conference,

determined that he had violated several provisions of the Student Code. The UConn Office of

Community Standards imposed a sanction of University probation and required participation in

an educational program *Id.* Neither the men's football head coach nor the Sport Administrator

for football recommended that the student's scholarship be cancelled. *Id.* ¶ 158.

### B.    Procedural Background

On December 19, 2016, Ms. Radwan filed her Complaint. She alleged that UConn had

violated Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681. Compl. ¶¶ 57–90

(Count I). She also alleged that, under 42 U.S.C. § 1983, Defendants Manuel, Tsantiris, and

Lucas had violated her First Amendment rights and rights under the Equal Protection Clause and

the Due Process Clause of the Fourteenth Amendment. *Id.* ¶¶ 91–125 (Counts II–IV). Finally,

she alleged two state law claims—breach of contract and negligent infliction of emotional

distress—against all Defendants. *Id.* ¶¶ 126–46 (Counts V–VI).

In support of her Complaint, Ms. Radwan submitted thirty-three exhibits. Compl. Exs.,

ECF No. 1-1 (Dec. 19, 2016) (Exs. A–GG).

On June 5, 2017, Defendants moved to partially dismiss the Complaint. Mot. to Dismiss,

ECF No. 13 (June 5, 2017).

On December 14, 2017, the Court granted in part and denied in part Defendants' motion

to dismiss. Order, ECF No. 29 (Dec. 14, 2017). The Court dismissed all claims against

Defendants Manuel, Tsantiris, and Lucas in their official capacities and dismissed Counts V and

VI with respect to Defendant UConn. *Id.* The Court permitted the Title IX claim to proceed

against Defendant UConn, and permitted all other claims to proceed only against Defendants Manuel, Tsantiris, and Lucas in their individual capacities. *Id.*

The parties engaged in discovery and motion practice for nearly two years after the Court's ruling on Defendants' motion to dismissed, including numerous motions for extensions of time as to various deadlines. *See* Docket Entries, ECF Nos. 30–87.

On November 1, 2019, having been granted permission by the Court to file such documents under seal, Defendants filed a motion for summary judgment, Defs.' Mot., with two sets of supporting memoranda of law and Local Rule 56(a)1 Statements of Undisputed Facts: one publicly accessible redacted version, Mem. in Supp. of Summ. J., ECF No. 90-1 (Nov. 1, 2019) ("Defs.' Redacted Mem."); Local Rule 56(a)(1) Statement of Undisputed Facts, ECF No. 90-2 (Nov. 1, 2019) ("Defs.' Redacted SOMF"); and one unredacted version under seal, Mem. in Supp. of Summ. J., ECF No. 91 (Nov. 1, 2019) ("Defs.' Mem."); Defs.' SOMF. Defendants also submitted fifty-two exhibits. Defs.' Exs., ECF No. 90-3 (Nov. 1, 2019) ("Defs.' Redacted Exs."); Defs.' Exs., ECF No. 91-2 (Nov. 1, 2019) ("Defs.' Exs.").

On December 23, 2019, Plaintiff filed a memorandum of opposition to Defendants' motion for summary judgment, along with a statement of material facts in opposition to Defendants' statement of material facts. Mem. in Opp'n, ECF No. 101 (Dec. 23, 2019) ("Pl.'s Opp'n"); Local Rule 56(a)2 Statement of Facts, ECF No. 101-1 (Dec. 23, 2019) ("Pl.'s Opp'n SOMF"). She also submitted eight exhibits, including a flash drive containing ESPN footage of the November 9, 2014 incident discussed herein. Pl.'s Index to Exs., ECF No. 101-2 (listing "Exhibit H: Flash Drive of ESPNU Video Recording of Middle Finger Gesture"); Pl.'s Exs. A–G, ECF Nos. 101-3–101-8.

On the same day, Plaintiff filed a cross-motion for summary judgment. Pl.'s Mot. In support of her motion, she filed a memorandum of law, a statement of material facts, and the same eight exhibits she submitted with her opposition to Defendants' summary judgment motion. Mem. in Supp. of Summ. J., ECF No. 102-1 (Dec. 23, 2019) ("Pl.'s Mem."); Pl.'s SOMF; Pl.'s Exs. A–G, ECF Nos. 102-3–101-8.

On February 7, 2020, Defendants filed a memorandum in opposition to Plaintiff's motion for summary judgment. Mem. in Opp'n, ECF No. 106 (Feb. 7, 2020) ("Defs.' Opp'n"). In support, Defendants filed a statement of material facts in opposition and nine additional exhibits. Defs.' Opp'n SOMF; Exs., ECF No. 106-2 (Exs. 53–61).

The same day, Defendants filed a reply in support of their motion for summary judgment, in response to Plaintiff's opposition. Reply, ECF No. 105 (Feb. 7, 2020) ("Defs.' Reply").

On February 19, 2020, Plaintiff filed a reply in support of her cross motion for summary judgment, in response to Defendants' opposition. Reply, ECF No. 106 (Feb. 7, 2020). She also filed a statement correcting a "typographical error of substance in Paragraph 5 of her Rule 56(a)1 Statement." Corr. to Local Rule 56(a)1 Statement, ECF No. 107 (Feb. 19, 2020).

On April 30, 2020, the Court held a telephonic hearing on the cross-motions for summary judgment. Minute Entry, ECF No. 111 (Apr. 30, 2020).

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may

defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc*., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*.; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment).

The court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017). Conclusory allegations or denials will not be credited. *See Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor and the moving party is entitled to judgment as a matter of law, the court will grant the summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587–88 (1986).

26

III.    **DISCUSSION**

   A.    **The Title IX Claim**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C.A. § 1681(a). This provision is enforceable through an implied private right of action. *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016). Title IX "is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (internal quotation marks and alterations omitted)).

The Second Circuit has "long interpreted Title IX 'by looking to the . . . the caselaw interpreting Title VII'" of the Civil Rights Act of 1964. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019) (quoting *Yusuf*, 35 F.3d at 714). Title IX discrimination claims thus are analyzed under the *McDonnell Douglas* burden-shifting framework that applies to discrimination claims under Title VII. *Columbia Univ.*, 831 F.3d at 53–56 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Menaker*, 935 F.3d at 30 ("Because it is often difficult to obtain direct evidence of discriminatory intent, [courts] employ a 'burden-shifting framework' . . . to 'progressively sharpen the inquiry into the elusive factual question of intentional discrimination.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))).

The burden begins with the plaintiff. A "plaintiff can establish a *prima facie* case without evidence sufficient to show discriminatory motivation" if she can show: "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence

27

suggesting an inference that the employer acted with discriminatory motivation[.]" *Columbia Univ.*, 831 F.3d at 54 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)).

If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant "at the summary judgment stage 'to articulate some legitimate, nondiscriminatory reason for the adverse [ ] action.'" *Menaker*, 935 F.3d at 30 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506). If the defendant meets its burden to show a legitimate, nondiscriminatory rationale for its actions, the burden shifts back to the plaintiff, who "must submit admissible evidence from which a finder of fact could 'infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506).

"The Second Circuit has recognized two categories of Title IX claims in the context of university discipline: (1) claims of an erroneous outcome from a flawed proceeding, and (2) claims of selective enforcement." *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015) (internal citations omitted). In a selective enforcement case, the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. A plaintiff bringing a selective enforcement claim under Title IX "must show that gender bias was a motivating factor behind the erroneous outcome or the severity of the penalty." *Yu*, 97 F. Supp. 3d at 462 (internal citation and quotation marks omitted).

The parties agree that Ms. Radwan's claim is one of selective enforcement. Defs.' Mem. at 6; Pl.'s Opp'n Mem. at 8. She claims that UConn discriminated against her in violation of Title IX by "subjecting her to more severe penalties than it did, and does, for male-student athletes," Pl.'s Mem. at 2.

28

Defendants do not dispute that Ms. Radwan has met the first three prongs of a prima facie case under Title IX. They argue, rather, that Ms. Radwan has failed to establish the fourth prong, Defs.' Mem. at 8, of producing "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation[.]" *Columbia Univ.*, 831 F.3d at 54 (quoting *Littlejohn*, 795 F.3d at 307).

A plaintiff may raise an inference of discriminatory intent by showing that similarly situated individuals outside the plaintiff's protected group are treated more favorably than the plaintiff. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997) (stating that a woman may prove inference of discrimination by showing a similarly situated man treated differently)).

"To be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare herself must be similarly situated in all material respects." *Shumway*, 118 F.3d at 64. "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (quoting *Graham*, 230 F.3d at 40)). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.* at 494 (quoting *Graham*, 230 F.3d at 40). Although the question of whether comparators are similarly situated is typically a question of fact for the jury, a court may "properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

29

In order for Ms. Radwan to establish a *prima facie* case, therefore, she must show that UConn's disciplinary actions "against [her] were motivated by h[er] gender and that a similarly situated []man would not have been subjected to the same disciplinary proceedings." *Yu*, 97 F. Supp. 3d at 480 (internal citation, alterations, and quotation marks omitted)).

Ms. Radwan contends that eight male athletes were similarly situated individuals who engaged in comparably serious or more serious conduct yet were disciplined less severely than she was. Pl.'s Opp'n Mem. at 11. Ms. Radwan argues that "male members of UConn's high-profile men's basketball and football teams [ ] have engaged in more serious misconduct, be it unsportsmanlike conduct during a game, violations of team rules on or off the playing field, and even criminal acts," Pl.'s Mem. at 2, "but did not have their athletic grant-in-aid cancelled and were not suspended or dismissed from their teams," Pl.'s Opp'n Mem. at 11.[1]

Defendants argue that "no reasonable jury could find that" any of the male student-athletes to whom Ms. Radwan compares herself were similarly situated to Ms. Radwan because "no male students-athletes [ ] made an obscene gesture on national television at the conclusion of competition from 2013 to 2016," none of the male student-athletes were reprimanded by the AAC for their behavior, Defs.' Mem. at 9, and "none of the male student-athletes' coaches recommended to the assigned Sport Administrator and then the Athletic Director that their grant-in-aid should [be] cancelled because of their behavior," Defs.' Reply at 4.

---

[1] Ms. Radwan also refers to a spreadsheet from the UConn Office of Community Standards detailing student-athletes' discipline action taken by that office. Compl. Ex. Y, ECF No. 1-1 at 128–37 (June 27, 2016) ("E-mail with Discipline Spreadsheet"). The spreadsheet in the record, however, does not indicate the gender of the students disciplined. Ms. Radwan's counsel conceded during the hearing on April 30, 2020, however, that the spreadsheet contains both men and women. Additionally, counsel for UConn represented at the hearing that the spreadsheet only reflects disciplinary actions taken against student-athletes involving the UConn Office of Community Standards, but does not reflect disciplinary actions taken solely within UConn's Athletics Department, such as Ms. Radwan's, an assertion not disputed by Plaintiff's counsel. For all of these reasons, to the extent the information provided in the spreadsheet is even relevant, it is not probative of Ms. Radwan's gender discrimination claim.

The Court agrees.

Under Title VII, which Title IX law follows as a model, *see Doe*, 831 F.3d at 55–56

("Title VII cases provide the proper framework for analyzing Title IX discrimination claims."),

"'whether or not co-employees report to the same supervisor is an important factor in

determining whether two employees are subject to the same workplace standards for purposes of

finding them similarly situated[,]'" *Brown v. Waterbury Bd. of Educ.*, 247 F. Supp. 3d 196, 209

(D. Conn. 2017) (quoting *Diggs v. Niagara Mohawk Power Corp.*, No. 114-CV-244GLSCFH,

2016 WL 1465402, at *4 (N.D.N.Y. Apr. 14, 2016)).

Where the proposed comparator employees "report[] to wholly different supervisors"

from the plaintiff, it "greatly weakens the strength of the inference that could be drawn from any

[] disparate treatment." *Gambrell v. Nat'l R.R. Passenger Corp.*, No. 01 CIV. 6433 (NRB), 2003

WL 282182, at *7 (S.D.N.Y. Feb. 3, 2003); *see also Smith v. Xerox Corp.*, 196 F.3d 358, 370–71

(2d Cir. 1999) ("Because intent is the critical issue [in disparate treatment cases], only a

comparison between persons evaluated by the same decision-maker is probative of

discrimination."), *overruled on alternate grounds by Meachem v. Knolls Atomic Power Lab*, 461

F.3d 134 (2d. Cir. 2006); *Russell v. N.Y. Univ.*, 1:15-cv-2185-GHW, 2017 WL 3049534 *32

(S.D.N.Y. July 17, 2017) ("To be considered similarly situated, an individual must have been

treated more favorably by the same decisionmaker that dealt with the plaintiff.").

Courts in the Second Circuit therefore have held that where employees are disciplined by

different supervisors, they are not similarly situated. *See Brown*, 247 F. Supp. at 209 (finding that

proposed comparators were not similarly situated because they had different supervisors, even

though they were "[p]resumably . . . subject to the same general workplace standards");

*McDowell v. T Mobile USA, Inc.*, No. CV-04-2909, 2007 WL 2816194, at *9 (E.D.N.Y. Sept.

31

26, 2007) (concluding that employees who reported to a different supervisor than plaintiff were not similarly situated, despite being subject to the same workplace rules), *aff'd*, 307 F. App'x 531 (2d Cir. 2009); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) (finding plaintiff not similarly situated where "[a] different decisionmaker was responsible for investigating and determining how to discipline" comparator); *Baity v. Kralik*, 51 F. Supp. 3d 414, 447 (S.D.N.Y. 2014) (plaintiff failed to create an inference of discrimination where different decisionmakers were involved in comparative employment decisions).

Indeed, although the Second Circuit has not ruled in a case involving student-athletes, the Sixth Circuit has recognized in the context of an Equal Protection claim that, "[t]o be similarly situated, a player 'must have dealt with the same [coach], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.'" *Heike v. Guevara*, 519 F. App'x 911, 920 (6th Cir. 2013).

It is undisputed that the process for terminating a student-athlete's grant-in-aid at UConn begins with the head coach for that student's team making such a recommendation to the Sport Administrator for that sport. Defs.' SOMF ¶ 53; Pl.'s Opp'n SOMF ¶ 53. If the Sport Administrator agrees, then he or she may make a recommendation to the Athletic Director. *Id.* If the Athletic Director is also in agreement, he or she may then make a recommendation to the Financial Aid Office that the student-athlete's scholarship be terminated. Defs.' SOMF ¶ 78; Pl.'s Opp'n SOMF ¶ 78. But if the coach never makes a recommendation to the Sport Administrator that the student's scholarship be terminated, the process is never started and neither the Sport Administrator nor the Athletic Director ever becomes involved in a decision regarding the student's scholarship.

None of the coaches for the male student-athletes' teams discussed here recommended to their respective Sport Administrators that the students' scholarships be cancelled, and thus the decision regarding their scholarships never reached a decision-maker—the athletic director, Mr. Manuel—who had to approve the cancellation of Ms. Radwan's scholarship. (Significantly, because Ms. Radwan failed to appeal timely her coach's recommendation of the termination of her scholarship, Mr. Manuel's adoption of the coach's recommendation does not provide record evidence probative of his alleged discriminatory intent.). As a result, these students cannot serve as comparators for purposes of raising an inference of discriminatory intent based on gender bias against Ms. Radwan. *Cf. Smith*, 196 F.3d at 370–71 ("Because intent is the critical issue [in disparate treatment cases], only a comparison between persons evaluated by the same decision-maker is probative of discrimination.").

In any event, except for the curfew incident with the male basketball players, none of these allegedly comparable incidents are sufficiently probative of the intent of the decision regarding Ms. Radwan because they happened months or even years after the incident with Ms. Radwan, and some of them occurred after Athletic Director Manuel left his position. *See Annis v. Cty. of Westchester*, 136 F.3d 239, 247 (2d Cir. 1998) (holding that evidence regarding events that took place years before the discriminatory acts at issue should have been excluded as it was prejudicial but "only minimally probative"); *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 208 (2d Cir. 2005) ("[I]t is not clear to us that the extrinsic evidence on which the court relied—including letters exchanged between the parties in Spring 2000—was in any event relevant to the determination of the parties' intent at the time they entered into the [contract], nearly three years earlier." (internal citation and quotation marks omitted)) ; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("While Morgan alleged that

he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through . . . the date that he was fired, only incidents that took place within the timely filing period are actionable."). And, as noted above with respect to the curfew incident, the basketball coach, unlike Ms. Radwan's coach, did not recommend the cancellation of their scholarships. The process involving the Athletic Director therefore never began.

As a result, Ms. Radwan has not established a genuine issue of material fact that any of her proposed comparators were similarly situated individuals for purposes of inferring discriminatory intent. *Cf. Curto v. Smith,* 248 F. Supp. 2d 132, 147 (N.D.N.Y. 2003) ("Plaintiff's allegations compare apples and oranges—the fact that a male student charged with misconduct was treated differently from a female student expelled for deficient academic performance is not probative of discriminatory animus."), *aff'd in part, appeal dismissed in part sub nom. Doe v. Anonymous Unnamed Sch. Emps. & Officials of Cornell Univ. Coll. of Veterinary Med.*, 87 F. App'x 788 (2d Cir. 2004), *and aff'd*, 93 F. App'x 332 (2d Cir. 2004).

Thus, Ms. Radwan has failed to establish a *prima facie* case.

Even if the record evidence could be considered sufficient to establish a *prima facie* case of discrimination for Ms. Radwan, Defendants argue that UConn has met its burden under the *McDonnell Douglas* framework to put forward a legitimate, nondiscriminatory reason for Ms. Radwan's treatment, and that Ms. Radwan has failed to meet the burden shifted back upon her under *McDonnell Douglas* to show that Defendants' non-discriminatory rationale was pretext. Defs.' Mem. at 17–19.

Ms. Radwan asserts that "UConn has not presented evidence of a non-discriminatory justification for the adverse action it took against [Ms. Radwan]." Pl.'s Opp'n Mem. at 14.

The Court disagrees.

Defendants claim to have removed Ms. Radwan from the soccer team and cancelled her scholarship because her gesture constituted misconduct. Sufficient evidence exists in the record to support this contention.

It is undisputed that Coach Tsantiris recommended to Sport Administrator Eskin and Mr. Manuel, who agreed, that Ms. Radwan's scholarship be cancelled because of her behavior on November 9, 2014 constituted serious misconduct in violation of a women's soccer team rule and the UConn Student-Athlete Code. Defs.' Mem. at 17.

Coach Tsantiris states that that "[n]o other player in [his] then 34 years as UConn head coach [for women's soccer] had behaved this way" and that Ms. Radwan's gesture "was a blow to the team, the program and UConn." Tsantiris Aff. ¶ 25. UConn issued an apology on Coach Tsantiris's behalf for Ms. Radwan's gesture immediately after it occurred, directing the apology to the AAC, the opposing team and school, and to television viewers who had seen the Ms. Radwan's gesture. UConn Women's Soccer Apology.

The release stated that that the "gesture showed poor judgment and sportsmanship and does not represent what we want our program and University to stand for." *Id.* It also stated that Ms. Radwan had been indefinitely suspended from all team activities, including participation in UConn's upcoming NCAA tournament games." *Id.* The AAC Commissioner's Report issued two days later stated that, "[a]lthough [Ms. Radwan] indicated to the coach that she 'was caught in the heat of the moment,'" her gesture to the ESPNU camera was "a clear violation of the Conference Code of Conduct." AAC Comm'r Report.

Defendants thus have met their burden to articulate a legitimate, non-discriminatory rationale for termination of Ms. Radwan's scholarship and her termination from the soccer team.

With the Defendants having met their burden, the burden shifts back to Ms. Radwan, who "must submit admissible evidence from which a finder of fact could 'infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Menaker*, 935 F.3d at 30 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506); *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 380–81 (2d Cir. 2003) ("Once the employer produces evidence of legitimate reasons for its actions, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the real reason for the adverse employment decision was discrimination."). "[A] motion for summary judgment may be defeated where 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *Bracey v. Waterbury Bd. of Educ.*, No. 3:17-cv-1100 (SRU), 2020 WL 1062939, at *5 (D. Conn. Mar. 5, 2020) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)).

But in the absence of comparators similarly situated to her or any other evidence that her gender affected the decision of her coach or UConn, no reasonable jury could find that UConn had discriminated against her under Title IX. *See Graham*, 230 F.3d at 39 (stating on summary judgment: "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, . . . [she] must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself.").

Accordingly, Defendants' motion for summary judgment as to Ms. Radwan's Title IX claim against UConn will be granted.

## B.    The Equal Protection Clause Claims

Ms. Radwan brings claims under 42 U.S.C. § 1983 that Athletic Director Manuel, Coach Tsantiris, and Director of Financial Aid Lucas discriminated against her based on her sex in

36

violation of her rights under the Equal Protection Clause of the Fourteenth Amendment. Both Ms. Radwan and Defendants have moved for summary judgment on these claims.

"Individuals have a clear right, protected by the Fourteenth Amendment, to be free from discrimination on the basis of sex" by public institutions. *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 117 (2d Cir. 2004). To establish a claim under Section 1983, a plaintiff must show that "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis*, 136 F.3d at 245 (citing *Eagleston v. Guido*, 41 F.3d 865, 872 (2d Cir. 1994)).

For a student to succeed on a claim of selective enforcement under the Equal Protection clause, she must show both "(1) that [she was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Doninger v. Niehoff*, 642 F.3d 334, 357 (2d Cir. 2011) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)); *Spring v. Allegany-Limestone Cent. Sch. Dist.*, 655 F. App'x 25, 28 (2d Cir. 2016) (a plaintiff must show that she "was treated differently than others similarly situated as a result of intentional or purposeful discrimination." (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (internal quotation marks omitted))).

Additionally, a plaintiff must show that the defendant was personally involved in the adverse action taken against her. *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) ("If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." (emphasis in the original)).

37

The Second Circuit recently held, in the employment context, that "a plaintiff pursuing a claim for employment discrimination under § 1983 . . . must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action." *Naumovski v.*, 934 F.3d at 214. This means that "a plaintiff must establish that the employer's stated reason would not, alone, constitute a sufficient basis for pursing an adverse action." *Id.* at 215.

Defendants argue that the Court should apply the causation standard recently imposed by the Second Circuit in employment cases brought under Section 1983. Defs.' Mem. at 5. They argue that Coach Tsantiris is not liable under the Equal Protection Clause because he was not involved in any decision that related to disciplining the male student-athlete comparators, *id.* at 15; that Mr. Manuel is not liable because the male students either were not similarly situated or, with respect to the comparators who were disciplined after Mr. Manuel left UConn in 2016, he was not involved in the discipline applied to male comparators, *id.* at 16; and that Financial Aid Director Lucas is not liable because she was not personally involved in the decision to discipline Ms. Radwan, *id.* at 19. Defendants argue in the alternative that Individual Defendants are entitled to qualified immunity on Ms. Radwan's Equal Protection Clause claims. Defs.' Mem. at 28–35.

Ms. Radwan does not explicitly address Defendants' contention that but-for causation is required for her claim to succeed. Rather, she argues that she is entitled to summary judgment because she has established that "Defendants violated her right to equal protection under the law by subjecting her, as a female student-athlete, to more stringent disciplinary standards and to harsher disciplinary sanctions than male student-athletes at UConn who engage in unsportsmanlike conduct or far more serious misconduct." Pl.'s Mem. at 8. She also argues that "Defendants did have the requisite personal involvement" to be liable under Section 1983. *Id.*

38

The Second Circuit has not ruled on whether but-for causation is required outside the employment context—for example, where, as here, student claims that a school's disciplinary action violated her rights under the Equal Protection Clause.

The Court need not resolve that question, however, because it finds that Defendants are entitled to summary judgment for reasons other than causation.

### 1.   The Equal Protection Clause Claim against Ms. Lucas

Ms. Radwan argues that Ms. Lucas, the Financial Aid Director, was personally involved in "depriving the Plaintiff of the opportunity to appeal the cancel[l]ation of her full scholarship" because she "made the determination to deny [P]laintiff's hearing request." Pl.'s Mem. at 10.

Defendants argue that Ms. Lucas did not violate Ms. Radwan's equal protection rights because she "had no knowledge about [Ms. Radwan]'s behavior, or that Coach Tsantiris recommended and that AD Manuel made the final decision that Ms. Radwan's athletic grant-in-aid should be cancelled at the time the Financial Aid letter was emailed to [Ms. Radwan]." Defs.' Mem. at 31. They argue further that Ms. Radwan's reliance on Ms. Lucas's involvement in denying Ms. Radwan's appeal "is wholly insufficient to demonstrate that Ms. Lucas personally acted with sexual discriminatory intent against the [P]laintiff." Defs.' Reply at 6.

The Court agrees.

"[I]n disparate treatment cases brought pursuant to § 1983, 'liability for an Equal Protection Clause violation . . . requires personal involvement by a defendant, who must act with discriminatory purpose." *Raspardo*, 770 F.3d at 125 (quoting *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012)).

There is nothing in this record suggesting that Ms. Lucas had any personal involvement in the decision to cancel Ms. Radwan's scholarship or even knew the reason why her scholarship

was terminated. Indeed, the record evidence shows that the Financial Aid Office merely executed decisions made by the Athletic Director regarding decisions to withdraw cancel student-athletes' scholarships, and that it did so in Ms. Radwan's case as usual. *See* Fiorvanti Aff. ¶¶ 16–17. Ms. Lucas did not sign the original letter cancelling Ms. Radwan's scholarship, but rather an authorized representative signed it on her behalf. *See id.*; Award Cancellation Letter. The evidence shows that Ms. Lucas was not even aware that Ms. Radwan's scholarship had been cancelled until January 23, 2015, when she sent an e-mail to her staff asking about it. Lucas Internal Appeal Inquiry.

As a result, Defendants will be granted summary judgment on Ms. Radwan's Equal Protection Clause claim against Ms. Lucas. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (granting summary judgment to defendants on a procedural due process claim where there was "insufficient evidence that any Defendant who directly participated in the parole rescission process knew of the facts making the process illegal"), *as amended* (Feb. 24, 2016). The Court therefore need not reach the issue of qualified immunity for Ms. Lucas on this claim.

### 2.  The Equal Protection Clause Claim against Coach Tsantiris

Ms. Radwan argues that Coach Tsantiris was personally involved in violating her equal protection rights because he made the decision to recommend that her scholarship be terminated. Pl.'s Mem. at 10.

Defendants argue that Coach Tsantiris did not violate Ms. Radwan's equal protection rights because he was not involved in any decision that related to disciplining the male student-athlete comparators, nor did he have any authority over those comparators. Defs.' Mem. at 15. Defendants cite to the Sixth Circuit decision in *Heike* to support their argument, arguing that, "[t]o be similarly situated, a player 'must have dealt with the same [coach], have been subject to

40

the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.'" *Id.* at 16 (quoting *Heike*, 519 F. App'x at 920)).

The Court agrees.

A plaintiff bringing an Equal Protection Clause claim must show that she "was treated differently than others similarly situated as a result of intentional or purposeful discrimination." (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (internal quotation marks omitted)). In combination with the Section 1983 requirement that the defendant be personally involved in the alleged constitutional violation, a defendant in a selective enforcement case must have been involved in the discipline leveled against both the plaintiff and her comparators.

The evidence in this record establishes, and Plaintiff concedes, that Coach Tsantiris had no authority over any of the male student-athletes and was not involved, nor could he have been involved, in the decisions to discipline any of them for their conduct. *See, e.g.*, Tsantiris Aff. ¶¶ 5–6.

As a result, Defendants will be granted summary judgment on Ms. Radwan's Equal Protection Clause claim against Coach Tsantiris. The Court therefore needs not reach the issue of qualified immunity for Coach Tsantiris on this claim.

### 3. The Equal Protection Claim against Athletic Director Manuel

Ms. Radwan argues that Athletic Director Manuel violated her equal protection rights because he "wrongfully took it upon himself to be the final decision-maker who terminated the Plaintiff's athletic grant-in-aid," rather than referring her conduct to the UConn Office of Community Standards. Pl.'s Mem. at 9–10.

41

Defendants argue in response that Ms. Radwan's argument as to Athletic Director Manuel is "confusing," because she "does not even allege that the process/procedure used for cancelling" Ms. Radwan's scholarship "was different from the process/procedure used to cancel" male student-athletes' scholarships. Defs.' Opp'n Mem. at 11. "In fact," Defendants contend:

> she argues just the opposite[,] . . . emphasiz[ing] that [the] Office of Community Standards "was never been [sic] involved with any cases in which a student athlete's grant-in-aid was terminated, and was never asked by the Athletic Director for her advice or guidance on how to handle a disciplinary matter."

*Id.* (quoting Pl.'s Mem. at 9–10).

Defendants argue further that Athletic Director Manuel did not violate Ms. Radwan's rights under the Equal Protection Clause because the male student-athletes are not similarly situated; or, with respect to the players who were disciplined after Athletic Director Manuel left UConn in March 2016, Athletic Director Manuel was not involved in the decisions to discipline them. Defs.' Mem. at 16.

The Court agrees.

Ms. Radwan admits Defendants' description of the process for cancelling a student-athlete's grant-in-aid for disciplinary reasons: the process begins with the student-athlete's coach making a recommendation to the Sport Administrator, who would make a recommendation to the Athletic Director. Defs.' SOMF ¶ 53; Pl.'s Opp'n SOMF ¶ 53. She also admits that none of the coaches for comparator male student-athletes recommended that their scholarships be cancelled. Thus, Mr. Manuel never became involved in a decision to terminate their student aid.

Of course, no male student-athlete disciplined after Athletic Director Manuel left UConn could be comparators for purposes of Ms. Radwan's Equal Protection Clause claim, even if their coaches had recommended their scholarships be removed, since Athletic Director Manuel would

not have been involved in the decisions to discipline those players. *See Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 143 (2d Cir. 2010) (affirming grant of summary judgment on equal protection claim in part based on lack of evidence "that the same decisionmakers were aware of [any alleged] similarity [between plaintiff and proposed comparators] and treated [plaintiff] differently"). Moreover, the lack of involvement of UConn's Office of Community Standards is immaterial to Plaintiff's claim, since that office also was not involved in all of the comparators' cases.

As a result, Defendants will be granted summary judgment on Ms. Radwan's Equal Protection Clause claim against Athletic Director Manuel because he, like Coach Tsantiris, was not involved in the decisions regarding the student aid for the male comparators. The Court therefore need not reach the issue of qualified immunity for Mr. Manuel on this claim.

### C.    The Procedural Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "To award damages under 42 U.S.C.§ 1983 for [an] alleged violation of procedural due process, a court must find that, as a result of conduct performed under color of state law, the plaintiff was deprived of life, liberty, or property without due process of law." *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).

To determine whether a procedural due process violation has occurred, courts first "ask whether there exists a liberty or property interest of which a person has been deprived," and, if

43

so, "whether the procedures followed by the State were constitutionally sufficient." *Victory*, 814 F.3d at 59 (quoting *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)). Again, Section 1983 claims require the personal involvement of defendants in order to for them to be liable for deprivation of constitutional rights. *Victory*, 814 F.3d at 67 ("'Because vicarious liability is inapplicable to . . . § 1983 suits,' [a plaintiff] must raise a genuine dispute as to whether 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)); *Raspardo*, 770 F.3d at 115 ("If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." (emphasis in the original)).

Ms. Radwan brings claims under 42 U.S.C. § 1983 that Athletic Director Manuel, Coach Tsantiris, and Director of Financial Aid Lucas violated her rights under the Due Process Clause of the Fourteenth Amendment by terminating her scholarship mid-way through the academic year without sufficient process. Both Ms. Radwan and Defendants have moved for summary judgment on these claims.

Ms. Radwan contends that she had a protected property interest in the athletic grant-in-aid that she was awarded for the 2014–15 academic year. Pl.'s Mem. at 11. She argues that Defendants violated her procedural due process rights by terminating the award mid-year. She argues that Athletic Director Manuel circumvented or ignored UConn's regular student disciplinary authority—the Director of Community Standards—in deciding to terminate her aid, and that Financial Aid Director Lucas denied her due process by failing to grant her a reasonable opportunity for a hearing. Compl. ¶¶ 102–116; Pl.'s Mem. at 11–12; Pl.'s Opp'n Mem. at 15–18.

Defendants argue that Ms. Radwan had no protected property interest in her athletic grant-in-aid. Defs.' Mem. at 20–22. Even if she did have a protected property interest,

Defendants argue that Defendants provided all process that was due. *Id.* at 22–24. Defendants argue further that Coach Tsantiris and Athletic Director Manuel would not be liable in any event because they were not personally involved in the alleged deprivation of Ms. Radwan's procedural due process. *Id.* at 24. Finally, Defendants argue that all Individual Defendants are entitled to qualified immunity on the procedural due process claims. *Id.* at 30–32; 35–36.

The Court agrees.

Property interests that are protected by the Due Process Clause of the Fourteenth Amendment are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). "Thus, when determining whether a plaintiff has a claim of entitlement, courts focus on the applicable statute, contract or regulation that purports to establish it." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 381 (S.D.N.Y. 2014); *see also Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994) (stating same).

"The Second Circuit has held that, where a complaint alleges the breach of an ordinary contract, 'the right to payment on such a contract does not rise to the level of a constitutionally protected property interest.'" *Res. Servs., LLC v. City of Bridgeport*, 590 F. Supp. 2d 347, 358 (D. Conn. 2008) (quoting *Martz*, 22 F.3d at 31); *see also Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991) ("[N]ot every contractual benefit rises to the level of a constitutionally protected property interest. It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state actor into a federal claim." (internal citation, quotation marks, and alterations omitted)).

A contract can, however, give rise to protected property interest where the contract "protects its holder from the 'state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits,[2] or permanence in the case of tenure,[3] or sometimes both.'" *Gizzo*, 44 F. Supp. 3d at 381 (quoting *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988)).

In the Second Circuit, employment contracts have been found to give rise to a cognizable property interest. *See Malapanis v. Regan*, 340 F. Supp. 2d 184, 190 (D. Conn. 2004) (stating that "the Second Circuit ha[d] found cognizable property interests in contracts only in the employment context, where the contracts include 'tenure provisions and the like, or where a clearly implied promise of continued employment has been made.'" (quoting *Walentas v. Lipper*, 862 F.2d 414 (2d Cir. 1988)), *aff'd*, 147 F. App'x 219 (2d Cir. 2005))).

Ms. Radwan's contract for an athletic grant-in-aid did not have the qualities of "dependence" or "permanence" required for it to create a constitutionally protected property interest. The contract was for a term of only one year, and Ms. Radwan did not depend on it for either continued enrollment at UConn or for athletic financial aid at another institution. Indeed, Ms. Radwan received an athletic scholarship from Hofstra University within weeks of losing her scholarship at UConn. *See Grasson v. Bd. of Educ. of Town of Orange*, 24 F. Supp. 3d 136, 151–52 (D. Conn. 2014) (granting summary judgment for defendants, stating: "[Plaintiff] was not dependent on the contract, because he contracted with the [other school districts], and the contract does not suggest permanence, because it had a five-year term. In short, this contract does not create a right protected by due process."). "Where a breach of contract does not give

---

[2] *See Goldberg v. Kelly*, 397 U.S. 254 (1970).

[3] *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972).

rise to a deprivation of a protectible property interest, plaintiff's exclusive remedy 'lies in state court for breach of contract.'" *Id.* (quoting *S & D Maint. Co.*, 844 F.2d at 968).

Because Ms. Radwan has failed to establish that her contract for a one-year athletic grant-in-aid created a constitutionally protect property interest, the Court needs not reach the question of whether the process she received was sufficient. In any event, UConn did have a procedure for appealing the cancellation of Ms. Radwan's scholarship; she, however, did not timely appeal the decision. *See* E-mails re: Appeal Request.

Accordingly, the Court will grant Defendants' summary judgment motion as to Ms. Radwan's procedural due process claims against all Individual Defendants.[4]

### D.      The First Amendment Claims

To show that a defendant retaliated against her in violation of a plaintiff's First Amendment rights, a plaintiff must show: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 106–07 (2d Cir. 2001).

"It is well established that 'the First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) (quoting *Virginia v. Black*, 538 U.S. 343 (2003)) (internal alterations omitted). "As the Supreme Court has cautioned, however, '[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever

---

[4] Even if the Court did find a protected property interest in this case, the absence of binding caselaw would warrant dismissal of this constitutional claim under the doctrine of qualified immunity. *See Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 213 (D. Conn. 2005) ("[I]n the education and employment context, 'courts have held that post-deprivation procedures, such as providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process.'" (quoting *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003) (internal alterations omitted)).

the person engaging in the conduct intends thereby to express an idea.'" *Id.* (quoting *O'Brien*, 391 U.S. at 376). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies, and that party must advance more than a mere plausible contention that its conduct is expressive." *Kerik*, 356 F.3d at 205 (citing *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 n.5 (1984) (internal quotation marks omitted)).

Ms. Radwan argues that her middle finger gesture was expressive conduct entitled to First Amendment protection, and that "[c]anceling the Plaintiff's athletic grant-in-aid for making a gesture with her upraised middle finger, directed at no one in particular, in a moment of youthful, celebratory exuberance after a victory in a soccer game, constituted retaliation that certainly infringed her right of free speech." Pl.'s Mem. at 16–17.

Defendants argue that Ms. Radwan's gesture was not protected by the First Amendment because she concedes that it was "inadvertent" and therefore that she did not intend for it to express a particularized message. Defs.' Mem. at 25. Defendants argue that Ms. Radwan "does not even allege that her conduct conveyed a message where the likelihood 'was great' [enough] that it 'would be understood by those who viewed it.'" *Id.* (quoting *NYC C.L.A.S.H., Inc. v. City of N.Y.*, 315 F. Supp. 2d 461, 469 (S.D.N.Y. 2004)). In Defendants' view, "[e]ven if [P]laintiff intended to show her middle finger to the ESPNU camera, a reasonable person watching her on TV, the internet[,] or in person would not understand to whom she was directing her conduct or the message she was conveying." *Id.*

Ms. Radwan argues in response that her gesture's "[i]nadvertence . . . does not detract from the nature of the gesture as protected speech," and that raising one's middle finger is expressive conduct regardless of whether it was intended it to be so. Pl.'s Opp'n Mem. at 21.

48

While Ms. Radwan does have a viable First Amendment claim, because of qualified immunity, the Defendants' motion for summary judgment on this claim will be granted.

Defendants appear to concede "that the defendant[s] took adverse action against the plaintiff, and [] that there was a causal connection between the protected speech and the adverse action," leaving only the issue of whether "the speech or conduct at issue was protected." *Garcia*, 280 F.3d at 106–07.

To determine whether particular conduct is sufficiently expressive to implicate the First Amendment, courts must assess whether "'[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Kerik*, 356 F.3d at 205 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). "[W]hile expressive conduct need not convey a message that is 'narrow,' 'specific,' or even 'articulable,' such a message must nonetheless be 'particularized' and likely to be understood." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 91 (2d Cir. 2006) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (internal quotation marks omitted))).

Raising one's middle finger, however, has long been recognized as expressive conduct protected by the First Amendment. *See Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 91 (2d Cir. 1998) ("[T]he gesture generally known as 'giving the finger' . . . is widely regarded as an offensive insult . . . ."); *id.* at 91 n.1 ("Hand gestures signifying an insult have been in use throughout the world for many centuries. The gesture of the extended middle finger is said to have been used by Diogenes to insult Demosthenes." (citing Betty J. Bäuml & Franz H. Bäuml, Dictionary of Worldwide Gestures 159 (2d ed. 1997)))).[5] Indeed, the gesture has been

[5] *See also Cruise-Gulyas v. Minard*, 918 F.3d 494, 496 (6th Cir.), (finding a violation of an individual's First

described as a as "a nonverbal expression of anger, rage, frustration, disdain, protest, defiance, comfort, or even excitement at finding a perfect pair of shoes." Ira P. Robbins, *Digitus Impudicus: The Middle Finger and the Law*, 41 U.C. DAVIS L. REV. 1403, 1407–08 (2008) (internal citations omitted)).[6]

As a result, to the extent that Defendants question whether Ms. Radwan's use of the middle finger here may not be expressive conduct, even though Ms. Radwan contends otherwise, that issue is for a jury, not this Court, to resolve. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[T]he assessment of a witness's credibility is a function reserved for the jury." (citing *Scholastic, Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001); *Brown v. Junction Pool Commons, Inc.*, 301 F. App'x 24, 26 (2d Cir. 2008) ("This Court cannot 'assess the weight of conflicting evidence, pass on credibility of the witnesses, or substitute its

---

Amendment rights because he increased her traffic violation sanction in retaliation for her raising her middle finger to him), *cert. denied*, 140 S. Ct. 116 (2019); *Davis v. Williams*, 598 F.2d 916, 920 n.5 (5th Cir. 1979), *on reh'g*, 617 F.2d 1100 (5th Cir. 1980) (stating, in dicta: "That symbols and conduct are designed to communicate is, indeed, recognized both by those who favor and those who oppose particular kinds of conduct . . . . The thumbed nose, the projected middle finger, the bronx cheer, the grimace and the smile are all conduct [ ] intended to convey a message[.]"); *B.L. by Levy v. Mahanoy Area Sch. Dist.*, 289 F. Supp. 3d 607, 615 (M.D. Pa. 2017) (granting a preliminary injunction to student removed from a cheerleading squad because she posted a photo online of herself holding up her middle finger with the text, "fuck school fuck softball fuck cheer fuck everything"); *Hall v. Gallo*, No. 030476708, 2008 WL 2796950, at *6 (Conn. Super. Ct. June 25, 2008) ("Generally, giving 'the finger' is considered to be speech." (quoting *Klein v. Smith*, 635 F. Supp. 1440 (D. Me. 1986) (holding that a high school improperly disciplined a student for giving the middle finger to a teacher off campus)))

[6] *See also Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (treating the plaintiff's middle finger gesture and yelling "f__ you!" at a group of protesters as expressive conduct subject to First Amendment analysis); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("Inarticulate and crude as [plaintiff's] conduct may have been, it represented an expression of disapproval toward a police officer . . . . As such, it fell squarely within the protective umbrella of the First Amendment[.]")*Brown v. Wilson*, No. 1:12-CV-1122-DAE, 2015 WL 4164841, at *5 (W.D. Tex. July 9, 2015) (treating a plaintiff "firmly g[i]v[ing] the middle finger" to defendant sheriff's office deputy as expressive conduct subject to First Amendment analysis); *Small v. McCrystal*, No. 10-CV-04088-DEO, 2012 WL 1134013, at *8 (N.D. Iowa Apr. 4, 2012) (treating a middle finger gesture to police officers as protected expressive conduct), *aff'd*, 708 F.3d 997 (8th Cir. 2013); *Hackbart v. City of Pittsburgh*, No. 2:07CV157, 2009 WL 10728584, at *3 (W.D. Pa. Mar. 23, 2009) ("[Plaintiff] . . . was expressing his frustration and anger when he gestured with his middle finger to both the driver behind him and to [defendant]. Both gestures are protected expressions under the First Amendment, unless they fall within a narrowly limited category of unprotected speech such as obscene speech or fighting words."); *Nichols v. Chacon*, 110 F. Supp. 2d 1099 (W.D. Ark. 2000), *aff'd*, 19 F. App'x 471 (8th Cir. 2001) (finding that police officer violated the plaintiff's First Amendment rights by arresting him for making a middle finger gesture at him (internal quotation marks and citations omitted)).

judgment for that of the jury.'" (quoting *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 60 (2d Cir. 1993))).

Defendants, however, claim an entitlement to qualified immunity, even if Ms. Radwan had engaged in expressive conduct protected by the First Amendment.

Qualified immunity protects public officials from liability for civil damages when either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F. 3d 196, 211 (2d Cir. 2007). "[T]he clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).

Defendants argue that "it is unclear in the Second Circuit (and other Circuits) whether" university discipline of a college student is governed by Supreme Court jurisprudence on student speech, as most of those cases involved student speech in elementary, middle, and high school settings. Defs.' Mem. at 33–34. In their view, because it was unclear what First Amendment analytical framework applied, "it was objectively reasonable" for Coach Tsantiris and Athletic Director Manuel to believe "they were permitted to discipline the plaintiff's behavior." *Id.* at 34.

Defendants argue in the alternative that, if student speech doctrine under *Tinker* applies to college and university student speech, it

> would be objectively reasonable for Mr. Manuel and Coach Tsantiris to conclude that Ms. Radwan's inappropriate gesture was obscene/lewd and punishable because it violated a team rule and the Student-Athlete rules, it happened while plaintiff was clearly representing UConn and its women's soccer team, and that the obscene gesture was disruptive to the degree required under *Tinker* as her conduct happened on television, was circulated extensively throughout the media and social media, required coach to issue a press release apologizing for the behavior, required the UConn Athletic Department to respond to the AAC about the behavior and the AAC issued a letter of reprimand to [P]laintiff.

*Id.* at 34–35 (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969);

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)). [7]

      The Court agrees that qualified immunity applies to Ms. Radwan's claim.

      As the Second Circuit recognized nearly three decades ago, citing U.S. Supreme Court

precedent from two decades earlier, "'[s]tate colleges and universities are not enclaves immune

from the sweep of the First Amendment.'" *Levin v. Harleston*, 996 F.2d 85, 88 (2d Cir. 1992)

(quoting *Healy v. James*, 408 U.S. 169, 180 (1972)). Just as importantly, the U.S. Supreme Court

in *Healy* applied the principles of *Tinker* to the college and university setting. *See Healy*, 408

U.S. at 180 ("[W]here state-operated educational institutions are involved, this Court has long

recognized 'the need for affirming the comprehensive authority of the States and of school

officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct

in the schools.'" (quoting *Tinker*, 393 U.S. at 507)).

      Under *Tinker*, students "do not 'shed their constitutional rights to freedom of speech or

expression at the schoolhouse gate.'" *Doninger*, 642 F.3d at 344 (quoting *Tinker*, 393 U.S. at

506). "Nonetheless, 'the First Amendment rights of students in the public schools . . . must be

applied in light of the special characteristics of the school environment.'" *Cuff ex rel. B.C. v.

Valley Cent. Sch. Dist.*, 677 F.3d 109, 112 (2d Cir. 2012) (quoting *Hazelwood Sch. Dist. v.

Kuhlmeier*, 484 U.S. 260, 266 (1988)). As a result, "school administrators may prohibit student

expression that will 'materially and substantially disrupt the work and discipline of the school.'"

*Doninger*, 642 F.3d at 344 (quoting *Tinker*, 393 U.S. at 513). The schools' ability to regulate

student speech extends to school-sponsored events. *Morse v. Frederick*, 551 U.S. 393 (2007)

---

[7] Ms. Radwan does not make any argument about how the First Amendment student speech framework under *Tinker* applies, instead arguing generally that "'no right is more clearly established in our republic than freedom of speech.'" Pl.'s Mem. at 14 (internal citation omitted).

(finding that a student banner displayed across the street from the school during a school sponsored parade down that street could be regulated).

Since *Tinker*, the Supreme Court has developed three standards for determining whether schools may discipline student speech: (1) whether it will "materially and substantially disrupt the work and discipline of the school," *DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 78 (2d Cir. 2010) (quoting *Tinker*, 393 U.S. at 513); (2) whether such "[s]peech [] could be perceived as affirmatively promoted by the school, as opposed to merely tolerated, . . . so long as the school's limitation is 'reasonably related to legitimate pedagogical concerns[,]'" *id.* at 77 (quoting *Hazelwood Sch. Dist.*, 484 U.S. at 273); and (3) whether the student speech is vulgar or lewd, "undermin[ing] the school's basic educational mission," *Fraser*, 478 U.S. at 685; *see also Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 325 (2d Cir. 2006) (distilling Supreme Court precedent on student speech into three standards under *Tinker*, *Fraser*, and *Hazelwood*).

Defendants argue that they could reasonably have believed they were justified in disciplining Ms. Radwan under all three of these standards. Defs.' Mem. at 34–35.

The Court agrees with respect to the lack of clearly established law under the *Fraser* standard.

Under *Tinker*'s material and substantial disruption standard, "[s]chool authorities may suppress student speech to prevent material disruption in the schools, when they have more than an 'undifferentiated fear or apprehension of disturbance' and can show that their action 'was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Cuff ex rel. B.C.*, 677 F.3d at 109 (quoting *Tinker*, 393 U.S. at 508–09). This "test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Id.* at 113.

53

In other words, under clearly established law, to justify canceling Ms. Radwan's scholarship under *Tinker*'s material and substantial disruption standard, Coach Tsantiris and Athletic Director Manuel must show that their decision "was caused by something more than a mere desire to avoid [] discomfort and unpleasantness." *Cuff ex rel. B.C.*, 677 F.3d at 109 (internal citations and quotation marks omitted); *cf. Wood v. Strickland*, 420 U.S. 308, 322 (1975) (recognizing the appropriateness of monetary relief only if the school official "has acted with such an impermissible motivation or with such disregard of the student's clearly established rights that his action cannot reasonably be characterized as being in good faith.").

But before the recommendation of the cancellation of Ms. Radwan's scholarship, Athletic Director Manuel had already stated that Ms. Radwan's written and verbal apology, along with a reprimand and suspension, effectively concluded the matter. Pl.'s SOMF ¶ 12 (responding to UConn President Herbst about the scope of punishment, Mr. Manuel stated that a "Letter of reprimand. I would believe that would be all they would do. Anything else would be excessive. She's already been suspended by [Coach Tsantiris]."); *id.* at ¶ 14 (commenting in an e-mail to President Herbst on November 11, 2014 after meeting with Ms. Radwan, "Case closed with the reprimand."). And Ms. Crum, the Senior Associate Director of Athletics at UConn, stated— before the cancellation of her scholarship, once again—that: "[Ms. Radwan] has learned from her experience as she is being proactive in acknowledging her mistake and is trying to correct the harm that was done." Def.'s Ex. 8, ECF No. 91-2 at 39.

As a result, on this record, a reasonable jury could find that the decision to cancel Ms. Radwan's scholarship was unjustified under *Tinker* based on clearly established law. *See Cuff ex rel. B.C.*, 677 F.3d at 109 (requiring "more than an 'undifferentiated fear or apprehension of disturbance'" and a showing "that their action 'was caused by something more than a mere

desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" (citing *Tinker*, 393 U.S. at 508–09)); *cf. Doninger*, 642 F.3d at 355 (granting qualified immunity because it was objectively reasonable for school officials to "portend disruption from the student speech at issue" based on evidence that other students were upset about the circumstances surrounding the student's speech, that students planning to disrupt other students' speeches during an assembly, and that the student plaintiff herself "had already demonstrated some willingness to incite confrontation with school officials"); *id.* at 350 (upholding school's decision to prohibit student from running for student government, noting that the "discipline extended only to her role as a student government representative: she was not suspended from classes or punished in any other way"); *Rubino v. Saddlemire*, No. 3:05-CV-1955 (PCD), 2007 WL 685183, at *10 (D. Conn. Mar. 1, 2007) ("Whether the punishment imposed is so out of proportion to the conduct proved as to 'shock the conscience' . . . is a question of fact.").

A school also may discipline students for "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. . . . so long as the[ school's] actions are reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist.*, 484 U.S. at 271, 273. But, under clearly established law, a reasonable jury could find that Ms. Radwan's inadvertent gesture made during the team's celebration on the soccer field did not represent the school's viewpoint under *Hazelwood*. *Morse*, 551 U.S. at 405 ("[N]o one would reasonably believe that [a student's] banner [displayed at a school sponsored and school sanctioned event] bore the school's imprimatur."); *cf. A.M. ex rel. McKay v. Taconic Hills Cent. Sch. Dist.*, 510 F. App'x 3, 8 (2d Cir. 2013) (summary order) ("In light of the School District's involvement in directing the Ceremony and in reviewing the speeches before they were

delivered, we believe as a matter of law that a reasonable observer would perceive A.M.'s speech as being endorsed by the Middle School, and that Hazelwood thus provides the governing standard for determining the appropriateness of the Defendants' conduct.").

Under *Fraser* and its progeny, however, the Defendants could have reasonably believed they were justified in disciplining Ms. Radwan for her expressive conduct broadcast on national television for all to see. *Id.* at 34–35.

"[S]chools have wide discretion to prohibit speech that is . . . vulgar, lewd, indecent or plainly offensive speech[.]" *Guiles ex rel. Guiles*, 461 F.3d at 325 (citing *Fraser*, 478 U.S. at 683–85). The Supreme Court in *Fraser* addressed a school's ability to prohibit vulgar or lewd speech by a high school student, noting the "obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." *Fraser*, 478 U.S. at 684. The Court further stated:

> The First Amendment guarantees wide freedom in matters of adult public discourse. . . . It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school.

*Id.* at 682.

The Second Circuit has reaffirmed that *Fraser* permits schools to discipline students for "[v]ulgar or offensive speech—speech that an adult making a political point might have a constitutional right to employ—. . . given the school's responsibility for 'teaching students the boundaries of socially appropriate behavior.'" *Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008) (quoting *Fraser*, 478 U.S. at 681); *Kramer v. N.Y.C. Bd. of Educ.*, 715 F. Supp. 2d 335, 353 (E.D.N.Y. 2010) (school's "authority [to restrict students' lewd, indecent, or vulgar speech]

is based in part on the state's greater ability to restrict the availability of sexually explicit material with respect to children than with respect to adults").

But university students, largely over the age of eighteen, are no longer children. Indeed, the Supreme Court has stated that "[t]he college classroom with its surrounding environs is peculiarly the "marketplace of ideas," *Healy*, 408 U.S. at 180 ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large."). The Second Circuit has also expressed skepticism that universities and colleges have as much latitude to regulate student speech as K-12 schools do. *See Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 105 (2d Cir. 2007) ("[C]ases like *Hazelwood* explicitly reserved the question of whether the 'substantial deference' shown to high school administrators was 'appropriate with respect to school-sponsored expressive activities at the college or university level, where the relation between students and their schools is 'different and at least arguably distinguishable.'").

Nevertheless, the specific facts in this case, involving expressive conduct widely and publicly broadcast on national television, rather than limited to the university setting, complicate the matter. *See Emmons*, 139 S. Ct. at 503 ("[T]he clearly established right must be defined with specificity."); *see also Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established.").

Accordingly, Coach Tsantiris and Athletic Director Manuel will be granted qualified immunity on Ms. Radwan's First Amendment claims.

The Court also will grant summary judgment as to Ms. Radwan's First Amendment claims against Ms. Lucas, UConn's Financial Aid Director, because there is no record evidence that Ms. Lucas had any personal involvement in the decision to terminate Ms. Radwan's scholarship, nor was she even aware of the circumstances leading to the decision. *See supra* Section III.B.1; *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) ("Before § 1983 damages are awarded, a plaintiff must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations[, meaning that the defendant] intentional[ly] participat[ed] in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." (internal quotation marks and alterations omitted) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)).

Accordingly, Defendants' summary judgment motion will be granted as to Ms. Radwan's First Amendment claims.

### E.    The State Law Claims

Ms. Radwan's Complaint alleges that Defendants are liable under Connecticut common law for breach of her financial aid agreement and that the Individual Defendants are liable under Connecticut common law for negligent infliction of emotional distress. Compl. ¶¶ 126–46. The Court previously granted Defendants' motion to dismiss these claims against UConn. Order, ECF No. 29 (Dec. 14, 2017).

Defendants argue that Ms. Radwan's breach of contract now claim fails as a matter of law because none of the Individual Defendants were parties to the contract. Defs.' Mem. at 26. Defendants also argue that Ms. Radwan's negligent infliction of emotional distress claim is barred by statutory immunity as provided in Conn. Gen. Stat. § 4-165. Defs.' Mem. at 27.

58

Ms. Radwan has now conceded Defendants' arguments as to both claims. Pl.'s Opp'n Mem. at 25; Pl.'s Reply at 5.

Accordingly, the Court will grant summary judgment to Defendants on Ms. Radwan's breach of contract claim and her negligent infliction of emotional distress claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**, and Plaintiff's motion for partial summary judgment is **DENIED**.

The Clerk is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 6th day of June, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE